ACCEPTED
12-14-00123-CV
TWELFTH COURT OF APPEALS
TYLER, TEXAS
1/16/2015 4:39:11 PM
CATHY LUSK
CLERK

**NO. 12-14-00123-CV**

FILED IN
12th COURT OF APPEALS
TYLER, TEXAS
1/16/2015 4:39:11 PM
CATHY S. LUSK
Clerk

## IN THE TWELFTH COURT OF APPEALS
## TYLER, TEXAS

**LIBERTY MUTUAL INSURANCE COMPANY, Appellant**

**v.**

**RICKIE SIMS, Appellee**

Appeal from the 276th Judicial District Court
Shelby County, Texas
Cause No. 13CV32,286

## APPELLANT'S REPLY BRIEF

David L. Plaut
State Bar No. 16066030
Jeffrey C. Glass
State Bar No. 08004000
HANNA & PLAUT, LLP
211 E. Seventh Street, Suite 600
Austin, Texas 78701
Telephone: (512) 472-7700
Facsimile: (512) 472-0205

**ATTORNEYS FOR APPELLANT
LIBERTY MUTUAL INSURANCE
COMPANY**

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ........................................................................... ii

TABLE OF AUTHORITIES ..................................................................... iv

SUMMARY OF ARGUMENT .................................................................. 1

ARGUMENT AND AUTHORITIES ......................................................... 3

Issue One ................................................................................................. 3

As a matter of law, the Chesapeake Policy unambiguously provides $250,000 in UM/UIM coverage.  The trial court therefore erred in submitting the issue of policy limits to the jury, admitting evidence about policy limits at trial, and entering judgment on the jury's answer to Question 1 ..................................................................3

Issue Two ................................................................................................. 14

The amount of policy limits was not relevant to any triable fact issue and determination of limits was material only to calculate the amount of the judgment after the verdict.  Therefore, the trial court erred by, among other things, submitting the issue of policy limits to the jury, admitting evidence about policy limits, and in entering judgment on the jury's answer to Question 1. ............................................14

Issue Three .............................................................................................. 17

Even if it was proper to submit the policy limits issue to the jury, the trial court erred by failing to submit the relevant amendatory endorsements and by refusing Liberty's offers of proof that it corrected all discovery errors prior to trial. ..................................17

Issue Four ................................................................................................ 18

Allowing the jury to consider and determine UM/UIM limits improperly injected insurance in the trial violating Texas Rule of Evidence 411. ...................................................................................18

CONCLUSION ......................................................................................... 21

CERTIFICATE OF SERVICE......................................................................... 22

CERTIFICATE OF COMPLIANCE ............................................................... 22

# TABLE OF AUTHORITIES

**Cases**                                                                      **Page**

*Brainard v. Trinity Universal Insurance Co.*,
216 S.W.3d 809 (Tex. 2006)......................................................................6, 15

*City of Amarillo v. Barnes*,
1998 WL 609765  (Tex. App.–Amarillo 1998, no pet.).................................. 13

*Dahl v. Dahl*,
2009 WL 866199 (Tex. App.–Dallas 2009, no pet.)........................................ 4

*Dallas Transit Co. v. Young*,
370 S.W.2d 6 (Tex. Civ. App.–Dallas 1963, writ ref'd n.r.e.) .......................5, 6

*Employers Insurance of Wausau v. Halton*,
792 S.W.2d 462 (Tex. App.–Dallas 1990, writ denied).................................... 5

*Gaspar v. Lawnpro, Inc.*,
372 S.W.3d 754 (Tex. App.–Dallas 2012, no pet.)......................................... 11

*Gore v. Cunningham*,
297 S.W.2d 287 (Tex. Civ. App.–Beaumont 1956, writ ref'd n.r.e.)..............4, 7

*Hathaway v. General Mills, Inc.*,
711 S.W.2d 227 (Tex. 1986)......................................................................... 17

*Henson v. Southern Farm Bureau Casualty Insurance Co.*,
17 S.W.3d 652 (Tex. 2000)........................................................................... 16

*Hercules Exploration, Inc. v. Halliburton Co.*,
658 S.W.2d 716 (Tex. App.–Corpus Christi 1983, writ ref'd n.r.e.).................. 4

*Houston First American Savings v. Musick*,
650 S.W.2d 764 (Tex. 1983).......................................................................... 4

*In re Progressive County Mutual Insurance Co.*,
    2014 WL 2618298  (Tex. App.–Houston [1st Dist.] 2014, no. pet.) ............... 15

*In re Reynolds*,
    369 S.W.3d 638 (Tex. App.–Tyler 2012, no pet.) ......................... 14, 15, 19, 20

*Industrial Disposal Supply Co., Inc. v. Perryman Brothers Trash Services, Inc.*,
    664 S.W.2d 756 (Tex. App.–San Antonio 1983, writ ref'd n.r.e.) .................... 4

*Mid-Century Insurance Co. of Texas v. McLain*,
    2010 WL 851407 (Tex. App.–Eastland, no pet.) ............................... 7, 8, 14, 16

*Peralta v. Durham*,
    133 S.W.3d 339 (Tex. App.–Dallas 2004, no pet.) ........................................... 3

*Restelle v. Williford*,
    364 S.W.2d 444 (Tex. Civ. App.–Beaumont 1963, writ ref'd n.r.e.) ................. 4

*S & I Management, Inc. v. Choi*,
    331 S.W.3d 849 (Tex. App.–Dallas 2011, no pet.) ......................................... 11

*Starks v. City of Houston*,
    448 S.W.2d 698 (Tex. Civ. App.–Houston [1st Dist.] 1969, writ ref'd n.r.e.) .... 4

*State Farm Mutual Auto Insurance Co. v. Norris*,
    216 S.W.3d 819 (Tex. 2006) ...................................................................... 16

*State Farm Mutual Auto Insurance Co. v. Grayson*,
    983 S.W.2d 769 (Tex. App.–San Antonio 1998, no pet.) .......................... 14, 19

*Stracener v. United Services Automobile Association*,
    777 S.W.2d 378 (Tex. 1989) ...................................................................... 19

*Thornhill v. Ronnie's I-45 Truck Stop, Inc.*,
    944 S.W.2d 780 (Tex. App.–Beaumont 1997, writ dism'd by agr.) ............ 18, 19

*Thota v. Young*,
    366 S.W.3d 678 (Tex. 2012) ...................................................................... 21

**Rules**

Texas Rule of Appellate Procedure 33.1(a)(1) ...................................................... 13

Texas Rule of Appellate Procedure 44.1 ............................................................. 21

Texas Rule of Civil Procedure 198.3 .................................................................... 5

Texas Rule of Evidence 411 ............................................................ 18, 19, 20, 21

**Publication**

1 Steven Goode, Olin Guy Wellborn III, and M. Michael Sharlot,
   *Texas Practice Series: Guide to the Texas Rules of Evidence* § 411.1
   (3d ed. 2002).........................................................................................18

## SUMMARY OF ARGUMENT

This appeal begins and ends with the certified policy that unambiguously provides $250,000 in UM/UIM coverage for the accident in which Sims was involved. Because the unambiguous policy was provided to the trial court at judgment when it first became relevant (as Sims concedes), the judgment of the trial court must be reversed and rendered for Liberty.

Sims argues in his brief both that policy limits were $1 million as a matter of law and that the amount of policy limits was a fact question. He cannot have it both ways. In any case, he is wrong on both counts. This Court cannot find the limits were $1 million as a matter of law because the trial court admitted incomplete misleading evidence of policy limits, submitted the issue to the jury, and relied on the jury verdict in entering judgment. By persuading the trial court to try policy limits to the jury, Sims waived reliance on Liberty's corrected admission. Thus, even if the trial court had found policy limits were $1 million as a matter of law – which it did not do – the judgment must be reversed.

Sims is also incorrect in arguing there was a fact question as to the amount of policy limits that was properly submitted to the jury. The question of limits is a question of law for the court to decide at the time of judgment and is never submitted to the jury in the liability phase of a UM/UIM case. Permitting the jury to consider the amount of policy limits is inherently prejudicial and requires, at the

very least, a reversal and remand. In any event, the policy limits question was not properly submitted as a question of fact because the court admitted only those portions of the policy Sims designated and refused Liberty's offer of the entire policy. Again, even if Sims is correct on his second argument, the judgment must be reversed.

This case was improperly tried. Either the question of policy limits was a question of law, in which case limits were irrelevant until judgment when the trial court was required to construe the entire certified policy Liberty submitted; or the question was one of fact, in which case the trial court was required to submit the *entire* policy to the jury, with all relevant endorsements, not just the misleading few pages Sims submitted for self-serving reasons. The proper way to try the case, as outlined in Liberty's opening brief, was to set aside the policy limits question until judgment, disregarding all incomplete documents, and then, at judgment, construe the unambiguous certified policy showing limits of $250,000. Because the evidence establishes that $250,000 policy limit as a matter of law, the judgment must be reversed and judgment rendered in that amount. In the alternative, the case must be remanded for trial on the policy limits question alone.

## ARGUMENT AND AUTHORITIES

### Issue One

As a matter of law, the Chesapeake Policy unambiguously provides $250,000 in UM/UIM coverage. The trial court therefore erred in submitting the issue of policy limits to the jury, admitting evidence about policy limits at trial, and entering judgment on the jury's answer to Question 1.

### A. Sims waived reliance on the admission relating to policy limits by trying the issue as a factual dispute.

Sims' argument that policy limits were $1 million as a matter of law relies on discovery answers and an admission that Liberty corrected before trial. Appellee's Brief at 20-21. Sims, however, very clearly disregarded that admission and tried the question of policy limits to the jury, introducing, over objection, evidence on policy limits (3 R.R. 55-58; 5 (Part 2) R.R. PX-13); reading, over objection, the superseded endorsement to the jury (3 R.R. 57-58); introducing, over objection, evidence of Liberty's discovery responses on policy limits (3 R.R. 59-62); and requesting, over objection, Jury Question No. 1. 4 R.R. 143-145; 6 C.R. 1005.

Texas law holds that by submitting the issue of policy limits to the jury, Sims waived reliance on the admission to establish limits as a matter of law. "The primary purpose of requests for admissions is to simplify trials by eliminating matters about which there is no real controversy." *Peralta v. Durham*, 133 S.W.3d 339, 341 (Tex. App.–Dallas 2004, no pet.). Requests for admissions exist "to

eliminate in advance of the trial fact issues which would not be in dispute, and . . . the rule does not contemplate or authorize admissions to questions involving points of law." *Gore v. Cunningham,* 297 S.W.2d 287, 291 (Tex. Civ. App.–Beaumont 1956, writ ref'd n.r.e.). A judicial admission takes the matter out of the domain of proof; it is not evidence, but serves as a substitute for evidence. *Hercules Exploration, Inc. v. Halliburton Co.,* 658 S.W.2d 716, 719 (Tex. App.–Corpus Christi 1983, writ ref'd n.r.e.).

Thus, a party relying on an admission of fact "must protect the record by objecting to the introduction of controverting evidence ***and to the submission of any issue bearing on the facts admitted.***" *Houston First Am. Sav. v. Musick,* 650 S.W.2d 764, 769 (Tex. 1983) (emphasis added). *See also Restelle v. Williford,* 364 S.W.2d 444 (Tex. Civ. App.–Beaumont 1963, writ ref'd n.r.e.). Texas courts consistently hold that a party waives reliance on an admission by introducing evidence on the subject matter of the admission as if it were a disputed issue. *Dahl v. Dahl*, 2009 WL 866199, at *2 (Tex. App.–Dallas 2009, no pet.); *Indus. Disposal Supply Co., Inc. v. Perryman Bros. Trash Serv., Inc.*, 664 S.W.2d 756, 764 (Tex. App.–San Antonio 1983, writ ref'd n.r.e); *Starks v. City of Houston*, 448 S.W.2d 698, 700 (Tex. Civ. App.–Houston [1st Dist.] 1969, writ ref'd n.r.e.) ("[E]ven if counsel's statement had amounted to a judicial admission, it was waived when evidence to the contrary was heard. Appellants not only did not object to such

evidence, they also introduced some on the disputed issue, and this certainly amounted to waiver."); *Dallas Transit Co. v. Young*, 370 S.W.2d 6, 11 (Tex. Civ. App.–Dallas 1963, writ ref'd n.r.e.) (treating the issue to which an admission was made as a disputed issue by introducing evidence thereon waived reliance on the admission).

The primary purpose of admissions is to *avoid* trial of fact questions. Far from objecting to the submission of any issue or evidence on policy limits, Sims' counsel tried the issue, repeatedly and directly informing the jury that policy limits were $1 million.[1] Sims therefore waived reliance on the admission, even if it was not withdrawn by written motion.[2] By permitting Sims to try the issue as a fact

---

[1] The only conceivable explanation for why Sims, believing the admission was binding on Liberty as a matter of law, would proceed to try the question to the jury is that it was a conscious tactic to inflate the jury's damages verdict. Liberty objected to admission of the policy limits for that reason. 3 R.R. 8-9; 3 R.R. 10-11; 3 R.R. 56-57.

[2] There is no question that Liberty amended its interrogatory answers three months before trial, disclosed that UM/UIM policy limits actually were $250,000, and produced the operative policy endorsement showing limits of $250,000. 6 C.R. 901-926. The admission on which Sims relies so heavily, Request for Admission No. 6, was withdrawn by *amendment* the day before trial rather than by a motion to withdraw. 4 R.R. 135-136 (amended admission response was read into the record as part of Liberty's offer of proof). Under Rule 198.3 of the Texas Rules of Civil Procedure, the trial court had the power to allow Liberty to "withdraw or amend" its admission that policy limits were $1 million. Tex. R. Civ. P. 198.3. Having submitted the question of limits to the jury, it must be presumed that the trial court allowed the amendment, which superseded the prior admission, rendering it null and void. Sims cannot possibly claim he was prejudiced by amendment of the mistaken admission when he was well aware, months before trial, that Liberty contended the policy limits were $250,000 and when Liberty subsequently contested his assertion of $1 million limits at every turn. *See Employers Ins. of Wausau v. Halton*, 792 S.W.2d 462, 467 (Tex. App.–Dallas 1990, writ denied) ("Plaintiff cannot now claim prejudice by its 'reliance' on the deemed admissions when he knew that defendant disputed almost every issue in the lawsuit").

---

question, the trial court also disregarded the admission and treated it as withdrawn. Accordingly, Sims failed to establish policy limits were $1 million as a matter of law.

**B.**     **The trial court erred by submitting the issue of policy limits to the jury.**

Although Sims incorrectly argues the admission was binding on Liberty, he is correct about one thing: policy limits were established conclusively, but by Liberty and in the amount of $250,000. As Liberty has shown, policy limits was a question of law for the court under the unambiguous terms of the Policy and, particularly, the Amended Policy Limits Schedule. Appellant's Brief at 13-21. Sims did not plead ambiguity and the policy limits are set out unambiguously in the Amended Policy Limits Schedule, thus precluding Sims from introducing evidence to contradict the policy's $250,000 limit. *Id.* at 13-18. The trial court was similarly precluded from submitting policy limits to the jury and from entering judgment on the jury finding that policy limits were $1 million. *Id.* at 19-21.

Further, in light of Texas law addressing UM/UIM claims, the question of policy limits became ripe only after trial at the time the court entered judgment. *See Brainard v. Trinity Universal Ins. Co.*, 216 S.W.3d 809, 815 (Tex. 2006) (holding that a UM/UIM insurer has no contractual duty to pay benefits until *after* the liability of the other motorist and the amount of damages suffered by the insured are determined). Sims admits the only reason the trial court needed to

determine policy limits was "in order to craft a judgment." Appellee's Brief at 17. This is correct, as Liberty has shown. Appellant's Brief at 21-24. *See also Mid-Century Ins. Co. of Texas v. McLain*, 2010 WL 851407, at *1, 3 (Tex. App.–Eastland, no pet.) (noting with approval that "[a]fter the verdict, [the carrier] put on evidence that its policy limit was $20,000" producing the UM/UIM policy at the time of judgment).

Because policy limits were established as a matter of law and were not ripe or material until entry of judgment, Liberty's corrected discovery error did not alter the trial court's obligation to construe the policy as a matter of law at the time of judgment. Admissions, whether deemed or otherwise, are ineffective and not permitted to resolve disputes on questions of law. *E.g., Gore v. Cunningham,* 297 S.W.2d 287, 291 (Tex. Civ. App.–Beaumont 1956, writ ref'd n.r.e.) (requests for admissions exist "to eliminate in advance of the trial fact issues which would not be in dispute, and . . . the rule does not contemplate or authorize admissions to questions involving points of law"). This provides a second reason Liberty's purported admission was ineffective to overrule the unambiguous policy limits of $250,000.

Sims admits the policy limits were relevant only to the crafting of the judgment but nevertheless argues the production of the fully certified policy after verdict was "too late." Appellee's Brief at 25-26. The argument is illogical and

erroneous. As Liberty has shown, the cases and the very nature of the UM/UIM claim dictate that the *only* stage at which policy limits becomes relevant is at the time of judgment. Appellant's Brief at 21-24; *McLain*, 2010 WL 851407 at *3. Thus, Liberty's production of the policy at that time cannot possibly have been too late; the issue of limits is properly addressed at entry of judgment. In light of Sims' concession that determining policy limits was necessary to craft a judgment, his citation of Rule 270 of the Texas Rules of Civil Procedure is inapposite.[3]

Deftly avoiding Liberty's argument that any plain reading of the Policy reflects unambiguous limits of $250,000, Sims contends that the issue before the jury was not what the policy language meant, but what language the policy actually contained. He argues that "the factual dispute that the jury decided was not what the language of the contract meant, but rather whether the Policy was modified to reduce the UIM policy limit from $1 million to $250,000" and that "Liberty Mutual insisted that PX-13 was not the actual Policy because the Policy had been modified by DX-12." Appellee's Brief at 30, 31. Jury Question No. 1, however, asked the jury to decide what the contract language meant by asking, "What was the policy limit of the underinsured motorist coverage in the Liberty Mutual Policy at the time of the Collision?" 6 C.R. 1005. The question clearly asked the jury to

---

[3] Appellee's Brief at 26. The policy of insurance is not "additional evidence" within the meaning of Rule 270 that can be received into evidence in the liability phase of a UM/UIM case.

construe and interpret the language of the policy and determine the policy limits. There is no other way the jury could decide the question asked.

In any case, it is patently false to suggest the jury decided "whether the Policy was modified to reduce the UIM policy limit from $1 million to $250,000" when the jury never saw the Amended Policy Limits Schedule, DX-12, or any other form that could have "modified" the entirely misleading and incomplete policy provisions Sims submitted to the jury. The jury could not have decided that question because the question and the evidence pertaining to it were never presented to them. The trial court erred in submitting Jury Question No. 1 because it asked the jury to do the trial court's job of interpreting contract language and did so unnecessarily when the contract provision in question, policy limits, was not ripe or relevant to any question of fact in this UM/UIM case.

For the same reason, the trial court's admission of only those portions of the policy that Sims offered, the jury's finding that limits were $1 million, and the trial court's entry of judgment on that finding are contrary to Texas law because they ignored the unambiguous terms of a binding contract.

**C. The complete, certified Policy, containing the endorsement establishing policy limits of $250,000, was fully and properly before the trial court and is before this Court for consideration.**

Liberty properly submitted the certified Policy to the trial court at the time of judgment showing the policy limits are $250,000 as a matter of law. 7 C.R. 1048

through 8 C.R. 1388. Sims has made no attempt to dispute that the Amended Policy Limits Schedule establishes the policy limits are $250,000. He now raises certain "suspicions" about the applicable endorsements but those objections were not raised with or ruled on by the trial court and, in any case, they do no more than demonstrate Sims' lack of familiarity with the issuance of complex commercial insurance policies. *See* Appellee's Brief at 3-5.[4] In addition to being ill-founded, these "suspicions" are irrelevant to construction of an unambiguous policy that had to be construed as a matter of law at the time of judgment.

Sims' also objected to Liberty's post-verdict submission of the certified Policy on hearsay grounds. Appellee's Brief at 26-27; 8 C.R. 1393. As Sims impliedly admits, however, he did not get a direct ruling on this objection. The trial court neither ruled on the hearsay objection nor struck the Policy from the record. Hearsay is an objection to the form of evidence and the trial court must rule on the objection or it is waived. *S & I Mgmt., Inc. v. Choi,* 331 S.W.3d 849, 855 (Tex. App.–Dallas 2011, no pet.). Sims' failure to get a ruling on his hearsay objection waived that objection. *Id.* Sims asserts – without authority – that the trial court's final judgment in his favor was an "implied" ruling on the hearsay

---

[4] For example, such policies are not stored in a paper file in some giant warehouse, as Sims' question about endorsements being "stored together" implies. Upon request, a paper copy is assembled from computer files showing the declarations and applicable forms and endorsements. Thus, Sims' "suspicions" about how Liberty would not know what the limits were, about "missing" signatures, and discrepancies in dates, and "storage" of endorsements and policy forms "close to one another in Liberty Mutual's files" derive entirely from a pre-electronic data mindset and not from any misleading conduct on Liberty's part.

objection but that proposition has been rejected by Texas law. *Gaspar v. Lawnpro, Inc.*, 372 S.W.3d 754, 756-57 (Tex. App.–Dallas 2012, no pet.) (employers waived hearsay objection to employees' summary judgment affidavits even though employers obtained favorable ruling on their no-evidence summary judgment motion, where employers never sought a ruling on their hearsay objections, and trial court never issued a ruling on those objections). The certified policy attached to Liberty's JNOV Motion is therefore properly before this Court for construction as a matter of law.

Sims' argument that the jury was presented with and resolved a factual dispute about what the policy included is also fallacious. He argues the dispute addressed whether the policy was "modified" to reduce policy limits from $1 million to $250,000 and asserts the evidence at trial "established" that Plaintiff's Exhibit 13 ("PX-13") was the contract. Appellee's Brief at 30. The only way that incomplete and misleading exhibit became the operative contract was through the trial court's erroneous reliance on the initial discovery error and subsequent refusal to permit the jury to consider the relevant amendatory endorsements establishing unambiguous policy limits of $250,000. The trial court simply disregarded long-standing rules of contract construction, ignored the proper and established method of trying UM/UIM cases, and violated the rule of optional completeness. Appellant's Brief at 25-33.

Taken cumulatively, the trial court's erroneous rulings more or less created a question of fact on an issue that should have been determined as a matter of law. The trial court accepted Sims purported reliance on a mistaken discovery response and on his self-serving selection of portions of the policy for the jury to review. This does not create a fact issue where ambiguity is not plead, where the discovery response is withdrawn and corrected, and where the issue (policy limits) is not even relevant to any proper jury question.

Further, any dispute over the policy contents was not ripe or relevant until judgment, as Sims admits. Post-trial, the court was charged with resolving any disputes about the policy's meaning, interpretation and construction. There is no basis in Texas law for permitting the jury to decide what is an inherently prejudicial issue such as the amount of insurance coverage – a legal issue at that – while deciding facts relating to liability and damages.

Sims is incorrect that Liberty argues the Policy had been "modified" by Defendant's Exhibit 12 ("DX-12"). At the time Liberty answered Request for Admission No. 6, erroneously admitting the applicable limits were $1 million, the true and correct policy, set out as an exhibit to Liberty's JNOV Motion (7 C.R. 1048 through 8 C.R. 1388), contained the endorsement providing for $250,000 in UM/UIM limits. Liberty's trial counsel simply made a mistake in the course of initial discovery about limits being $1 million. There is no question of

modification of the policy relevant to this case and Liberty's corrected discovery responses made that clear months before trial. Sims simply latched onto the original, erroneous admission because it served his interests, not because there has ever been any doubt about the effect of the policy's amendatory endorsements or applicable limits. Sims' authority on contract modification, offer and acceptance, consideration, and "meeting of the minds" is simply irrelevant. *See* Appellee's Brief at 22-23. In any event, Sims never raised those issues before the trial court and cannot rely on them in this appeal. *See* Tex. R. App. P. 33.1(a)(1); *City of Amarillo v. Barnes*, 1998 WL 609765 at *1 (Tex. App.–Amarillo 1998, no pet.) ("even the right to have a question of law reviewed by an appellate court may be waived if it is not first presented to the trial court for consideration").

All of Sims' argument about admissibility of evidence at trial and Liberty's discovery mistake is immaterial because the policy could not properly be offered to the jury for interpretation. The trial court was charged with interpreting that policy and ascertaining its meaning. The fact that Sims refuses to admit that the applicable policy was defined by the exhibit attached to the JNOV Motion is irrelevant. That policy was unambiguous and definitive and was provided to the trial court at the time it became relevant, *i.e.,* at judgment.

**Issue Two**

> The amount of policy limits was not relevant to any triable fact issue and determination of limits was material only to calculate the amount of the judgment after the verdict. Therefore, the trial court erred by, among other things, submitting the issue of policy limits to the jury, admitting evidence about policy limits, and in entering judgment on the jury's answer to Question 1.

As Liberty has shown, the *amount* of coverage is irrelevant to any properly submitted jury issue in a UM/UIM case. *See* Appellant's Brief at 21-24. As Sims concedes, the *amount* of coverage is relevant only to the amount of the judgment and becomes material only at the time the court calculates the judgment. *In re Reynolds*, 369 S.W.3d 638, 654 (Tex. App.–Tyler 2012, no pet.) (noting UM/UIM claimant has the burden of establishing coverage, but emphasizing that introduction of the policy in violation of Rule 411 and "injection of insurance" into the liability phase of trial was inherently prejudicial); *McLain*, 2010 WL 851407 at *3 (noting with approval that "[a]fter the verdict, [the carrier] put on evidence that its policy limit was $20,000" producing the UM/UIM policy at the time of judgment); *State Farm Mut. Auto. Ins. Co. v. Grayson,* 983 S.W.2d 769, 770 (Tex. App.–San Antonio 1998, no pet.). If the *existence* of some amount of UM/UIM coverage is undisputed, the only triable issues of fact are liability of the underinsured driver and the amount of damages. *E.g., In re Progressive County Mut. Ins. Co.*, 2014 WL 2618298 at *4 (Tex. App.–Houston [1st Dist.] 2014, no. pet.) (because UM/UIM coverage was not in dispute, claimant's suit only involved

"the issues in a typical car wreck: the comparative negligence of [claimant] and the other driver and [claimant's] damages"). The observation in *Reynolds* that a plaintiff must show UM/UIM "coverage" goes only to the ***existence*** of coverage under the relevant policy; it does not include the ***amount*** of coverage. Appellee's Brief at 33.

The amount of available coverage is an irrelevant – and inflammatory – issue for jury consideration because a UM/UIM insurer has no contractual duty to pay benefits until the liability of the underinsured driver and the amount of damages suffered by the insured are determined. *Brainard v. Trinity Universal Ins. Co.,* 216 S.W.3d 809, 815 (Tex. 2006) (holding insurer's contractual duty to pay UM/UIM insurance does not exist "until the insurer breaches the contract by withholding benefits after the insured has obtained a judgment establishing the liability and underinsured status of the other motorist"); *In re Reynolds,* 369 S.W.3d at 652. Thus, until liability and damages issues are determined, the ***amount*** of UM/UIM coverage is simply not an issue because the underinsured driver might not be negligent or the damages might not exceed the underinsured driver's coverage. *Henson v. Southern Farm Bureau Cas. Ins. Co.*, 17 S.W.3d 652, 654 (Tex. 2000).

The trial court, at Sims' urging, repeatedly departed from the proper procedure for trying a UM/UIM case. Published decisions discussing these

procedures uniformly require that the jury *first* determine liability and damages. *See, e.g., State Farm Mut. Auto Ins. Co. v. Norris*, 216 S.W.3d 819, 821 (Tex. 2006) (discussing trial court's application of policy limits, settlement credits and PIP offsets to the jury verdict on the issues of liability and damages); *Henson,* 17 S.W.3d at 653 (discussing calculation of judgment after jury decided only liability and damages); *McLain*, 2010 WL 851407 at *2-3 (after jury decided liability and damages, trial court held a "hearing on entry of judgment" in which the UM/UIM carrier proved amount of policy limits, personal injury payments it had made, and amounts the injured driver received from the underinsured driver).

Because the availability of UM/UIM coverage under the Policy was undisputed, the only triable fact issues in this case were liability of the underinsured driver (Knous) and the amount of Sims' damages. The amount of UM/UIM coverage available to Sims could not have been relevant until the jury found Knous responsible for the accident and that Sims' damages exceeded his settlement with Knous ($100,000), which was stipulated. If the jury had found Sims rather than Knous responsible or if Sims' damages had not exceeded his settlement with Knous, the Policy's UM/UIM coverage would never have become available. Once those issues were decided in Sims' favor by the jury, and only then, the Insurance Code and Policy required that the trial court apply the Policy as written to determine available UM/UIM limits, and enter judgment for Sims'

damages, after applying offsets, up to the applicable UM/UIM policy limits. Thus, the *amount* of UM/UIM policy coverage was irrelevant to any issue the jury had to decide, as Liberty repeatedly informed the trial court. Even if that amount was disputed, it never became a jury issue because construction of the policy was for the court alone.

As Liberty's brief shows (in the Statement of Facts and at 19-20), the trial court erred repeatedly by refusing to construe the policy as a matter of law after trial. Sims cites a case holding that the intentions of the *parties* to a contract to modify that contract is a question of fact. *See* Appellee's Brief at 34 (citing *Hathaway v. General Mills, Inc.*, 711 S.W.2d 227, 228 (Tex. 1986)). Obviously, that principle is irrelevant here, where the parties to the Policy, Chesapeake and Liberty, do not dispute that policy limits were $250,000 for UM/UIM coverage in Texas. Moreover, the policy limit was determinable, as a matter of law, at the time of judgment and was not a proper issue for jury determination, as discussed above and in Liberty's opening brief.

## Issue Three

> Even if it was proper to submit the policy limits issue to the jury, the trial court erred by failing to submit the relevant amendatory endorsements and by refusing Liberty's offers of proof that it corrected all discovery errors prior to trial.

Moreover, even if it was proper to submit the policy limits issue to the jury, the trial court erred by failing to submit the relevant amendatory endorsements and

by refusing Liberty's offers of proof that it corrected all discovery errors prior to trial, as Liberty showed in its opening brief. Appellant's Brief at 26-30.

## Issue Four

Allowing the jury to consider and determine UM/UIM limits improperly injected insurance in the trial violating Texas Rule of Evidence 411.

### A. The unfairly prejudicial nature of the evidence of UM/UIM limits vastly outweighed its probative value.

Allowing the jury to consider and determine UM/UIM limits improperly injected insurance in the trial violating Texas Rule of Evidence 411, as Liberty also showed in its brief. Appellant's Brief at 30-33. Evidence that a defendant was or was not insured against liability is not admissible on the issue of negligence. Tex. R. Evid. 411. "[This] rule is founded on the belief that the probative value of such evidence is vastly outweighed by the danger of unfair prejudice." 1 Steven Goode, Olin Guy Wellborn III, and M. Michael Sharlot, *Texas Practice Series: Guide to the Texas Rules of Evidence* § 411.1 (3d ed. 2002). *See also Thornhill v. Ronnie's I-45 Truck Stop, Inc.,* 944 S.W.2d 780, 794 (Tex. App.–Beaumont 1997, writ dism'd by agr.) (recognizing that one purpose of Rule 411 is to avoid informing the jury that someone other than defendant may be liable to pay damages). For example, "in the simultaneous trial of two claims, when evidence of liability insurance will be admissible as to only one of the claims, detailed evidence of insurance is prejudicial." *In re Reynolds*, 369 S.W.3d at 653-54.

In addition to Knous' negligence and Sims' damages, the only thing Sims had to prove in this trial was that Knous was underinsured. *State Farm Mut. Auto Ins. Co. v. Grayson,* 983 S.W.2d 769, 770 (Tex. App.–San Antonio 1998, no pet.). Knous was underinsured if the available proceeds of her liability coverage were insufficient to compensate Sims for his actual damages. *Stracener v. United Servs. Auto. Ass'n,* 777 S.W.2d 378, 380 (Tex. 1989) ("[A] negligent party is underinsured whenever the available proceeds of his liability insurance are insufficient to compensate for the injured party's actual damages."). Once Sims' damages were determined by the jury, the court had all it needed to determine if those damages exceeded the $100,000 settlement with Knous.

The ***amount*** of available UM/UIM limits had no bearing on any issue the jury properly considered. The amount of limits had nothing to do with whether Knous, as opposed to Sims, caused the accident nor did the amount of limits have anything to do with the amount of Sims' damages. Moreover, the amount of limits had nothing to do with whether Knous was underinsured. To the contrary, because the ***existence*** of UM/UIM coverage was admitted by Liberty, the ***amount*** of UM/UIM limits was highly prejudicial to Liberty. Any jury knowing there was $1 million in coverage for a seriously injured plaintiff would be encouraged to increase its damages findings. Rule 411 was intended to prevent just such a result. Allowing any evidence of available UM/UIM policy limits violated Liberty's right

to have Knous' liability and Sims' damages decided without the prejudicial and inflammatory fact of liability insurance influencing the jury. *In re Reynolds*, 369 S.W.3d at 653-54.

Most important, the improper prejudicial influence of the evidence of policy limits vastly outweighed its actual probative value, which was zero. As shown above, the amount of UM/UIM insurance was irrelevant to any fact issue properly before the jury. Further, unless and until Knous was found liable and underinsured, the UM/UIM coverage could not possibly come into play, and it was unnecessary to inform the jury of policy limits at trial. The prejudicial nature of the evidence thus vastly outweighed its probative value and violated Rule 411.

> **B.** **The trial court erred repeatedly by permitting Sims to introduce evidence of the amount of UM/UIM policy coverage over Liberty's objections.**

Because the amount of UM/UIM coverage was immaterial to any issue properly before the jury, and because such evidence was highly inflammatory and improperly prejudicial, the trial court therefore abused its discretion in connection with the improper evidentiary ruling addressed above. *See* Appellant's Brief at 19-20. Each of those rulings violated Rule 411 and constituted an abuse of the trial court's discretion. Each of these errors was harmful and reversible in that each error resulted in the erroneous jury finding on Question 1 that applicable policy

limits were $1 million and in the erroneous judgment based on that finding. Tex. R. App. P. 44.1; *Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012).

## CONCLUSION

The trial court largely abdicated its responsibility under settled Texas law to interpret the Policy and determine available limits without assistance from the jury. This resulted in erroneous evidentiary rulings, including the admission of irrelevant but highly inflammatory evidence, the submission of erroneous jury issues, and the entry of an erroneous judgment. The judgment should therefore be reversed and rendered based on available UM/UIM limits of $250,000. In the alternative, the judgment should be vacated and the case remanded for a new trial on the question of policy limits alone.

Respectfully submitted,

HANNA & PLAUT, L.L.P.
211 E. Seventh Street, Suite 600
Austin, Texas 78701
Telephone: (512) 472-7700
Facsimile: (512) 472-0205
dplaut@hannaplaut.com

By: /s/ David L. Plaut
    David L. Plaut
    State Bar No. 16066030
    dplaut@hannaplaut.com
    Jeffrey C. Glass
    State Bar No. 08004000
    jglass@hannaplaut.com

**ATTORNEYS FOR APPELLANT**

## CERTIFICATE OF SERVICE

I hereby certify that on 16th day of January 2015, a true and correct copy of this document was e-filed with the Twelfth Court of Appeals and served electronically pursuant to TRCP 21(a). Any other counsel of record will be served pursuant to TRCP 21(a) this same date.

Don Wheeler
LAW OFFICE OF DON WHEELER
101 Tenaha Street
P.O. Box 1687
Center, Texas 75935
Telephone: (936) 598-2925
Facsimile: (936) 598-7024

Darrin M. Walker
LAW OFFICE OF DARRIN WALKER
6134 Riverchase Glen Dr.
Kingwood TX 77345
Telephone: (281) 358-2295
Facsimile: (281) 358-5602

/s/ David L. Plaut
David L. Plaut

## CERTIFICATE OF COMPLIANCE

I certify that this document was produced on a computer using Microsoft Word 2010 and contains 5,828 words, as determined by the computer software's word-count function, excluding the sections of the document listed in Texas Rule of Appellate Procedure 9.4(i)(1).

/s/ David L. Plaut
David L. Plaut
Attorney for Liberty Mutual Insurance Company

Dated: January 16, 2015

Lilith BRAINARD, et al., Petitioners,

v.

TRINITY UNIVERSAL INSURANCE
COMPANY, Respondent.

No. 04–0537.

Supreme Court of Texas.

Argued April 14, 2005.

Decided Dec. 22, 2006.

Rehearing Denied April 13, 2007.

**Background:** Automobile accident victim's surviving spouse and children brought wrongful death action and sought underinsured motorist (UIM) benefits. Liability insurer then settled without admitting liability. The 31st District Court, Gray County, Steven R. Emmert, J., awarded attorney fees to plaintiffs, but denied prejudgment interest. Appeal and cross-appeal were taken. The Amarillo Court of Appeals, Don H. Reavis, J., 153 S.W.3d 508, affirmed in part and reversed and rendered in part. Review was granted.

**Holdings:** The Supreme Court, Jefferson, C.J., held that:

(1) UIM insurance covers prejudgment interest that underinsured motorist would owe to the insured;

(2) credit for payment of personal injury protection (PIP) benefits reduced principal on which prejudgment interest subsequently began to accrue against UIM carrier, but credit for liability insurer's payment after interest began to accrue applied first to interest and then to principal; and

(3) carrier's failure to pay within thirty days of claim did not entitle spouse and children to attorney fees, abrogating *Norris v. State Farm*, 217 S.W.3d 1, *State Farm Mut. Auto. Ins. Co. v. Nickerson*, 130 S.W.3d 487, *Allstate Ins. Co. v. Lincoln*, 976 S.W.2d 873,

*Whitehead v. State Farm Mut. Auto. Ins. Co.*, 952 S.W.2d 79, *Novosad v. Mid–Century Ins.* Co., 881 S.W.2d 546.

Affirmed in part, reversed in part, and remanded.

**1. Insurance ⟐2787**

A motorist is underinsured if his or her liability insurance is insufficient to pay for the injured party's actual damages. V.A.T.S. Insurance Code, art. 5.06–1(5).

**2. Insurance ⟐2806**

Liability coverage limit and insured's recovery of personal injury protection (PIP) benefits were an offset to actual damages and reduced underinsured motorist (UIM) carrier's liability.

**3. Insurance ⟐2803**

Underinsured motorist (UIM) insurance covers prejudgment interest that underinsured motorist would owe to the insured; statute requires UIM coverage for sums that insured is legally entitled to recover as damages from owners or operators of underinsured motor vehicles because of bodily injury or property damage, prejudgment interest represents additional compensatory damages for the insured's bodily injury and property damage although it accrues because of lost use of money, and contractual basis of suit for UIM benefits does not render prejudgment interest statute inapplicable. V.A.T.S. Insurance Code, art. 5.06–1(5); V.T.C.A., Finance Code § 304.102.

**4. Interest ⟐39(2.6)**

Prejudgment interest is awarded to fully compensate the injured party, not to punish the defendant.

**5. Interest ⟐39(2.6)**

"Prejudgment interest" is compensation allowed by law as additional damages for lost use of the money due as damages

during the lapse of time between the accrual of the claim and the date of judgment.

> See publication Words and Phrases for other judicial constructions and definitions.

**6. Interest ⚖59(1)**

The declining principal formula of crediting payments when received is the proper way to apply credits in the calculation of prejudgment interest.

**7. Interest ⚖60**

At each new interval between payments entitling defendant to credit, prejudgment interest continues to accrue only on the remaining principal because, under the general prejudgment interest provisions, interest is computed as simple interest and does not compound. V.T.C.A., Finance Code § 304.104.

**8. Interest ⚖59(1)**

   **Payment ⚖42**

Automobile insurer's credit for payment of personal injury protection (PIP) benefits reduced principal on which prejudgment interest subsequently began to accrue against insurer as UIM carrier, but credit for liability insurer's payment after interest began to accrue applied first to interest and then to principal.

**9. Interest ⚖39(2.35)**

Prejudgment interest owed by underinsured motorist (UIM) carrier did not accrue after date that insured's surviving spouse and children rejected carrier's settlement offer more favorable than judgment. V.T.C.A., Finance Code § 304.105(a).

**10. Costs ⚖194.16**

Attorney fees are recoverable from an opposing party only as authorized by statute or by contract between the parties.

**11. Insurance ⚖3585**

"Presentment" for purposes of statute entitling insured to attorney fees if underinsured motorist (UIM) carrier failed to pay just amount owed before end of thirtieth day after claim was presented occurred when judgment established tortfeasor's liability and underinsured status; no just amount was owed by carrier until the judgment; abrogating *Norris v. State Farm*, 217 S.W.3d 1, *State Farm Mut. Auto. Ins. Co. v. Nickerson*, 130 S.W.3d 487, *Allstate Ins. Co. v. Lincoln*, 976 S.W.2d 873, *Whitehead v. State Farm Mut. Auto. Ins. Co.*, 952 S.W.2d 79, *Novosad v. Mid–Century Ins.* Co., 881 S.W.2d 546. V.A.T.S. Insurance Code, art. 5.06–1(5); V.T.C.A., Civil Practice & Remedies Code § 38.002.

> See publication Words and Phrases for other judicial constructions and definitions.

**12. Insurance ⚖2790**

The underinsured motorist (UIM) carrier is under no contractual duty to pay benefits until the insured obtains a judgment establishing the liability and underinsured status of the other motorist. V.A.T.S. Insurance Code, art. 5.06–1(5).

**13. Insurance ⚖3343, 3585**

Neither requesting underinsured motorist (UIM) benefits nor filing suit against the insurer triggers a contractual duty to pay, and where there is no contractual duty to pay, there is no just amount owed for purposes of statute requiring the insurer to pay just amount owed within thirty days of presentment to avoid fees award. V.T.C.A., Civil Practice & Remedies Code § 38.002.

**14. Insurance ⚖2790, 2793(1)**

Neither a settlement nor an admission of liability from the tortfeasor establishes underinsured motorist (UIM) coverage, because a jury could find that the other

motorist was not at fault or award damages that do not exceed the tortfeasor's liability insurance.  V.A.T.S.  Insurance Code, art. 5.06–1(5).

**15. Insurance ☞2790**

The underinsured motorist (UIM) carrier's contractual obligation to pay benefits does not arise until liability and damages are determined.  V.A.T.S. Insurance Code, art. 5.06–1(5).

————

Bryan W. Scott, Katy, for Petitioner.

Gregory R. Ave, Walters, Balido & Crain, L.L.P., Dallas, for Respondent.

Chief Justice JEFFERSON delivered the opinion of the Court.

This case presents the following issues: (1) whether uninsured/underinsured motorist (UIM) insurance covers prejudgment interest that the underinsured motorist would owe the insured in tort liability; (2) if so, how to apply settlement and personal injury protection (PIP) credits to the interest calculation; and (3) the circumstances under which an insured may recover attorney's fees from the UIM insurer under Chapter 38 of the Civil Practice and Remedies Code. We hold that: (1) UIM insurance covers this prejudgment interest; (2) under the "declining principal" formula, each credit is applied according to the date on which it was received; and (3) the insured may recover attorney's fees under Chapter 38 only if the insurer does not tender UIM benefits within thirty days after the trial court signs a judgment establishing the liability and underinsured status of the other motorist. We reverse the court of appeals' judgment in part, affirm in part, and remand this case to the trial court to calculate pre-

judgment interest consistent with this opinion.

## I

## Background

On July 1, 1999, Edward H. Brainard II was killed when his vehicle was involved in a head-on collision with a rig owned by Premier Well Service, Inc. His widow, Lilith Brainard, and their five children (collectively, Brainard) brought a wrongful death action against Premier and sought UIM benefits from Trinity Universal Insurance Company under a policy issued to the family business, Brainard Cattle Company. Trinity paid Brainard $5,000 under the policy's PIP provision but requested further information supporting the UIM claim. Brainard alleges she submitted the information and performed all conditions precedent to receiving the benefits, but Trinity never paid. Eventually, Brainard joined Trinity as a defendant, alleging breach of contract, breach of the common law duty of good faith, violations of the Deceptive Trade Practices–Consumer Protection Act, and violations of Insurance Code articles 21.21 and 21.55.

On December 7, 2000, Brainard and Premier settled Brainard's claims for $1,000,000, Premier's policy limit, and Premier was subsequently dismissed from the suit. When Brainard demanded that Trinity also tender the $1,000,000 UIM policy limit, Trinity countered with an offer of $50,000. The trial court severed Brainard's extra-contractual claims, which remain pending, and the parties proceeded to trial on the UIM contract. A jury found that Premier's negligence caused the accident and awarded Brainard $1,010,000 for pecuniary loss, funeral expenses, loss of companionship and society, and mental anguish. The jury also awarded $100,000 for attorney's fees.

The trial court applied a $1,005,000 credit for Brainard's settlement and PIP benefits, and signed a judgment against Trinity for the remaining $5,000 in damages plus $100,000 in attorney's fees. On appeal, Trinity challenged the attorney's fees award, and Brainard, by cross appeal, alleged the trial court erred in refusing to award prejudgment interest on the $1,010,000 in actual damages. The court of appeals reversed that portion of the trial court's judgment awarding attorney's fees and affirmed the denial of prejudgment interest. 153 S.W.3d 508, 513. Because both points have engendered disagreement among the courts of appeals, we granted Brainard's petition for review. 48 Tex. Sup.Ct. J. 439 (Mar. 11, 2005).

## II

### Recovery of Prejudgment Interest

**[1–3]** The Insurance Code requires insurers to offer Texas motorists UIM coverage and mandates that such coverage:

> provide for payment to the insured of all sums which he shall be legally entitled to recover as damages from owners or operators of underinsured motor vehicles because of bodily injury or property damage in an amount up to the limit specified in the policy, reduced by the amount recovered or recoverable from the insurer of the underinsured motor vehicle.

Tex. Ins.Code art. 5.06–1(5). A motorist is underinsured if his or her liability insurance is insufficient to pay for the injured party's actual damages. *Stracener v. United Servs. Auto. Ass'n,* 777 S.W.2d 378, 380 (Tex.1989). Because the jury valued Brainard's damages at $1,010,000, and Premier's liability policy limit was $1,000,000, Premier was underinsured. The trial court correctly applied the sum of Premier's $1,000,000 liability limit and Brainard's $5,000 PIP recovery as an off-

set to actual damages. *Mid–Century Ins. Co. of Tex. v. Kidd,* 997 S.W.2d 265, 271 (Tex.1999); *Stracener,* 777 S.W.2d at 380. Thus, Trinity does not dispute that the $5,000 difference is covered under Brainard's UIM policy. The issue is whether, in addition to this amount, UIM insurance covers prejudgment interest that Premier would owe on the $1,010,000 in actual damages. We conclude that it does.

**[4, 5]** Prejudgment interest is awarded to fully compensate the injured party, not to punish the defendant. *Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549, 552 (Tex.1985), *superseded in part by statute,* Act of June 3, 1987, 70th Leg., 1st C. S., ch. 3, § 1, 1987 Tex. Gen. Laws 51, 51–52, *as recognized in Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507 (Tex.1998) *and C & H Nationwide, Inc. v. Thompson,* 903 S.W.2d 315, 327 (Tex.1994). It is " 'compensation allowed by law as additional damages for lost use of the money due as damages during the lapse of time between the accrual of the claim and the date of judgment.' " *Johnson & Higgins,* 962 S.W.2d at 528 (quoting *Cavnar,* 696 S.W.2d at 552). By statute, "[a] judgment in a wrongful death, personal injury, or property damage case earns prejudgment interest." Tex. Fin.Code § 304.102. Thus, if Brainard obtained a judgment against Premier for past damages resulting from the collision, Premier would be liable for prejudgment interest. Whether Brainard may recover this interest from Trinity is governed by their UIM insurance contract.

In language closely tracking article 5.06–1(5), Brainard's policy states that Trinity will pay "damages which [Brainard] is legally entitled to recover from" Premier. We have consistently viewed prejudgment interest as falling within the common law meaning of damages, and Trinity does not argue that the Legislature

or the parties intended the term to convey a narrower meaning. TEX. INS.CODE art. 5.06–1(5); *see, e.g., Horizon/CMS Healthcare Corp. v. Auld,* 34 S.W.3d 887, 898 (Tex.2000) (citing *Cavnar,* 696 S.W.2d at 552–54). Two courts of appeals have held that prejudgment interest constitutes damages that the insured is "legally entitled to recover" from the underinsured motorist. *Norris v. State Farm Mut. Auto. Ins. Co.,* 217 S.W.3d 1, 7 (Tex.App.-Waco 2004, pet. granted); *Menix v. Allstate Indem. Co.,* 83 S.W.3d 877, 880 (Tex.App.-Eastland 2002, pet. denied); *Allstate Indem. Co. v. Collier,* 983 S.W.2d 342, 343 (Tex.App.-Waco 1998, pet. dism'd by agr.).

Trinity's primary argument to the contrary, upon which the court of appeals relied, emphasizes that the UIM policy, like article 5.06–1(5), requires Trinity to pay only those damages which the insured is legally entitled to recover "because of bodily injury or property damage." 153 S.W.3d at 512; *see also* TEX. INS.CODE art. 5.06–1(5). Trinity contends that this qualification negates coverage for prejudgment interest because the essence of prejudgment interest is compensation for lost use of money, not damages from bodily injury. Further, Trinity suggests that Brainard's interpretation of the UIM endorsement would require the insurer to cover all damages assessed against the underinsured motorist, yet the courts of appeals have held that UIM insurance does not cover punitive damages. *See, e.g., Milligan v. State Farm Mut. Auto. Ins. Co.,* 940 S.W.2d 228, 232 (Tex.App.-Houston [14th Dist.] 1997, writ denied); *State Farm Mut. Auto. Ins. Co. v. Shaffer,* 888 S.W.2d 146, 148 (Tex.App.-Houston [1st Dist.] 1994, writ denied); *Vanderlinden v. United Servs. Auto. Ass'n Prop. & Cas. Ins. Co.,* 885 S.W.2d 239, 242 (Tex.App.-Texarkana 1994, writ denied).

Trinity's argument fails for several reasons. First, although several courts of appeals have held that UIM insurance does not cover punitive damages assessed against the underinsured motorist, none reached this result by adopting Trinity's narrow interpretation of damages "because of bodily injury." In fact, their reasoning effectively supports UIM coverage for prejudgment interest. In *Shaffer,* the court concluded that the phrase "because of bodily injury" was ambiguous because it could mean that the damages must (a) literally derive from a bodily injury or (b) arise as a result of bodily injury. *Shaffer,* 888 S.W.2d at 148–49. If this language were ambiguous and had been drafted by the insurance company, precedent would require that it be interpreted to favor the insured. *Nat'l Union Fire Ins. Co. v. Hudson Energy Co.,* 811 S.W.2d 552, 555 (Tex.1991). Most UIM provisions, however, recite nearly the exact text of article 5.06–1(5). For that reason, the *Shaffer* court inquired into the statute's legislative intent, which it found addressed in one of this Court's opinions. In *Stracener,* we concluded that the Legislature sought to protect "conscientious motorists from 'financial loss caused by negligent financially irresponsible motorists.'" *Stracener,* 777 S.W.2d at 382 (quoting Act of Oct. 1, 1967, 60th Leg., R. S., ch. 202, § 3, 1967 Tex. Gen. Laws 448, 449). Accordingly, the court of appeals observed that a primary purpose of UIM insurance is compensatory; it protects against financial loss. *Shaffer,* 888 S.W.2d at 149. Other courts of appeals have added that neither deterring wrongful conduct nor punishing the defendant is accomplished when the UIM insurer pays punitive damages assessed against the underinsured motorist. *Milligan,* 940 S.W.2d at 231; *Vanderlinden,* 885 S.W.2d at 240–42. Thus, they have held that neither the language of article 5.06–

1(5) nor public policy supports coverage of punitive damages.

We have already noted that prejudgment interest serves to compensate the injured party, not to punish the defendant. *Johnson & Higgins,* 962 S.W.2d at 528; *Cavnar,* 696 S.W.2d at 552. This distinction is apparent in the rule that "[p]rejudgment interest may not be assessed or recovered on an award of exemplary damages." TEX. CIV. PRAC. & REM.CODE § 41.007. Article 5.06–1(5)'s compensatory purpose is well served when the insured obtains, in addition to actual damages, any prejudgment interest that the underinsured motorist would owe the insured. Trinity's attempt to give the phrase "because of bodily injury" an artificially literal meaning—so as to establish a nexus requirement that eliminates coverage for prejudgment interest—has no basis in the statute's history or our precedent, under which article 5.06–1 is liberally construed to protect persons who are legally entitled to recover damages from underinsured motorists. *Stracener,* 777 S.W.2d at 382.

Moreover, Trinity's rigid reading proves too much, for it would entail splitting hairs even among purely compensatory damages, such as those for mental anguish and loss of society. Article 5.06–1(5) states that the insurer will pay the insured "all sums which he shall be legally entitled to recover as damages from owners or operators of underinsured motor vehicles because of bodily injury or property damage." TEX. INS.CODE. art. 5.06–1(5). The qualification "because of bodily injury or property damage" merely underscores that UIM insurance is compensatory. In addition, it clarifies what should be obvious—that only injuries and damages caused by the motor vehicle accident are covered—because if the qualification is omitted, the policy would not exclude damages arising from unrelated incidents and transactions between the parties. In sum, while it is true that prejudgment interest accrues over time because of lost use of money, it is equally accurate to say that it constitutes additional compensatory damages for the insured's bodily injury and property damage.

Trinity's alternative argument against coverage for prejudgment interest is based on the contractual aspect of a UIM claim. *Franco v. Allstate Ins. Co.,* 505 S.W.2d 789, 791–92 (Tex.1974) (noting that, "although ultimate recovery in this type of action depends upon proof of damages due to the tort of an uninsured third party, the cause of action against the insurer arises by reason of the written contract"). If the claim is purely contractual, as Trinity contends, then Finance Code section 304.102, which authorizes prejudgment interest in wrongful death, personal injury, and property damage cases, would have no application in this case. TEX. FIN.CODE § 304.102. The court of appeals adopted this approach, citing our decision in *Henson v. Southern Farm Bureau Casualty Insurance Company,* 17 S.W.3d 652, 653 (Tex. 2000), as additional support for the view that "the relationship between the Brainards and Trinity is that of contracting parties." 153 S.W.3d at 513.

The reference to *Henson* deserves further discussion because our reasoning in that case clarifies the issues presented here. Henson was a passenger in a truck driven by Millican, which collided with a vehicle driven by Contreras. *Henson,* 17 S.W.3d at 652. Henson sued Millican and Contreras for negligence and, before establishing liability, settled with Contreras for $20,000—her liability insurance limit. *Id.* at 652–53. A jury attributed one hundred percent of the negligence to Contreras and assessed Henson's damages at $133,842. *Id.* at 653. Within thirty days of the judgment, Henson and Millican's

UIM insurers tendered $45,000—their combined UIM policy limits. *Id.* Henson, however, refused the payment and demanded prejudgment interest on top of the policy limits, alleging the interest began to accrue against the insurers from the earlier of 180 days after he gave notice of his claim or the day he filed suit against them. *Id.* at 653–54.

The issue in *Henson* was whether prejudgment interest accrued on the insured's contractual claim for UIM benefits. The prejudgment interest which Henson could recover from Contreras in tort liability was not at issue, as the damages assessed by the jury already exceeded the UIM policy limit. We examined the insurer's obligation to pay damages which the insured is "legally entitled to recover" from the underinsured motorist and concluded that there is no contractual duty to pay benefits until the liability of the other motorist and the amount of damages suffered by the insured are determined. *Id.* at 653–64. Thus, we held that a UIM claim does not earn prejudgment interest until the insurer breaches the contract by withholding benefits after the insured has obtained a judgment establishing the liability and underinsured status of the other motorist. *Id.* at 654. The jury could have found that Contreras was not negligent or that Henson's damages did not exceed Contreras's liability insurance limit, precluding any recovery of UIM benefits. *Id.* Because the insurers tendered the benefits promptly after the jury made its findings, no contractual duty was breached, and Henson was not entitled to receive the benefits earlier than he did. *Id.* The question we answer today—whether UIM insurance covers the prejudgment interest an underinsured motorist would owe the insured— was not before us in *Henson.*

Under section 304.102, Premier would be liable for prejudgment interest on $1,010,000. Tex. Fin.Code § 304.102. The fact that Brainard's suit against Trinity is based on contract in no way renders the statute inapplicable. On the contrary, the UIM policy effectively incorporates the statute by requiring Trinity to pay damages which Brainard is "legally entitled to recover" from Premier. Section 304.102, like the law of negligence, is necessary to determine the liability of the underinsured motorist. The UIM policy, however, controls Trinity's obligations. Because Brainard obtained a judgment establishing the negligence and underinsured status of Premier, the contract requires Trinity to pay benefits. *Henson,* 17 S.W.3d at 654.

Accordingly, we hold that UIM insurance covers prejudgment interest that the underinsured motorist would owe the insured. The court of appeals erred in affirming the trial court's judgment denying Brainard this recovery.

### III

### Calculation of Prejudgment Interest

The parties do not challenge the calculation of actual damages; they agree that the trial court properly deducted Brainard's $1,000,000 settlement and $5,000 PIP recovery from the jury's $1,010,000 verdict, resulting in Trinity's liability for $5,000. *Mid–Century Ins. Co.,* 997 S.W.2d at 271; *Stracener,* 777 S.W.2d at 380. Instead, the issue concerns how to apply these credits when calculating prejudgment interest. Based on the jury's verdict, Premier would have been liable for $1,010,000 in actual damages, plus prejudgment interest on this amount. Having concluded that UIM insurance covers this interest, we turn now to its calculation.

Brainard's suit against Premier was for wrongful death. In a wrongful death case, prejudgment interest accrues beginning on the 180th day after the defendant receives

written notice of the claim or the day suit is filed, whichever occurs first, and ending on the day preceding the date judgment is rendered. TEX. FIN.CODE § 304.104. In this case, the prejudgment interest period commenced on January 19, 2000, when Brainard filed suit against Premier. Because the trial court signed its judgment on January 15, 2003, the period ended on January 14. *Id.* Prejudgment interest is computed as simple interest with a rate equal to the postjudgment interest rate applicable at the time judgment is rendered. *Id.* §§ 304.103, 304.104. The trial court's judgment set the rate at ten percent.

Brainard contends that prejudgment interest is calculated on the entire $1,010,000 before applying credits. Accordingly, she seeks $263,430 in prejudgment interest— ten percent interest on $1,010,000 from January 19, 2000, until August 29, 2002, the date the parties moved to enter judgment.[1] In Brainard's view, the interest is added to the jury's verdict before deducting settlement and PIP credits, so that the credits do not affect the prejudgment interest calculation. Trinity objects, arguing that Brainard should not continue to earn interest on $1,010,000 in damages despite having already received $1,005,000 in compensation. We agree.

[6] We recently touched on this issue in *Battaglia v. Alexander,* 177 S.W.3d 893, 908–09 (Tex.2005), in which we held that the trial court erred in calculating prejudgment interest on total damages before deducting payments that the plaintiff received from settling defendants. Although *Battaglia* involved health care liability claims subject to section 16.02 of former Revised Civil Statutes article 4590i, we established a framework that resolves the issue presented here. We reiterated that

prejudgment interest is compensation " 'for lost use of the money due as damages during the lapse of time between the accrual of the claim and the date of judgment.' " *Id.* at 907 (quoting *Cavnar,* 696 S.W.2d at 552). Therefore, compensation other than for lost use of money is not interest but a windfall for the claimant and a penalty to the defendant. *Id.* We concluded that, to satisfy the purpose of prejudgment interest, settlements must be credited periodically, according to the date they are received. *Id.* at 907–08. This approach, known as the "declining principal" formula, is the proper way to apply credits in the calculation of prejudgment interest. *Id.* at 909 (overruling in part *C & H Nationwide, Inc. v. Thompson,* 903 S.W.2d 315, 327 (Tex.1994)).

[7] In *Battaglia,* we concluded that "[a] settlement payment should be credited first to accrued prejudgment interest as of the date the settlement payment was made, then to 'principal,' thereby reducing or perhaps eliminating prejudgment interest from that point in time forward." *Id.* at 908. Thus, as we explain below, each credit applies first to the accrued interest and then to the principal, with each credit establishing a new interval. At each new interval, interest continues to accrue only on the remaining principal because under the general prejudgment interest provisions, "interest is computed as simple interest and does not compound." TEX. FIN. CODE § 304.104.

[8, 9] Under the "declining principal" formula, the trial court is to consider the date on which the insured received each payment. Trinity paid Brainard $5,000 in PIP benefits shortly after the July 1, 1999 collision. Because there is no dispute that

---

**1.** As explained above, however, the relevant date is that of the trial court's judgment,

rather than when the parties moved for entry of judgment.

this payment was made sometime in July, well before the prejudgment interest period commenced, we may assume it was July 31. Brainard settled with Premier for $1,000,000—its liability insurance limit—on December 7, 2000. On March 9, 2001, Trinity offered to settle with Brainard for $50,000. *See* TEX. FIN. CODE § 304.106. Two weeks later, in a letter to Brainard's counsel, Trinity confirmed that the offer would remain open. Because Brainard's $5,000 recovery did not exceed Trinity's settlement offer, prejudgment interest did not accrue on the judgment after March 9, 2001. *Id.* § 304.105(a) ("If judgment for a claimant is equal to or less than the amount of a settlement offer of the defendant, prejudgment interest does not accrue on the amount of the judgment during the period that the offer may be accepted."). Following are the relevant dates:

| | | |
|---|---|---|
| A. | 07/31/1999 | Brainard receives $5,000 PIP payment |
| B. | 01/19/2000 | Prejudgment interest period begins when Brainard files suit |
| C. | 12/07/2000 | Brainard receives $1,000,000 settlement |
| D. | 03/09/2001 | Trinity offers Brainard $50,000 |

Brainard is entitled to recover prejudgment interest on the damages caused by Premier's negligence. The beginning principal is $1,010,000—the amount of damages determined by the jury. The $5,000 PIP credit reduced the principal before prejudgment interest began to accrue. Thus, during the period from B to C, interest accrued on $1,005,000. At point C, the $1,000,000 credit is applied first to accrued prejudgment interest and then to principal. During the period from C to D, interest accrued on the principal remaining after application of the $1,000,000 credit. At point D, Brainard could have accepted Trinity's settlement offer, and interest ceased to accrue on that date. Trinity is liable for the remaining sum, up to Brainard's UIM policy limit, of the uncredited principal plus the uncredited interest that accrued from point C to point D. TEX. INS.CODE art. 5.06–1(5).

We remand this case to the trial court to modify the judgment in accordance with this opinion.

## IV

### Attorney's Fees

The final issue is whether Brainard may recover attorney's fees on her contract claim. The court of appeals reversed that portion of the trial court's judgment awarding Brainard $100,000 in attorney's fees. 153 S.W.3d at 510–11.

**[10]** Attorney's fees are recoverable from an opposing party only as authorized by statute or by contract between the parties. *Travelers Indem. Co. v. Mayfield,* 923 S.W.2d 590, 593 (Tex.1996). Chapter 38 of the Civil Practice & Remedies Code permits an insured to recover attorney's fees incurred in a successful breach of contract suit against the insurer unless the insurer is liable for the fees under a different statutory scheme. TEX. CIV. PRAC. & REM.CODE §§ 38.001(8), 38.006; *Grapevine Excavation, Inc. v. Maryland Lloyds,* 35 S.W.3d 1, 5 (Tex.2000). Because no other statutory scheme applies, Brainard seeks to recover the fees under Chapter 38.

**[11]** Under section 38.002, Brainard must show that: (1) she was represented by counsel; (2) she presented the claim to Trinity; and (3) Trinity failed to pay the just amount owed within thirty days of presentment. TEX. CIV. PRAC. & REM.CODE § 38.002. Brainard contends that her suit is like any other breach of contract suit, and therefore, presentment occurred on February 15, 2000, the day she made a claim for UIM benefits. Three courts of appeals support her position. *See Norris v. State Farm,* 217 S.W.3d at 3; *State Farm Mut. Auto. Ins. Co. v. Nickerson,* 130 S.W.3d 487, 490 (Tex.App.-Texarkana 2004, pet. granted); *Allstate Ins. Co. v.*

*Lincoln,* 976 S.W.2d 873, 876 (Tex.App.-Waco 1998, no pet.); *Whitehead v. State Farm Mut. Auto. Ins. Co.,* 952 S.W.2d 79, 88–89 (Tex.App.-Texarkana 1997), *rev'd on other grounds,* 988 S.W.2d 744 (Tex.1998); *Novosad v. Mid–Century Ins. Co.,* 881 S.W.2d 546, 552 (Tex.App.-San Antonio 1994, no writ). Trinity, on the other hand, argues that a UIM policy is different because the insurer's duty to pay does not arise until the underinsured motorist's liability, and the insured's damages, are legally determined. Five courts of appeals, including the court of appeals in this case, agree. *See DeLaGarza v. State Farm Mut. Auto. Ins. Co.,* 175 S.W.3d 29, 34 (Tex.App.-Dallas 2005, pet. denied); *Menix v. Allstate Indem. Co.,* 83 S.W.3d 877, 882 (Tex.App.-Eastland 2002, pet. denied); *Sprague v. State Farm Mut. Auto. Ins. Co.,* 880 S.W.2d 415, 416 (Tex.App.-Houston [14th Dist.] 1993, writ denied); *Sikes v. Zuloaga,* 830 S.W.2d 752, 753 (Tex.App.-Austin 1992, no writ).

**[12, 13]** This issue turns on the language in Chapter 38 requiring that "payment for the just amount owed must not have been tendered before the expiration of the 30th day after the claim is presented." TEX. CIV. PRAC. & REM. CODE § 38.002(3). The purpose of presentment is to allow the opposing party a reasonable opportunity to pay a claim without incurring an obligation for attorney's fees. *Jones v. Kelley,* 614 S.W.2d 95, 100 (Tex.1981). Thus, an essential element to recovery of attorney's fees under Chapter 38 in a suit based on contract is "the existence of a duty or obligation which the opposing party has failed to meet." *Ellis v. Waldrop,* 656 S.W.2d 902, 905 (Tex.1983). The UIM insurer is obligated to pay damages which the insured is "legally entitled to recover" from the underinsured motorist. TEX. INS. CODE art. 5.06–1(5). As discussed above, we have determined that

this language means the UIM insurer is under no contractual duty to pay benefits until the insured obtains a judgment establishing the liability and underinsured status of the other motorist. *Henson,* 17 S.W.3d at 653–54. Neither requesting UIM benefits nor filing suit against the insurer triggers a contractual duty to pay. *Id.* Where there is no contractual duty to pay, there is no just amount owed. Thus, under Chapter 38, a claim for UIM benefits is not presented until the trial court signs a judgment establishing the negligence and underinsured status of the other motorist.

**[14, 15]** Of course, the insured is not required to obtain a judgment against the tortfeasor. *State Farm Mut. Auto. Ins. Co. v. Matlock,* 462 S.W.2d 277, 278 (Tex. 1970). The insured may settle with the tortfeasor, as Brainard did in this case, and then litigate UIM coverage with the insurer. But neither a settlement nor an admission of liability from the tortfeasor establishes UIM coverage, because a jury could find that the other motorist was not at fault or award damages that do not exceed the tortfeasor's liability insurance. *See Henson,* 17 S.W.3d at 654. Brainard's contention that a UIM policy is to be treated like other contracts, for which damages are liquidated in a judicial proceeding and attorney's fees incurred are recoverable, misinterprets the nature of UIM insurance. The UIM contract is unique because, according to its terms, benefits are conditioned upon the insured's legal entitlement to receive damages from a third party. Unlike many first-party insurance contracts, in which the policy alone dictates coverage, UIM insurance utilizes tort law to determine coverage. Consequently, the insurer's contractual obligation to pay benefits does not arise until liability and damages are determined. *Id.*

1998 WL 609765
Only the Westlaw citation is currently available.

NOTICE: NOT DESIGNATED FOR PUBLICATION.
UNDER TX R RAP RULE 47.7, UNPUBLISHED
OPINIONS HAVE NO PRECEDENTIAL
VALUE BUT MAY BE CITED WITH THE
NOTATION "(not designated for publication)."

Court of Appeals of Texas, Amarillo.

CITY OF AMARILLO, Appellant,
v.
Billy J. BARNES, Appellee.

No. 07-97-0217-CV.  |  Sept. 14, 1998.

FROM THE 181ST DISTRICT COURT OF RANDALL
COUNTY; NO. 38,296-B; HONORABLE SAMUEL C.
KISER, JUDGE

Before BOYD, C.J., and DODSON and QUINN, JJ.

BOYD.

### *ON MOTION FOR REHEARING*

**\*1**  The City filed a motion for rehearing seeking to have this court withdraw its June 4, 1998 judgment and opinion. With the comment we make below, we overrule its motion.

The City argues in its motion that the question of whether attorney's fees should be limited by statute is a question of law to be decided by the trial court, not by the jury, and therefore, Rule 278 of the Texas Rules of Civil Procedure does not

apply. We agree. However, even the right to have a question of law reviewed by an appellate court may be waived if it is not first presented to the trial court for consideration. *See* Tex.R.App. P. 33.1(a)(1); *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 243 (Tex.1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986) (holding that appellant waived its argument that the trial court erred in awarding prejudgment interest in a Jones Act case tried to a jury because it did not present its argument to the trial court); *Hardeman v. Judge,* 931 S.W.2d 716, 720 (Tex.App.-Fort Worth 1996, writ denied) (holding that it could not review appellant's assertion that the trial court erred by not following the mandatory requirements of the relevant provisions of the Probate Code because appellant failed to raise such error in the trial court); *Reyna v. State Nat'l. Bank of Iowa Park,* 911 S.W.2d 851, 858 (Tex.App.-Fort Worth 1995, writ denied) (holding that it could not reform the portion of the judgment concerning wrongful foreclosure damages based upon a formula never presented to the trial court); *Centroplex Ford, Inc. v. Kirby,* 736 S.W.2d 261, 264-65 (Tex.App.-Austin 1987, no writ) (holding that by failing to raise its objections at trial, appellant waived its complaint that the trial court erred by awarding pre-judgment interest because the award was not supported by pleadings and because the rate was contrary to statute); *Great N. Am. Stationers, Inc. v. Ball,* 770 S.W.2d 631, 632-33 (Tex.App.-Dallas 1989, writ dism'd) (holding that appellant waived its choice of law argument by waiting until the case was on appeal to raise the issue for the first time). Although the City reasserts that it brought to the trial court's attention that the award of attorney fees was subject to a statutory limitation, after reviewing the record, we do not find that it did so.

Accordingly, the City's motion for rehearing is overruled.

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 866199
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR
DESIGNATION AND SIGNING OF OPINIONS.

MEMORANDUM OPINION
Court of Appeals of Texas,
Dallas.

Lori Ann Melton DAHL, Appellant
v.
Kelly Louis DAHL, Appellee.

No. 05-07-01338-CV.  |  April 2, 2009.

On Appeal from the 330th Judicial District Court, Dallas County, Texas, Trial Court Cause No. 04-21372-Y, Marilea Lewis, J.

**Attorneys and Law Firms**

W. Michael Read, Law Offices of W.M. Read, Dallas, TX, for Appellant.

Jerry Michael Pittman, Arlington, TX, Thomas B. Cowart, Turley Law Firm, Dallas, TX, for Appellee.

Before Justices MOSELEY, FITZGERALD, and MAZZANT.

**MEMORANDUM OPINION**

Opinion by Justice FITZGERALD.

**\*1** This is an appeal from a divorce decree. In three points of error, appellant Lori Ann Melton Dahl argues that the trial court erred when it (1) divided the parties' property, (2) denied appellant's request to change her name back to her maiden name, and (3) denied her motion for continuance. We sustain her first two points of error, overrule her third point of error, reverse the divorce decree in part, and remand the case for further proceedings.

**I. BACKGROUND**

The parties were married in 1998. Appellant filed for divorce in 2004, and appellee filed an answer and a counterpetition for divorce. The case was tried to the bench in March 2007. The trial judge signed the final decree of divorce a few months later, and appellant timely filed her notice of appeal.

**II. PROPERTY DIVISION**

In her first point of error, appellant complains of the trial court's division of the house in which the parties lived during their marriage (the "Coleridge property"). Under the heading "*Division of Marital Estate,*" the trial court awarded appellee 60% of the net proceeds from the sale of the Coleridge property and appellant 40% of those net proceeds. Appellant argues that the trial court erred in dividing the house as part of the marital estate because the Coleridge property was her separate property rather than community property.

**A. Applicable law**

In a decree of divorce, a trial court must "order a division of the estate of the parties in a manner that the court deems just and right." TEX. FAM.CODE ANN. § 7.001 (Vernon 2006). The court may divide only the parties' community property. *Jacobs v. Jacobs,* 687 S.W.2d 731, 733 (Tex.1985). Community property is property, other than separate property, acquired by either spouse during marriage. TEX. FAM.CODE ANN. § 3.002. Property possessed by either spouse during or on dissolution of marriage is presumed to be community property rather than separate property. *Id.* § 3.003(a). Separate property includes, among other things, property owned or claimed by a spouse before marriage. *Id* . § 3.001(1). The characterization of property as community or separate is determined by the inception of title, i.e., when a party first has a right of claim to the property by virtue of which title is finally vested. *Id.* § 3.404(a); *Chavez v. Chavez,* 269 S.W.3d 763, 767 (Tex.App.-Dallas 2008, no pet.). A party who claims that property is separate property must prove the necessary facts by clear and convincing evidence in order to overcome the presumption of community property. TEX. FAM.CODE ANN. § 3.003(b).

We review property-characterization rulings for abuse of discretion. *See Chavez,* 269 S.W.3d at 766. In family law cases, the traditional sufficiency standard of review overlaps with the abuse of discretion standard, so legal and factual sufficiency are not independent grounds of error but are relevant factors in our assessment of whether the trial court abused its discretion. *Id.*

**B. Application of the law to the facts**

**\*2** Appellee was the only witness to testify at trial. He testified that he and appellant were married on September 22, 1998. He also testified that the Coleridge property was purchased in July 1997. He admitted that appellant made the entire down payment for the Coleridge property at that time by borrowing $16,000 against her 401(k). He further acknowledged that he did not "pay a dime" for the house at the time of the purchase. No title documents regarding the purchase of the Coleridge property were introduced at trial. In short, the only evidence presented at trial relevant to the inception of title was appellee's own testimony that the Coleridge property was purchased before the parties were married and that appellant supplied the down payment. This undisputed evidence established that the Coleridge property was separate property. *See Chavez,* 269 S.W.3d at 767.

Appellee argues that the trial court's characterization is supported by a judicial admission in appellant's petition for divorce. In her petition, appellant alleged, "Petitioner and Respondent possess and own community property which requires a division of the marital estate, including, but not limited to, their residence on Coleridge Street, vehicle(s), savings, retirement savings, and personal property." Appellee argues that this statement is a judicial admission as to the proper characterization of the Coleridge property. We have held, however, that a party waives a judicial admission by introducing evidence on the disputed issue. *Dallas Transit Co. v. Young,* 370 S.W.2d 6, 11 (Tex.Civ.App.-Dallas 1963, writ ref'd n.r.e.); *accord Indus. Disposal Supply Co. v. Perryman Bros. Trash Serv., Inc.,* 664 S.W.2d 756, 764 (Tex.App.-San Antonio 1983, writ ref'd n.r.e.); *see also Houston First Am. Sav. v. Musick,* 650 S.W.2d 764, 769 (Tex.1983) (to rely on judicial admissions, a party "must protect his record by objecting to the introduction of evidence contrary to that admission of fact and by objecting to the submission of any issue bearing on the fact admitted"). Appellee's own testimony at trial established that the Coleridge property was separate property, so he waived appellant's judicial admission, if any. We conclude that the trial court abused its discretion by characterizing the Coleridge property as community property instead of separate property.

Appellee argues in the alternative that appellant fails to demonstrate that the trial court's erroneous characterization of the Coleridge property was harmful error. But the erroneous characterization of a spouse's separate property as community property is never harmless error. *See Eggemeyer v. Eggemeyer,* 554 S.W.2d 137, 140-42 (Tex.1977) (affirming reversal of mischaracterization of separate property as community property without conducting harm analysis); *In re Marriage of Case,* 28 S.W.3d 154, 161 (Tex.App.-Texarkana 2000, no pet.) ("When a court mischaracterizes separate property as community property, the error requires reversal because a spouse is divested of separate property."); *Hodges v. Hodges,* No. 05-92-00239-CV, 1993 WL 25347, at *7 (Tex.App.-Dallas Feb.4, 1993, no writ) (not designated for publication) ("Such divestiture of title [to separate property] is beyond the discretion of the court and cannot be harmless error."); Barbara A. Kazen, *Division of Property at the Time of Divorce,* 49 BAYLOR L.REV. 417, 429 (1997) (describing mischaracterization of separate property as community property as "an error that will result in reversal"). Moreover, the Coleridge property appears to be the most substantial asset addressed in the proceedings, and "[w]hen the court mistakenly characterizes property that constitutes the main asset of the parties, the error is of such a magnitude that it materially affects the just and right division of the community estate." *Evans v. Evans,* 14 S.W.3d 343, 347 (Tex.App.-Houston [14th Dist.] 2000, no pet.); *see also In re Marriage of Morris,* 123 S.W.3d 864, 868 (Tex.App.-Texarkana 2003, no pet.) (stating that "any mischaracterization of a major asset of the parties' estate" is reversible error).

**\*3** We conclude that the trial court abused its discretion in characterizing the Coleridge property as community property and that this error constitutes reversible error. This necessitates remand for a new division of the entire community estate. *Jacobs,* 687 S.W.2d at 732; *Bufkin v. Bufkin,* 259 S.W.3d 343, 350-51 (Tex.App.-Dallas 2008, pet. denied).

### III. OTHER ISSUES

In her second point of error, appellant complains that the trial court erred by denying her unopposed request to change her name back to her maiden name. At trial, appellee stated that he was unopposed to appellant's regaining her prior name. The trial judge said on the record that she would restore appellant's maiden name, but the decree of divorce is silent on the subject and denies all relief not expressly granted therein. The denial of appellant's request to change her name appears to have been a clerical error. We sustain appellant's second point of error, reverse the judgment to the extent it denies appellant's request

for a name change, and remand for further proceedings not inconsistent with this opinion.

In her third point of error, appellant complains that the trial court erred by denying her counsel's oral motion for continuance on the day of the trial. As a result of the denial, appellant was not present at the trial. Appellant does not demonstrate that she was prejudiced by the denial of her motion, so we overrule this point of error. *See Ngo v. Ngo,* 133 S.W.3d 688, 693 (Tex.App.-Corpus Christi 2003, no pet.) ("The appellant must show that the denial [of a continuance] resulted in her prejudice and that she had a reasonable excuse for her absence."); *Humphrey v. Ahlschlager,* 778 S.W.2d 480, 483 (Tex.App.-Dallas 1989, no writ) (stating

that party complaining of denial of continuance must show "the materiality of the testimony to be offered by the absent witness").

### IV. DISPOSITION

We reverse the portion of the final decree of divorce that divides the marital estate and the denial of appellant's request to change her name. We remand for a new division of the community estate and other appropriate proceedings. We affirm the final decree of divorce in all other respects.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Because the contract did not require Trinity to pay UIM benefits before Premier's negligence and underinsured status were determined, Brainard did not present a contract claim before the trial court rendered its judgment, and the court of appeals correctly concluded that Brainard is not entitled to recover attorney's fees under Chapter 38.

## V

### Conclusion

We reverse the portion of the court of appeals' judgment that denied Brainard prejudgment interest, affirm the portion that denied attorney's fees, and remand this case to the trial court to calculate prejudgment interest consistent with this opinion. TEX.R.APP. P. 60.2(a), (d).

Justice O'NEILL and Justice JOHNSON did not participate in the decision.



**STATE FARM MUTUAL AUTOMO-
BILE INSURANCE COMPA-
NY, Petitioner,**

**v.**

**Jimmie R. NORRIS, Respondent.**

**No. 04–0514.**

Supreme Court of Texas.

Argued April 14, 2005.

Decided Dec. 22, 2006.

**Background:** Insured brought action to recover underinsured motorist (UIM) benefits. The 87th District Court, Limestone County, Sam B. Bournias, J., entered a take-nothing judgment. Insured appealed. The Waco Court of Appeals, Vance, J., 217 S.W.3d 1, 2004 WL 811722, reversed and remanded. Review was granted.

**Holdings:** The Supreme Court, Jefferson, C.J., held that:

(1) prejudgment interest could not be calculated without payment dates for liability coverage proceeds and personal injury protection (PIP) benefits;

(2) as a matter of first impression, insured released claim for prejudgment interest on difference between liability coverage limits and tort settlement;

(3) UIM carrier's credits reduced principal, if payment was made before prejudgment interest began to accrue, and reduced interest, if payment was made after interest began to accrue; and

(4) insured was not entitled to attorney fees after take-nothing judgment in favor of carrier, disapproving *Allstate Insurance Company v. Lincoln*, 976 S.W.2d 873.

Reversed and remanded.

**1. Interest ⏀56**

The declining principal formula is used to calculate prejudgment interest on underinsured motorist (UIM) benefits; thus, the trial court considers the date on which the insured received each payment and cannot calculate prejudgment interest until those dates are established.

**2. Insurance ⏀2793(1), 2803**
   **Interest ⏀26**

When automobile accident victim settled tort claim for less than liability coverage limits and released tortfeasor, he also released any prejudgment interest in the difference between the policy limits and the settlement amount; thus, the victim could recover from his underinsured motorist (UIM) carrier prejudgment interest

their appeal with success, the costs are divided equally.

### On Motion for Rehearing.

[7] Defendants' motion for rehearing is grounded upon the point that plaintiffs did not invoke the theory of ratification or revivor. In our opinion plaintiffs, by pleading, proof and brief, have done enough to invoke it. By pleading, they said that the subsequent conduct of the parties gave meaning to an ambiguity in paragraph 2 of the leases, quoted in our opinion, with respect to the sale of gas. The pleading also asserted the specific words of the April 26, 1960 lease, wherein the defendants recognized the validity of the 1958 lease. They alleged that the 1960 lease was a recognition, that defendants made demands for shut-in royalty, and that plaintiffs paid the royalty, "thus clearly evidencing that they recognized said lease as being in full force and effect."

At the trial the recognition oil lease from Hastings and wife to Holcombe and Mabry was introduced, while Hastings himself was on the stand. Plaintiffs asked him, "now, on the date of this oil lease here, Mr. Hastings, you were still taking the position that Tower Production Company or the assignees still owned the leasehold rights insofar as the gas on that property, is that correct?" To this he answered, "I sure did, I didn't think it belonged to anybody else at that time, he hadn't give it up or nothing." The 1960 recognition lease was admitted without objection.

Plaintiffs' brief points to the statement of facts and the exhibit of the 1960 lease and makes the argument, "in fact the evidence clearly established that such individuals considered such leases insofar as the gas rights thereunder were concerned were in full force and effect as late as April 28, 1960, when they entered into an Oil Lease to and with C. G. Holcombe on the same property wherein it was recited

that the gas rights thereunder were owned by Tower Production Company."

Most of the trial related to other issues, but when plaintiffs had proved enough, that was and is all that is required of them. The motion for rehearing is overruled.



**DALLAS TRANSIT COMPANY, Appellant,**

v.

**E. D. YOUNG et al., Appellees.**

**No. 16190.**

Court of Civil Appeals of Texas.

Dallas.

June 28, 1963.

Rehearing Denied July 26, 1963.

Vehicular collision case. The District Court, Dallas County, Paine L. Bush, J., rendered judgment for plaintiffs, and defendant, a bus company, appealed. The Court of Civil Appeals, Bateman, J., held that evidence supported findings of improper lookout by overtaking bus driver who claimed he could have stopped instantly and was not shown to have observed preceding truck from time it was 200 feet ahead of bus until it was only 10 feet ahead of bus and whose bus hit truck after it had been stopped about 3 or 4 seconds, and that in view of existence of some evidence to support finding of failure to keep proper lookout, reviewing court was required to disregard all evidence which would lead to contrary result.

Affirmed.

**I. Appeal and Error ⟜901**

Appellant had burden of demonstrating lack of evidence which had probative

force and upon which jury could have made findings in question.

**2. Appeal and Error ⚖ 930(1), 989**

In determining whether appellant met burden of demonstrating that there was no evidence which had probative force and upon which jury could have made findings in question, reviewing court could consider only that evidence, if any, which, viewed in its most favorable light, supported the findings and was required to disregard all evidence that would lead to contrary result.

**3. Automobiles ⚖ 244(34)**

Evidence supported findings of improper lookout by overtaking bus driver who claimed he could have stopped instantly and was not shown to have observed preceding truck from time it was 200 feet ahead of bus until it was only 10 feet ahead of bus and whose bus hit truck after it was stopped about 3 or 4 seconds.

**4. Trial ⚖ 140(1)**

Credibility of witnesses was for jury.

**5. Appeal and Error ⚖ 719(6)**

Unchallenged jury finding was binding on appellant. Vernon's Ann.Civ.St. art. 6701d, § 68(c); Vernon's Ann.P.C. art. 801(K).

**6. Trial ⚖ 350(6)**

Evidence supported submission to jury of issue whether bus driver who did not glance in rearview mirror to see if there was anything behind him after he saw stopped vehicles in front of him had failed to keep proper lookout to see if vehicle overtaking him might be too close to stop and might push bus into the stopped vehicles unless driver turned to right as he had sufficient room to do.

**7. Automobiles ⚖ 172(5)**

Ordinarily, a motorist need not keep lookout for overtaking vehicles. Vernon's Ann.Civ.St. art. 6701d, § 68(c); Vernon's Ann.P.C. art. 801(K).

**8. Evidence ⚖ 208(1)**

First stopped driver's plea that in alternative, overtaking bus driver failed to apply brakes and allowed bus to hit rear of second stopped vehicle at about the same time as bus was hit from behind could not be used as judicial admission opposed to first or main plea that bus struck second stopped vehicle with such force as to make it hit first stopped vehicle. Rules of Civil Procedure, rule 48.

**9. Evidence ⚖ 208(1)**

Alternative plea to effect that at about time overtaking bus struck second stopped vehicle, which hit first stopped vehicle, bus was hit from behind and given added impetus was not admission that bus was hit first in such manner as to cause bus to hit second stopped vehicle.

**10. Estoppel ⚖ 68(2)**

By failing to contend at trial that certain pleadings were judicial admissions and by treating the matter they raised as a disputed issue, point that they were judicial admissions was waived.

**11. Appeal and Error ⚖ 238(2)**

Point not mentioned in motion for judgment non obstante veredicto could not be considered on appeal for first time.

On Motion for Rehearing.

**12. Appeal and Error ⚖ 989**

In view of existence of some evidence to support finding that driver of overtaking bus which struck stopped preceding vehicle and pushed it into another stopped vehicle had failed to keep proper lookout, reviewing court was required to disregard all evidence which would lead to contrary result.

———◆———

John L. Hauer, Dallas, for appellant.

Yarborough, Yarborough & Johnson, and Allison & Ford, Dallas, for appellees.

BATEMAN, Justice.

This damage suit stems from a collision, or series of collisions, between four motor vehicles, all headed in a northerly direction on Second Avenue in the City of Dallas. The first car in the line was a Ford sedan owned and occupied by appellee Jesse Ford and his wife, which was stopped awaiting an opportunity to make a left turn. The second vehicle was a Chevrolet panel truck owned and operated by appellee E. D. Young, which had moved up behind the Ford and was either stopped or going very slowly. The next in line was appellant's city bus operated by one Holt. The fourth vehicle was a Chevrolet pick-up truck owned and driven by Luther Rodgers.

Ford and Young sued Dallas Transit Company, Holt and Rodgers, claiming damages for bodily injuries. The jury found that the bus driver, Holt, failed to keep a proper lookout, which was a proximate and, in fact, the sole proximate cause of the collision. No other party was found guilty of negligence proximately causing the collision. Appellant and Holt moved for judgment *non obstante veredicto*, which motion was overruled, and the court rendered judgment on the verdict in favor of Young and Ford against appellant and Holt.

Appellant alone has appealed and presents only one point of error; viz., that the trial court erred in overruling its motion for judgment *non obstante veredicto* because (a) there was no evidence to support the improper lookout findings, and (b) appellees filed judicial admissions that Rodgers' truck hit the bus from behind before the bus hit Young's truck. We see no merit in this point and affirm the judgment.

[1, 2] Appellant's burden here is to demonstrate that there was no evidence having probative force upon which the jury could have made the findings in question; and in determining whether that burden has been discharged we "may consider only that evidence, if any, which, viewed in its most favorable light, supports the jury findings, and we must disregard all evidence which would lead to a contrary result." Biggers v. Continental Bus System, 157 Tex. 351, 303 S.W.2d 359, 363; Lynch v. Ricketts, Tex.Civ.App., 306 S.W.2d 410, 413, reformed and affirmed 158 Tex. 487, 314 S.W.2d 273.

[3] Holt testified that he did not know whether Young's panel truck had completely stopped before the bus struck it, that he could have stopped the bus instantly, that there was nothing between him and Young's truck to prevent him from seeing its movements, but that he did not know, or could not recall, whether Young "had his hand out from the time he first saw him stop up until there was a collision." His testimony further indicated that the truck was about 200 feet ahead of him when he first observed it, that he knew that both his bus and the Young truck would have to stop because of the stopped Ford, and that the Young truck was only about ten feet ahead of him when the Rodgers vehicle struck the rear of the bus. There is no evidence that he observed the Young truck at any time in the interim. Young testified that he brought his truck to a complete stop behind the Ford and extended his arm outside his vehicle to indicate that he was stopping, that his stop light was on, and that he was in a stopped position three or four seconds before his vehicle was struck.

While this evidence may lack something in clearness and directness, yet we must hold that it is some evidence, more than a scintilla, sufficient to carry the issues to the jury and to support the findings thereon. The lookout maintained or neglected by a motorist is often very difficult to prove by direct evidence, and yet many cases turn, as this one does, on this single issue. Improper lookout, like any other negligent act or omission, may be proved by circumstantial evidence. Lynch v. Ricketts, 158 Tex. 487, 314 S.W.2d 273, 275. And it was held by the Fort Worth Court

of Civil Appeals that "[t]he collision itself is some evidence of negligence on the part of the driver who strikes a preceding car from the rear." Renshaw v. Countess, Tex. Civ.App., 289 S.W.2d 621, 624, no wr. hist. See also Caraway v. Behrendt, Tex.Civ. App., 224 S.W.2d 512, no wr. hist., and Miller v. Wagoner, 356 S.W.2d 363, no wr. hist.

· On the other hand, appellant relies heavily on Rankin v. Nash-Texas Co., 129 Tex. 396, 105 S.W.2d 195, 199, in which it was held that: "The occurrence of an accident, or a collision, is not of itself evidence of negligence." This principle is firmly rooted and widely recognized. "But, while the naked fact that an accident has happened may be no evidence of negligence, yet the character of the accident and the circumstances in proof attending it may be such as to lead reasonably to the belief that, without negligence, it would not have occurred." Washington v. Missouri, K & T Ry. Co., 90 Tex. 314, 38 S.W. 764, 765.

As said in Hoey v. Solt, Tex.Civ.App., 236 S.W.2d 244, 246: "It can not be gainsaid that one who fails to stop his automobile in response to a traffic signal, but propels the same into the rear end of an automobile which has stopped in obedience to the signal, is guilty of negligence proximately causing injury or damage unless such conduct is excused by some extenuating circumstance or condition."

[4] Appellant attempts to explain or excuse the collision of its bus with the rear of Young's truck, not by saying that Young stopped suddenly or failed to signal his intention to stop, or that the brakes on the bus suddenly became ineffective without warning or fault on the part of appellant or its employee, but on the sole ground that Rodgers negligently hit the rear of the bus and pushed or knocked it into the rear of Young's truck. This was apparently the only reed on which appellant could lean; and it turned out to be a weak one. Unless appellant could establish that its bus was pushed involuntarily into the vehicle ahead of it, the conduct of its driver stood rather defenseless. His testimony was quite definite that the bus was struck violently from the rear—violent enough to knock him loose from the steering wheel, and to cause him to lose his balance, his cap to fall off and his foot to come off the brake pedal—and that this force shoved the bus into the Young truck. He was corroborated in this, to some extent, by two passengers on the bus. There was testimony to the contrary, which, although weak, was more than a scintilla. Joske v. Irvine, 91 Tex. 574, 44 S.W.2d 1059. (See Footnote) [1] The jury had a right to be-

1. Luther Rodgers testified that shortly before he struck the rear of the bus he heard a fairly loud crash which sounded like an automobile accident; that he looked ahead of him on each side to see if he could see an accident, but did not see one; that he did not say he heard the crash in front of the bus although it appeared to be up in front of him; that he couldn't tell whether it was on the side or straight ahead, but out in front of him some place; that he was 150 or 200 feet behind the bus when he heard it, traveling about 45 miles per hour, at which time he took his foot off the accelerator; that he saw the brake light on the bus "flicker" when he was about 60 to 90 feet behind the bus and then for the first time applied his own brakes, reducing his speed to about 25 to 35 miles per hour when he hit the bus;

that he does not know whether the bus ran into a vehicle in front of it before he hit the bus. In his deposition Rodgers said that he was about 60 feet from the bus traveling 15 or 20 miles per hour, when he first applied his brakes and skidded about 60 feet into the bus; that when he was approaching the bus he heard a crash and that's when he slowed down; that the noise sounded like it was in the immediate area.

His wife, Mrs. Katie Rodgers, testified that she was riding with her husband and that as they approached the scene she heard a "bang" which sounded like "two people running together" and sounded like it was in front of her; that after their pick-up struck the bus she did not see it move forward and to the best of her knowledge it did not; that after the pick-up struck the bus she did not hear

lieve this testimony and reject that of Holt and the two passengers.

[5] Obviously, that is exactly what happened, as evidenced by the jury's answer to Special Issue No. 61, as follows:

"Do you find from a preponderance of the evidence that on the occasion in question the defendant, Luther Clifford Rodgers, in driving his vehicle into the rear of the bus proximately caused it to collide with the car in front of it?

"ANSWER: NO."

The transcript does not reflect that appellant objected to the submission of that issue, or moved the court to disregard the finding; no complaint as to the submission of the issue or as to the finding was made in the amended motion for new trial, and no point of error is made in this court with respect thereto. Therefore, it seems to us that this jury finding, unchallenged in any manner, is binding on appellant and obliterates the only basis it could have for the only explanation it offers for the collision between the bus and the Young panel truck.

[6, 7] There is yet another basis for our conclusion that the jury findings on lookout have support in the evidence. Holt also testified that as he approached the scene of the accident he would occasionally "glance in the rear-view mirror to see if there was anything in behind" him, but that on this occasion he did not do so after he saw the cars in front of him. The jury may well have considered that as the bus approached the place where the two vehicles ahead of it were already stopped and the bus driver knew he would also have to stop, the exercise of ordinary care would have required him at that very time to look in his rear-view mirror to see if another vehicle might be following so closely be-

hind him that it would be unable to stop and might push him and his bus into the cars in front. The evidence is undisputed that there was sufficient room to the right in which he could have turned the bus, thus avoiding the collision.

It has been held that ordinarily a motorist need not keep a lookout for vehicles approaching from his rear, but we think circumstances such as are presented here at least warrant the submission of the issue to the jury. As said in Jones v. Downey, Tex.Civ.App., 359 S.W.2d 116, 118, err. ref. n. r. e.: "However where a motorist is traveling upon a paved highway and is preparing stop, slow down or change directions, he is required to keep a lookout for traffic to his rear, and to give proper signals of his intentions." See also Art. 6701d, § 68(c), V.A.T.S.; Art. 801(K), Texas Penal Code; Le Sage v. Smith, Tex. Civ.App., 145 S.W.2d 308, 315; Scott v. McElroy, Tex.Civ.App., 361 S.W.2d 432, err. ref. n. r. e.; Langham v. Talbott, Tex. Civ.App., 211 S.W.2d 987, err. ref. n. r. e.

Therefore, we hold that the findings in question were not without some support in the evidence.

Appellant's contention that Ford and Young filed judicial admissions that Rodgers' pick-up truck hit the bus from behind before the bus hit Young's truck will now be noticed. Ford pled that he stopped his car, that Young stopped behind him, and that the bus struck Young's truck with such force as to knock it forward into Ford's car; and, in the alternative, that the bus driver failed to apply his brakes but allowed the bus to crash into the rear of Young's truck, etc. He then added, in the same sentence: "that, in any event there was immediately behind said bus, at the time and on the occasion in question, a Chevrolet pick-up truck driven by the said Luther Rodgers, who was also proceeding

the bus then strike something in front of it; that the noise she heard before the pick-up struck the bus was like colliding vehicles would make; that she would say,

based on this noise, that the bus hit the vehicle in front of it before she and her husband hit the bus, although she couldn't see around in front of the bus.

in a Northwesterly direction on said Second Avenue * * * and said Luther Rodgers, at about the same time the bus crashed into the rear of the Chevrolet truck driven by Elisha David Young, at the time and on the occasion in question, crashed into the rear of said bus, giving added impetus to said bus and it crashed into the rear of said truck driven by Elisha David Young, etc."

In Young's petition, after alleging that the bus crashed into the back of Young's truck, it was alleged: "that almost instantaneously prior thereto, the back of said Dallas Transit Company bus had been struck from the rear by a vehicle owned and operated by defendant Luther Clifford Rodgers."

This contention is overruled for four reasons:

[8, 9] 1) The pleadings in question do not, in our opinion, constitute the judicial admissions claimed for them by appellant. Ford's pleading was in the alternative, and the alternative plea cannot be used as a judicial admission opposed to his first or main plea. Climatic Air Distributors of South Texas v. Climatic Air Sales, 162 Tex. 237, 345 S.W.2d 702; Rule 48, Vernon's Texas Rules of Civil Procedure. Furthermore, it does not actually allege that the pick-up hit the bus first and *caused* it to strike Young's truck, merely that it gave "added impetus." Young's pleading, quoted above, likewise falls far short of admitting that Rodgers' truck hit the bus first in such manner as to cause the collision between the bus and Young's truck. As said in Restelle v. Williford, Tex.Civ. App., 364 S.W.2d 444, 445, err. ref. n. r. e.: "We doubt that the allegations were made with such clarity that they, strictly construed, may be considered a judicial admission."

[10] 2) Appellant did not contend in the trial court that these pleadings were such admissions as to obviate the necessity of evidence on the point. On the contrary,

it treated the matter as a disputed issue by introducing evidence thereon. The point was thereby waived. 31 C.J.S. Evidence § 381c, p. 1172; 7 C.J.S. Pleading § 161, p. 335; Restelle v. Williford, 364 S.W.2d 444, 446, err. ref. n. r. e.

[11] 3) It was not mentioned in the motion for judgment *non obstante veredicto*, and since the only point of error on appeal relates to the overruling of that motion, the contention cannot properly be considered here for the first time.

4) Having no direct bearing on the proper lookout issues, the matter of which vehicle struck which vehicle first is at most evidentiary and not in any sense determinative of the appeal. As indicated above, this case turns on whether there was any evidence to support jury findings on lookout, not on a determination of the order in which the vehicles collided with each other. Our inquiry is limited to the question: Does the record contain any evidence to support the finding of improper lookout? Having demonstrated that it does, the judgment is affirmed.

Affirmed.

## ON MOTION FOR REHEARING

In its motion for rehearing appellant directs our attention to the fact that we did not express our views on its contention that the appellees are bound by the only direct evidence on lookout, which was that of its driver Holt, who testified that the truck struck the bus knocking him away from the controls and knocking the bus into the panel truck. Appellant says this testimony is so binding on appellees as to require us to reverse and render the judgment, even though Holt was a defendant and interested witness. It relies on Cochran v. Wool Growers Central Storage Co., 140 Tex. 184, 166 S.W.2d 904, 908, wherein it is held that "where the testimony of an interested witness is not contradicted by any other witness, or attendant circumstances, and the same is clear, direct and positive,

and free from contradiction, inaccuracies, and circumstances tending to cast suspicion thereon, it is taken as true, as a matter of law."

In view of the corroboration of Holt's testimony by that of the two bus passengers, appellant also says that this case is governed by Simonds v. Stanolind Oil & Gas Co., 134 Tex. 332, 136 S.W.2d 207.

[12] We have again reviewed the evidence and adhere to our original opinion that the finding of failure to keep a proper lookout is not without at least some evidence to support it. If we are correct in that, it is our duty to "disregard all evidence which would lead to a contrary result." Biggers v. Continental Bus System, 157 Tex. 351, 303 S.W.2d 359. This would of course include the testimony of Holt and his passengers. The motion for rehearing is overruled.



---

**TEXAS EMPLOYERS' INSURANCE ASSOCIATION, Appellant,**

**v.**

**Merritt MILLER, Appellee.**

**No. 7451.**

Court of Civil Appeals of Texas.

Texarkana.

June 11, 1963.

Rehearing Denied July 23, 1963.

Workmen's compensation case in which the District Court, Panola County, Ward Chandler, J., entered a judgment for the employee and the carrier appealed. The Court of Civil Appeals, Fanning, J., held that Texas employee who had worked in Louisiana for Texas employer several weeks before he was injured there while working on job as both mechanic and woods foreman was entitled to recover under extra-territorial provisions of Texas Workmen's Compensation Act.

Affirmed.

**1. Workmen's Compensation ⟊77**

Extra-territorial provisions of Texas Workmen's Compensation Act are mainly to protect Texas employees temporarily out of state. Vernon's Ann.Civ.St. art. 8306, § 19.

**2. Workmen's Compensation ⟊51**

Workmen's Compensation Act should be liberally construed to effectuate beneficent purposes for which it was enacted.

**3. Workmen's Compensation ⟊82**

Texas employee who had worked in Louisiana for Texas employer several weeks before he was injured there while working on job as both mechanic and woods foreman was entitled to recover under extra-territorial provisions of Texas Workmen's Compensation Act. Vernon's Ann. Civ.St. art. 8306, § 19.

**4. Election of Remedies ⟊1**

Doctrine of election of remedies is not a favorite of equity.

**5. Workmen's Compensation ⟊1111**

Texas employee who was injured while temporarily working in Louisiana and who received weekly compensation benefits voluntarily paid under Louisiana law but who did not file suit in Louisiana had not, under circumstances, made a binding election which would preclude his recovery under extra-territorial provisions of Texas Workmen's Compensation Law where compensation benefits under Louisiana law were deducted from judgment under Texas law. Vernon's Ann.Civ.St. art. 8306, § 19.

---

Herbert Boyland, Kenley, Ritter & Boyland, Longview, for appellant.

EMPLOYERS INSURANCE OF
WAUSAU, Appellant,

v.

Larry J. HALTON, Appellee.

No. 05–89–00065–CV.

Court of Appeals of Texas,
Dallas.

Feb. 27, 1990.

Rehearing Denied May 5, 1990.

In workers' compensation case, employer's workers' compensation carrier appealed summary judgment of the 14th District Court, Dallas County, John McClellan Marshall, J., in favor of claimant. The Court of Appeals, Howell, J., held that: (1) defense counsel's negligence in failing to timely respond to requests for admissions did not rise to level of conscious indifference, and defense counsel made sufficient showing of good cause to warrant withdrawal of deemed admissions, and (2) genuine issues of material fact precluded summary judgment.

Reversed and remanded.

**1. Appeal and Error ⬅961**
   **Pretrial Procedure ⬅483**

Trial court possesses broad discretion to permit or deny withdrawal of deemed admissions, and its ruling on withdrawal will be set aside only upon clear showing of abuse of discretion; such abuse occurs when court acts without reference to guiding rules or principles or acts arbitrarily or unreasonably. Vernon's Ann.Texas Rules Civ.Proc., Rule 169.

**2. Pretrial Procedure ⬅483**

Good cause is threshold standard for withdrawal of deemed admissions. Vernon's Ann.Texas Rules Civ.Proc., Rule 169.

**3. Judgment ⬅143(2), 146**

Under civil rule providing that new trials may be granted and judgment set aside for good cause on motion, proof of three elements is required before new trial will be granted after default judgment:

that defendant's failure to answer was result of accident or mistake rather than intentional or the result of conscious indifference, that defendant has set up a meritorious defense, and that a new trial will not cause delay or injury to plaintiff. Vernon's Ann.Texas Rules Civ.Proc., Rule 320.

**4. Pretrial Procedure ⬅483**

Defense counsel's negligence in failing to timely respond to requests for admissions did not rise to level of conscious indifference, and defense counsel made sufficient showing of good cause to warrant withdrawal of deemed admissions in workers' compensation case; defense counsel stated in affidavit that he was never contacted by plaintiff's counsel about tardiness of answers and that, upon discovering missed deadline, he immediately contacted plaintiff's attorney and notified him that responses would be filed late. Vernon's Ann.Texas Rules Civ.Proc., Rule 169.

**5. Judgment ⬅185(2)**

Movant for summary judgment has burden to show that no genuine issue of material fact exists and that it is entitled to judgment as matter of law.

---

Jeffrey R. Boggess, Irving, for appellant.

Roger G. Williams and Mark Darrow Wilson, Dallas, for appellee.

Before HOWELL, THOMAS, and OVARD, JJ.

OPINION ON REHEARING

HOWELL, Justice.

The following revised opinion is now the opinion of the Court.

In this workers' compensation case, Employers Insurance of Wausau (defendant) appeals a summary judgment rendered in favor of Larry J. Halton (plaintiff). Plaintiff had served requests for admissions on defendant, along with other discovery requests, which defendant failed to answer timely. Based primarily on the deemed admissions, the trial court entered judgment that plaintiff recover approximately

$62,000 in workers' compensation payments, plus lifetime medical benefits, and $20,000 in attorney's fees.

In this appeal, defendant claims that the trial court abused its discretion in failing to grant defendant's motion to set aside the deemed admissions and to extend time to file objections and responses to plaintiff's requests for admissions. In urging this point, defendant claims that, under rule 169 of the Texas Rules of Civil Procedure, it proved "good cause" for the court to allow withdrawal of the deemed admissions. We agree with defendant's contentions. Because we conclude that its negligence in this matter did not rise to the level of conscious indifference, we reverse the summary judgment and remand this cause for trial on the merits.

## I. PROCEDURAL HISTORY

On June 16, 1988, about one month after this case was filed, plaintiff's counsel mailed requests for admissions to defense counsel, which defense counsel admits he received "[s]hortly after that date." The requests consisted of fifty-one statements covering every issue in the case. In support of his motion to set aside the deemed admissions, defense counsel asserted by affidavit that during the thirty-day response period allowed by rule 169, he had prepared handwritten responses to the discovery requests according to his usual custom. He maintains that he intended to submit these to his secretary for typing, which was also his customary practice.

By his affidavit, defense counsel also stated that on September 7, 1988, while reviewing the file for reasons unrelated to the discovery requests, he discovered that the handwritten responses had never been transcribed, mailed, or filed. He said that he immediately contacted plaintiff's counsel to explain his failure to respond and to request an extension of time to prepare answers. Plaintiff's counsel refused and informed defense counsel that he was preparing a motion for summary judgment based on the deemed admissions.

On September 9, 1988, defense counsel filed answers to plaintiff's requests for admissions and delivered a copy to plaintiff's counsel. On this same date, plaintiff filed his motion for summary judgment based on the deemed admissions. Ten days later, defendant filed its motion to set aside the deemed admissions and to extend time to file objections and responses. On October 4, 1988, the trial court conducted a hearing on defendant's motions and on plaintiff's summary judgment motion. One week later, the trial court denied defendant's requests and granted summary judgment to plaintiff. We note that the case had been set for jury trial November 7, 1988.

## II. REQUIREMENTS OF RULE 169

Rule 169 of the Texas Rules of Civil Procedure provides in pertinent part:

> Each matter of which an admission is requested shall be separately set forth. The matter is admitted, without necessity of a court order unless, within thirty (30) days after service of the request, or within such time as the court may allow, the party to whom the request is directed serves upon the party requesting the admission a written answer or objection.

TEX.R.CIV.P. 169(1). The consequence of "deemed admissions" is that the matters are conclusively established against the admitting party unless the court, on motion, permits withdrawal or amendment of the admissions. The rule states:

> [T]he court may permit withdrawal or amendment of responses and deemed admissions upon a showing of good cause for such withdrawal or amendment if the court finds that the parties relying upon the responses and deemed admissions will not be unduly prejudiced and that the presentation of the merits of the action will be subserved thereby.

TEX.R.CIV.P. 169(2). The "good cause" language was added to the rule by an amendment that took effect January 1, 1988. The remaining language has been part of the rule since 1973. Since the 1988 amendment, few, if any, Texas courts have examined the "good cause" requirement under rule 169.

In construing the withdrawal prerequisites of rule 169, we must give the rule a

liberal construction. TEX.R.CIV.P. 1; *cf. Sanders v. Harder,* 148 Tex. 593, 596–97, 227 S.W.2d 206, 208–09 (1950) (trial court declined to deem matters admitted where defendant substantially complied with rule). The objective of the rules of civil procedure is to obtain a just, fair, equitable, and impartial adjudication of the rights of litigants. TEX.R.CIV.P. 1.

A number of decisions have elaborated on the policy underlying rule 169. In *Sanders* the Texas Supreme Court stated:

> The primary purpose of the rule is to simplify trials by eliminating matters about which there is no real controversy, but which may be difficult or expensive to prove. It was never intended to be used as a demand upon a plaintiff or defendant to admit that he had no cause of action or ground of defense.

*Sanders,* 227 S.W.2d at 208. It has been held that rule 169 "should not be so construed as to give one litigant an advantage over his opponent, permitting him to have judgment without supporting testimony when, without injustice to either party, the case can be opened for a full hearing on the evidence." *Gordon v. Williams,* 164 S.W.2d 867, 868 (Tex.Civ.App.—Beaumont 1942, no writ). The court in *Bynum v. Shatto,* 514 S.W.2d 808, 811 (Tex.Civ.App. —Corpus Christi 1974, writ ref'd n.r.e.), stated that the rules of civil procedure "were never designed as traps for the unwary nor should they be construed in order to prevent a litigant from presenting the truth to the trier of facts."

[1] As a consequence of these policies, the trial court possesses broad discretion to permit or deny withdrawal of deemed admissions. *Eckman v. Centennial Sav. Bank,* 757 S.W.2d 392, 396 (Tex.App.—Dallas 1988, writ denied); *Rosenthal v. National Terrazzo Tile & Marble, Inc.,* 742 S.W.2d 55, 57 (Tex.App.—Houston [14th Dist.] 1987, no writ). The court's ruling on withdrawal will be set aside only upon a clear showing of abuse. *Crime Control, Inc. v. RMH–Oxford Joint Venture,* 712 S.W.2d 550, 552 (Tex.App.—Houston [14th Dist.] 1986, no writ); *Texas Employers Ins. Ass'n v. Bragg,* 670 S.W.2d 712, 715 (Tex.App.—Corpus Christi 1984, writ ref'd n.r.e.). An abuse of discretion occurs when a court acts without reference to guiding rules or principles or acts arbitrarily or unreasonably. *See Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241 (Tex.1985).

[2] In most of the rule 169 cases prior to the 1988 amendment, the litigant seeking to avoid the consequences of failing to answer a request for admissions was required to show a legal or equitable excuse for his failure to answer. *Crime Control,* 712 S.W.2d at 552; *Bragg,* 670 S.W.2d at 715; *Mathes v. Kelton,* 565 S.W.2d 78, 81 (Tex.Civ.App.—Amarillo 1977), *aff'd,* 569 S.W.2d 876 (Tex.1978); *Burnett v. Cory Corp.,* 352 S.W.2d 502, 507 (Tex.Civ.App.— Dallas 1961, writ ref'd n.r.e.). In one preamendment case from this Court, the litigant was required to show good cause for the failure to answer timely. *Curry v. Clayton,* 715 S.W.2d 77, 79 (Tex.App.— Dallas 1986, no writ). But, in a later case from this Court, we again required a showing of legal or equitable excuse, possibly because the case was tried preamendment. *Eckman,* 757 S.W.2d at 396. However, with the amendment of rule 169, it is apparent that "good cause" has been adopted as the threshold standard for the withdrawal of deemed admissions.

### III. TEXAS CASES CONSIDERING RULE 169

In *Trevino v. Central Freight Lines, Inc.,* 613 S.W.2d 356 (Tex.Civ.App.—Waco 1981, no writ), relied on by plaintiff, the respondent never answered the movant's requests and waited until the day of trial (eleven months after the requests had been served) to file a motion for extension of time. *Id.* at 358. The *uncontradicted* testimony in the case established that the failure to answer was due solely to the attorney's neglect. The *Trevino* court noted that under the agency relationship of attorney and client, the neglect of the attorney is attributable to the client. *Id.* at 359. Thus, the court found no abuse of discretion in the court's denial of the motion to extend time. *Id.*

In *Bragg*, also cited by plaintiff, the respondent was three months tardy with its responses to the requests for admissions. Respondent thereafter delayed an additional five months in filing a motion to extend the time to file its answers, said motion being filed on the date of trial (third setting). *Bragg*, 670 S.W.2d at 716. The appellate court found no abuse in the trial court's striking of the late-filed answers. *Id.*

In both *Trevino* and *Bragg*, the delays by both respondents in filing their motions for extension of time were quite lengthy (eleven months and eight months). Plainly, in *Trevino*, the attorney's conduct in waiting eleven months until the day of trial to try to withdraw the deemed admissions, upon which the movant had relied in preparing his case, caused undue prejudice to the movant and would have resulted in unnecessary delay in the trial. Apparently, the attorneys in both cases gave no valid reason for their lack of compliance with the rules. More importantly, they offered no rationale for their delay in attempting to seek relief from their defaults. Such inaction by the answering party only compounds the initial breach of the rules and constitutes the sort of attorney neglect that the amended rule seeks to abolish.

Plaintiff also directs us to *Curry v. Clayton*, 715 S.W.2d at 77. *Curry* is procedurally similar to the instant case in that the respondent filed his answers several days late and subsequently filed his motion to extend time. Movant, in the meantime, filed a motion for summary judgment. The trial court overruled respondent's motions and granted summary judgment to movant based on the deemed admissions. From that point, however, *Curry* differs from the case at hand. In *Curry*, the respondent's affidavit stated only that "his delay in filing his response to [movant]'s requests for admissions was not intentional but was merely the result of his attorney's 'busy schedule.'" *Curry*, 715 S.W.2d at 79. This Court held that "[a] statement that the delay was due to the attorney's 'busy schedule,' *without more*, is not sufficient to show good cause for permitting the late filing of a response to requests for

admissions." *Id.* (emphasis added). In the present case, as we will detail below, defendant's showing of "good cause" was much more extensive than the respondent's in *Curry*.

But, more importantly, *Bragg*, *Trevino*, and *Curry* are not controlling because they were decided before the "good cause" provision of rule 169 was effective. In our opinion, a respondent to a request for admissions is no longer required to show a legal or equitable "excuse" other than "good cause" in order to meet the first prong of the three-prong test for allowing the withdrawal of deemed admissions. Additionally, "good cause" can now be shown, even though a party may have been negligent, if his negligence does not rise to the level of conscious indifference.

Finally, in one of the most recent cases addressing withdrawal of deemed admissions, this Court held that where the respondent waited almost one year to file a motion to extend time to file answers, the trial court did not err in overruling the motion. *See Eckman*, 757 S.W.2d at 396. Interestingly, the Court noted, "[W]e recognize that a loss of an employee or a heavy caseload might, in fairness, justify a short delay by counsel in responding to discovery. We also recognize that these difficulties are an inexorable reality of the practice of law." *Id.* The Court, however, found the year-long delay to be "inconsistent with the spirit of the Rules of Civil Procedure" and found no abuse of discretion by the trial court. *Id.*

Again, in *Curry* and *Eckman*, this Court seems to have stressed the answering parties' delinquency in taking no adequate action to correct their initial failure to timely respond. A bare assertion that an attorney is "busy" cannot be enough to merit withdrawal, nor can waiting almost a year to attempt to remedy the original default.

## IV. ANALOGY TO RULE 320 AND MOTIONS FOR NEW TRIAL

[3] Defendant also directs us to rule 320 of the Texas Rules of Civil Procedure, which governs motions for new trial after

default judgments, urging that cases construing this rule should guide us in our construction of rule 169. Rule 320 provides, in pertinent part, that "[n]ew trials may be granted and judgment set aside for *good cause,* on motion...." Tex.R.Civ.P. 320 (emphasis added). Courts have widely construed the "good cause" language to require proof of three elements before a new trial will be granted after default judgment: (1) that defendant's failure to answer was the result of an accident or mistake, rather than intentional or the result of conscious indifference; (2) that defendant has set up a meritorious defense; and (3) that a new trial will not cause delay or injury to the plaintiff. *E.g., Strackbein v. Prewitt,* 671 S.W.2d 37, 38 (Tex.1984); *Ivy v. Carrell,* 407 S.W.2d 212, 213 (Tex.1966); *Craddock v. Sunshine Bus Lines,* 134 Tex. 388, 391, 133 S.W.2d 124, 126 (1939).

Courts have liberally interpreted the first element in the *Craddock* formula, and each case depends on its own facts. *See The Moving Co. v. Whitten,* 717 S.W.2d 117, 119 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.). In deciding whether a defendant's failure to answer was the result of an accident or mistake, the "controlling fact" is the "absence of a purposeful or bad faith failure to answer." *Gotcher v. Barnett,* 757 S.W.2d 398, 401 (Tex.App.—Houston [14th Dist.] 1988, no writ). Consequently, under rule 320, "even a *slight excuse* will suffice, especially where delay or prejudice would not result" against the plaintiff. *Id.* (emphasis added).

Moreover, courts interpreting rule 320 have said that "negligence alone will not preclude setting aside of a default judgment." *Id.* at 402; *see also Ivy,* 407 S.W.2d at 213; *Dallas Heating Co. v. Pardee,* 561 S.W.2d 16, 19 (Tex.Civ.App.—Dal-

las 1977, writ ref'd n.r.e.). The court must look to the knowledge and acts of the defaulting party to determine the existence of intentional disregard or conscious indifference. *Strackbein,* 671 S.W.2d at 39. In addition, where the factual allegations in the defaulting party's affidavits are not controverted, they are generally taken as true; if they set forth facts to negate intentional disregard and conscious indifference, the court must conclude that the failure to answer was due to accident or mistake. *See Strackbein,* 671 S.W.2d at 38–39; *Gotcher,* 757 S.W.2d at 401.

These cases, which construe the "good cause" language of rule 320, give us additional persuasive authority in our construction of "good cause" under rule 169. Perhaps most importantly, these cases hold that, in some situations, negligence can be a mere accident or mistake; it will not necessarily constitute conscious indifference and preclude a new trial. *See, e.g., Southland Paint Co. v. Thousand Oaks Racket Club,* 724 S.W.2d 809, 811 (Tex. App.—San Antonio 1986, writ ref'd n.r.e.) (shortness of staff in insurance office does not constitute conscious indifference where plaintiff not injured by new trial); *Evans v. Woodward,* 669 S.W.2d 154, 155 (Tex.App. —Dallas 1984, no writ) (confusion in attorney's office not conscious indifference). Further, they illustrate that, where the plaintiff is not injured and the trial is not delayed, a slight excuse for the original failure to answer will suffice to comply with the rule 320 requirements.

## V. SHOWING OF GOOD CAUSE IN PRESENT CASE

[4] We turn to the facts of the case at bar.[1] As related above, defense counsel's

---

1. Plaintiff asserts that the record is incomplete for lack of a statement of facts pertaining to the hearing on the motion to set aside. However, there is no suggestion that any evidence was presented at that hearing. Defendant filed the affidavit upon which it relied as an exhibit to its motion. A copy of the handwritten answers were also attached.

Where there is no evidence to be presented at a simple motion hearing, it is a widespread practice to dispense with the presence of a re-

porter and the making of a record. In the absence of any other showing, we will assume that this hearing followed the common course for hearings of this nature. In the absence of any showing to the contrary, we assume that the trial court only heard argument at the motion hearing. We will base our decision solely upon the papers filed with the trial court as they appear in the transcript. It is unnecessary to include argument in a statement of facts. *See Barnes v. Whittington,* 751 S.W.2d 493, 495 (Tex.

affidavit set forth a number of factual statements. In our view, the most important statements are that he was never contacted by plaintiff's counsel about the tardiness of his answers and, upon discovering the missed deadline, defense counsel immediately contacted plaintiff's attorney and notified him that the responses would be filed late. Counsel's affidavit stated that defendant disputed most of the issues that were deemed admitted, including the core issue of whether plaintiff had ever sustained an injury compensable under the worker's compensation laws. Counsel further alleged that defendant would suffer "great hardship" if the motion to set aside and to extend time were denied. In addition, to reduce any possible prejudice to plaintiff, defendant offered to pay plaintiff's reasonable attorney's fees incurred in responding to defendant's motions.

Defendant's motion to set aside and to extend time also included factual and legal arguments supporting its "good cause" showing under rule 169. Defendant's counsel pointed out that plaintiff had almost a month before trial to conduct additional discovery to prove the matters previously admitted. We reiterate that plaintiff had known since early July, when defendant filed its original answer, that defendant contested almost all material issues in the case.

## VI. CONCLUSION

Based on the testimony of counsel in his affidavit and the additional evidence in the record, we conclude that defense counsel made a sufficient showing of "good cause" under rule 169 to warrant withdrawal of the deemed admissions. Although the responses were approximately fifty-five days late, counsel was diligent in filing the answers immediately after the missed deadline came to his attention. He was also diligent in pursuing the motion to set aside and to extend time to file answers. Plaintiff never sought responses to its discovery requests during this time, and plaintiff's

counsel never objected to those failures nor filed motions to compel or motions for sanctions to rectify the alleged discovery abuses.

Regarding the prejudice requirement of the rule, plaintiff has made no specific suggestion as to how he might be prejudiced by the withdrawal of the deemed admissions. To the contrary, defendant proved a considerable lack of prejudice. It is hard to find prejudice where the parties had almost a month before the trial in which they could conduct additional discovery about the injury and other disputed fact issues. Moreover, as we have stressed, plaintiff knew that defendant contested the very "injury" upon which plaintiff's Industrial Accident Board award was based. Plaintiff cannot now claim prejudice by its "reliance" on the deemed admissions when he knew that defendant disputed almost every issue in the lawsuit.

The presentation of the merits will be served by withdrawal of the deemed admissions. Plaintiff will be required to prove such disputed matters as his injury, the producing cause of the injury, and the extent of his incapacity. As the purpose of rule 169 is to remove *uncontested* issues from the trial, we conclude that the factual matters disputed by the parties must be resolved at trial.

We have concluded that the facts of this case do not merit the ultimate sanction of deeming all facts in the case admitted against defendant. We hold that the trial court abused its discretion in failing to grant defendant's motion to set aside and to extend time to file answers. We therefore sustain defendant's first point of error.

## VII. GRANTING OF SUMMARY JUDGMENT

[5] Defendant asserts in his second point of error that, because the court erred in refusing to withdraw the deemed admis-

---

1988); Tex.Gov't. Code Ann. § 52.046(a)(2) (Vernon 1988). *Cf. Houston Lighting & Power Co. v. Klein Independent School Dist.,* 739 S.W.2d 508, 520 (Tex.App.—Houston [14th Dist.] 1987, writ

denied) (court held that missing portions of the statement of facts were not critical to appellate review).

sions, the court erroneously relied upon them in granting summary judgment to plaintiff. In view of our holding under point one, we agree. The movant for summary judgment has the burden to show that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *Nixon v. Mr. Property Management,* 690 S.W.2d 546, 548–49 (Tex. 1985). With the deemed admissions thus withdrawn, we hold that a number of fact issues exist and that plaintiff failed to establish defendant's liability as a matter of law. The trial court, therefore, improvidently granted summary judgment; we sustain defendant's second point of error.

Plaintiff's cross-point is left without support by our ruling on defendant's points. We reverse the summary judgment and remand this cause for proceedings consistent with this opinion.



---

**Floyd D. ARRINGTON, Appellant,**

v.

**COUNTY OF DALLAS and Constable Jack Richardson, Appellees.**

No. 05–89–00245–CV.

Court of Appeals of Texas, Dallas.

March 29, 1990.

Rehearing Denied May 8, 1990.

Terminated deputy constable brought declaratory judgment action maintaining that deputy constables are subject to civil service rules and thus are entitled to posttermination hearings. The 116th District Court, Dallas County, Frank Andrews, J., granted summary judgment in favor of county, and appeal was taken. The Court of Appeals, Ovard, J., held that: (1) deputy constables were excluded from class of defined employees subject to rules, and (2)

doctrine of estoppel could not be applied against county.

Affirmed.

**1. Officers and Public Employees ⊕69.4**

Deputy constables are excluded from class of defined employees subject to county civil service rules; authority of deputy constables, in performing governmental functions, may be exercised in their own right and by use of their discretion. V.T. C.A., Local Government Code § 158.031 et seq.

**2. Estoppel ⊕62.3**

County was not estopped from denying that deputy constable was employee subject to rules which provide for posttermination hearings despite fact that deputy claimed that county provided deputies with copies of rules, distributed memorandum to deputies informing them of changes made in area of discipline under rules and that termination form which deputy signed provided he had right to appeal his dismissal and obtain hearing; estoppel could not be asserted against governmental unit.

**3. Estoppel ⊕52(1)**

"Quasi-estoppel" differs from equitable estoppel or estoppel in pais in that "quasi-estoppel" requires no concealment or misrepresentation of existing facts on one side, and no ignorance or reliance on other.

See publication Words and Phrases for other judicial constructions and definitions.

**4. Estoppel ⊕62.3**

Doctrine of quasi-estoppel could not be applied against county to prevent county from denying deputy constable employee status and associated right to posttermination hearing; no evidence was presented that deputy's decision to accept position was based in any part on right to have posttermination hearing before grievance committee in event he was terminated.

---

Albert B. Greco, Jr., Chet L. Wheless, Jr., Dallas, for appellant.

439 S.W.3d 422
Court of Appeals of Texas,
Houston (1st Dist.).

In re PROGRESSIVE COUNTY MUTUAL
INSURANCE COMPANY, Relator.

No. 01–14–00199–CV. | June 12, 2014.

**Synopsis**

**Background:** Insured brought action against uninsured motorist (UM) carrier to recover for breach of contract, breach of the duty of good faith and fair dealing, and statutory violations. The 215th District Court, Harris County, Elaine H. Palmer, J., denied carrier's motion to sever and abate extra-contractual claims. Carrier petitioned for writ of mandamus.

**[Holding:]** The Court of Appeals, Harvey Brown, J., held that severance of extra-contractual claims from breach of contract claim was required.

Writ conditionally granted.

**Attorneys and Law Firms**

**\*424** Mark R. Lapidus, Megan L. Knudsen, Lapidus Knudsen, PC, Houston, TX, for Relator.

Timothy R. Hightower, Alexandra Muthcler, Houston, TX, for Real Party in Interest.

Panel consists of Justices KEYES, BLAND and BROWN.

**OPINION**

HARVEY BROWN, Justice.

Relator, Progressive County Mutual Insurance Company seeks a writ of mandamus compelling the trial court to (1) vacate its order denying Progressive's motion to sever extra-contractual claims asserted against it and (2) enter an order abating those extra-contractual claims until the breach-of-contract claim brought by Alma Guia, the real party in interest, has been resolved. We conditionally grant the writ.

**Background**

Following an automobile collision with an uninsured motorist's vehicle, Guia sued her insurer, Progressive. [1] While investigation into the claim was ongoing, Guia sued Progressive for breach of the uninsured motorist provisions in her policy, violations of Chapter 542 of the Texas Insurance Code, violations of the Deceptive Trade Practices–Consumer Protection Act, and breach of the duty of good faith and fair dealing. Guia served Progressive with a number of discovery requests, some of which would not be relevant to the breach-of-contract claim. Progressive filed a motion to sever the breach of contract claim for uninsured motorist coverage from the extra-contractual claims. The trial court judge signed an order abating the motion to sever, allowing discovery to move forward on all claims, and deferring the other issues covered by the motion until the pretrial hearing. Progressive filed a writ seeking to compel severance and abatement.

**Standard of Review**

**[1]** **[2]** **[3]** **[4]** We may issue a writ of mandamus to correct a trial court's clear abuse of discretion or violation of duty imposed by law when no adequate remedy by appeal exists. *See Walker v. Packer,* 827 S.W.2d 833, 839 (Tex.1992) (orig. proceeding). A clear abuse of discretion occurs when the trial court's decision is so arbitrary and unreasonable that it amounts to clear error. *See id.* (quoting *Johnson v. Fourth Court of Appeals,* 700 S.W.2d 916, 917 (Tex.1985)). Because a trial court has no discretion in determining what the law is, the trial court abuses its discretion if it clearly fails to analyze or apply the law correctly. *See id.* at 840. "In determining whether appeal is an adequate remedy, [we] consider whether the benefits outweigh the detriments of mandamus review." *In re BP Prods. N. Am., Inc.,* 244 S.W.3d 840, 845 (Tex.2008) (orig. proceeding).

**[5]** **[6]** The trial court has "broad" discretion in the severance of causes of action. *Morgan v. Compugraphic Corp.,* 675 S.W.2d 729, 734 (Tex.1984); *Black v. Smith,* 956 S.W.2d 72, 75 (Tex.App.-Houston [14th Dist.] 1997, orig. proceeding). However, that discretion is not unlimited. *See U.S. Fire Ins. Co. v. Millard,* 847 S.W.2d 668, 671 (Tex.App.-Houston [1st Dist.] 1993, orig. proceeding). The trial court has a duty to order severance when **\*425** "all of the facts and circumstances of the case unquestionably require a separate

trial to prevent manifest injustice, and there is no fact or circumstance supporting or tending to support a contrary conclusion, and the legal rights of the parties will not be prejudiced thereby." *Womack v. Berry,* 156 Tex. 44, 291 S.W.2d 677, 682–83 (Tex.1956) (orig. proceeding).

## Severance of Contractual and Extra–Contractual Claims

 **[7]**    Texas Rule of Civil Procedure 41 governs severance of claims. *See* TEX.R. CIV. P. 41. The rule provides, in part, that "[a]ctions which have been improperly joined may be severed ... on such terms as are just. Any claim against a party may be severed and proceeded with separately." *Id.* The predominant reasons for a severance are to do justice, avoid prejudice, and promote convenience. *F.F.P. Op. Partners, L.P. v. Duenez,* 237 S.W.3d 680, 693 (Tex.2007). Claims are properly severable if: (1) the controversy involves more than one cause of action; (2) the severed claim is one that would be the proper subject of a lawsuit if independently asserted; and (3) the severed claim is not so interwoven with the remaining action that it involves the same facts and issues. *Guar. Fed. Sav. Bank v. Horseshoe Operating Co.,* 793 S.W.2d 652, 658 (Tex.1990). Only the third element is in dispute here.

In *Liberty National Fire Insurance Co. v. Akin,* the Texas Supreme Court considered whether severance was required in a case involving breach of contract and extra-contractual claims against an insurer under a homeowner's policy. 927 S.W.2d 627 (Tex.1996). In refusing to grant mandamus relief, the Court rejected "an inflexible rule that would deny the trial court all discretion and ... require severance in every case [involving bad-faith insurance claims], regardless of the likelihood of prejudice." *Id.* at 630. Ultimately, the Court concluded that the contractual and extra-contractual claims in that case were interwoven, with most evidence admissible on both claims, and that any prejudicial effect could be ameliorated by appropriate limiting instructions. *See id.* The Court went on to

> Several Texas appellate courts have found severance may nevertheless be necessary in some bad faith cases. A trial court will undoubtedly confront instances in which evidence admissible only on the bad faith claim would prejudice the insurer to such an extent that a fair trial on the contract claim would become unlikely. One example would be when the insurer has made a settlement offer on the disputed contract claim. As we have noted, some courts have concluded that the insurer would be unfairly prejudiced by having to defend the contract claim at the same time and before the same jury that would consider evidence that the insurer had offered to settle the entire dispute. While we concur with these decisions, we hasten to add that evidence of this sort simply does not exist in this case. In the absence of a settlement offer on the entire contract claim, or other compelling circumstances, severance is not required.

*Id.* (internal citations omitted); *see also In re Miller,* 202 S.W.3d 922, 925–26 (Tex.App.-Tyler 2006, orig. proceeding [mand. denied] ); *In re Trinity Universal Ins. Co.,* 64 S.W.3d 463, 468 (Tex.App.-Amarillo 2001, orig. proceeding [mand. denied] ). Thus, in *Liberty National,* the Court opined a settlement offer by an insurer may create a situation where severance of an insured's contract claim is required. 927 S.W.2d at 630 (Tex.1996).

There is no evidence in the record that Progressive made a settlement offer to **\*426** Guia. However, *Liberty National* does not limit severance to cases where such an offer has been made, instead holding that "other compelling circumstances" may also require severance. *Id.* In the case before us, Progressive argues that "other compelling circumstances" should include the effort and cost associated with conducting discovery on extra-contractual claims that have not yet accrued because the insured's breach-of-contract claim has not yet been decided.

Several courts of appeals have considered the issues of severance and abatement in the context of uninsured motorist or underinsured motorist insurance coverage; these courts have concluded that, when uninsured motorist claims are involved, severance of the extra-contractual claims was required. *See In re Am. Nat'l Cnty. Mut. Ins. Co.,* 384 S.W.3d 429 (Tex.App.-Austin 2012, orig. proceeding) (concluding trial court abused discretion by denying insurer's motion for severance and abatement of extra-contractual claims where settlement offer was made on underinsured motorist claim); *In re Reynolds,* 369 S.W.3d 638, 650–55 (Tex.App.-Tyler

2012, orig. proceeding) (holding severance of underinsured motorist claim was required to prevent prejudice); *In re United Fire Lloyds,* 327 S.W.3d 250, 257 (Tex.App.-San Antonio 2010, orig. proceeding) (finding abuse of discretion in granting motion for bifurcation of trial rather than severance and abatement of extra-contractual claims); *see also In re Old Am. Cnty. Mut. Fire Ins. Co.,* No. 13–12–00700–CV, 2013 WL 398866 (Tex.App.-Corpus Christi January 30, 2013, orig. proceeding) (mem. op.) (holding that severance and abatement of extra-contractual claims is required in many instances when insured asserts claim to uninsured or underinsured motorist benefits); *In re Farmers Tex. Cnty. Mut. Ins. Co.,* No. 07–11–00396–CV, 2011 WL 4916303, (Tex.App.-Amarillo Oct. 17, 2011, orig. proceeding) (mem. op.) (denying mandamus because complaint was not preserved, but agreeing that abatement of extra-contractual claims is required in most instances when an insured asserts claim to uninsured motorist benefits).

The San Antonio Court of Appeals explained its determination that mandamus relief was proper to compel severance and abatement of an underinsured motorist claim from related bad faith claims as follows:

> [The insurer] is under no contractual duty to pay [underinsured motorist] benefits until [the insured] establishes the liability and underinsured status of the other motorist. Therefore, [the insurer] should not be required to put forth the effort and expense of conducting discovery, preparing for a trial, and conducting voir dire on bad faith claims that could be rendered moot by the portion of the trial relating to [underinsured motorist] benefits. To require such would not do justice, avoid prejudice, and further convenience. Under these circumstances, we conclude the trial court abused its discretion in bifurcating the case instead of severing and abating the [underinsured motorist] claim from the bad faith claims.

*In re United Fire Lloyds,* 327 S.W.3d at 256. [2]

**\*427** **[8]** In this case, to prevail on her extra-contractual claims against Progressive, Guia must demonstrate that

Progressive was contractually obligated to pay her uninsured motorist claim. To do this, Guia must first prove that she had uninsured motorist coverage, that the other driver negligently caused the accident and was uninsured, and the amount of her damages. *See In re Reynolds,* 369 S.W.3d at 652. It appears that the first issue is not in dispute. Therefore, Guia's breach-of-contract claim will essentially involve the issues in a typical car wreck: the comparative negligence of Guia and the other driver and Guia's damages. The bad faith claim here is more complicated. In her most recent petition, she alleges that Progressive breached their duty of good faith and fair dealing, violated the insurance code by failing to timely pay the claim, and further alleges Progressive's conduct was knowing and intentional in violation of the Deceptive Trade Practices Act. In discovery, Guia seeks production of all documents related to lawsuits and claims against Progressive regarding the denial of uninsured/underinsured motorist claims for over ten years. Examples of these requests include:

> Request 3. Produce all documents of any type as to claims asserted against Progressive during period from January 1, 2001, up to and including present day as a result of nonpayment of uninsured/underinsured motorist claims in Texas regardless of whether a lawsuit was filed and/or liability was denied.

> Request 4. Produce all documents of any type as to all lawsuits filed against Progressive during period from January 1, 2001, up to and including present day, as a result of nonpayment of uninsured/underinsured motorist claims in Texas regardless of whether liability was denied.

> ...

> Request 16. A copy of each and every policy, manual, protocol, instruction booklet or similar writing concerning procedures for the investigation and handling of uninsured/ underinsured motorist claim which was in effect at the time Plaintiff made her claims in this case, and for the seven years preceding Progressive's denial of Plaintiff's claim.

These requested documents are irrelevant to the breach-of-contract claim, and the introduction of Progressive's claims handling history in unrelated accidents at the trial of Guia's breach-of-contract claim would be manifestly unjust. *See Womack v. Berry,* 291 S.W.2d at 682–83 (Tex.1956) (orig. proceeding).

The trial court's abatement of any decision on severance until the eve of trial requires the parties to engage in discovery on the extra-contractual claims and prepare for a trial on

these claims, even though extra-contractual liability could only accrue if Progressive is found liable on the contract. *See In re United Fire Lloyds,* 327 S.W.3d at 256. Accordingly, the trial court's decision to postpone severance, unless writ is granted, will require Progressive to expend resources answering discovery that is far broader than the car accident claim that must be resolved.

Consistent with *In re Reynolds* and *In re United Fire Lloyds,* we conclude that severance of insured's extra-contractual claims is required in this instance to avoid prejudice.

### Adequate Remedy by Appeal

 **[9]**    A writ of mandamus will issue only if there is no adequate remedy available by direct appeal. *See*  **\*428** *Walker,* 827 S.W.2d at 839. The Corpus Christi Court of Appeals in *In re United Fire Lloyds* concluded the insurer did not have an adequate remedy by appeal because, if a writ of mandamus were not granted, the insurer stood to lose substantial rights by being required to prepare for claims that might be rendered moot and never even accrue. *In re Fire Lloyds,* 327 S.W.3d at 256 (citing *U.S. Fire Ins. Co.,* 847 S.W.2d at 675; *In re Trinity Universal Ins. Co.,* 64 S.W.3d at 468).

The Corpus Christi Court of Appeals agreed. *See In re Old Am. Cnty. Mut. Fire Ins. Co.,* 2013 WL 398866. Likewise, other appellate courts have also found these claims do not have an adequate remedy by appeal. *See In re Am. Nat'l Cnty. Mut. Ins. Co.,* 384 S.W.3d 429, 439; *In re Reynolds,* 369 S.W.3d at 658; *In re United Fire Lloyds,* 327 S.W.3d at 256.

### Conclusion

Based on our review of the record, we conclude that Guia's extra-contractual claims against Progressive are severable, the facts and circumstances of the case require a severance to prevent manifest injustice, and the legal rights of the parties will not be prejudiced thereby. *See Womack,* 291 S.W.2d at 683. The trial court, therefore, abused its discretion in refusing to sever and abate the uninsured motorist claims from the bad faith claims pending the determination of Progressive's liability for the uninsured motorist damages under the policy. *See In re Am. Nat'l Cnty. Mut. Ins. Co.,* 384 S.W.3d 429; *In re Reynolds,* 369 S.W.3d at 650–55; *In re United Fire Lloyds,* 327 S.W.3d at 257; *see also In re Old Am. Cnty. Mut. Fire Ins. Co.,* 2013 WL 398866; *In re Farmers Tex. Cnty. Mut. Ins. Co.,* 2011 WL 4916303.

We conditionally grant Progressive's writ of mandamus and order the trial court to vacate the February 11, 2014 Order, grant Progressive County Mutual Insurance Company's Motion to Sever, and abate the extra-contractual claims. We are confident that the trial court will promptly comply, and our writ will issue only if it does not.

### Footnotes

1    The underlying case is *Alma Guia v. Jessica Nicole Estes, Relinda Estes, Progressive Insurance Company and Progressive County Mutual Insurance Company;* No. 2012–57535, in the 215th District Court of Harris County, Texas, the Honorable Elaine H. Palmer presiding.

2    The court relied on the Texas Supreme Court's reasoning in *Brainard v. Trinity Universal Insurance Co.,* 216 S.W.3d 809 (Tex.2006), but acknowledged that *Brainard* concerned timing of presentment of contract claim to determine whether party was entitled to attorney's fees under Chapter 38 of Texas Civil Practice and Remedies Code, rather than severance and abatement in the context of uninsured motorist claim. *See In re United Fire Lloyds,* 327 S.W.3d 250, 257 (Tex.App.-San Antonio 2010, orig. proceeding) (discussing *Brainard,* 216 S.W.3d at 818).

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

court had jurisdiction over appellants' claims in the tort suit, the trial court nevertheless abused its discretion by consolidating the two cases at the conclusion of trial because it deprived appellants of the opportunity to present evidence or argument in support of their claims.

**[3, 4]** As a threshold issue, we must decide whether appellants have preserved their complaint for appellate review. *See In re M.S.,* 115 S.W.3d 534, 547 (Tex.2003) (noting "error preservation in the trial court [ ] is a threshold to appellate review"). "To preserve a complaint for appellate review, a party generally must present it to the trial court by timely request, motion, or objection, stating the specific grounds, and obtain a ruling." *Shaw v. Cnty. of Dallas,* 251 S.W.3d 165, 174 (Tex.App.-Dallas 2008, pet. denied) (citing Tex.R.App. P. 33.1(a)). In addition, "a party's argument on appeal must comport with its argument in the trial court." *Knapp v. Wilson N. Jones Mem'l Hosp.,* 281 S.W.3d 163, 170 (Tex.App.-Dallas 2009, no pet.).

At the conclusion of trial, when the trial court announced its decision to grant the motion to consolidate the tort lawsuit, Tate stated, "But I'm the—I'm the plaintiff in that cause." She also stated, "I'd like my objection noted for the record, Your Honor." Appellants did not argue, either before or after the trial court granted the motion to consolidate, that the consolidation deprived them of the opportunity to present evidence or argument in support of their claims. As a result, we conclude that appellants' second issue was not preserved for appellate review. *See, e.g., id.* at 171 ("We conclude [appellant] failed to preserve the issue for appellate review because his issue on appeal does not comport with his objections made at trial."). We resolve appellants' second issue against them.

## CONCLUSION

We resolve appellants' two issues against them and affirm the trial court's judgment.



**Rafael GASPAR, Arturo Gaspar, Javier Rodriguez, Guillermo Gaspar, Antonio Gaspar, and Carmen Gaspar, Appellants**

**v.**

**LAWNPRO, INC. and Kirk E. Henton, Appellees.**

**No. 05–11–00861–CV.**

Court of Appeals of Texas, Dallas.

July 25, 2012.

**Background:** Employees brought breach of contract action against employers seeking unpaid wages. The County Court at Law, No. 1, Collin County, Corinne Mason, J., granted employers' no-evidence motion for summary judgment. Employees appealed.

**Holdings:** The Court of Appeals, Bridges, J., held that:

(1) employers waived hearsay objection to employees' affidavits, and

(2) genuine issue of material fact existed as to whether employees had a formalized working relationship with employers.

Reversed and remanded.

**1. Evidence ☞314(1)**

Evidence that contains hearsay is defective as to form; that is, it is competent, but inadmissible.

**2. Trial ☞31**

A defect in form must be raised in the trial court, the opposing party must be given an opportunity to amend, and the trial court must rule upon the objection or the objection is waived.

**3. Judgment ☞189**

Although the rules of civil procedure do not prescribe a period of time in which a trial court is required to rule on summary judgment objections, the better practice is for the court to rule on any objections at or before the time it signs an order granting or denying summary judgment.

**4. Appeal and Error ☞242(4)**

Employers waived hearsay objection to employees' summary judgment affidavits in employees' action to recover allegedly unpaid wages, even though employers obtained favorable ruling on their no-evidence summary judgment motion, where employers never sought a ruling on their hearsay objections, and trial court never issued a ruling on those objections.

**5. Contracts ☞315**

A breach of contract occurs when a party fails to perform an act it has explicitly or impliedly promised to perform.

**6. Contracts ☞326**

The elements of a breach of contract claim are (1) the existence of a valid contract between plaintiff and defendant; (2) the plaintiff's performance or tender of performance; (3) the defendant's breach of the contract; and (4) the plaintiff's damage as a result of the breach.

**7. Contracts ☞168**

Terms of a contract are implied when they are necessarily involved in the contractual relationship such that the parties must have intended to include them, but failed due to inadvertence or because they were too obvious to need expression.

**8. Judgment ☞185.3(13)**

Genuine issue of material fact raised by employees' summary judgment affidavits as to whether employees had a working relationship with employers formalized by checks, pay statements, and a work contract precluded summary judgment in employees' breach of contract action to recover unpaid wages. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(i).

———————

Winston Ndubueze Udeh, Law Office of Winston Udeh & Assoc., Dallas, TX, for Appellant.

Jeremy F. Rosenthal, Rosenthal & Wadas, PLLC, for Appellee.

Before Justices BRIDGES, FITZGERALD, and LANG.

## OPINION

Opinion By Justice BRIDGES.

Rafael Gaspar, Arturo Gaspar, Javier Rodriguez, Guillermo Gaspar, Antonio Gaspar, and Carmen Gaspar appeal the trial court's no-evidence summary judgment in favor of Lawnpro, Inc., and Kirk E. Henton. In two issues, appellants argue the affidavits they presented in response to appellees' no-evidence motion for summary judgment were sufficient to defeat the motion, and the trial court erred in granting appellees' no-evidence motion for summary judgment. We reverse the

trial court's judgment and remand for further proceedings.

In June 2010, appellants filed suit alleging they all worked for appellees during June 2009 doing lawn maintenance and construction work. The petition alleged appellees issued checks for compensation for the work performed, but the bank refused the checks for insufficient funds. Appellants complained, and appellees promised to make the checks good. However, for a period of two months appellees continued to pay appellants with worthless checks. Appellants asserted claims for breach of contract, fraud, conversion, punitive damages, and attorney's fees. Appellees filed an answer and a no-evidence motion for summary judgment asserting "There is no evidence of one or more of the following elements of" each of appellants' claims. The motion did not refer to the facts alleged in appellants' petition or specify in what way the evidence entirely failed to support appellants' claims. Instead, the motion merely broke appellants' causes of action for breach of contract, fraud, conversion, punitive damages, and attorney's fees into elements and asserted no evidence existed "as to one or more of the aforementioned elements."

Appellants filed a response to appellees' motion and attached an appendix containing affidavits from each appellant stating each appellant was employed by appellees for certain specified months, all of the checks appellees gave them were denied for insufficient funds for a total of a specified dollar amount, and appellee "took the checks and promised to give me cash but never did." The appendix also contained statements from Lawnpro stamped "SUB–CONTRACT/SEASONAL LABOR" and indicating hours worked, pay rate, current payments, pay periods, pay dates, and year-to-date amounts paid to some appellants. Appellees filed an amended no-evi-

dence motion for summary judgment virtually identical to the first motion. Again, appellees did not mention the factual assertions made by appellants and did not raise any specific challenge to the evidence supporting appellants' claims. In a separate pleading entitled "Defendants' Reply and Objections to Plaintiffs' Summary Judgment Evidence," appellees argued the affidavits filed by appellants were hearsay. However, it does not appear appellees obtained a ruling on their objections. The trial court granted appellees motion, and this appeal followed.

Appellants raise two issues, which they argue together, asserting their affidavits were sufficient to defeat appellees' motion for no-evidence summary judgment, and the trial court therefore erred in granting appellees' motion. Appellees did not file a brief in response. A no-evidence summary judgment motion under rule 166a(i) is essentially a motion for a pretrial directed verdict; it requires the nonmoving party to present evidence raising a genuine issue of material fact supporting each element contested in the motion. Tex.R. Civ. P. 166a(i); *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex.2009). When reviewing a no-evidence summary judgment, we review the evidence presented by the motion and response in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *Timpte Indus.*, 286 S.W.3d at 310.

**[1–4]** We note appellees raised a hearsay objection to appellant's affidavits in the trial court. Evidence that contains hearsay is defective as to form; that is, it is competent, but inadmissible. *S & I Mgmt., Inc. v. Choi*, 331 S.W.3d 849, 855 (Tex.App.-Dallas 2011, no pet.). A defect

in form must be raised in the trial court, the opposing party must be given an opportunity to amend, and the trial court must rule upon the objection or the objection is waived. *Id.* Although the rules of civil procedure do not prescribe a period of time in which a trial court is required to rule on summary judgment objections, the "better practice" is for the court to rule on any objections at or before the time it signs an order granting or denying summary judgment. *Stewart v. Sanmina Tex., L.P.,* 156 S.W.3d 198, 207 (Tex.App.-Dallas 2005, no pet.).

**[5–8]** Here, the trial court did not rule on appellees' objections to appellants' affidavits, and those objections are therefore waived. *Choi,* 331 S.W.3d at 855. Appellants raised a breach of contract claim against appellees. A breach of contract occurs when a party fails to perform an act it has explicitly or impliedly promised to perform. *Esty v. Beal Bank S.S.B.,* 298 S.W.3d 280, 299 (Tex.App.-Dallas 2009, no pet.). The elements of a breach of contract claim are (1) the existence of a valid contract between plaintiff and defendant; (2) the plaintiff's performance or tender of performance; (3) the defendant's breach of the contract; and (4) the plaintiff's damage as a result of the breach. *Id.* Terms of a contract are implied when they are necessarily involved in the contractual relationship such that the parties must have intended to include them, but failed due to inadvertence or because they were too obvious to need expression. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding,* 289 S.W.3d 844, 850 (Tex. 2009). Appellant's affidavits, together with copies of checks and pay statements from Lawnpro, raised a fact issue as to the elements of their claims against appellees. *See Timpte Indus.,* 286 S.W.3d at 310. The affidavits and supporting documents indicate the parties had a working relationship formalized by checks and pay statements, and appellees breached that agreement, damaging appellants. The evidence indicates appellees made representations that they would pay appellants but instead issued additional worthless checks and failed to pay cash. We conclude appellants' evidence was sufficient to defeat appellees' no-evidence motion for summary judgment, and the trial court therefore erred in granting appellees' motion. We sustain appellants' issues.

We reverse the trial court's judgment and remand for further proceedings.



attorney that he was going to do so" is not admissible in evidence and could not form the basis of a finding that an agreement was made by the attorney for the insurance company that he would dismiss the case. An affidavit based upon conclusions and matters that are not admissible in evidence are insufficient to overrule a motion for summary judgment. Westfall v. Lorenzo Gin Company, Tex.Civ.App., 287 S.W.2d 551; Sparkman v. McWhirter, Tex.Civ.App., 263 S.W.2d 832 (Writ Ref.). It is the settled law of this state that when the court, upon consideration of the affidavits and other proof offered, determines that there are no disputed facts a summary judgment should be granted. Clark v. Barr, Tex.Civ.App., 239 S.W.2d 114; Fonville v. Southern Materials Co., Tex.Civ. App., 239 S.W.2d 885; Drake v. First Nat. Bank, Mercedes, Tex.Civ.App., 254 S.W.2d 230. We have considered all points of error presented by appellant and find no merit in any of them.

The judgment of the trial court is affirmed.



F. F. GORE et al., Appellants,

v.

Mary J. CUNNINGHAM et al., Appellees.

No. 5083.

Court of Civil Appeals of Texas.

Beaumont.

Nov. 28, 1956.

Rehearing Denied Dec. 26, 1956.

Suit in trespass to try title involving claim of descendants of wife whose husband had purportedly conveyed entire interest after wife's death without joining them. The District Court, Hardin County, P. C. Matthews, J., granted motion to with-

draw case from jury and rendered judgment against plaintiffs. Plaintiffs appealed. The Court of Civil Appeals, R. L. Murray, C. J., held that in view of fact that deed under which defendants claimed and went into possession of land did not connect them with the sovereign of the soil, evidence was sufficient for jury on question of applicability of statutes of limitation.

Judgment affirmed in part and reversed in part and cause remanded for new trial.

1. Discovery ⟐123

Purpose of rule providing that party may make written request of other parties to law suit for admission of genuineness of documents or of truth of matters of fact, is to eliminate in advance of trial fact issues which would not be in dispute; rule does not contemplate or authorize admissions to questions involving points of law. Rules of Civil Procedure, rule 169.

2. Discovery ⟐123

Request for admission in trespass to try title suit that land in controversy in Nelson League was same land described in deed which described tract of land in Brooks League did not involve question of fact not in dispute, and could not be subject to admission under rule relating to admissions of non-disputed matters of fact before trial. Rules of Civil Procedure, rule 169.

3. Discovery ⟐128

A reviewing court is not bound by admissions of parties of purported matters of fact when record before court shows that such admissions were not truthful, but that opposite of admissions was true. Rules of Civil Procedure, rule 169.

4. Discovery ⟐128

Where request to admit and admission that person had record title to land in controversy involved question of law more than matter of fact, admission did not con-

stitute proof, under rule relating to admissions of matters of fact before trial. Rules of Civil Procedure, rule 169.

**5. Deeds ⊕114(1)**

Instruments and deed, which described land in Brooks League, and which did not in fact describe or mention land in Nelson League, did not convey land in Nelson League.

**6. Deeds ⊕8**

Where grantor had conveyed land in Nelson League, which he had occupied under deed which described land in Brooks League, purported deed of land in Nelson League was not sufficient to convey record title to such land in Nelson League.

**7. Appeal and Error ⊕837(1)**

In view of fact that appellants had dismissed appeal as to certain appellees, matters affecting these appellees as set out in certain paragraphs in motion to withdraw case from jury and render judgment in favor of appellees, defendants in trial court, could not be considered in support of action of trial court as it affected remaining appellees.

**8. Vendor and Purchaser ⊕229(1)**

Where at time father executed deed of land to uncle, uncle was living at home of descendants of mother, and of father, and uncle knew of fact of death of mother, uncle was charged with notice of descendant's claim of equitable title to half of land by inheritance from mother.

**9. Tenancy in Common ⊕43**

Uncle, to whom father purported to deed entire interest in land after death of mother without joining descendants of mother who held equitable title to one-half interest, became co-tenant, with descendants, of land.

**10. Tenancy in Common ⊕14**

That uncle, to whom father had purported to deed entire interest in land after death of mother without joining descendants of mother who held equitable title to one-half interest, had filed deed for record was not necessarily repudiation of co-tenancy, with descendants, which deed created, where deed described land in league other than league in which he occupied land under deed.

**11. Tenancy in Common ⊕15(10)**

In suit in trespass to try title involving claim of descendants of wife whose husband had purportedly conveyed entire interest in land after wife's death without joining them, evidence was sufficient for jury on question of adverse possession and of notice to plaintiffs.

**12. Limitation of Actions ⊕197(1)**

In suit in trespass to try title involving claim of descendants of wife whose husband had purportedly conveyed entire interest in land after wife's death without joining them, in view of fact that deed under which defendants claimed and went into possession did not connect them with sovereign of soil, evidence was sufficient for jury on question of applicability of statutes of limitation. Vernon's Ann.Civ.St. arts. 5507, 5509, 5510, 5519.

**13. Appeal and Error ⊕1173(1)**

Where appellants' suit in trespass to try title was only for one-half undivided interest in land, and remaining undivided half interest not recovered from other appellees would be sufficient to support judgment in favor of named appellees for their fractional royalty mineral interest, which emanated from other appellees' title, judgment for named appellees would be affirmed notwithstanding reversal of judgment for other appellees.

———◆———

Houston Thompson, Silsbee, Adams, Browne & Sample, Beaumont, Grover C. Lowe, Woodville, for appellant.

B. F. Whitworth, Jasper, W. H. Blades, Houston, A. M. Huffman, Beaumont, Bur-

ton Morris, Houston, A. L. Bevil, Kountze, for appellee.

R. L. MURRAY, Chief Justice.

This is an appeal from a judgment in a suit in trespass to try title in the district court of Hardin County.

Appellants F. F. Gore, et al., all the children and surviving heirs of W. J. Gore and his wife, Martha Jane Carraway Gore, brought the suit against appellees Mary J. Cunningham, surviving widow of R. E. Cunningham, and the surviving children of Mr. and Mrs. Cunningham, and Houston Oil Company of Texas, the American Republics Corporation, D. K. Cutshall, William Seale, and Mrs. Jewel Haralson, seeking to recover a one-half undivided interest in and to a 147 acre tract of land in the O. C. Nelson League in Hardin County. The petition contained a plea of ten years limitation title, in addition to the formal allegations in trespass to try title. The suit also was for one-half the value of the oil produced from said land.

The defendants answered with pleas of not guilty, general denial, 3-year, 5-year, 10-year, and 25-year statutes of limitation, Vernon's Ann.Civ.St. arts. 5507, 5509, 5510, 5519, bona fide purchaser, laches and stale demand, and Houston Oil Company of Texas and American Republics Corporation also pleaded improvements in good faith.

The trial was to a jury and at the conclusion of all the evidence in the trial court, the defendants moved for an instructed verdict and in the alternative that the court withdraw the case from the jury and render judgment for the defendants. The court granted the motion to withdraw the case from the jury and rendered judgment that the plaintiffs take nothing by their suit against the defendants. The plaintiffs in the trial court have duly perfected their appeal from such judgment.

The cause was submitted on briefs and oral argument of all parties, and thereafter

297 S.W.2d—19

on motion of the appellants the appeal was dismissed as to the appellees Houston Oil Company of Texas and the American Republics Corporation. The appellants here are children and grandchildren of W. J. Gore and his wife, Martha Jane Carraway Gore. The appellees Cunningham are the widow and children of R. E. (Bay) Cunningham, who died in 1939. The two oil companies, the appeal against which has been dismissed, were holders of an oil and gas lease on the land in suit from the Cunninghams. The appellees Cutshall, Haralson and Seale bought royalty interests from some of the Cunninghams.

By deed dated January 18, 1858, W. B. Frazier, Administrator of the Estate of David Brown, conveyed to Thomas J. Word both the O. C. Nelson League and the George W. Brooks League of land in Hardin County. Word conveyed by deed dated December 11, 1871, to W. N. Perryman 147 acres of land out of the G. W. Brooks League in Hardin County. The deed described the land by metes and bounds, as follows:

"Beginning on the North boundary line of said G. W. Brooks League, 225 varas from the Northwest corner of said League at a stake, whence a pine 18 in. dia. bears N. 75 deg. W. 4¾ vrs. a pine 20 in. dia. brs. S. 31 deg. 30′ E. 9¼ vrs;

"Thence East 1155 to a stake, whence a pine 10 in. dia. S. 60 deg. 30′ E. 4 vrs.;

"Thence South 720 varas to a stake;

"Thence West 1155 varas to a stake, whence a pine 30 in. dia. bears N. 70 deg. E. 4¾ varas a pine 18 inches dia brs. S. 67 deg. E. 7 varas;

"Thence North 720 varas to the place of beginning, containing one hundred forty seven acres of land, more or less, together with all and singular the rights, members, hereditaments and appurtenances to the same belonging or appertaining."

By deed dated August 13, 1872, Perryman conveyed to W. J. Gore "147 acres out of the G. W. Brooks League in Hardin

County" and such deed described the land conveyed by metes and bounds, using the same description with the same calls as that used in the Word to Perryman deed above. In 1871 W. J. Gore and his wife went into possession of the land in suit, which is in the O. C. Nelson League. W. J. Gore and his wife lived there for many years and Mrs. Gore died there in 1882, or 1883. Thereafter in 1884 W. J. Gore and his children moved off the land in the Nelson League to a home on the Rafferty League. Thereafter by deed dated May 5, 1896, W. J. Gore conveyed to Jesse Moss, who was an uncle of the appellants Gore, a tract of 147 acres of land out of the G. W. Brooks League. This deed used the same description as the two prior deeds mentioned. About six months after the date of the deed to Jesse Moss, Moss and his wife, Fronia Moss, went into possession of the land in controversy in the O. C. Nelson League. This deed to Moss was executed some 14 years after the death of Mrs. Gore. Thereafter Jesse Moss executed a deed to Delaney and McClelland and in such deed the land conveyed was described as a 147 acre tract of land in the Nelson League. This description placed the beginning corner of the tract 1225 varas from the Northwest corner of the Nelson League, but the calls for distances and corners were the same as the calls in the deed from Gore to Moss. This deed also contained the recitation, "This is the same land deeded to us by W. J. Gore on the 5th day of May, 1896." Thereafter McClelland, in 1915, and Delaney in 1919, conveyed to R. E. Cunningham "147 acres of land out of the Old C. Nelson League," and such deed of conveyance employed the same description as that in the deed from Jesse Moss and wife to McClelland and Delaney, describing land in the Nelson League. The appellees, Seale, Cutshall and Haralson own an undivided royalty interest in the land by virtue of conveyances executed by some of the Cunningham heirs. Gore and his wife and family resided on the land in suit, the land

in the Nelson League, and later tenants of R. E. Cunnningham resided on and cultivated portions of the land in controversy.

Appellants, in the course of the trial, introduced evidence to show that W. J. Gore and Mary Jane Carraway Gore were married in Hardin County in 1869, that Mrs. Gore died intestate either in April, 1882 or March, 1883, and that the appellants are the heirs, and successors in title and claim of heirs, of Mrs. Gore.

The appellants also introduced in evidence their requests for admissions of fact made upon the appellees, and appellees' answers to such requests for admissions. The requests Nos. 8, 9, 3, and 6, and the answers of the appellees thereto, and the legal effect of such requests and answers, form a large part of the controversy on this appeal.

By request No. 8, appellants requested appellees to admit that the land in controversy is the same tract of land as that described in the deed from Word to Perryman, dated December 11, 1871. The appellees admitted that the land in controversy is the same tract of land described in the Word to Perryman deed. The land described in the plaintiffs' petition, the land in suit, is 147 acres out of the O. C. Nelson League. The land described in the deed from Word to Perryman is described as 147 acres out of the G. W. Brooks League.

By request No. 9, the appellants requested the appellees to admit, and the appellees did admit, that Thomas J. Word had title to the land in controversy at the time of his deed to Perryman on December 11, 1871.

By request No. 3, the appellants asked the appellees to admit that the land in controversy is the same tract of land described in the deed from Perryman to Gore, dated August 13, 1872, and the appellees admitted that this was true. Again we note that the land in controversy is alleged to be 147 acres in the O. C. Nelson League and the

description of the land in the Perryman to Gore deed described 147 acres of land in the Brooks League.

By request No. 6, the appellants requested the appellees to admit, and the appellees did admit, that William H. Perryman had record title to the property described in the deed from Perryman to Gore, dated August 13, 1872.

From the instruments of title introduced in evidence, as set out above, and the requests for admissions and the admissions themselves, both appellants and appellees on appeal contend that they are shown to be the holders of the record title of the land in suit, the land in controversy, 147 acres out of the O. C. Nelson League in Hardin County. We are unable to agree with the contentions of either party in this regard.

[1–5] We will discuss first the effect of the requests and admissions to the effect that the 147 acres of land in the O. C. Nelson League is the same tract of land as that described in a deed which describes a tract of land in the G. W. Brooks League. Rule 169, Texas Rules of Civil Procedure, provides that a party may make written request of other parties to a lawsuit for the admission by such party of the genuineness of any relevant documents described and exhibited with the request, or of the truth of any relevant matters of fact set forth by the request. The courts of this State have not been called upon in many instances to construe the operation of this rule, but according to the distinguished author of McDonald's Civil Practice in Volume 3 of that work, Paragraph 10.06, it is made clear that the purpose of the rule is to eliminate in advance of the trial fact issues which would not be in dispute, and that the rule does not contemplate or authorize admissions to questions involving points of law. It is apparent that the above request for admission that the land in controversy in the Nelson League was the same land described in a deed which described a tract of land in the Brooks League

did not involve a question of fact not in dispute. Also, we do not believe that a reviewing court is bound by the admissions of the appellees of purported matters of fact when the record before it shows that such admissions are not truthful, but that the opposite of the admissions is true. Likewise, it is apparent that the request to admit and the admission that Perryman had record title to the land in controversy, involved a question of law more than a matter of fact. The admissions did not constitute proof as a matter of law that the land in the Nelson League is the same tract described in the Word to Perryman deed, describing a tract in the Brooks League. They did not constitute proof as a matter of law that the land in the Nelson League is the same tract described in the Perryman to Gore deed, which described a tract in the Brooks League. They did not make it proof as a matter of law that Perryman had record title to the property described in his deed to Gore and therefore had record title to the land in controversy in the Nelson League. These instruments and the deed from Gore to Moss did not convey the land in controversy, because they did not in fact describe or mention the land in the Nelson League. See: Davis v. George, 104 Tex. 106, 134 S.W. 326; Cleveland State Bank v. Gardner, Tex.Com.App., 286 S.W. 173; Strong v. Garrett, 148 Tex. 265, 224 S.W.2d 471.

[6] As we view the fact situation, the determination of this appeal must start from the beginning point that the ancestor of the appellants, W. J. Gore, went into possession of the land in controversy in the Nelson League when he had a deed to a tract of land in the Brooks League; that he went into possession of and occupied the land in the Nelson League for many years and probably acquired a valid limitation title to it; that when his wife died the appellants and those under whom they claim, acquired an equitable title to their mother's one-half of the community estate and thus an equitable title to one-half the

land in the Nelson League; that thereafter, some 14 years after the death of his wife, W. J. Gore attempted to convey the entire tract of land out of the Nelson League to Moss, but executed a deed to a tract of land out of the Brooks League; that the first deed to the land in the Nelson League in the chain of title of the appellees was the deed from Moss to Delaney and McClelland, which also stated that the land conveyed was the same land deeded to Moss by W. J. Gore, and this deed was not sufficient to convey record title to the land in the Nelson League to Delaney and McClelland, since Moss had no deed to the land in the Nelson League.

The motion of the appellees for judgment at the close of all the evidence sets out the following grounds in support of said motion:

"1

"The stipulations, requests for admissions, and the admissions made in answer and reply thereto, and the documentary and other evidence, show and establish, as a matter of law, that the legal title to the land in controversy vested in Wm. J. Gore on August 13, 1872, by virtue of a deed of such date from Wm. H. Perryman to Wm. J. Gore.

"2

"The evidence shows, as a matter of law, that Wm. J. Gore, by deed dated May 5, 1896, conveyed the land in controversy and the legal title thereto, to Jessie Moss.

"3

"The evidence, as a matter of law, establishes that Jessie Moss, joined by his wife, by deed dated August 6, 1913, conveyed the land in controversy and the legal title thereto, to L. B. McClelland and F. A. Delaney.

"4

"The evidence, as a matter of law, establishes that by deeds dated respectively, November 29, 1915, and January 31, 1919, L. B. McClelland and F. A. Delaney conveyed the land in controversy and the legal title thereto, to R. E. Cunningham.

"5

"The evidence, as a matter of law, establishes that the defendant, Mrs. Mary J. Cunningham, is the surviving wife of R. E. Cunningham, deceased, and the defendants, Thomas S. Cunningham, Jettie Briggs, whose husband is Richard Briggs, Jr., E. B. Cunningham, Thelma Sheffield, whose husband is E. L. Sheffield, M. M. Cunningham, Emma Cunningham, Mattie Lee Taylor, whose husband is C. W. Taylor, and Otelia Turner, whose husband is F. E. Turner, are all of the children and heirs at law of the said R. E. Cunningham, deceased.

"6

"The evidence, as a matter of law, establishes that Emma Cunningham is a Non Compos Mentis, and that M. M. Cunningham is the duly and legally appointed, acting and qualified guardian of the estate of the said Emma Cunningham.

"7

"The evidence, as a matter of law, establishes that by oil, gas and mineral leases dated respectively, June 22, 1948, and June 16, 1949, the defendant, American Republics Corporation, acquired the legal title to a seven/eighths (7/8ths) oil, gas and mineral leasehold estate in and to and covering the land in controversy, by leases from Mrs. Mary J. Cunningham, Jettie Briggs and husband, Richard Briggs, Jr., E. B. Cunningham, Thelma Sheffield and husband, E. L. Sheffield, Thomas S. Cunningham, M. M. Cunningham, Mattie Lee Taylor and husband, C. W. Taylor, Otelia Turner and husband, F. E. Turner, and M. M. Cunningham, Guardian of the Estate of Emma Cunningham, a Non Compos Mentis, and by virtue of such oil, gas and mineral leases, the legal title to seven-eighths (7/8ths) mineral leasehold estate in and to the land in controversy, vested in said defendant, American Republics Corporation.

"8

"The evidence establishes, as a matter of law, that by assignments dated December 20, 1948, and November 4, 1949, defendant, American Republics Corporation, assigned and conveyed to defendant, Houston Oil Company of Texas, an undivided one-half (½) interest in such seven/eighths (⅞ths) oil, gas and mineral leasehold estate in and to the land in controversy, and that by virtue of said assignments, the legal title to such one-half (½) interest in such seven/eighths (⅞ths) oil, gas and mineral leasehold estate, vested in the defendant, Houston Oil Company of Texas.

"9

"The evidence shows, as a matter of law, that plaintiffs herein, claim as heirs and assigns of Martha Jane Carraway Gore, the first wife of Wm. J. Gore, and that the title of said Martha Jane Carraway Gore to an interest in the land in controversy, if any she had, was an equitable title only. It follows, as a matter of law, therefore, that the title being *assered* by plaintiffs in this suit, to an interest in the land in controversy, is an equitable title and not a legal title.

"10

"The title asserted and relied on by plaintiffs, being an equitable title, and the evidence establishing that these defendants have and hold the legal title to a seven/eighths (⅞ths) oil, gas and mineral leasehold estate in and to the land in controversy, the burden is on plaintiffs to prove that these defendants are not bona fide purchasers, and the plaintiffs have wholly failed to discharge such burden in that they have not proven that these defendants are not bona fide purchasers, for value, of such leasehold estate, and have not introduced evidence which raises an issue to be submitted to the jury as to such matter.

"11

"The undisputed evidence showing that Wm. J. Gore conveyed the land in contro-

versy on May 5, 1896, and that plaintiffs did not bring suit seeking recovery of such equitable title claimed by them until August 29, 1952, laches and stale demand, under the circumstances as shown by the evidence herein, bar and estop plaintiffs from a recovery, and the plea of laches and stale demand, contained in the pleadings of these defendants, should be sustained, and judgment should be rendered in favor of these defendants and denying plaintiffs any recovery as against these defendants.

"12

"The undisputed evidence showing that this suit, based on a claim of equitable title, was not brought until more than fifty-six (56) years after Wm. J. Gore conveyed the legal title to the land in controversy, the presumption should be indulged that said Wm. J. Gore conveyed such land for the purpose of paying debts owing at the time of the death of Martha Jane Carraway Gore, his wife, and incurred during their marital relationship. Under the circumstances, it should be presumed that Wm. J. Gore sold and conveyed the land in controversy, for the purpose of paying community debts of himself and his deceased wife, Martha Jane Carraway Gore, and if such presumption be indulged, the plaintiffs cannot recover and judgment must be rendered denying plaintiffs any recovery as against these defendants.

"13

"The evidence, as a matter of law, establishes that these defendants and those through whom they claim and hold title have matured and perfected, and now hold title by adverse possession, under and by virtue of the three years statute of limitation of the State of Texas.

"14

"The overwhelming preponderance of the evidence, compels a conclusion and finding that these defendants and those through whom they claim and hold title, have ma-

tured and perfected title by adverse possession, under and by virtue of the three years statute of limitation of the State of Texas.

### "15

"The evidence, as a matter of law, establishes that these defendants and those through whom they claim and hold title, have matured and perfected title and now have title, by adverse possession, under and by virtue of the five years statute of limitation of the State of Texas.

### "16

"The overwhelming preponderance of the evidence, compels a conclusion and finding that these defendants and those through whom they claim and hold title, have matured and perfected title, by adverse possession, under and by virtue of the five years statute of limitation of the State of Texas.

### "17

"The evidence, as a matter of law, establishes that these defendants and those through whom they claim and hold title, have matured and perfected title and now have title, by adverse possession, under and by virtue of the ten years statute of limitation of the State of Texas.

### "18

"The overwhelming preponderance of the evidence, compels a conclusion and finding that these defendants and those through whom they claim and hold title, have matured and perfected title, by adverse possession, under and by virtue of the ten years statute of limitation of the State of Texas.

### "19

"The evidence, as a matter of law, establishes that these defendants and those through whom they claim and hold title, have matured and perfected title and now have title, by adverse possession, under and by virtue of the twenty-five (25) years statute of limitation of the State of Texas.

### "20

"The overwhelming preponderance of the evidence, compels a conclusion and finding that these defendants and those through whom they claim and hold title, have matured and perfected title, by adverse possession, under and by virtue of the twenty-five (25) years statute of limitation of the State of Texas.

### "21

"The evidence in the case on the essential facts, is such that reasonable minds cannot differ as to its verity and inference, and when the proper verity is accorded such evidence, and the proper inference is drawn from it, these defendants are entitled to judgment that these plaintiffs take nothing from these defendants, and any other judgment in the case, would be entirely unsupported by the evidence.

### "22

"The undisputed evidence establishes, as a matter of law, that Wm. J. Gore and Martha Jane Carraway Gore owed community debts, same being taxes on the land in controversy, at the time of her death, and the presumption must be indulged that said Wm. J. Gore sold and conveyed the land in controversy for the purpose of paying such community debts. When such presumption is indulged, it must be held that Wm. J. Gore conveyed full and perfect title, both legal and equitable, by his deed to Jessie Moss, dated May 5, 1896.

"Wherefore, these defendants pray that the Court withdraw this case from the jury as to these defendants, and render judgment that plaintiffs take nothing as against these defendants, or, in the alternative, that the court instruct the jury to return a verdict in favor of these defendants and against the plaintiffs."

[7] In view of the fact that the appellants have dismissed their appeal as to Houston Oil Company of Texas and American Republics Corporation, the mat-

ters set out in paragraphs 7 and 8 in the above motion to withdraw the case from the jury and render judgment in favor of the appellees, defendants in the trial court, cannot be considered now in support of such action of the trial court as it affects the remaining appellees.

In view of our views announced above that the various deeds which employed a description of land out of the Brooks League did not convey record title to the land in controversy, the land in the Nelson League, and that the other conveyances, beginning with the deed from Moss to Delaney and McClelland did not convey legal title to the land in controversy, various other grounds in said motion must now be considered as finding no support in the record. The reasons for this are that Grounds Nos. 1, 2, 3, and 4, 10, 11 and 12 all begin with the erroneous assumption that the evidence, stipulations and admissions show as a matter of law that W. J. Gore acquired legal title by his deed from Perryman, that Gore conveyed the land in controversy and legal title thereto to Moss by his deed, and that the deeds from Moss to McClelland and Delaney and from McClelland and Delaney to R. E. Cunningham conveyed the land in controversy and the legal title thereto. Ground No. 10 assumes that the evidence established that the defendants had legal title to a ⅞ths leasehold estate, and Ground No. 11 is based on the assumption that Gore conveyed the land in controversy by his deed to Moss in 1896, and urges defense of laches and stale demand. Likewise Ground No. 12 assumes that Gore's deed to Moss conveyed the legal title to the land in controversy, then urges that it must be presumed that Gore conveyed the land for the purpose of paying community debts of himself and his deceased wife. Ground No. 22 assumes that Gore conveyed the land in controversy and urges that he did so for the purposes of paying community debts. These are all based on erroneous assumptions of what the evidence showed as a matter of law.

Grounds set forth in paragraphs 5, and 6 and 9 of said motion simply state that the present Cunningham appellees are the children and heirs at law of R. E. Cunningham, deceased; that M. M. Cunningham, the appellee, is the guardian of the estate of one other named appellee, Emma Cunningham; that the appellants' claim as heirs and assigns of Martha Jane Carraway Gore was grounded upon an equitable title only to the land in controversy. There is no dispute as to the correctness of these matters in paragraphs 5, 6 and 9, but they show no ground in support of the motion, except as they pertain to the remaining grounds discussed below.

As we view the record, none of these grounds set forth in said motion present matters which would warrant sustaining the motion of the present appellees for instructed verdict or to withdraw the case from the jury and render judgment for these appellees.

Such a conclusion leaves for consideration only the matters set out in paragraphs 13, 14, 15, 16, 17, 18, 19, 20, and 21. These grounds present the contention of the appellees that they now hold title by adverse possession under the 3-year, 5-year, 10-year, and 25-year statutes of limitation, as a matter of law. Paragraph 21 of this group is a general one and is that the evidence in the case on the essential facts is such that reasonable minds cannot differ as to its verity and inference, and when the proper verity is accorded such evidence, and the proper inference is drawn from it, the appellees are entitled to judgment that these appellants take nothing in their suit, and that any other judgment in the case would be entirely unsupported by the evidence.

In other words, we believe this appeal must be decided upon the contentions of these appellees that the evidence as a matter of law, or the overwhelming preponderance of the evidence, entitle them to this judgment against the appellants by limitation.

We agree with the contention of the appellants that the facts in regard to the claims of limitation of these appellees are not undisputed. As we view the evidence from a reading of the lengthy statement of facts, it was of such a nature that it raised various fact issues which required the submission thereof to the jury for determination, and it was not of such a conclusive nature as to support the action of the trial court in withdrawing the case from the jury and rendering judgment for the appellees. A discussion of such evidence and a summary thereof is necessary.

[8–11] At the time of the execution of the deed from W. J. Gore, father of the appellants, to Jesse Moss, Jesse Moss was living at the home of the appellants. He was an uncle and well acquainted with the family. He also lived nearby when their mother died and knew of her death. He was therefore charged with notice of the equitable title which the appellants owned in the land. He was charged with notice of their claim of an equitable title to half of the land by inheritance from their mother. The relation between Jesse Moss and the appellants then became that of cotenancy. The appellees assert in their brief that even if it be conceded for the purpose of argument that such relation of cotenancy existed, it was repudiated by Moss when he placed his deed of record to the land, since by such deed by Gore conveyed the entire interest in the land. We are unable to agree with this contention because of the fact that the deed which Moss took and placed of record did not describe the land as being in the O. C. Nelson League. It described and purported to convey the land in the Brooks League. We cannot find any act of repudiation of co-tenancy as a matter of law in the filing for record of the deed conveying land in the Brooks League. It was evidence thereof, but not conclusive. It appears then that there was a question of fact raised regarding the adverse possession and claim of Moss, Cunningham, and McClelland and Delaney, and of notice thereof to the appellants.

There was evidence on the part of the appellants, also, that after Jesse Moss went into possession of the land in controversy he lived there awhile and moved off and came back; that the Mosses moved away at least twice; that Moss sold the property and moved away and it was vacant four or five years; that after that one Brown moved there and stayed about two years and afterwards McKee and Hutto were on the place two or three months, then the place was vacant for a year or two, then one Forrest stayed there about six months, then the place was vacant for a short time, then Stanley Gore moved on the place; the house burned down on the place in 1930, that no one lived there for several months.

The appellants also introduced evidence that the Mosses, Jesse Moss and wife, at various times during their occupancy of the land admitted that he had not bought the interest in the land owned by the deceased mother of the appellants; that they were claiming but one-half of it. Appellants also submitted proof that Bay Cunningham, the ancestor of the Cunningham appellees, admitted the ownership of the appellants of one-half interest in the property and he told William J. Gore, in 1924, that he wanted to sell the timber there and wanted to see the Gores first, because, as he said, "I always knew the place, and knew it was your mother's and father's; that he always wanted to divide the property, but he didn't want to sell it without their consent; that the witness consented and told him to go ahead and sell the timber and keep the taxes paid up on the land. Bay Cunningham was a neighbor of appellants, knew the family and knew of the death of their mother. J. M. Gore testified that in 1909 he cut switch ties off the land in suit, sold the ties, that the Mosses were living on the place at that time and made no objection to his cutting the trees. There was other testimony about other people cutting timber off the land in 1925, while nobody was living on the property; that it was not being cultivated and it appeared

not to have been cultivated for two or three years. The last occupancy of the land was in 1932 and probably the last cultivation was in 1931.

We cannot agree with the contention of the appellees that they were entitled to judgment by the court under the three years statute of limitations, because as we view the matter, the deed under which they claim and went into possession of the land does not connect them with the sovereign of the soil. Their chain of title by mesne conveyances begins with the deed from Moss to McClelland and Delaney, and before the Moss deed, they do not have a deed in their chain of title connecting them with the sovereign.

[12] There was a great deal of other testimony, of course, in behalf of the appellees tending to show that the land in controversy was in the possession of the appellees and their predecessors in title, that such possession and use and cultivation or enjoyment were adverse to the claims of the appellants. It appears to us, however, that when such evidence is viewed in connection with the evidence we have noted above and a great volume of other testimony of like import, the evidence was not sufficient to sustain the action of the trial court in withdrawing the case from the jury and rendering judgment for the appellees. It went only so far as to present fact issues in regard to appellees' title by limitation. We believe that the trial court's action in withdrawing the case from the jury and rendering judgment that appellants take and recover nothing as to the Cunningham appellees was error, and requires reversal of the judgment as to them.

[13] The appellees, D. K. Cutshall, William Seale and Mrs. Jewel Haralson, appear to be in a different position from that of the other appellees. In the course of the trial, the parties stipulated that the named appellees own an undivided ten five hundred twelfths royalty interest in the property in suit. These named appellees presented to the trial court their motion for

297 S.W.2d—19½

judgment, which motion adopted in toto the motion for judgment filed by the Houston Oil Company of Texas and American Republics Corporation, and also in their motion presented the point that the uncontroverted evidence showed that the Cunninghams, appellees here, were the owners of at least an undivided one-half interest in the land in controversy, and that the named appellees had purchased from the said Cunninghams the royalty interest of ten five hundred twelfths and such one-half undivided interest was more than sufficient as a source of title for their fractional royalty interest, and that they were entitled to an instructed verdict in their favor, or if the case should be withdrawn from the jury and judgment rendered by the court, judgment should be rendered in their favor. They maintain in their brief that regardless of the disposition of the appeal between the appellants and the other appellees, the record requires that the judgment of the trial court be affirmed as to their interest. This contention is on solid ground and is not opposed by any of the parties to this appeal. It was stipulated that these appellees "own an*d* undivided ten five hundred twelfths royalty interest in the property in suit." Appellants' suit was only for a one-half undivided interest in the land. If appellants should prevail upon another trial, a judgment in their favor for a one-half undivided interest, the remaining undivided half interest not recovered from the Cunningham appellees would be sufficient to support a judgment in favor of these named appellees for their fractional royalty interest, which emanates from the Cunningham title. Their contention is sustained and judgment in their favor will be affirmed.

The judgment of the trial court that the appellants take and recover nothing against appellees D. K. Cutshall, William Seale and Mrs. Jewel M. Haralson is affirmed. The judgment that the appellants take and recover nothing as against all the other remaining appellees is reversed and the cause is remanded for a new trial.

non Pamph.1986). Although receivers derive their powers from several sources, their primary purpose is to aid the courts in protecting the interest of all. *Ex parte Britton*, 127 Tex. 85, 89, 92 S.W.2d 224, 226 (1936); *Prince v. Forman*, 119 S.W.2d 102, 105 (Tex.Civ.App.—Dallas 1938, writ dism'd). This is consistent with their roles as agents of the court into whose custody the property passes upon their appointment as receiver. *Texas Trunk Railroad Co. v. Lewis*, 81 Tex. 1, 8, 16 S.W. 647, 649 (1891).

[2] Because a receiver is an officer of the court, the district court erred in denying Griffitts' written request to be released on personal recognizance pending a determination of his guilt or innocence of contempt by a judge of a district court other than the offended court. As an officer of the court, Griffitts was entitled to have his contempt certified to the presiding judge of the First Administrative Judicial District for assignment of another judge to determine Griffitts' guilt or innocence. TEX. GOV'T CODE ANN. § 21.002(d) (Vernon Pamph.1986).

We accordingly grant the writ of habeas corpus and order that relator be discharged.



**Gregg N. HATHAWAY, et ux., Petitioners,**

**v.**

**GENERAL MILLS, INC., Respondent.**

**No. C–4481.**

Supreme Court of Texas.

April 23, 1986.

Rehearing Denied July 9, 1986.

Former employee brought action against former employer to recover sales commissions. The 298th District Court, Dallas County, Sid Fitzwater, J., entered judgment on the verdict for the former employee. Former employer appealed. The Dallas Court of Appeals, Fifth Supreme Judicial District, 694 S.W.2d 96, reversed and rendered. Former employee brought error. The Supreme Court, Spears, J., held that the former employer failed to prove conclusively that it provided the former employee with unequivocal notification of the modification of the sales commission term of the at-will employment contract and, therefore, the employee's continued employment could not be deemed acceptance of the modification.

Reversed.

1. **Master and Servant** ⬅7

Either party may impose modifications to terms of employment at will as condition of continued employment.

2. **Master and Servant** ⬅7

Party asserting modification of terms of employment at will must prove that other party agreed to modify employment terms.

3. **Master and Servant** ⬅7

When employer notifies employee of changes in employment terms, employee must accept new terms or quit; if employee continues working with knowledge of changes, he has accepted changes.

4. **Master and Servant** ⬅7

To prove modification of at-will employment contract, party asserting modification must prove notice of change and acceptance of change.

5. **Master and Servant** ⬅7

Employer asserting modification of at-will employment contract must prove that it unequivocally notified employee of definite changes in employment terms.

6. **Master and Servant** ⬅7

If employer proves that he has unequivocally notified employee of changes in employment terms, employee's continuing employment will constitute acceptance.

**7. Master and Servant** ⊂⇒80(13)

Conflicting signals from former employer's manager to former employee on whether sales commission term of at-will employment had been modified made jury issue of whether employer unequivocally notified employee of modification.

**8. Master and Servant** ⊂⇒7

Former employee's continued employment under protest with respect to former employer's modification of sales commission did not equal acceptance of modification as matter of law where there was no proof of unequivocal notification of modification.

---

Daniel J. Sheehan, Jr., Sheehan, Young, Smith & Culp, San Antonio, for petitioners.

Robert H. Mow, Jr., and Michael Braden, Carrington, Coleman, Sloman & Blumenthal, Dallas, for respondent.

SPEARS, Justice.

This employment contract case involves a dispute between a salesman and his former employer over commission rates. The issue on appeal is whether General Mills and Gregg N. Hathaway agreed to modify their employment at will contract to lower commission rates. The trial court rendered judgment for Hathaway based on jury findings that Hathaway did not accept the modification. The court of appeals reversed, 694 S.W.2d 96. We reverse the court of appeal's judgment and affirm the trial court's.

Hathaway began selling La Coste "Izod" shirts for General Mills on a commission basis in 1978. On January 21, 1980, Hathaway met with Stephen Berkley, General Mills' national sales manager, to discuss lowering Hathaway's 1980 commission rate. Their versions of the discussion differ. Berkley testified that he told Hathaway of a proposed new commission rate and that Hathaway "would either [have to] accept it or leave." Berkley also stated that Hathaway neither rejected nor disputed the lower rates. Hathaway testified that he disagreed with the rate change and

told Berkley that he "thought it was ridiculous." According to Hathaway, Berkley then told him to discuss the proposed new commission rate with Gary Duncan, Hathaway's regional sales manager in Dallas. Hathaway further testified that Duncan told him not to worry about the rate change and that Duncan would "take care of the situation."

Hathaway continued to work for General Mills. In February of 1980, General Mills sent Hathaway a letter proposal containing the new rates. Hathaway did not sign the letter. Hathaway testified that Duncan told Hathaway not to sign the letter and that Duncan would talk to Berkley about the rate changes.

After firing Hathaway in April, 1980, General Mills offered to pay him under the proposed new, lower commission rates for his work to that time. Hathaway sued for the old, higher commissions, alleging that he never accepted the new rates.

In its answers to special issues, the jury found that Hathaway never accepted or ratified the commission rate change, and that General Mills ratified Hathaway's refusal to accept the changes. Based on these findings, the trial court rendered judgment for Hathaway for $106,042 in commissions plus pre-judgment interest and attorney's fees. The court of appeals reversed, holding that Hathaway accepted the lower rates as a matter of law by continuing to work for General Mills knowing of the changed rates.

Hathaway argues that General Mills did not clearly notify him of the rate changes and, therefore, he did not accept the modification as a matter of law by remaining with General Mills. We agree.

Parties have the power to modify their contracts. A modification must satisfy the elements of a contract: a meeting of the minds supported by consideration. *Rhoads Drilling Co. v. Allred*, 123 Tex. 229, 70 S.W.2d 576, 583 (1934); *Mandril v. Kasishke*, 620 S.W.2d 238 (Tex.Civ.App.—Amarillo 1981, writ ref'd n.r.e.). Whether a contract is modified depends on the par-

ties' intentions and is a question of fact. *Coastal Plains Development Corp. v. Tech-Can Corp.*, 531 S.W.2d 143 (Tex.Civ. App.—Houston [1st Dist.] 1975, writ ref'd n.r.e.). The burden of proving modification rests on the party asserting the modification. *Stower v. Harper*, 376 S.W.2d 34 (Tex.Civ.App.—Tyler 1964, writ ref'd n.r. e.).

[1–4] In employment at will situations, either party may impose modifications to the employment terms as a condition of continued employment. *L.G. Balfour Co. v. Brown*, 110 S.W.2d 104, 107 (Tex.Civ. App.—Fort Worth 1937, no writ). The party asserting the modification still must prove that the other party agreed to modify the employment terms. Generally, when the employer notifies an employee of changes in employment terms, the employee must accept the new terms or quit. If the employee continues working with knowledge of the changes, he has accepted the changes as a matter of law. *Balfour*, 110 S.W.2d at 107. Thus, to prove a modification of an at will employment contract, the party asserting the modification must prove two things: (1) notice of the change; and, (2) acceptance of the change.

[5] To prove notice, an employer asserting a modification must prove that he unequivocally notified the employee of definite changes in employment terms. *Stowers v. Harper*, 376 S.W.2d 34, 39 (Tex.Civ. App.—Tyler 1964, writ ref'd n.r.e.). Cases dealing with employment modifications require that the employee have knowledge of the proposed modification. *Id.* at 39. *See also Pine River State Bank v. Mettille*, 333 N.W.2d 622 (Minn.1983) (employee *with knowledge* of changes accepts by retaining employment); *Sterba v. Blaser*, 33 Ill. App.3d 1, 337 N.E.2d 410, 416 (1975) (same); *Gishen v. Dura Corp.*, 362 Mass. 177, 285 N.E.2d 117, 121 (1972) (same). Fairness also dictates this rule. To have knowledge of a modification, the employee must know the nature of the changes and the certainty of their imposition. *Stowers*, 364 S.W.2d at 39.

[6] The employer asserting a modification must also prove that the employee accepted the proposed changes. If the employer proves that he has unequivocally notified the employee of the changes, the employee's continuing employment will constitute acceptance as a matter of law. *Balfour*, 110 S.W.2d at 107.

The court of appeals held that Hathaway accepted the modification as a matter of law by remaining with General Mills. The court of appeals, however, ignored the fact that no issue on notification was submitted or requested. We must deem notification in support of the trial court's judgment for Hathaway unless notification was conclusively proven. Tex.R.Civ.P. 279.

[7] General Mills did not conclusively prove unequivocal notification. Although the versions differ, Hathaway testified that Berkley told him to discuss the changes with Duncan. Hathaway further testified that Duncan, Hathaway's superior, told him that Duncan would take care of the problem. Further, General Mills sent Hathaway a letter containing the new rates, and Duncan again told Hathaway not to worry and that Duncan would take care of it. These conflicting signals from General Mills' managers make unequivocal notification a jury question.

[8] Because General Mills did not conclusively prove or request an issue on notification, we must deem this element in support of the judgment and against unequivocal notification. TEX.R.CIV.P. 279. Without proof of unequivocal notification, Hathaway's continued employment under protest did not equal acceptance as a matter of law. Therefore, the court of appeals erred in setting aside the jury's answer that Hathaway did not accept the modification.

Because a contract modification was not proven, Hathaway is entitled to payment at the previous contract rate as determined in the trial court's judgment. *See Stowers*, 376 S.W.2d at 39. We reverse the judgment of the court of appeals and affirm that of the trial court.

**Jerry L. HENSON, Petitioner,**

**v.**

**SOUTHERN FARM BUREAU CASU-
ALTY INSURANCE COMPANY and
Texas Farm Bureau Mutual Insur-
ance Company, Respondents.**

**No. 99–0453.**

Supreme Court of Texas.

Argued Feb. 9, 2000.

Decided April 13, 2000.

Insured sought to recover underin-
sured motorist (UIM) benefits following
judgment against the tort-feasor. The
121st Judicial District Court, Terry Coun-
ty, Kelly G. Moore, J., denied request for
prejudgment interest. Insured appealed.
The Court of Appeals, Charles L. Reyn-
olds, Senior Justice (Retired), 989 S.W.2d
837, affirmed. Review was granted. The
Supreme Court, Enoch, J., held that the
insured was not entitled to prejudgment
interest.

Affirmed.

**1. Interest ⚖39(2.35)**

Prejudgment interest on claim for un-
derinsured motorist (UIM) benefits did not
begin to run 180 days after a demand for
those benefits or upon the filing of a suit;
rather, it would begin when tort liability
was established by judgment and, there-
fore, never accrued where the insurers
paid within 30 days after the tort judg-
ment. Vernon's Ann.Texas Civ.St. art.
5069–1.05 §§ 2, 6 (Repealed); V.T.C.A.,
Finance Code §§ 304.003, 304.006, 304.102.

**2. Interest ⚖39(2.35)**

Insurers owe prejudgment interest on
top of the policy benefits only if they with-
hold those benefits in breach of the insur-
ance contracts.

**3. Insurance ⚖2793(1), 2816**

Insured's settlement with tort-feasor
without an admission of liability did not
alone establish a right to underinsured
motorist (UIM) benefits; the jury could
have found that the tort-feasor was not at
fault or that the damages resulting from
her actions did not exceed her policy lim-
its.

———————

Kenneth D. Cowling, Lubbock, for peti-
tioner.

James L. Wharton, G. Douglas Welch,
Lubbock, for respondents.

Justice ENOCH delivered the opinion
for a unanimous Court.

**[1]** The question is whether an insurer,
obligated to pay uninsured/underinsured
benefits, owes on top of those benefits
prejudgment interest to be computed ei-
ther from 180 days after a demand for
those benefits has been made, or from the
day a suit is filed for those benefits. Be-
cause uninsured/underinsured insurers do
not breach their contractual obligation to
pay until tort liability is established, we
conclude that prejudgment interest begins
running from the date liability of the unin-
sured/underinsured motorist is established.
Consequently, Texas Farm Bureau Mutual
Insurance Company and Southern Farm
Bureau Casualty Insurance Company do
not owe Jerry Henson prejudgment inter-
est on top of the uninsured/underinsured
benefits.

On March 3, 1991, Henson was a passen-
ger in a truck driven by Robert Millican.
Henson was injured when the truck collid-
ed with a truck driven by Consuelo Contr-
eras. In March 1991, Henson submitted
his claim to his insurance carrier, Texas
Farm Bureau Mutual Insurance Company,
and Millican's insurance carrier, Southern
Farm Bureau Casualty Insurance Compa-
ny, for uninsured/underinsured motorists
benefits. In February 1993, Henson and
his wife sued both Millican and Contreras
for negligence. They also sued Texas

Farm Bureau and Southern Farm Bureau for the uninsured/underinsured motorists benefits.

Without establishing liability, but with the insurers' permission, the Hensons settled with Contreras for $20,000, the limits of her liability policy. Before proceeding to trial against Millican, the claim against the insurers was severed, and the insurers agreed to be bound by the judgment rendered in the negligence action against Millican. The agreement also provided that the insurers had thirty days before the judgment would be binding against them. The jury attributed 100% of the negligence that caused the collision to Contreras, and fixed Henson's damages at $133,842.13. The court then entered a take-nothing judgment as to Millican.

Within thirty days of the judgment, the insurers tendered $45,000, the combined uninsured/underinsured motorist policy limits, to Henson. But he refused the tender, demanding prejudgment interest on top of the benefits. In the severed action, the insurers then filed an amended answer, denying that Henson met all conditions precedent required by the contract prior to the judgment in the tort action, and specifically denying that Henson was entitled to prejudgment interest. With their amended answer, the insurers paid the policy benefits into the court's registry.

Henson moved for judgment and summary judgment, and the insurers moved for summary judgment. The trial court denied both of Henson's motions and granted the insurers' motion, ordering that Henson recover from Texas Farm its uninsured/underinsured policy limits of $25,000, and from Southern Farm the uninsured/underinsured policy limits of $20,000, plus interest accrued while in the court's registry, "in full satisfaction of this judgment."

Henson believes that our previous holdings on prejudgment interest and sections 2 and 6 of article 5069–1.05 of the Texas Revised Civil Statutes [1] entitle him to prejudgment interest of ten percent on the uninsured/underinsured motorist benefits computed from 180 days after he made demand for the benefits.

But Henson conflates two prejudgment interest concepts. There is no doubt that if Henson were recovering directly from Contreras, the judgment would include prejudgment interest. And the insurers do not dispute that had the trial court awarded prejudgment interest against the tort defendants, the insurers would be obligated to pay the entire judgment including that portion awarded for prejudgment interest, to the extent of policy limits.[2] But here, Henson is seeking to recover prejudgment interest based not on the tortfeasor's obligations, but upon the insurance companies' obligations. Unlike the relationship between Henson and Contreras, which is that of injured party and tortfeasor, the relationship between Henson and the insurers is that of contracting parties. Consequently, their respective duties are established by the contract.

Under the policies, the insurance companies are obligated to pay the uninsured/underinsured motorist's shortfall to the extent of the policy limits. The Texas Farm policy limits were $25,000 per person and $50,000 per accident; the Southern Farm policy limits were $20,000 per person and $40,000 per accident. Both policies stated:

> We will pay damages which a covered person is legally entitled to recover from the owner or operator of an [uninsured/underinsured] motor vehicle because of bodily injury sustained by a covered person, or property damage, caused by an accident. The owner's or operator's liability for these damages

1. TEX.REV.CIV. STAT. art. 5069–1.05 §§ 2 and 6 have been subsequently recodified at TEX. FIN. CODE §§ 304.003, .006, and 304.102.

2. TEX.REV.CIV. STAT. art. 5069–1.05 §§ 2 and 6; *see Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 529–30 (Tex. 1998).

must arise out of the ownership, maintenance, or use of the uninsured motor vehicle.

**[2]** We have emphasized that prejudgment interest is awarded not to punish the defendant, but to fully compensate the injured party.[3] The insurers owe prejudgment interest on top of the policy benefits only if they withheld those benefits, in breach of the insurance contracts. In that case, the injured insured would have lost the use of funds that he would otherwise have had, and prejudgment interest would compensate for the time the proceeds were withheld.

Here, Henson has failed to demonstrate that the insurers were obligated to pay the benefit at any time earlier than they did. In his brief, Henson appears to concede that the insurer's obligation to pay did not arise until the first judgment was rendered, stating that the trial court's entry of judgment "had the effect of entitling Mr. Henson to recover the respective sums of $20,000 and $25,000 from Southern Farm Bureau and Texas Farm Bureau, by reason of the . . . stipulation."[4] He fails to specify any point earlier than rendition of the judgment that a breach of contract could have occurred. We infer from his insistence that the prejudgment interest accrued either 180 days after he gave notice of the claim, or the day he filed suit against the companies, that he believes the obligation to pay arose either at the time he filed his claim, or at the time he filed suit against the insurers. But neither of these events, the claim itself or filing suit, triggers an obligation to pay.

**[3]** In this case, Henson settled with Contreras for $20,000, the limits of her liability insurance policy, and released her from any further claims. Because the jury could have found that Contreras was not at fault, or that the damages resulting from her actions did not exceed her policy limits, the settlement alone did not establish

that Henson was entitled to recover from the uninsured/underinsured insurers.

In fact, though, the jury found the entire losses to be inflicted by Contreras, and fixed the amount of those losses at $133,842.13. The policies provided that the insurers will pay damages that a covered person is legally entitled to recover from an uninsured/underinsured motorist. When the jury found Contreras at fault for the accident and found Henson damaged by her negligence, Henson became legally entitled to recover from her. And because the damages exceeded Contreras' liability policy limits, Henson became entitled to the uninsured/underinsured motorist policy benefits, up to the policy limits. By the terms of the policies, no obligation to pay the claim existed until the jury established Contreras' liability. And the insurers paid the claim promptly after the jury made its findings. Because no contractual duty was breached, Henson had no right to receive the benefits earlier than he in fact received them. Therefore no compensation is due for lost use of the funds. Thus Henson is not entitled to prejudgment interest on top of the benefits he is otherwise entitled to receive from the insurers.

The judgment of the court of appeals is affirmed.



**In re DAISY MANUFACTURING COMPANY, INC., Relator.**

**No. 99–0500.**

Supreme Court of Texas.

April 13, 2000.

In design-defect products liability suit against air rifle manufacturer, plaintiff

---

**3.** *Johnson & Higgins,* 962 S.W.2d at 528.

**4.** Petitioner's brief on the merits at 4.

A brief has been filed for Friendswood Development Company, King Ranch, Inc., and Kingwood Sales Associates, all of whom prevailed as defendants in the court below. The two cross-points of error raised therein are overruled without further discussion since the effect of our holding is to affirm the directed verdict in their favor.

The district court's judgment is reformed to reflect an award of actual damages of $2,500.00 against the appellant, rather than $7,500.00. In all other respects, the trial court's judgment is affirmed.



HERCULES EXPLORATION, INC., Andrew Weaver & Thomas A. Myers, Appellants,

v.

HALLIBURTON COMPANY, Appellee.

No. 13–82–214–CV.

Court of Appeals of Texas, Corpus Christi.

Sept. 1, 1983.

Rehearing Denied Oct. 6, 1983.

Oil company sued debtor and guarantors on sworn account. The 105th District Court, Nueces County, Vernon D. Harville, J., entered judgment for the oil company, and defendants appealed. The Court of Appeals, Bissett, J., held that: (1) allegation in oil company's pleading did not constitute judicial admission that suit was not wholly based upon a contract; (2) unsigned written invoices and work or delivery tickets, together with letter of guaranty, constituted a "contract in writing," and therefore suit on sworn account was not barred by two-year statute of limitations; (3) invoices and delivery tickets whose identity and mode of preparation were proved by custodian in accordance with business rec-

ords statute were competent and admissible; and (4) evidence supported jury's finding that essential elements of action on sworn account had been proven.

Affirmed.

**1. Limitation of Actions ⊗⇒43**

"Cause of action," in statutes providing that two-year and four-year limitations begin to run when the cause of action accrues, means right to institute suit. Vernon's Ann.Texas Civ.St. arts. 5526, 5527.

> See publication Words and Phrases for other judicial constructions and definitions.

**2. Evidence ⊗⇒207(1)**

"Judicial admission" is a formal act, done in the course of judicial proceedings, which dispenses with production of evidence and takes matter out of the domain of proof; it is not evidence, but it is substitute for evidence.

> See publication Words and Phrases for other judicial constructions and definitions.

**3. Evidence ⊗⇒207(1)**

A statement is not a judicial admission unless: (1) it is made in the course of a judicial proceeding; (2) it is contrary to an essential fact for the parties' recovery; (3) it is deliberate, clear and unequivocal; (4) it is related to a fact upon which judgment for the opposing party could be based; and (5) enforcing the admission would be consistent with public policy.

**4. Evidence ⊗⇒264**

Allegation in plaintiff's pleading in action on sworn account that "this suit is founded on an oral or a written contract" did not constitute a judicial admission that suit was not wholly based upon a contract, for purposes of determining appropriate limitation period, since statement was not a deliberate, clear and unequivocal statement of fact. Vernon's Ann.Texas Civ.St. arts. 5526, 5527.

**5. Contracts ⊗⇒150**

Contracts in writing should be liberally construed, and strict construction should

not be used in determining what does and does not constitute a contract in writing.

## 6. Limitation of Actions ⊕⇒24(2)

Unsigned written invoices and work tickets describing materials and services furnished debtor, together with letter signed by guarantors guarantying payment of debtor's account, constituted a "contract in writing" within meaning of two-year statute of limitations governing actions for debt not evidenced by a "contract in writing" and thus oil company's action on sworn account, brought within four years from date cause of action accrued, was timely. Vernon's Ann.Texas Civ.St. arts. 5526, subd. 4, 5527.

> See publication Words and Phrases for other judicial constructions and definitions.

## 7. Account, Action on ⊕⇒14

Invoices and delivery tickets were admissible and competent to show that debtor on account ordered materials, services and labor and that the same were furnished pursuant to order, where credit manager of company bringing action on sworn account testified that he was a custodian of items, that items were made in regular course of business by employees who had personal knowledge of contents, and that they were made at or near time materials and services were furnished. Vernon's Ann.Texas Civ.St. art. 3737e.

## 8. Account, Action on ⊕⇒14

Where defendants filed a verified denial to plaintiff's verified petition in sworn account, force of the sworn account being prima facie true was destroyed, and plaintiff had burden to prove every item of account by competent evidence.

## 9. Account, Action on ⊕⇒10

Essential elements of proof of items of sworn account are generally: (1) sale and delivery of the merchandise through performance of the services involved, and (2) that the amount of such account is just and that the prices charged are in accordance with an express agreement, or, in the absence of express agreement, that they are usual, customary or reasonable.

## 10. Appeal and Error ⊕⇒930(1), 989

Under standard of review of "no evidence" points, Court of Appeals reviews the evidence in its most favorable light in support of the jury findings, considers only the evidence which supports findings, and rejects all evidence and inferences contrary to findings.

## 11. Account, Action on ⊕⇒14

In action on sworn account for materials and services, evidence supported jury's findings that the merchandise had been sold and delivered, that the services had been performed, that the services provided were necessary, and that prices charged for services were reasonable.

## 12. Guaranty ⊕⇒38(1)

"Continuing guaranty" is a guaranty which contemplates a series of future transactions and remains in effect, according to its terms, until revoked.

> See publication Words and Phrases for other judicial constructions and definitions.

## 13. Guaranty ⊕⇒36(1)

Guarantor's liability is measured by the principal's liability.

## 14. Trial ⊕⇒350.4(1)

Where goods and services were furnished to principal during period while open and continuing guaranty was in effect, principal's indebtedness was less than ceiling set in letter of guaranty, and letter of guaranty contained no ambiguities, issue regarding guarantors' liability became question of law for trial court and thus no special issues regarding guarantors' liability had to be submitted to jury prior to determination that guarantors were liable.

## 15. Trial ⊕⇒136(1)

An issue should not be submitted to a jury if it involves determination of a question of law.

---

John T. Dailey, Strickland & Dailey, Patrick V. Strong, San Antonio, for appellants.

Todd Hunter, Kleberg, Dyer, Redford & Weil, Corpus Christi, for appellee.

Before BISSETT, UTTER and GONZALEZ, JJ.

## OPINION

BISSETT, Justice.

This is an appeal from a judgment rendered in a suit on sworn account, wherein Halliburton Company was plaintiff and Hercules Exploration, Inc., Andrew Weaver and Thomas A. Myers were defendants. Following a jury trial, judgment was rendered that plaintiff recover from defendants, jointly and severally, the sum of "$32,001.27, with interest thereon as to Hercules Exploration, Inc. at the rate of 6% per annum from October 25, 1976 until date of judgment and thereafter at the rate of 9% per annum, together with reasonable attorney's fees as to Hercules Exploration, Inc. in the sum of $6,288.75, with interest thereon at the rate of 9% per annum from date of judgment until paid, together with all costs of court in this behalf expended."

All of the defendants have appealed. The defendants in their first, second, third and fourth points of error, attack the judgment on the ground that plaintiff's suit was barred under the provisions of Tex.Rev.Civ. Stat.Ann. art. 5526 (1958), the two-year statute of limitations. Plaintiff argues that the suit was not barred by that statute, and that Tex.Rev.Civ.Stat.Ann. art. 5527 (Supp. 1982–83), the four-year statute of limitations, is applicable.

Halliburton, in its duly verified original petition, its trial pleading, alleged that it, at the request of Hercules, provided the latter with "certain goods, wares, services and merchandise or rendered personal services for labor done or material furnished." In the alternative, it was alleged that its suit was based upon "labor performed and material furnished on the theory of quasi contract or quantum merit." It was further alleged that the suit was founded on an "oral or written contract." Attached to the petition and incorporated therein were invoices and work tickets describing the ma-

terials and services furnished and the labor performed. The invoices are dated August 20, 1976 and August 24, 1976. Such materials, services, and labor were furnished and rendered in connection with a "Kiel Frac," of Hamilton No. 1 well, in Dimmit County, Texas. The liability of Weaver and Myers was claimed under a certain "Letter of Guaranty," signed by them on March 11, 1976, addressed to Halliburton, wherein they guaranteed payment of Hercules' accounts up to $50,000.00. Suit was filed on October 23, 1979.

Articles 5526 and 5527 were both amended by Acts of the 66th Legislature. Such amendments became effective on August 27, 1979.

Prior to amendment, Article 5526, in pertinent part, provided:

"There shall be commenced and prosecuted within two years after the cause of action shall have accrued, and not afterward, all actions or suits in court of the following description:

\*  \*  \*  \*  \*  \*

4. Actions for debt where the indebtedness is not evidenced by a contract in writing.

5. Actions upon stated or open accounts other than such mutual and current amounts as concern the trade of merchandise between merchant and merchant, their factors or agents ... and limitation shall run against each item from the date of such delivery, unless otherwise specially contracted."

The amendment to Article 5526 deleted Sections 4 and 5 of the statute as the same existed prior to August 27, 1979, and provided for a two-year limitations within which to file suits in six (6) separate situations, none of which are applicable to the case at bar. The effect of the amendment was to abolish the two-year statute of limitations within which to bring suit "for actions for debt where the indebtedness is not evidenced by a contract in writing," and where the action was upon "stated or open accounts."

Prior to amendment of Article 5527, the statute, in pertinent part, provided:

"There shall be commenced and prosecuted within four years after the cause of action shall have accrued, and not afterward, all actions or suits in court of the following description:

1. Actions for debt where the indebtedness is evidenced by or founded upon any contract in writing."

\* \* \* \* \* \*

As amended, article 5527, in pertinent part, reads:

"There shall be commenced and prosecuted within four years after the cause of action shall have accrued, and not afterward, all actions or suits in court of the following description:

1. Actions for debt."

\* \* \* \* \* \*

Hercules, Weaver and Myers argue that the invoices and work tickets do not, in fact, constitute contracts in writing, because they do not set out specifically the obligations of the parties, and that the obligation of Hercules to pay for the items set out therein rests, at least in part, upon parol evidence, and that they reveal "only a listing of services" alleged to have been provided by Halliburton and charged to Hercules. It is further contended that Halliburton, by pleading that its suit is "founded on an oral or written contract," has judicially admitted that "such suit is not wholly based upon a contract in writing. It is also argued that the invoices and work tickets were not introduced in evidence for "all purposes," but were introduced for the limited purpose of showing that certain charges were made to Hercules by Halliburton, and that in order to prevail, Halliburton, of necessity, had to rely on parol evidence to establish any liability for the charges reflected in the invoices. They insist that the cause of action is barred by Article 5526.

Halliburton argues that Article 5527, the four-year statute of limitations, before and after its amendment, controls. Consequently, it says that since it is conclusively shown that suit was filed within four years from the date its cause of action accrued that it was not barred by any statute of limitation. It first asserts that as a result of the 1979 amendments, Sections 4 and 5 of Article 5526 were eliminated, and Article 5527, insofar as this appeal is concerned, was amended to cover only "actions for debt," which amendments "showed the concern of the legislature to apply the four-year limitations to actions for debt and actions founded upon writings." Next, Halliburton contends that "the invoices, delivery tickets and letter of guaranty represent a contract in writing and action for debt." It further contends that the amendments, from and after August 27, 1979, "placed all actions for debt under the four-year statute." Finally, it is argued that the invoices, delivery or work tickets, and the letter of guaranty, all of which were attached to and made a part of Halliburton's petition and were introduced in evidence at the trial, are sufficient to show that Hercules' became obligated to pay for the services and materials furnished and labor performed, and that the letter of guaranty was sufficient to hold Weaver and Myers liable for payment of Hercules' debt.

[1] Under the express terms of both Article 5526 and 5527, limitations begins to run when the cause of action accrues; by "cause of action" is meant the right to institute suit. *Luling Oil & Gas Co. v. Humble Oil & Refining Co.,* 144 Tex. 475, 191 S.W.2d 716, 721 (1946); *Port Arthur Rice Milling Co. v. Beaumont Rice Mills,* 105 Tex. 514, 143 S.W. 926 (1912); *Jones County v. Moore,* 4 S.W.2d 289 (Tex.Civ.App.—Eastland 1928, writ ref'd).

[2] A judicial admission is a formal act, done in the course of judicial proceedings, which dispenses with the production of evidence and takes the matter out of the domain of proof. It is not evidence, but is a substitute for evidence. *First National Bank in Dallas v. Kinabrew,* 589 S.W.2d 137 (Tex.Civ.App.—Tyler 1979, writ ref'd n.r. e.); *Valdes v. Moore,* 476 S.W.2d 936 (Tex. Civ.App.—Houston [14th Dist.] 1972, writ ref'd n.r.e.).

The leading case on the subject is *United States Fidelity & Guaranty Co. v. Carr,* 242 S.W.2d 224 (Tex.Civ.App.—San Antonio 1951, writ ref'd). It sets out five requirements of a judicial admission. They are: the admission was: 1) made in the course of a judicial proceeding; 2) contrary to an essential fact for the party's recovery; 3) deliberate, clear and unequivocal; 4) related to a fact upon which judgment for the opposing party could be based; and 5) enforcing the admission would be consistent with public policy."

[3, 4] Unless the statements asserted to be a judicial admission meet all of the requirements set out in *United States Fidelity & Guaranty Co. v. Carr,* supra, it is not a judicial admission. *Mendoza v. Fidelity & Guaranty Insurance Underwriters, Inc.,* 606 S.W.2d 692 (Tex.1980). The allegation that "this suit is founded on an oral or a written contract" does not meet all of such requirements. It does not constitute a judicial admission that the suit is not wholly based upon a contract, as argued by Hercules, Weaver and Myers. It is not a deliberate, clear and unequivocal statement of a fact, but is nothing more than a conclusion based on the facts alleged in the petition and the exhibits which were incorporated therein.

In the case of *International Printing Pressmen and Assistant's Union of North America v. Smith,* 145 Tex. 399, 198 S.W.2d 729 (1946), the Supreme Court of Texas had before it the question of whether plaintiff's cause of action was a tort action and, consequently barred by limitations under Article 5526, or whether the suit was founded upon a contract in writing within the meaning of Article 5527. In holding that the suit was founded upon a contract in writing, and was not barred by the two-year statute of limitations since suit was filed more than two years but less than four years after the cause of action accrued, the Court, on page 736, of the published opinion, said:

"However, it is not indispensable that the written instrument relied upon contain an express promise to do the things for the nonperformance of which the action is brought. It is sufficient if the obliga-

tion or liability grows out of a written instrument, not remotely but immediately, or if the written instrument acknowledges a state of facts from which, by fair implication, the obligation or liability arises. And while parol evidence is not admissible to establish the promise, it is admissible to show performance on the part of the plaintiff and a breach on the part of the defendant."

The Court further quoted with approval the following statements found in *Reyburn v. Casey,* 29 Mo. 129:

"The broad and comprehensive language of the statute evidently embraces all kinds of written instruments, without regard to their mere form or phraseology, which imply a promise or agreement to pay money, and is not restricted to such as have the requisites of promissory notes, or to such instruments as contain an express promise or agreement upon their face to pay. It is sufficient if the words import a promise or agreement, or that this can be inferred from the terms employed."

The Court, on page 737 of the published opinion, also quoted with approval the following statements found in *Bracklein v. Realty Insurance Co.,* 95 Utah 490, 80 P.2d 471, 476:

"... [i]f the fact of liability arises or is assumed or imposed from the instrument itself, or its recitals, the liability is founded upon an instrument in writing. If the instrument acknowledges or states a fact from which the law implies an obligation to pay, such obligation is founded upon a written instrument within the statute. If the writing upon its face shows a liability to pay, such liability is on a written instrument within the statute of limitations."

\* \* \* \* \* \*

"An obligation being established by a writing, a promise to pay or to perform is implied. By necessary inference of law and fact such promise is embodied in the language of the writing although it may not be expressed in words."

The Court, in *Texas Pacific Coal & Oil Co. v. Stuard,* 7 S.W.2d 878, 882 (Tex.Civ. App.—Eastland 1928, writ ref'd), held that an implied covenant in an oil and gas lease to develop the leased premises after production was obtained was part of the written contract and a suit thereon for development was governed by the four-year statute of limitations.

[5] It is well established case law in Texas that contracts in writing should be liberally construed, and a strict construction should not be used in determining what does and does not constitute a contract in writing. *Kiel v. City of Houston,* 558 S.W.2d 69 (Tex.Civ.App.—Houston [14th Dist.] 1977, writ ref'd n.r.e.); *Jackson v. Paulsel Lumber Co.,* 461 S.W.2d 161 (Tex. Civ.App.—Fort Worth 1970, writ ref'd n.r. e.); *First State Bank of Green's Bayou v. Tanner,* 495 S.W.2d 267 (Tex.Civ.App.— Houston [1st Dist.] 1973, no writ).

[6] The contention that there could be no contract in writing because the invoices and work tickets were not signed by an authorized representative of Hercules has no merit. It has been held that a writing, in order to constitute a contract in writing within the meaning of the four-year statute of limitations, does not necessarily have to be signed by both parties to the contract. *Republic Supply Co. v. Waggoner,* 283 S.W. 537 (Tex.Civ.App.—Amarillo 1926, writ ref'd); *Jackson v. Paulsel Lumber Co.,* supra. See, also, *Ferguson v. Parker,* 176 S.W.2d 768 (Tex.Civ.App.—Dallas 1943, writ ref'd w.o.m.).

We hold that Halliburton's suit was not barred by Article 5526, the two-year statute of limitations. The written invoices and work or delivery tickets, together with the letter of guaranty, constitute "a contract in writing." Suit was filed within four years from the date Halliburton's cause of action accrued. The first, second, third and fourth points of error are overruled.

[7] In the ninth point of error, Hercules, Weaver and Myers contend that it was error to admit into evidence for any purposes Halliburton's Exhibits 3 and 4 because the "proof relating to the admission of same did not meet the requirements of Article 3737e, Texas Revised Civil Statutes, Business Records Act."

Tex.Rev.Civ.Stat.Ann. art. 3737e (Vernon's Supp.1982–83), in pertinent part, reads:

"Section 1. A memorandum or record of an act, event or condition shall, insofar as relevant, be competent evidence of the occurrence of the act or event or the existence of the condition if the judge finds that:

(a) It was made in the regular course of business;

(b) It was the regular course of that business for an employee or representative of such business with personal knowledge of such act, event or condition to make such memorandum or record or to transmit information thereof to be included in such memorandum or record;

(c) It was made at or near the time of the act, event or condition or reasonably soon thereafter.

Sec. 2. The identity and mode of preparation of the memorandum or record in accordance with the provisions of paragraph one (1) may be proved by the testimony of the entrant, custodian or other qualified witness even though he may not have personal knowledge as to the various items or contents of such memorandum or record. Such lack of personal knowledge may be shown to affect the weight and credibility of the memorandum or record but shall not affect its admissibility."

Exhibits 3 and 4 consisted of invoices and work (delivery) tickets relating to the "Kiel Frac" of the Hamilton No. 1 well. The basis of their being offered into evidence was the testimony of the witness O.D. Ilseng, who was credit manager of the Corpus Christi Division of Halliburton at the time the well was fraced. He did not personally supervise the persons who prepared them, nor did he personally supervise the persons who actually furnished the materials and services described therein. He did, however, explain in great detail the proce-

dures established by Halliburton for the bookkeeping and billing of accounts. He further testified that he was familiar with such procedures and that they were followed in this instance. In particular, he testified that 1) it was Halliburton's regular course of business for its employees or representatives, who had personal knowledge of the particular work, to make invoices and delivery tickets concerning the same; 2) all invoices, work tickets and delivery tickets, including Exhibits 3 and 4, were made by the employees and representatives of Halliburton who had personal knowledge of the contents contained therein; 3) Exhibits 3 and 4 were made in the regular course of business; 4) he was the custodian of Exhibits 3 and 4 on the dates that they were made, and that they were made at the time such materials and services were furnished, or near the time thereafter.

The identity and mode of preparation of the invoices and delivery tickets (Exhibits 3 and 4) were proved by the witness Ilseng, even though he did not have any personal knowledge concerning the several items contained in those documents. The witness was a qualified witness within the meaning and intent of Article 3737e, and his testimony supports the implied finding by the trial judge that the invoices and delivery tickets were made in the regular course of business, and were made at the time such materials and services described therein were furnished; the testimony of Ilseng also supports an implied finding that it was in the regular course of Halliburton's business for one of its employees or representatives who had personal knowledge of the transactions to make a memorandum, or record, thereof; Ilseng's testimony also supports an implied finding that it was the regular course of Halliburton's business for an employee thereof having personal knowledge that Hercules had ordered the "Kiel Frac" to transmit that information to other employees of Halliburton for accomplishment, and thence to still other employees to be included in the invoices. *University Savings & Loan Ass'n. v. Security Lumber Co.*, 423 S.W.2d 287, 291 (Tex.1967). The invoices were admissible in evidence, and under Ar-

ticle 3737e the entries therein are competent evidence to show that Hercules ordered the materials, services and labor from Halliburton in connection with the fracing of Hamilton No. 1 Well, and that Halliburton furnished the same pursuant to such order. Any question regarding Ilseng's personal knowledge as to any of the items set out in the invoices and delivery tickets go to the weight and credibility of the documents, not to their admissibility into evidence. The ninth point of error is overruled.

Hercules, Weaver and Myers, in their fifth, sixth, seventh and eighth points of error, attack the judgment on the ground that there is "no evidence" or "insufficient evidence" to support the submission of any issue to the jury because Halliburton "failed to sustain its burden of proof required on a suit on an account." They prayed that this Court "reverse the judgment of the trial court and render in their favor." We treat the points as "no evidence" points and apply the "no evidence" standard of review. *Miller v. Riata Cadillac Co.*, 517 S.W.2d 773 (Tex.1974); *Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965).

The jury was instructed by the trial judge that Halliburton's Exhibits 3 and 4 "were admitted into evidence for the limited purpose of showing what was billed," and that such exhibits were to be considered "only for the purpose for which they were admitted into evidence and for no other." The jury found: 1) Halliburton provided goods and services to Hercules "after August 19, 1976 on the Hamilton No. 1 well"; 2) Hercules became obligated to pay Halliburton "for the goods and services provided"; 3) Hercules is presently indebted to Halliburton "for the goods and services provided"; and 4) Hercules owed Halliburton $32,001.27 "for the goods and services provided."

Hercules, Weaver and Myers argue that there is no evidence that the goods and services were provided by Halliburton; that there is no evidence as to whether any of such services were necessary to perform the fracing operation on Hamilton No. 1 well; and that there is no evidence as to whether

the prices charged for such services were reasonable. We do not agree.

[8] Hercules, Weaver and Myers filed a verified denial to Halliburton's verified petition in sworn account. Therefore, the force of the sworn account as being prima facie true was destroyed, and Halliburton had the burden to prove every item of the account by competent evidence.

[9] Case law dictates that the essential elements of such proof are generally 1) the sale and delivery of the merchandise or performance of the services and 2) that the amount of such account is just and that the prices charged are in accordance with an express agreement or, in the absence of such express agreement, that they are usual, customary or reasonable. *Opryshek v. McKesson & Robbins, Inc.,* 367 S.W.2d 357 (Tex.Civ.App.—Dallas 1963, no writ); *Marr v. Craddock,* 406 S.W.2d 278 (Tex.Civ.App. —Tyler 1966, no writ); *Parker v. Center Grocery Company,* 387 S.W.2d 903 (Tex.Civ. App.—Tyler, 1965, no writ); *Brooks v. Eaton, Yale & Towne, Inc.,* 474 S.W.2d 321 (Tex.Civ.App.—Waco 1971, no writ); *Blue Bell, Inc. v. Isbell,* 545 S.W.2d 563 (Tex.Civ. App.—El Paso 1976, no writ).

[10, 11] Applying the standard of review to the "no evidence" points, we review the evidence in its most favorable light in support of the jury findings consider only the evidence which supports such findings, and reject all evidence and inferences contrary to such findings. The witness Ilseng, Halliburton's credit manager for its Corpus Christi Division for many year, testified:

"Q All right. Can you explain what Halliburton provided the defendants?

A We provided services and materials for them."

He further testified that he, in his capacity as credit manager, contacted Mr. Joe Nance, the Secretary-Treasurer of Hercules, and that Nance told him that the subject well "was Hercules' and charges should be made to Hercules," and that the invoices "would be paid" by Hercules as soon as the latter received certain "funds." Ilseng also

said that the amounts of money for the charges made to Hercules had not been paid as of the date of trial, and that the unpaid bills were the amounts which were set out in the invoices, Halliburton's Exhibits 3 and 4.

Ilseng further testified that he contacted defendant Weaver, Vice-President of Hercules, "in regard to both of these bills." He (Ilseng) said that Weaver told him that Hercules "didn't have the funds at that time, they were anticipating receiving monies that would pay it."

Defendant Myers testified:

"Q You understand that this lawsuit happens to involve goods and services, is that correct, that have been provided by Halliburton?

A Yes, sir, that is correct."

\* \* \* \* \* \*

"Q Can you explain to me the type of services and goods that were provided, that you understand that Halliburton provided in this matter?

A Just normal frac job."

He further testified that he was President of Hercules when "these services and goods from Halliburton were provided," and that he was still President at the time of trial. When questioned as to whether the "fracing expense" which was shown on Hercules' 1976 corporate income tax return as a deduction against income included the fracing of the Hamilton well, he answered:

"For the J.R. Hamilton and other wells."

Mr. Newton Lale, a petroleum engineer and division sales manager for Halliburton for many years, testified that he was familiar with the goods, material and services with respect to fracing operations and with the reasonable prices charged therefor in the area where the Hamilton well was located. After reviewing Halliburton's Exhibits 3 and 4, he testified that the goods and services shown thereon were necessary in fracing operations and that the charges therefor were reasonable and necessary, based on his knowledge in regard to fracing requirements and procedures and to the

pricing for the necessary and required goods and services.

We hold that there was ample evidence of probative value to support the jury findings complained of, and that the trial court did not err in submitting those issues to the jury. The fifth, sixth, seventh and eighth points of error are overruled.

In the tenth and eleventh points of error, complaint is made, first, that it was reversible error for the trial court to render judgment against the defendants Weaver and Myers because no issues were submitted to the jury inquiring into any such liability, and, second, that by failing to request the submission of such issues relating to the individual liabilities of Weaver and Myers that Halliburton waived any right of recovery it might have had against them. The points cannot be sustained.

The "Letter of Guaranty," Halliburton's Exhibit 2, was introduced into evidence. It was addressed to Halliburton, and was signed by the defendants Weaver and Myers on March 11, 1976. The letter, in pertinent part, reads:

"Gentlemen:

It is the desire of the undersigned that an open line of credit be extended to the

Hercules Exploration, Inc.
200 Wilson Tower
Corpus Christi,
Texas 78401

In consideration of your extending said credit to the Hercules Exploration, Inc., the undersigned hereby unconditionally guarantees payment of whatever amount the said Hercules Exploration, Inc. shall at any time owe to the said Halliburton Company, its divisions and subsidiaries, on account of material and equipment hereafter furnished or sold, and services hereafter rendered, whether said indebtedness is in the form of notes, bills or open account."

\* \* \* \* \* \*

Notice of indebtedness, notice of default in payment and notice of acceptance are hereby waived. It shall not be necessary for you to take proceedings against Hercules Exploration, Inc. before proceeding against the undersigned for payment of any sum, the payment of which is hereby guaranteed. Liability under this guaranty shall at no time exceed the sum of $50,000.00"

It is conclusively shown by the record that the goods and services furnished Hercules by Halliburton were furnished on August 20 and 24, 1976, respectively. There is no evidence that the guaranty was revoked by either Weaver or Myers prior to August 24, 1976, the date when the last of such goods and services were furnished. The document itself stated that it was an "open and continuing guaranty, subject only to the limitations hereinafter set forth." None of the limitations affect the provisions of the "Letter of Guaranty."

[12, 13] A "continuing guaranty" is a guaranty which contemplates a series of future transactions and remains in effect, according to its terms, until revoked. *Houston Furniture, Etc. v. Bank of Woodlake*, 562 S.W.2d 880, 884 (Tex.Civ.App.— Houston [1st Dist.] 1978, no writ); *Blount v. Westinghouse Credit Corp.*, 432 S.W.2d 549 (Tex.Civ.App.—Dallas 1968, no writ). The guarantor's liability is measured by the principal's liability. *Houston Furniture, Etc. v. Bank of Woodlake*, supra. In the case at bar, Hercules, the principal, was found liable by the jury and Weaver and Myers, the guarantors were found liable, individually, by the trial judge.

Hercules became indebted to Halliburton in an amount which was less than the $50,000.00 ceiling set by Weaver and Myers. There are no ambiguities in the "Letter of Guaranty."

[14, 15] Special issues were not required to be submitted to the jury in regard to the liability of Weaver and Myers. The issue of liability of the guarantors became a question of law, to be resolved by the trial court and not by the jury. An issue should not be submitted to a jury if it involves the determination of a question of law. *Burgess v. Sylvester*, 143 Tex. 25, 182 S.W.2d 358 (1944); *Kirkman v. City of Amarillo*, 508

HOUSTON FIRST AMERICAN
SAVINGS, et al., Petitioners,

v.

Vann MUSICK and C.C. Divine, et
al., Respondents.

No. C–1370.

Supreme Court of Texas.

April 20, 1983.

Rehearing Denied June 15, 1983.

Action was instituted in trespass to try title. The District Court No. 164, Harris County, Solito, J., rendered judgment non obstante veredicto in favor of plaintiff, and defendants appealed. The Houston Court of Civil Appeals, Fourteenth Supreme Judicial District, Murphy, J., reversed and remanded, and plaintiff brought error. The Supreme Court, Ray, J., held that: (1) trust deed on which plaintiff based its claim to property was invalid when trustee failed to give notice of sale as required by law, and (2) plaintiff was, however, entitled to rely on doctrine of after-acquired title with respect to remaining defendants.

Judgment of the Court of Appeals reversed, judgment rendered that plaintiff take nothing from one defendant, and judgment of trial court as to remaining defendants affirmed.

1. Evidence ⟊208(1)

Assertions of fact, not pled in alternative, in live pleadings of a party are regarded as formal judicial admissions.

2. Evidence ⟊265(1)

Any fact admitted is conclusively established in case without introduction of pleadings or presentation of other evidence.

3. Evidence ⟊265(7)

Act of defendant in admitting as a fact that individual bought note and deed of trust in name of corporation which named substitute trustee under whose deed plaintiff claimed was to be regarded as a formal judicial admission and, hence, conclusively established in trespass to try title action that corporation had bought the deed of trust.

4. Evidence ⟊383(7)

Recitals contained in deed by which substitute trustee conveyed property were prima facie evidence that terms of trust were fulfilled, but gave rise only to a presumption of validity and related only to matters of evidence, and thus did not conclusively establish that foreclosure sale under which plaintiff claimed property conformed to conditions set out in deed.

5. Mortgages ⟊352

Substitute trustee's deed was invalid where substitute trustee was not appointed until within 21 days of sale, with result that notice of sale was not given for 21 days prior to sale as required by deed of trust and statute. Vernon's Ann.Texas Civ.St. art. 3810.

6. Mortgages ⟊333

Maker of a deed of trust with power of sale may condition exercise of power upon such conditions as he may prescribe and, since that power admits of no substitution and no equivalent, trustee must strictly adhere to terms of power.

7. Mortgages ⟊353

Compliance with notice condition contained in deed of trust and as prescribed by law is a prerequisite to right of trustee to make sale.

8. Evidence ⟊265(8)

Language in answer and cross petition referring to "purported" appointment of substitute trustee on certain date was not so clear and unequivocal as to rise to a judicial admission that substitute trustee was appointed on that date, particularly where answer included plea of not guilty on general denial.

**9. Evidence ⟜208(1)**

Allegations in answer which includes a general denial are not a waiver of the general denial and may not be used by plaintiff as admissions.

**10. Evidence ⟜265(8)**

Assuming that answer in trespass to try title case admitted that substitute trustee, under whose deed plaintiff claimed, was appointed on certain date, plaintiff nonetheless waived its right to rely on admission, where plaintiff's only objection to special issue regarding appointment of substitute trustee was that there was no evidence raising such an issue and that it was irrelevant, and objection did not indicate that it was relying on defendant's pleadings as a judicial admission, and where plaintiff's own chain of title established that substitute trustee was not appointed on date claimed by plaintiff.

**11. Evidence ⟜265(8)**

Facts alleged or admitted in live pleadings of a party are accepted as true by court and jury and are binding on pleader.

**12. Trial ⟜105(1)**

Party relying on his opponent's pleadings as judicial admissions of fact must protect his record by objecting to introduction of evidence contrary to that admission of fact and by objecting to submission of any issue bearing on fact admitted.

**13. Estoppel ⟜32(1)**

Although substitute trustee's deed was invalid as between grantee of the trustee's deed and grantor of deed of trust, where it did give appearance of good title in grantee, grantor would be estopped to assert the invalidity of the trustee's sale with respect to a subsequent bona fide purchaser of the property.

**14. Mortgages ⟜372(5)**

Although invalid trustee's deed gave appearance of good title, party claiming under the grantee was not a bona fide

purchaser or bona fide mortgagee, and thus had no better title than its grantor, where it was aware of litigation at time it acquired its interest and notice of lis pendens had been filed.

**15. Appeal and Error ⟜878(4)**

Where trial court's judgment non obstante veredicto was exactly the judgment requested by plaintiff, it was unnecessary for plaintiff to file cross points on defendant's appeal in order to advance arguments supporting the trial court's judgment.

**16. Estoppel ⟜50**

When one conveys land by warranty of title, or in such a manner as to be estopped to dispute title of his grantee, a title subsequently acquired to that land will pass eo instante to his warrantee, binding both warrantor and his heirs and subsequent purchasers from either.

**17. Mortgages ⟜374**

Plaintiff was entitled to rely on doctrine of after-acquired title with respect to certain tract of land, though deed to its ancestor in title was executed, individually, by one of three trustees while property was held under deed of trust requiring signature of two trustees, where, subsequently, all three trustees conveyed the property to a person who, through mesne conveyance, conveyed the property to the grantor of the first deed.

---

Anderson, Brown, Orn & Jones, Nelson Jones, Houston, for petitioners.

Heath & Associates, Robert A. Heath, Gladys R. Goffney, Houston, for respondents.

RAY, Justice.

This is a trespass to try title case. Houston First American Savings Association, successor to American Savings & Loan Association of Houston, filed suit in 1966 to recover possession of 618.7 acres in Harris

County. Named as defendants were Vann Musick,[1] who claims an undivided ⅓ interest in the 618.7 acres, and C.C. Divine,[2] who claimed a specific 27 acres. The trial court rendered judgment non obstante veredicto in favor of Houston First American Savings (American). The court of appeals reversed the judgment of the trial court and remanded the cause with instructions to render judgment for Vann Musick and C.C. Divine consistent with the jury's verdict.[3]

We reverse the judgment of the court of appeals and render judgment that American take nothing from defendant Vann Musick and that the judgment of the trial court be affirmed in all other respects. American's claims against the respective defendants are unrelated and will be discussed separately.

### I. American v. Vann Musick

In 1951, W.O. Bartle conveyed the 618.7 acres in controversy to Ted and Levoy Musick, the brothers of Vann Musick. In 1952 Ted Musick and Levoy, joined by his wife Mary Ann Musick, conveyed an undivided ⅓ interest in the property to Vann Musick. On March 14, 1961, Vann Musick, joined by her brothers, executed a deed of trust covering the 618.7 acres to secure a note of the same date payable to Theodore Lucas, trustee of the J.B. Lucas Trust. This note was subsequently purchased by TWI Development Company, a corporation wholly owned by Levoy Musick and his wife. Thereafter, TWI appointed B.J. Brown, substitute trustee, to replace the trustee originally named in the deed of trust. At the trustee's sale held on July 2, 1963, Brown, as substitute trustee, conveyed the 618.7 acres to TWI. In June 1964, TWI conveyed the land to Harry Holmes, Jr. and W.M. Wheless, Sr., reserving an option to repurchase. Four months after this conveyance Levoy Musick died. Under the terms of his will, Mary Ann Musick became owner of all TWI stock and the repurchase option. Subsequently, TWI agreed to a plan for exercising its repurchase option. Pursuant to this plan, TWI repurchased the land and conveyed the 618.7 acres to Meyer Jacobson and T.S. Kent who used the land as collateral to secure a loan from American. On December 18, 1964, three transactions occurred:

1) TWI exercised its option and Holmes and Wheless executed a warranty deed to TWI;

2) Mary Ann Musick, as president of TWI conveyed the land to Kent and Jacobson by general warranty deed;

3) Kent and Jacobson executed a deed of trust to Ralph B. Lee as trustee for the benefit of American.

The deed of trust secured a loan of $150,000 from American to Kent and Jacobson. No payments were ever made on the promissory note. At a trustee's sale held on February 6, 1966, the property was sold to American for $25,000.

American initiated its trespass to try title action in 1966, naming as defendants several members of the Musick family who were already litigating their respective rights in the property. American's lawsuit and the Musick family litigation were consolidated in 1968. Thereafter, American's claims against Vann Musick and C.C. Divine were severed and a separate trial ordered. Before this case was tried, a separate trial was held between American, Levoy Musick, Mary Ann Musick, TWI and others who claimed an interest in the 618.7-acre tract. As between the parties to that suit, this Court rendered judgment for American. *American Savings and Loan Ass'n of Houston v. Musick*, 531 S.W.2d 581 (Tex.1975).

In January, 1980, American's trespass to try title claim against Vann Musick and C.C. Divine came to trial. At the close of

---

1. Vann Musick has conveyed a part of her interest in the 618.7 acres to her attorney, Bob Heath.

2. C.C. Divine is deceased.

3. The court of appeals decision is unpublished. Tex.R.Civ.P. 452.

evidence American moved for an instructed verdict. The trial court denied American's motion and submitted twenty-four special issues requested by Vann Musick. All of the jury's answers to these issues favored Vann Musick. Vann Musick thereafter moved for judgment on the verdict. American filed an opposing motion for judgment non obstante veredicto. The trial court granted American's motion, finding that the jury's verdict was not supported by the pleadings or evidence and was immaterial.

The court of appeals reversed the judgment of the trial court and remanded the cause for entry of judgment on the jury's verdict. Although the court of appeals found evidence to support the verdict, the court did not specifically discuss the evidence or address which issue or issues served to defeat American's title.

American argues that the court of appeals has erred in remanding the cause for entry of judgment on the jury's verdict, because the special issues are immaterial and unsupported by the pleadings and evidence. American submits that the trial court correctly rendered judgment in its favor because it established superior title out of a common source.

American's claim of superior title depends upon the foreclosure of a deed of trust signed by Vann Musick and her brothers on March 14, 1961. This deed of trust was given to secure a note payable to Theodore Lucas, Trustee of the J.B. Lucas Trust. This deed of trust granted the trustee the power to sell the property at the request of the holder or payee of the note in the event of default. The deed of trust further set forth the conditions of the Trustee's power of sale which included, among others, that notice of the sale be posted in three public places in Harris County for at least twenty-one days prior to the sale. The deed of trust also contained the customary provisions authorizing the trustee, or a duly appointed substitute trustee, to recite in the trustee's deed the facts concerning the sale, and that such recitals should be prima facie evidence of the truth of the facts recited.

[1–3] In order to connect this deed of trust to a substitute trustee's deed which purported to convey the 618.7-acre tract to TWI, American introduced in evidence a document entitled "Appointment of Substitute Trustee." This document recited that TWI was the owner and holder of the note and deed of trust, dated March 14, 1961. Although there was no other evidence in the record confirming that TWI bought the note and deed of trust from the J.B. Lucas Trust, none was necessary. Vann Musick admitted as a fact that Levoy Musick "bought the note and deed of trust in the name of TWI Development Company, a corporation" in a pleading which she entitled "Cross-Plaintiff's First Amended Petition." Assertions of fact, not pled in the alternative, in the live pleadings of a party are regarded as formal judicial admissions. Any fact admitted is conclusively established in the case without the introduction of the pleadings or presentation of other evidence. *Kirk v. Head,* 137 Tex. 44, 152 S.W.2d 726 (1941); 1A R. Ray, *Texas Law of Evidence,* § 1144 (Texas Practice 3d ed. 1980).

American next introduced in evidence the deed by which the substitute trustee conveyed the property to TWI. This deed recited compliance with all conditions of the deed of trust. American argues that the recitals in the substitute trustee's deed establish that the foreclosure sale at which TWI acquired the property conformed to the conditions set out in the deed of trust.

[4] While we agree that these recitals are prima facie evidence that the terms of the trust were fulfilled, we note that the recitals in a trustee's deed only give rise to a presumption of validity and relate only to matters of evidence. *Slaughter v. Qualls,* 139 Tex. 340, 162 S.W.2d 671, 676 (1942). The presumption of the validity of the sale is not conclusive and may be rebutted. *Hart v. Eason,* 159 Tex. 375, 321 S.W.2d 574, 575 (1959). Although Vann Musick admitted in her "cross-claim" that TWI purchased the note and deed of trust and

thereby conceded TWI's authority to appoint a substitute trustee, Vann Musick nevertheless did rebut the presumption that the substitute trustee complied with the conditions contained in the deed of trust.

[5] The "Appointment of Substitute Trustee" recites that B.J. Brown was appointed substitute trustee on May 21, 1963. The appointment, however, refers to the volume and page where the deed of trust is recorded. Since the deed of trust was not recorded until June 17, 1963, the volume and page could not have been known on May 21, 1963. The jury found that B.J. Brown was not appointed substitute trustee until some time after June 17, 1963. Since Brown sold the property to TWI on July 2, 1963, it is apparent that notice of the sale was not given for twenty-one days prior to sale as required by the deed of trust and Article 3810.[4]

[6, 7] The maker of a deed of trust with power of sale may condition the exercise of the power upon such conditions as he may prescribe. *Slaughter v. Qualls, supra.* The trustee must strictly adhere to the terms of the power for the power "admits of no substitution and no equivalent." *Michael v. Crawford,* 108 Tex. 352, 193 S.W. 1070 (1917). In *Fuller v. O'Neal,* 69 Tex. 349, 6 S.W. 181 (1887) we wrote:

> The course marked out for the trustee to pursue must be strictly followed by him: for the method of enforcing the collection through such deeds is a harsh one. The grantor of the power is entitled to have his directions obeyed; to have the proper notice of sale given; to have it to take

place at the time and place, and by the person appointed by him.

Compliance with the notice condition contained in the deed of trust and as prescribed by law is a prerequisite to the right of the trustee to make the sale. *Goode v. Davis,* 135 S.W.2d 285, 292 (Tex.Civ.App.—Fort Worth 1939, writ dism'd judgmt cor.); *Childs v. Hill,* 20 Tex. 162, 49 S.W. 652 (Tex.Civ.App.1898, no writ).

[8–10] American argues, however, that the jury finding that the substitute trustee was not appointed by TWI until sometime after June 17, 1963 is immaterial because Vann Musick admitted in her pleadings that the appointment of the substitute trustee was made on May 21, 1963. In "Cross-Plaintiff's First Amended Petition," Vann Musick alleged:

> "On the 21st day of May, 1963, conspiring with B.J. Brown and Pat Towery, a purported appointment of Substitute Trustee was executed by A.R. Morris, as president attested by Pat Towery, Secretary of the TWI Development Company."

In her amended answer she alleged:

> "The TWI Development Company obtained title to the 618.7 acres in question by an invalid substitute trustee sale from B.J. Brown who was appointed trustee by A.R. Morris purported president of TWI Development Company on the 21st day of May, 1963."

Assuming for the sake of argument that Vann Musick's pleadings do admit as fact that TWI appointed the substitute trustee on May 21, 1963,[5] American has nevertheless waived its right to rely on the admis-

---

4. Tex.Rev.Civ.Stat.Ann. art. 3810 (1966) provided in part:

   "* * * Notice of such proposed sale shall be given by posting written notice thereof for three consecutive weeks prior to the day of sale in three public places in said county or counties, one of which shall be made at the courthouse door of the county in which such sale is to be made, and if such real estate be in more than one county, one at the courthouse door of each county in which said real estate may be situated, or the owner of such real estate may, upon written application,

cause the same to be sold as provided in said deed of trust or contract lien. * * *"

5. We doubt that Vann Musick judicially admitted as fact that TWI appointed B.J. Brown substitute trustee on May 21, 1963. Both the answer and cross-petition use "purported" which is synonymous with "rumored." We do not view the sentence from either the cross-petition or answer as being so clear and unequivocal as to rise to a judicial admission. *American Savings and Loan Ass'n of Houston v. Musick, supra,* at 589. Furthermore, the an-

sion. American's only objection to the special issue regarding the appointment of B.J. Brown as substitute trustee was "there is no evidence which raises such an issue and it is irrelevant." American's objection did not indicate that it was relying on Vann Musick's pleadings as a judicial admission. Furthermore, American's own chain of title, and hence its own evidence, establishes that B.J. Brown was not appointed substitute trustee on May 21, 1963. Although the "Appointment of Substitute Trustee" recites that the appointment was executed on May 21, 1963, when this instrument is considered together with the deed of trust to which it refers by volume and page, it is evident that the May 21 date is erroneous.

[11, 12] The facts alleged or admitted in the live pleadings of a party are accepted as true by the court and jury and are binding on the pleader. 1A R. Ray, *Texas Law of Evidence,* § 1127 (Texas Practice 3d ed. 1980). The party relying on his opponent's pleadings as judicial admissions of fact, however, must protect his record by objecting to the introduction of evidence contrary to that admission of fact and by objecting to the submission of any issue bearing on the fact admitted. *Starks v. City of Houston,* 448 S.W.2d 698 (Tex.Civ.App.—Houston [1st Dist.] 1969, writ ref'd n.r.e.); *Restelle v. Williford,* 364 S.W.2d 444 (Tex.Civ. App.—Beaumont 1963, writ ref'd n.r.e.); *Dallas Transit Co. v. Young,* 370 S.W.2d 6 (Tex.Civ.App.—Dallas 1963, writ ref'd n.r. e.).

[13, 14] Although the substitute trustee's deed was invalid as between TWI and Vann Musick, it did give the appearance of good title in TWI. Were American a bona fide purchaser of the property, Vann Musick would be estopped to assert the invalidity of the trustee's sale. *Slaughter v. Qualls,* 162 S.W.2d at 675. The jury, however, found that American was neither a

bona fide purchaser, nor a bona fide mortgagee. Both terms were defined as requiring the purchaser or mortgagee to acquire its interest in the property in good faith, for value and without notice of the claim or interest of a third party. *Houston Oil Co. of Texas v. Hayden,* 104 Tex. 175, 135 S.W. 1149 (1911). There is evidence in the record from which the jury could reasonably have concluded that American was aware of the Musick family litigation at the time it acquired its interest in the 618.7-acre tract. This land was the subject of a lawsuit filed in May, 1962. Vann Musick, Ted Musick, Levoy Musick, TWI and other members of the Musick family were all parties to the litigation. In 1963, a notice of lis pendens was filed in the lis pendens records of Harris County. American did not take its deed of trust on the property until December, 1964, and did not foreclose on the property until 1966.

In summary, we hold that the substitute trustee's deed conveying the property to TWI is invalid because the trustee failed to give the notice required by law and by the terms of the deed of trust. We further hold that American is not a bona fide purchaser and, hence, has no better title than its grantor. *See Hartel v. Dishman,* 135 Tex. 600, 145 S.W.2d 865 (1940).

## II. American v. C.C. Divine

C.C. Divine claimed a specific 27 acres out of the 618.7-acre tract. Levoy Musick is the common source of title. American's title is identical to that traced above with respect to its claim against Vann Musick.

On December 13, 1961, Levoy and his wife conveyed the 27 acres to C.C. Divine. On October 25, 1962, C.C. Divine and H.G. Divine placed certain property in trust. The corpus of the trust included the 27 acres in controversy. The purpose of the trust was to serve as security for the post-

---

swer includes a plea of not guilty and a general denial. Allegations in a defendant's answer which includes a general denial are not a waiver of the general denial and may not be used by

the plaintiff as admissions. *Climatic Air Distributors v. Climatic Air Sales, Inc.,* 162 Tex. 237, 345 S.W.2d 702 (1961); *Hynes v. Packard,* 92 Tex. 44, 45 S.W. 562, 564 (1898).

ing of bail bonds. The trust required the signatures of at least two trustees for a valid conveyance of property from the trust. C.C. Divine, H.G. Divine and A. Divine were named trustees. On July 27, 1963, C.C. Divine, individually, executed a general warranty deed conveying the 27 acres to Levoy Musick and his wife. The other two trustees did not join in this conveyance.

On September 5, 1963, all three trustees conveyed the 27 acres to Fred Divine who, on March 19, 1964, conveyed the property to W.E. Whitter and G.D. Peyton. On June 15, 1965, Whitter and Peyton, by general warranty deed, conveyed the 27 acres to C.C. Divine.

Over the objections of American, C.C. Divine was permitted to testify that he did not intend to convey the 27 acres by his warranty deed of July 27, 1963. The jury apparently believed Divine's testimony, because all special issues were answered in Divine's favor. The trial court, however, disregarded the jury's verdict and rendered judgment for American.

The court of appeals reversed the judgment of the trial court and remanded the cause for entry of judgment on the verdict. The court of appeals concluded that there was evidence to support the jury verdict and that American had waived any error by failing to file cross-points.

American argues that it was not required to file cross-points in the court of appeals. American further argues that under the doctrine of after-acquired title, the title conveyed to C.C. Divine by Whitter and Peyton on June 15, 1965, flowed immediately into Levoy Musick and wife, and their assigns because of Divine's general warranty deed dated July 27, 1963.

[15] We agree with both arguments. In *Jackson v. Ewton,* 411 S.W.2d 715, 717 (Tex. 1967) we explained that "cross-points" are used to preserve error committed by the trial court and "are the means by which an appellee may bring forward complaints of some ruling or action of the trial court

which the appellee alleges constituted error as to him." The judgment non obstante veredicto rendered by the trial court is exactly the judgment requested by American. In fact, the trial court judgment incorporates by reference American's entire motion for judgment non obstante veredicto. Hence, it was unnecessary for American to file cross-points, because American had no complaint with the judgment of the trial court.

[16, 17] The court of appeals' erroneous "cross-point" holding apparently caused the court to conclude that American had waived its argument under the doctrine of after-acquired title. We hold that American is entitled to rely on the doctrine. The rule is that "when one conveys land by warranty of title, or in such a manner as to be estopped to dispute the title of his grantee, a title subsequently acquired to that land will pass eo instante to his warrantee, binding both the warrantor and his heirs and subsequent purchasers from either." *Caswell v. Llano Oil Co.,* 120 Tex. 139, 36 S.W.2d 208, 211 (Tex.Comm'n App.1931, opinion adopted), citing *Baldwin v. Root,* 90 Tex. 546, 40 S.W. 3, 6 (1897).

The judgment of the court of appeals is reversed. We render judgment that American take nothing from Vann Musick. The judgment of the trial court is affirmed in all other respects.



**DAIRYLAND COUNTY MUTUAL INSURANCE COMPANY OF TEXAS, Petitioner,**

v.

**Harry CHILDRESS, et al., Respondents.**

No. C-1554.

Supreme Court of Texas.

May 25, 1983.

Plaintiffs injured in automobile accident, after securing judgment against driv-

439 S.W.3d 422
Court of Appeals of Texas,
Houston (1st Dist.).

In re PROGRESSIVE COUNTY MUTUAL
INSURANCE COMPANY, Relator.

No. 01–14–00199–CV.  |  June 12, 2014.

**Synopsis**

**Background:** Insured brought action against uninsured motorist (UM) carrier to recover for breach of contract, breach of the duty of good faith and fair dealing, and statutory violations. The 215th District Court, Harris County, Elaine H. Palmer, J., denied carrier's motion to sever and abate extra-contractual claims. Carrier petitioned for writ of mandamus.

**[Holding:]** The Court of Appeals, Harvey Brown, J., held that severance of extra-contractual claims from breach of contract claim was required.

Writ conditionally granted.

**Attorneys and Law Firms**

**\*424** Mark R. Lapidus, Megan L. Knudsen, Lapidus Knudsen, PC, Houston, TX, for Relator.

Timothy R. Hightower, Alexandra Muthcler, Houston, TX, for Real Party in Interest.

Panel consists of Justices KEYES, BLAND and BROWN.

**OPINION**

HARVEY BROWN, Justice.

Relator, Progressive County Mutual Insurance Company seeks a writ of mandamus compelling the trial court to (1) vacate its order denying Progressive's motion to sever extra-contractual claims asserted against it and (2) enter an order abating those extra-contractual claims until the breach-of-contract claim brought by Alma Guia, the real party in interest, has been resolved. We conditionally grant the writ.

**Background**

Following an automobile collision with an uninsured motorist's vehicle, Guia sued her insurer, Progressive. [1] While investigation into the claim was ongoing, Guia sued Progressive for breach of the uninsured motorist provisions in her policy, violations of Chapter 542 of the Texas Insurance Code, violations of the Deceptive Trade Practices–Consumer Protection Act, and breach of the duty of good faith and fair dealing. Guia served Progressive with a number of discovery requests, some of which would not be relevant to the breach-of-contract claim. Progressive filed a motion to sever the breach of contract claim for uninsured motorist coverage from the extra-contractual claims. The trial court judge signed an order abating the motion to sever, allowing discovery to move forward on all claims, and deferring the other issues covered by the motion until the pretrial hearing. Progressive filed a writ seeking to compel severance and abatement.

**Standard of Review**

**[1] [2] [3] [4]** We may issue a writ of mandamus to correct a trial court's clear abuse of discretion or violation of duty imposed by law when no adequate remedy by appeal exists. *See Walker v. Packer,* 827 S.W.2d 833, 839 (Tex.1992) (orig. proceeding). A clear abuse of discretion occurs when the trial court's decision is so arbitrary and unreasonable that it amounts to clear error. *See id.* (quoting *Johnson v. Fourth Court of Appeals,* 700 S.W.2d 916, 917 (Tex.1985)). Because a trial court has no discretion in determining what the law is, the trial court abuses its discretion if it clearly fails to analyze or apply the law correctly. *See id.* at 840. "In determining whether appeal is an adequate remedy, [we] consider whether the benefits outweigh the detriments of mandamus review." *In re BP Prods. N. Am., Inc.,* 244 S.W.3d 840, 845 (Tex.2008) (orig. proceeding).

**[5] [6]** The trial court has "broad" discretion in the severance of causes of action. *Morgan v. Compugraphic Corp.,* 675 S.W.2d 729, 734 (Tex.1984); *Black v. Smith,* 956 S.W.2d 72, 75 (Tex.App.-Houston [14th Dist.] 1997, orig. proceeding). However, that discretion is not unlimited. *See U.S. Fire Ins. Co. v. Millard,* 847 S.W.2d 668, 671 (Tex.App.-Houston [1st Dist.] 1993, orig. proceeding). The trial court has a duty to order severance when **\*425** "all of the facts and circumstances of the case unquestionably require a separate

trial to prevent manifest injustice, and there is no fact or circumstance supporting or tending to support a contrary conclusion, and the legal rights of the parties will not be prejudiced thereby." *Womack v. Berry,* 156 Tex. 44, 291 S.W.2d 677, 682–83 (Tex.1956) (orig. proceeding).

### Severance of Contractual and Extra–Contractual Claims

[7] Texas Rule of Civil Procedure 41 governs severance of claims. *See* TEX.R. CIV. P. 41. The rule provides, in part, that "[a]ctions which have been improperly joined may be severed ... on such terms as are just. Any claim against a party may be severed and proceeded with separately." *Id.* The predominant reasons for a severance are to do justice, avoid prejudice, and promote convenience. *F.F.P. Op. Partners, L.P. v. Duenez,* 237 S.W.3d 680, 693 (Tex.2007). Claims are properly severable if: (1) the controversy involves more than one cause of action; (2) the severed claim is one that would be the proper subject of a lawsuit if independently asserted; and (3) the severed claim is not so interwoven with the remaining action that it involves the same facts and issues. *Guar. Fed. Sav. Bank v. Horseshoe Operating Co.,* 793 S.W.2d 652, 658 (Tex.1990). Only the third element is in dispute here.

In *Liberty National Fire Insurance Co. v. Akin,* the Texas Supreme Court considered whether severance was required in a case involving breach of contract and extra-contractual claims against an insurer under a homeowner's policy. 927 S.W.2d 627 (Tex.1996). In refusing to grant mandamus relief, the Court rejected "an inflexible rule that would deny the trial court all discretion and ... require severance in every case [involving bad-faith insurance claims], regardless of the likelihood of prejudice." *Id.* at 630. Ultimately, the Court concluded that the contractual and extra-contractual claims in that case were interwoven, with most evidence admissible on both claims, and that any prejudicial effect could be ameliorated by appropriate limiting instructions. *See id.* The Court went on to

> Several Texas appellate courts have found severance may nevertheless be necessary in some bad faith cases. A trial court will undoubtedly confront instances in which evidence admissible only on the bad faith claim would prejudice the insurer to such an extent that a fair trial on the contract

claim would become unlikely. One example would be when the insurer has made a settlement offer on the disputed contract claim. As we have noted, some courts have concluded that the insurer would be unfairly prejudiced by having to defend the contract claim at the same time and before the same jury that would consider evidence that the insurer had offered to settle the entire dispute. While we concur with these decisions, we hasten to add that evidence of this sort simply does not exist in this case. In the absence of a settlement offer on the entire contract claim, or other compelling circumstances, severance is not required.

*Id.* (internal citations omitted); *see also In re Miller,* 202 S.W.3d 922, 925–26 (Tex.App.-Tyler 2006, orig. proceeding [mand. denied] ); *In re Trinity Universal Ins. Co.,* 64 S.W.3d 463, 468 (Tex.App.-Amarillo 2001, orig. proceeding [mand. denied] ). Thus, in *Liberty National,* the Court opined a settlement offer by an insurer may create a situation where severance of an insured's contract claim is required. 927 S.W.2d at 630 (Tex.1996).

There is no evidence in the record that Progressive made a settlement offer to **\*426** Guia. However, *Liberty National* does not limit severance to cases where such an offer has been made, instead holding that "other compelling circumstances" may also require severance. *Id.* In the case before us, Progressive argues that "other compelling circumstances" should include the effort and cost associated with conducting discovery on extra-contractual claims that have not yet accrued because the insured's breach-of-contract claim has not yet been decided.

Several courts of appeals have considered the issues of severance and abatement in the context of uninsured motorist or underinsured motorist insurance coverage; these courts have concluded that, when uninsured motorist claims are involved, severance of the extra-contractual claims was required. *See In re Am. Nat'l Cnty. Mut. Ins. Co.,* 384 S.W.3d 429 (Tex.App.-Austin 2012, orig. proceeding) (concluding trial court abused discretion by denying insurer's motion for severance and abatement of extra-contractual claims where settlement offer was made on underinsured motorist claim); *In re Reynolds,* 369 S.W.3d 638, 650–55 (Tex.App.-Tyler

2012, orig. proceeding) (holding severance of underinsured motorist claim was required to prevent prejudice); *In re United Fire Lloyds,* 327 S.W.3d 250, 257 (Tex.App.-San Antonio 2010, orig. proceeding) (finding abuse of discretion in granting motion for bifurcation of trial rather than severance and abatement of extra-contractual claims); *see also In re Old Am. Cnty. Mut. Fire Ins. Co.,* No. 13–12–00700–CV, 2013 WL 398866 (Tex.App.-Corpus Christi January 30, 2013, orig. proceeding) (mem. op.) (holding that severance and abatement of extra-contractual claims is required in many instances when insured asserts claim to uninsured or underinsured motorist benefits); *In re Farmers Tex. Cnty. Mut. Ins. Co.,* No. 07–11–00396–CV, 2011 WL 4916303, (Tex.App.-Amarillo Oct. 17, 2011, orig. proceeding) (mem. op.) (denying mandamus because complaint was not preserved, but agreeing that abatement of extra-contractual claims is required in most instances when an insured asserts claim to uninsured motorist benefits).

The San Antonio Court of Appeals explained its determination that mandamus relief was proper to compel severance and abatement of an underinsured motorist claim from related bad faith claims as follows:

> [The insurer] is under no contractual duty to pay [underinsured motorist] benefits until [the insured] establishes the liability and underinsured status of the other motorist. Therefore, [the insurer] should not be required to put forth the effort and expense of conducting discovery, preparing for a trial, and conducting voir dire on bad faith claims that could be rendered moot by the portion of the trial relating to [underinsured motorist] benefits. To require such would not do justice, avoid prejudice, and further convenience. Under these circumstances, we conclude the trial court abused its discretion in bifurcating the case instead of severing and abating the [underinsured motorist] claim from the bad faith claims.

*In re United Fire Lloyds,* 327 S.W.3d at 256. [2]

**\*427** **[8]** In this case, to prevail on her extra-contractual claims against Progressive, Guia must demonstrate that

Progressive was contractually obligated to pay her uninsured motorist claim. To do this, Guia must first prove that she had uninsured motorist coverage, that the other driver negligently caused the accident and was uninsured, and the amount of her damages. *See In re Reynolds,* 369 S.W.3d at 652. It appears that the first issue is not in dispute. Therefore, Guia's breach-of-contract claim will essentially involve the issues in a typical car wreck: the comparative negligence of Guia and the other driver and Guia's damages. The bad faith claim here is more complicated. In her most recent petition, she alleges that Progressive breached their duty of good faith and fair dealing, violated the insurance code by failing to timely pay the claim, and further alleges Progressive's conduct was knowing and intentional in violation of the Deceptive Trade Practices Act. In discovery, Guia seeks production of all documents related to lawsuits and claims against Progressive regarding the denial of uninsured/underinsured motorist claims for over ten years. Examples of these requests include:

> Request 3. Produce all documents of any type as to claims asserted against Progressive during period from January 1, 2001, up to and including present day as a result of nonpayment of uninsured/underinsured motorist claims in Texas regardless of whether a lawsuit was filed and/or liability was denied.

> Request 4. Produce all documents of any type as to all lawsuits filed against Progressive during period from January 1, 2001, up to and including present day, as a result of nonpayment of uninsured/underinsured motorist claims in Texas regardless of whether liability was denied.

> ...

> Request 16. A copy of each and every policy, manual, protocol, instruction booklet or similar writing concerning procedures for the investigation and handling of uninsured/underinsured motorist claim which was in effect at the time Plaintiff made her claims in this case, and for the seven years preceding Progressive's denial of Plaintiff's claim.

These requested documents are irrelevant to the breach-of-contract claim, and the introduction of Progressive's claims handling history in unrelated accidents at the trial of Guia's breach-of-contract claim would be manifestly unjust. *See Womack v. Berry,* 291 S.W.2d at 682–83 (Tex.1956) (orig. proceeding).

The trial court's abatement of any decision on severance until the eve of trial requires the parties to engage in discovery on the extra-contractual claims and prepare for a trial on

these claims, even though extra-contractual liability could only accrue if Progressive is found liable on the contract. *See In re United Fire Lloyds,* 327 S.W.3d at 256. Accordingly, the trial court's decision to postpone severance, unless writ is granted, will require Progressive to expend resources answering discovery that is far broader than the car accident claim that must be resolved.

Consistent with *In re Reynolds* and *In re United Fire Lloyds,* we conclude that severance of insured's extra-contractual claims is required in this instance to avoid prejudice.

### Adequate Remedy by Appeal

 **[9]**    A writ of mandamus will issue only if there is no adequate remedy available by direct appeal. *See* **\*428** *Walker,* 827 S.W.2d at 839. The Corpus Christi Court of Appeals in *In re United Fire Lloyds* concluded the insurer did not have an adequate remedy by appeal because, if a writ of mandamus were not granted, the insurer stood to lose substantial rights by being required to prepare for claims that might be rendered moot and never even accrue. *In re Fire Lloyds,* 327 S.W.3d at 256 (citing *U.S. Fire Ins. Co.,* 847 S.W.2d at 675; *In re Trinity Universal Ins. Co.,* 64 S.W.3d at 468).

The Corpus Christi Court of Appeals agreed. *See In re Old Am. Cnty. Mut. Fire Ins. Co.,* 2013 WL 398866. Likewise, other appellate courts have also found these claims do not have an adequate remedy by appeal. *See In re Am. Nat'l Cnty. Mut. Ins. Co.,* 384 S.W.3d 429, 439; *In re Reynolds,* 369 S.W.3d at 658; *In re United Fire Lloyds,* 327 S.W.3d at 256.

### Conclusion

Based on our review of the record, we conclude that Guia's extra-contractual claims against Progressive are severable, the facts and circumstances of the case require a severance to prevent manifest injustice, and the legal rights of the parties will not be prejudiced thereby. *See Womack,* 291 S.W.2d at 683. The trial court, therefore, abused its discretion in refusing to sever and abate the uninsured motorist claims from the bad faith claims pending the determination of Progressive's liability for the uninsured motorist damages under the policy. *See In re Am. Nat'l Cnty. Mut. Ins. Co.,* 384 S.W.3d 429; *In re Reynolds,* 369 S.W.3d at 650–55; *In re United Fire Lloyds,* 327 S.W.3d at 257; *see also In re Old Am. Cnty. Mut. Fire Ins. Co.,* 2013 WL 398866; *In re Farmers Tex. Cnty. Mut. Ins. Co.,* 2011 WL 4916303.

We conditionally grant Progressive's writ of mandamus and order the trial court to vacate the February 11, 2014 Order, grant Progressive County Mutual Insurance Company's Motion to Sever, and abate the extra-contractual claims. We are confident that the trial court will promptly comply, and our writ will issue only if it does not.

### Footnotes

1    The underlying case is *Alma Guia v. Jessica Nicole Estes, Relinda Estes, Progressive Insurance Company and Progressive County Mutual Insurance Company;* No. 2012–57535, in the 215th District Court of Harris County, Texas, the Honorable Elaine H. Palmer presiding.

2    The court relied on the Texas Supreme Court's reasoning in *Brainard v. Trinity Universal Insurance Co.,* 216 S.W.3d 809 (Tex.2006), but acknowledged that *Brainard* concerned timing of presentment of contract claim to determine whether party was entitled to attorney's fees under Chapter 38 of Texas Civil Practice and Remedies Code, rather than severance and abatement in the context of uninsured motorist claim. *See In re United Fire Lloyds,* 327 S.W.3d 250, 257 (Tex.App.-San Antonio 2010, orig. proceeding) (discussing *Brainard,* 216 S.W.3d at 818).

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

in control of a corporation uses that control, or uses the corporate assets, to further his or her own personal interests, the fiction of the separate corporate identity may properly be disregarded.

*Id.* at 641 (citations omitted).

The focus of Delaware and Pennsylvania law is on the conduct of the corporation rather than on the relationship between the corporation and its creditors. The law of those states emphasizes equitable concerns, directed at holding the control entity accountable and addressing unjust enrichment to that company. We are convinced that the policies that persuaded the Fifth Circuit that alter ego claims against a debtor's parent corporation may be brought by the bankruptcy estate representative, rather than individual creditors, support the same conclusion in this case. *See S.I. Acquisition,* 817 F.2d at 1152–53; *see also Baillie Lumber,* 612 S.E.2d at 300.

**[27]** Moreover, we recognize that the alter ego doctrine is an equitable remedy. *See Peacock v. Thomas,* 516 U.S. 349, 354, 116 S.Ct. 862, 866, 133 L.Ed.2d 817 (1996). To the extent that each were damaged by its respective parent's domination and control over it to the point that it was rendered insolvent and unable to meet its legal obligations, the subsidiary should have standing to assert an equitable claim against its dominant parent. *See In re iPCS, Inc.,* 297 B.R. 283, 298 (Bankr. N.D.Ga.2003) (interpreting Delaware law and holding that estate representative had standing to assert alter ego claim of debtor corporation).

**[28]** We conclude that, under Delaware and Pennsylvania law, a corporation, par-

ticularly an insolvent one, has standing to pierce its own corporate veil under an alter ego theory to reach the assets of its parent. *See S.I. Acquisition,* 817 F.2d at 1152. We further conclude that such claim passes into the bankruptcy estate on the filing of the bankruptcy petition. *See* 11 U.S.C. § 541(a)(1). At that point, the trustee or debtor-in-possession has exclusive standing to assert the alter ego claim. *See Tow,* 312 S.W.3d at 757; Highland Capital Mgmt., 212 S.W.3d at 530. As applied to this case, the debtor-in-possession, Washington Group, was the only party with standing to assert an alter ego claim against Raytheon. Boccard did not have standing to assert the alter ego claim. Thus, we hold that the trial court was without subject-matter jurisdiction to render judgment based on the equitable claim of alter ego.

We sustain Raytheon's first issue.[10]

### Conclusion

Because we hold that Boccard did not have standing to pursue its alter ego claim against Raytheon, we vacate the trial court's judgment and dismiss the case.



**In re James Michael REYNOLDS and Pelhams Industrial Warehouse, Inc.**

**No. 12–10–00176–CV.**

Court of Appeals of Texas, Tyler.

May 16, 2012.

**Background:** Injured motorist brought personal injury action against truck driver

---

**10.** Because this issue is dispositive, we do not address Raytheon's remaining three issues.

*See* Tex.R.App. P. 47.1.

and truck diver's employer, and asserted a claim against his automobile insurer for underinsured motorist (UIM) benefits. The 273rd Judicial District Court, Shelby County, Charles R. Mitchell, J., denied truck driver's and employer's motion to sever and transfer venue, and truck driver and employer filed petition for writ of mandamus.

**Holdings:** The Court of Appeals, Brian Hoyle, J., held that:

(1) motorist's claims against truck driver and driver's employer and motorist's claim against UIM insurer were not interwoven and thus were properly severable;

(2) severance was necessary to avoid prejudice to truck driver and driver's employer; and

(3) truck driver and driver's employer did not have an adequate appellate remedy, as required in order to obtain mandamus relief.

Petition conditionally granted.

**1. Mandamus** ⬅1

Mandamus is an extraordinary remedy.

**2. Mandamus** ⬅4(1), 28

To obtain mandamus relief, a relator must show that: (1) the trial court clearly abused its discretion, and (2) the benefits of mandamus outweigh the detriments to the extent that an appellate remedy is inadequate.

**3. Mandamus** ⬅28

A trial court clearly abuses its discretion, as required for mandamus relief, if it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law.

**4. Mandamus** ⬅28

With respect to resolution of factual issues or matters committed to the trial court's discretion, a relator seeking mandamus relief must establish that the trial court could reasonably have reached only one decision.

**5. Mandamus** ⬅172

An appellate cannot in a mandamus proceeding disturb a trial court's decision unless it is shown to be arbitrary and unreasonable, even if the appellate court would have decided the issue differently.

**6. Mandamus** ⬅28

Because a trial court has no discretion in determining what the law is or applying the law to the facts, a clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion and may result in appellate reversal by extraordinary writ or mandamus.

**7. Mandamus** ⬅4(1)

When determining whether mandamus relief is appropriate, the adequacy of an appellate remedy must be determined by balancing the benefits of mandamus review against the detriments.

**8. Mandamus** ⬅4(1)

When the benefits of mandamus review outweigh the detriments, appellate courts must consider whether the appellate remedy is adequate.

**9. Mandamus** ⬅3(2.1)

Mandamus will not issue when the law provides another, plain, adequate, and complete remedy.

**10. Appeal and Error** ⬅78(1)

An order denying severance is not a final judgment and therefore is not appealable.

**11. Mandamus ☞32**

Mandamus is the appropriate avenue by which a party may seek review of a trial court's order denying severance.

**12. Mandamus ☞44**

Venue determinations generally are not reviewable by mandamus. V.T.C.A., Civil Practice & Remedies Code § 15.064(b).

**13. Mandamus ☞4(4), 44**

Where a relator does not seek enforcement of a mandatory venue statute, mandamus generally is not available absent an abuse of discretion by the trial court and an inadequate appellate remedy. V.T.C.A., Civil Practice & Remedies Code § 15.064(b).

**14. Mandamus ☞44**

Mandamus review of permissive venue determinations is appropriate in extraordinary circumstances. V.T.C.A., Civil Practice & Remedies Code § 15.064(b).

**15. Venue ☞76**

Like any other interlocutory order, an order denying a motion to transfer venue may be reconsidered at any time within the period of the trial court's plenary power. Vernon's Ann.Texas Rules Civ.Proc., Rule 87(5).

**16. Venue ☞17**

The existence of a cause of action is immune from challenge at a venue hearing. Vernon's Ann.Texas Rules Civ.Proc., Rule 87.

**17. Action ☞6**

Ripeness is a component of subject matter jurisdiction.

**18. Action ☞6**

Ripeness is a question of law.

**19. Action ☞13**

Standing is a component of subject matter jurisdiction.

**20. Action ☞6, 13**

Standing focuses on who may bring the cause of action, and ripeness focuses on when the cause of action may be brought.

**21. Appeal and Error ☞842(1)**

Because ripeness is a component of subject matter jurisdiction, an appellate court reviews a ripeness determination under the same standard by which it reviews subject matter jurisdiction generally. Vernon's Ann.Texas Rules Civ.Proc., Rule 87.

**22. Courts ☞32.3**

A pleader must allege facts that affirmatively demonstrate the court's jurisdiction to hear the cause.

**23. Insurance ☞3571**
   **Venue ☞8.5(1)**

Trial court did not abuse its discretion by concluding that injured motorist properly pled a cause of action against motorist's underinsured motorist (UIM) benefits insurer and that such claim could fix venue, in motorist's action against insurer which also asserted a personal injury claim against truck driver and driver's employer; assuming that proper pleading required allegations supporting ripeness, motorist alleged that truck driver and driver's employer were UIMs at the time of the subject collision, that all conditions precedent to a recovery under the policy had been complied with, that he made a demand for payment, and that insurer refused to pay. Vernon's Ann.Texas Rules Civ.Proc., Rule 87.

**24. Action ☞60**

Severance of claims rests within the sound discretion of the trial court. Ver-

non's Ann.Texas Rules Civ.Proc., Rules 41, 174.

**25. Action** ⚖**60**

Although a trial court has broad discretion in determining whether to grant severance, that discretion is not unlimited; a trial court is required to exercise a sound and legal discretion within limits created by the circumstances of the particular case. Vernon's Ann.Texas Rules Civ. Proc., Rules 41, 174.

**26. Action** ⚖**60**

That a claim may be severed does not always mean that it must. Vernon's Ann.Texas Rules Civ.Proc., Rules 41, 174.

**27. Action** ⚖**60**

There is no room for the exercise of discretion on a motion to sever claims when all of the facts and circumstances of the case unquestionably require a separate trial to prevent manifest injustice, there is no fact or circumstance supporting or tending to support a contrary conclusion, and the legal rights of the parties will not be prejudiced thereby; under these circumstances, the refusal to order a severance constitutes a violation of a plain legal duty, even though it is often termed a clear abuse of discretion. Vernon's Ann.Texas Rules Civ.Proc., Rule 41.

**28. Action** ⚖**60**

On a motion for severance, the desire to avoid some identified prejudice to the movant by denying severance must be weighed against the prejudice that could result from ordering severance. Vernon's Ann.Texas Rules Civ.Proc., Rule 41.

**29. Action** ⚖**60**

A severance divides a lawsuit into two or more separate and independent causes. Vernon's Ann.Texas Rules Civ.Proc., Rule 41.

**30. Action** ⚖**60**

When a trial court grants a severance, the separated causes of action typically proceed to individual judgments that are themselves separately final and appealable. Vernon's Ann.Texas Rules Civ.Proc., Rule 41.

**31. Action** ⚖**60**

A claim is properly severable only if: (1) the controversy involves more than one cause of action; (2) the severed claim is one that would be the proper subject of a lawsuit if independently asserted; and (3) the severed claim is not so interwoven with the remaining action that they involve the same facts and issues. Vernon's Ann.Texas Rules Civ.Proc., Rule 41.

**32. Action** ⚖**60**

The controlling reasons for a severance are to do justice, avoid prejudice, and further convenience. Vernon's Ann.Texas Rules Civ.Proc., Rule 41.

**33. Action** ⚖**60**

Whether a trial court should grant a motion to sever is ultimately a question of law. Vernon's Ann.Texas Rules Civ.Proc., Rule 41.

**34. Action** ⚖**60**

When considering whether to grant a motion for severance, a trial court must generally accept the plaintiff's pleadings as true and then determine whether severance is appropriate; consequently, the only remaining dispute concerns the legal consequences stemming from accepted-as-pleaded facts. Vernon's Ann.Texas Rules Civ.Proc., Rule 41.

**35. Action** ⚖**60**

The intimately connected test, applicable when the issue is venue, is not applicable when severance is the issue; instead, a court must determine whether the claims are "interwoven," meaning that they in-

volve the same facts and issues. Vernon's Ann.Texas Rules Civ.Proc., Rule 41.

See publication Words and Phrases for other judicial constructions and definitions.

**36. Negligence ⬤202**

To prevail on a negligence claim, a plaintiff must establish that the defendant had a legal duty, he breached that duty, and plaintiff suffered damages that were proximately caused by the breach.

**37. Labor and Employment ⬤3025, 3045**

To prevail on a respondeat superior claim, a plaintiff must show that the defendant was the tortfeasor's employer and also that the tortfeasor's act was committed within the scope of his general authority, in furtherance of the defendant's business, and for the accomplishment of the object for which the tortfeasor was hired.

**38. Insurance ⬤2790**

A underinsured motorist (UIM) benefits insurer has no contractual duty to pay benefits until the liability of the other motorist and the amount of damages suffered by the insured are determined. V.T.C.A., Insurance Code § 1952.106.

**39. Insurance ⬤2787**

A motorist is underinsured for purposes of underinsured motorist (UIM) benefits if the available proceeds of his liability insurance are insufficient to compensate for the injured party's actual damages. V.T.C.A., Insurance Code § 1952.106.

**40. Insurance ⬤2787, 2790**

To recover underinsured motorist (UIM) benefits, an injured motorist must establish that he had UIM coverage, the other motorist's negligence proximately caused his damages and the amount of his damages, and the other motorist was underinsured. V.T.C.A., Insurance Code § 1952.106.

**41. Action ⬤60**

Injured motorist's negligence and respondeat superior claims against truck driver and truck driver's employer, and his claim against his underinsured motorist (UIM) insurer, were not "interwoven," and thus were properly severable; though the claims against truck driver and employer and claim against insurer shared the issues of whether driver was negligent, whether the negligence damaged motorist and the amount of motorist's damages, motorist's UIM claim had the additional issues of whether motorist had UIM coverage and whether truck driver and employer had insurance coverage in at least the amount of the damages recovered. V.T.C.A., Insurance Code § 1952.106; Vernon's Ann.Texas Rules Civ.Proc., Rule 41.

**42. Action ⬤60**

Ordinarily, a party seeking severance has the burden to show how it will be prejudiced if severance is not granted and to present evidence to the trial court, in camera if necessary, to support its position. Vernon's Ann.Texas Rules Civ.Proc., Rule 41.

**43. Action ⬤60**

The injection of insurance into a trial does not necessarily create prejudice, for purposes of severance. Vernon's Ann.Texas Rules Civ.Proc., Rule 41.

**44. Trial ⬤127**

The rule that evidence that a defendant was or was not insured is not admissible on the issue of negligence is founded on the belief that the probative value of such evidence is vastly outweighed by the danger of unfair prejudice. Rules of Evid., Rule 411.

**45. Action ⬤60**

Failure of truck driver and truck driver's employer to present evidence of prejudice, when they moved to sever injured

motorist's negligence and respondeat superior claims against them from injured motorist's underinsured motorist (UIM) claim against motorist's UIM insurer, was not fatal to truck driver's and employer's severance motion, as injured motorist would be required to present evidence regarding truck driver's and employer's insurance to establish his UIM claim, truck driver and employer had a substantial right to have their liability decided without any mention of insurance, and allowing evidence of insurance presented an irreconcilable conflict that was apparent without the introduction of evidence. Vernon's Ann.Texas Rules Civ.Proc., Rule 41; Rules of Evid., Rule 411.

**46. Action** ⬤➡**60**
**Trial** ⬤➡**3(1)**

The rules authorize two distinct trial procedures, severance and bifurcation, for avoiding prejudice; a severance divides the lawsuit into two or more separate and independent causes, resulting in a final, appealable judgment in each cause, while a bifurcated trial results in one trial with separate parts before one jury. Vernon's Ann.Texas Rules Civ.Proc., Rules 41, 174(b).

**47. Action** ⬤➡**60**

Severance of injured motorist's negligence and respondeat superior claims against truck driver and truck driver's employer, and injured motorist's underinsured motorist (UIM) benefits claim against his UIM insurer, was necessary to avoid prejudice to truck driver and employer, as a bifurcation order had not been requested or signed and it appeared that the claims would be tried simultaneously, truck driver and employer had a substantial right to have their liability decided without any mention of insurance, and, though injured motorist had a consent clause in his UIM policy and UIM insurer

had not agreed to be bound by the results of a separate trial against truck driver and employer, joinder of motorist's claims against truck driver and employer with motorist's claim against his UIM insurer did not negate the consent clause. Vernon's Ann.Texas Rules Civ.Proc., Rules 41, 174(b); V.T.C.A., Insurance Code § 1952.106.

**48. Insurance** ⬤➡**2792, 3556**

Unless an underinsured motorist (UIM) insurer has consented in writing to a suit against the tortfeasor, the usual result of a consent provision in a UIM policy is that the insurer is not bound by a judgment entered in an action prosecuted by its insured against a UIM; to avoid this result an insured seeking UIM benefits may sue his UIM insurer directly without suing the UIM, obtain written consent from his UIM insurer and then sue the UIM alone, making the judgment binding against the insurance company, or sue the UIM without the written consent of the UIM insurer and relitigate liability and damages. V.T.C.A., Insurance Code § 1952.106.

**49. Venue** ⬤➡**8.5(1, 8)**

Following severance of injured motorist's negligence and respondeat superior claims against truck driver and truck driver's employer from motorist's underinsured motorist (UIM) benefits claim against his UIM insurer, correct venue for motorist's negligence and respondeat superior claims was the county in which truck driver resided and where employer had its principal place of business, rather than county in which motorist resided; venue of claims against truck driver and employer in injured motorist's county was derivative only, and injured motorist did not allege that any basis existed for maintaining venue is his county following severance. V.T.C.A., Civil Practice & Remedies Code §§ 15.002(2, 3), 15.005.

**50. Mandamus ⊸4(1)**

In evaluating benefits and detriments to determine the adequacy of an appellate remedy when determining whether a party is entitled to mandamus relief, appellate courts consider whether mandamus will: (1) preserve important substantive and procedural rights from impairment or loss; (2) allow the appellate court to give needed and helpful direction to the law that would otherwise prove elusive in appeals from final judgments; and (3) spare litigants and the public the time and money utterly wasted enduring eventual reversal of improperly conducted proceedings.

**51. Mandamus ⊸4(4), 32**

Truck driver and truck driver's employer did not have an adequate appellate remedy, as required in order to obtain mandamus relief when trial court denied truck driver's and employer's motion for severance, in action injured motorist brought asserting negligence and respondeat superior claims against truck driver and employer, and claim for underinsured motorist (UIM) benefits against motorist's UIM insurer; truck driver and employer had a substantial right to have their liability decided without any mention of insurance that would be lost if mandamus was not granted, severance and venue were intertwined and if mandamus was not granted driver's and employer's right to a correct venue would be lost, and the denial of severance when negligence and UIM claims were joined in the same action was a recurring one. Vernon's Ann.Texas Rules Civ.Proc., Rule 41.

**52. Venue ⊸2, 46, 68, 74**

Under the statutory venue scheme, a plaintiff has the first choice to fix venue in a proper county, but a trial court must transfer venue to the county specified in the defendant's motion to transfer if the plaintiff fails to establish proper venue and

the defendant provides prima facie proof that its requested venue is proper. V.T.C.A., Civil Practice & Remedies Code § 15.002(2, 3).

———

Rebecca E. Bell, Thomas W. Fee, for Relator.

Don Wheeler, Darrin Walker, for Real Party in Interest Richard Sharp.

Dick Davis, Real Party in Interest Southern Farm Bureau Casualty.

Panel consisted of WORTHEN, C.J., GRIFFITH, J., and HOYLE, J.

## OPINION

BRIAN HOYLE, Justice.

James Michael Reynolds, Pelhams Industrial Warehouse, Inc., and Texas Farm Bureau Casualty Insurance Company (Farm Bureau) are defendants in a personal injury action filed by the real party in interest, Richard Sharp. Reynolds and Pelhams, Relators, request a writ of mandamus directing the trial court to (1) sever Sharp's claim against Texas Farm Bureau Casualty Insurance Company (Farm Bureau) and, following severance, to (2) grant Relators' motion to transfer venue, and (3) transfer Sharp's claims against Relators to Tarrant County. The respondent is the Honorable Charles R. Mitchell, Judge of the 273rd Judicial District Court, Shelby County, Texas. We conditionally grant the petition.

### PROCEDURAL BACKGROUND

Richard Sharp filed a personal injury action in Shelby County to recover damages he sustained in an accident involving his vehicle and an eighteen wheeler driven by James Michael Reynolds. Sharp alleges that Reynolds caused the accident.

Pelhams Industrial Warehouse, Inc. is Reynolds's employer. Sharp seeks damages from both Reynolds and Pelhams, and alleges they were underinsured motorists at the time of the accident.

Sharp also alleges that, at the time of the accident, he had an insurance policy issued by Farm Bureau's predecessor that provided for underinsured motorist (UIM) benefits. He asserts that all conditions precedent to recovery under the policy have been satisfied and seeks the policy limits for UIM benefits.

Relators each filed a general denial subject to a motion to transfer venue in which each asserted that Sharp had not pleaded any facts showing that venue is proper in Shelby County. To the contrary, they urged, Sharp alleged that Reynolds is a resident of Tarrant County, Pelhams is a company doing business and having its principal office in Tarrant County, and the accident occurred in Johnson County. They asserted that these allegations showed venue was not proper in Shelby County, but was proper in Tarrant County. Accordingly, Relators requested that the case be transferred to Tarrant County pursuant to the general venue statute.[1] Sharp filed a response opposing the motions, and Relators filed a reply to his response. After a hearing, the trial court denied the motions to transfer venue without specifying a reason.[2]

Relators then filed a joint motion to sever, subject to their motions to transfer venue, alleging that Farm Bureau had been improperly joined in the suit and that Sharp's claim against Farm Bureau

was "neither ripe nor a part of the underlying liability matter." They alleged further that Sharp had not pleaded the "inextricably intertwined" elements or factual support necessary to support Farm Bureau's joinder. Accordingly, they asserted that "it is difficult to understand why same is included in this lawsuit at all other than for impermissible purposes such as shadow parties to establish venue or to otherwise attempt to place the issue of insurance coverage (and the amount of such coverage) before the fact finder." Relators also filed a joint motion for reconsideration of their motions to transfer venue. The motion for reconsideration included a supplemental motion to sever. It also incorporated by reference Relators' original motions to transfer venue, all supporting briefing, and their motion to sever, "as it relates to [Sharp's] potential claim that may not exist as to [Farm Bureau]."

Sharp responded that venue is proper in Shelby County, citing the mandatory venue statute for suits pertaining to uninsured/underinsured motorist coverage.[3] He also reurged his previous arguments in opposition to the venue motions and disputed Relators' ripeness and severance arguments.

In a telephonic hearing, the trial court denied Relators' motion for severance, but did not sign a written order. Thereafter, Sharp filed a motion requesting the trial court to (1) vacate its prior order denying Relators' motions to transfer venue; (2) grant Sharp leave to file supplemental evidence; (3) reconsider Relators' motions to

---

1. *See* Tex. Civ. Prac. & Rem.Code Ann. § 15.002(a)(2), (3) (West 2002) (general venue statute, when applicable, prescribes four possible venue choices, including county of defendant's residence when cause of action accrued if defendant is natural person, and county of defendant's principal office in this state if defendant is not natural person).

2. The record includes an order setting a hearing on Relators' motions to transfer venue. We assume that this hearing was held.

3. *See* Tex. Ins.Code Ann. § 1952.110 (West 2009).

transfer venue and motion to sever; and (4) deny the motions. In a second telephonic hearing, the trial court granted Sharp's motion in its entirety without specifying a reason. Relators then filed this original proceeding challenging the trial court's order denying reconsideration of their motions for severance and transfer of venue. They also filed a motion for emergency relief. We granted the motion, and stayed the proceedings in the trial court until further order of this court.

### AVAILABILITY OF MANDAMUS

**[1, 2]** Mandamus is an extraordinary remedy. *In re Sw. Bell Tel. Co., L.P.*, 235 S.W.3d 619, 623 (Tex.2007) (orig. proceeding). To obtain mandamus relief, the relator must show that (1) the trial court clearly abused its discretion, and (2) the benefits of mandamus outweigh the detriments to the extent that an appellate remedy is inadequate. *In re Poly–America*, 262 S.W.3d 337, 347 (Tex.2008) (orig. proceeding).

**[3–6]** A trial court clearly abuses its discretion if it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law. *Walker v. Packer*, 827 S.W.2d 833, 839 (Tex.1992) (orig. proceeding). With respect to resolution of factual issues or matters committed to the trial court's discretion, the relator must establish that the trial court could reasonably have reached only one decision. *Id.* at 839–40. We cannot disturb the trial court's decision unless it is shown to be arbitrary and unreasonable, even if we would have decided the issue differently. *Id.* at 840. However, a trial court has no discretion in determining what the law is or applying the law to the facts. *Id.* Thus, a clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion and may result in

appellate reversal by extraordinary writ. *Id.*

**[7]** In providing guidance for determining whether an appellate remedy is adequate, the Texas Supreme Court has noted that the operative word, "adequate," has no comprehensive definition. *In re Prudential Ins. of Am.*, 148 S.W.3d 124, 136 (Tex.2004) (orig. proceeding). Instead, it is simply a proxy for the careful balance of jurisprudential considerations that determine when appellate courts will use original mandamus proceedings to review the actions of lower courts. *Id.* These considerations include both public and private interests, and the determination is practical and prudential rather than abstract or formulaic. *Id.* Thus, the adequacy of an appellate remedy must be determined by balancing the benefits of mandamus review against the detriments. *In re Team Rocket, L.P.*, 256 S.W.3d 257, 262 (Tex.2008) (orig. proceeding).

**[8, 9]** When the benefits of mandamus review outweigh the detriments, appellate courts must consider whether the appellate remedy is adequate. *Id.* "Mandamus will not issue when the law provides another, plain, adequate, and complete remedy." *In re Tex. Dep't of Family and Protective Servs.*, 210 S.W.3d 609, 613 (Tex.2006).

### *Severance and Venue*

**[10, 11]** An order denying severance is not a final judgment and therefore is not appealable. *See Beckham Group, P.C. v. Snyder*, 315 S.W.3d 244, 245 (Tex.App.-Dallas 2010, no pet.). Consequently, mandamus is the appropriate avenue by which a party may seek review of a trial court's order denying severance. *In re Liu*, 290 S.W.3d 515, 518 (Tex.App.-Texarkana 2009, orig. proceeding).

**[12–14]** A party may appeal a venue ruling following the trial on the merits.

*See* TEX. CIV. PRAC. & REM.CODE ANN. § 15.064(b) (Vernon 2002). If venue was improper, "it shall in no event be harmless error and shall be reversible error." *Id.* Consequently, venue determinations generally are not reviewable by mandamus. *In re Masonite Corp.,* 997 S.W.2d 194, 197 (Tex.1999) (orig. proceeding). Where, as here, the relator does not seek enforcement of a mandatory venue statute, mandamus generally is not available absent an abuse of discretion by the trial court and an inadequate appellate remedy. *See id.* But mandamus review of permissive venue determinations is appropriate in "extraordinary circumstances." *Team Rocket, L.P.,* 256 S.W.3d at 262.

### AUTHORITY TO RECONSIDER VENUE RULING

Sharp and Relators disagree on whether the trial court correctly denied reconsideration of Relators' motions to transfer venue. But neither Sharp nor Relators question the trial court's authority to reconsider its venue ruling. Nevertheless, there are cases holding that a trial court has no such authority. And if the trial court has no authority to reconsider its venue ruling, mandamus is not available to compel it to do so. *See, e.g., Van Es v. Frazier,* 230 S.W.3d 770, 775 (Tex.App.-Waco 2007, pet. denied) (denying mandamus directing reconsideration of prior venue ruling where reconsideration would have been improper).

In this case, Relators requested a severance in connection with their motion for reconsideration of the trial court's venue ruling. In other words, they requested severance and transfer of venue; they did not request a separate trial on Sharp's claim against Farm Bureau if the trial court declined to reconsider its venue ruling. Therefore, if the trial court had no authority to reconsider its venue ruling, we need not address severance. Accordingly,

we first consider whether the trial court had the authority to reconsider its venue ruling.

Except under circumstances not present in this case, "[i]f venue has been sustained as against a motion to transfer . . ., then no further motions to transfer shall be considered. . . ." *See* TEX.R. CIV. P. 87(5). In reliance on this rule, some courts have held that a trial court cannot reconsider the denial of a motion to transfer venue, even if, as here, only one such motion has been filed. *See, e.g., In re Med. Carbon Res. Inst., L.L.C.,* No. 14–07–00935–CV, 2008 WL 220366, at \*1–2 (Tex.App.-Houston [14th Dist.] Jan. 29, 2008, orig. proceeding) (mem. op.); *Van Es,* 230 S.W.3d at 775; *Dorchester Master Ltd. P'ship v. Anthony,* 734 S.W.2d 151, 152 (Tex.App.-Houston [1st Dist.] 1987, orig. proceeding). Some courts have also held that an order reconsidering the prior denial of a motion to transfer venue is void. *See, e.g., Med. Carbon Res. Inst.,* 2008 WL 220366, at \*1–2; *Dorchester,* 734 S.W.2d at 152.

**[15]** The San Antonio court of appeals has held, however, that Rule 87(5) does not preclude reconsideration of the "first and only motion to transfer scheduled for hearing. . . ." *Orion Enters., Inc. v. Pope,* 927 S.W.2d 654, 659 (Tex.App.-San Antonio 1996, orig. proceeding [motion to file mandamus overruled]) (citing *HCA Health Servs. of Tex., Inc. v. Salinas,* 838 S.W.2d 246, 248 (Tex.1992)). The court reasoned that an order denying a motion to transfer venue is interlocutory, both as to the trial court and the parties. *Id.* Therefore, like any other interlocutory order, an order denying a motion to transfer venue may be reconsidered at any time within the period of the trial court's plenary power. *Id.* We agree with the reasoning in *Orion* and conclude that the trial court in this case had authority to reconsider its prior denial of Relators' motions to transfer venue.

*See id.* We now proceed to the merits of Relators' petition.

### RIPENESS

Relators first argue that the trial court abused its discretion when it concluded that Texas Insurance Code Section 1952.110, a mandatory venue statute, fixes venue in Shelby County. Section 1952.110 provides that, in an action against an insurer "in relation to [uninsured/underinsured motorist] coverage ..., including an action to enforce that coverage," venue is mandatory in (1) the county in which the policyholder or beneficiary instituting the action resided at the time of the accident, or (2) the county in which the accident occurred. TEX. INS.CODE ANN. § 1952.110 (West 2009).

Sharp contends that Section 1952.110 applies here. Therefore, his argument continues, venue is mandatory in Shelby County because he resided there at the time of the accident. Relators disagree, asserting that Sharp's claim against Farm Bureau is not ripe for adjudication and therefore cannot fix venue.

### Venue Challenges

**[16]** The rules of procedure prescribe the scope of the trial court's consideration in venue challenges. *See* TEX.R. CIV. P. 87. One significant limitation is that the trial court may not inquire into the merits of a cause of action. *See* TEX.R. CIV. P. 87(2)(b) (providing that "[i]t shall not be necessary for a claimant to prove the merits of a cause of action, but the existence of a cause of action, when pleaded properly, shall be taken as established as alleged by the pleadings"); *see generally* William Underwood, *Reconsidering Derivative–Venue in Cases Involving Multiple Parties and Claims*," 56 BAYLOR L.REV. 579 (Spring

2004). Moreover, "no party shall ever be required for venue purposes to support by prima facie proof the existence of a cause of action or part thereof, and at the hearing the pleadings of the parties shall be taken as conclusive on the issues of existence of a cause of action." TEX.R. CIV. P. 87(3)(a). Consequently, the existence of a cause of action is immune from challenge at a venue hearing. *Killeen v. Lighthouse Elec. Contractors, L.P.,* 248 S.W.3d 343, 349 (Tex.App.-San Antonio 2007, pet. denied); *see also* Underwood, *supra* at 606–07 ("[A] plaintiff who can adequately plead a claim against a resident defendant is not required to show that he has any evidence whatsoever to support the claim—at least not in connection with the venue determination at the trial court level."). But absent proper pleading, the Rule 87 presumption does not arise. *See* TEX.R. CIV. P. 87(2)(b).

### Proper Pleading Under Rule 87

**[17–20]** Ripeness is a component of subject matter jurisdiction. *Waco Indep. Sch. Dist. v. Gibson,* 22 S.W.3d 849, 851 (Tex.2000). Therefore, ripeness is a question of law. *Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922, 928 (Tex.1998). We have been unable to locate any Texas case addressing whether the proper pleading required by Rule 87 must include allegations establishing ripeness. One court has held that proper pleading must include facts that demonstrate standing.[4] *See In re Valetutto,* 976 S.W.2d 893, 895 (Tex. App.-Austin 1998, orig. proceeding). Another court, quoting Rule 87(2)(b), questioned whether its review of the trial court's venue determination should encompass a standing challenge. *See Sw. Bell*

---

**4.** Standing is also a component of subject matter jurisdiction. *Gibson,* 22 S.W.3d at 851. Standing focuses on who may bring the

cause of action, and ripeness focuses on when the cause of action may be brought. *Id.*

*Tel. Co. v. Superior Payphones, Ltd.,* No. 13–05–00661–CV, 2006 WL 417423, at *5–6 (Tex.App.-Corpus Christi Feb. 23, 2006, pet. dism'd) (mem. op.). Ultimately, that court concluded that it need not define the extent of its review because the result was the same, regardless of whether its review included the standing challenge. *Id.,* at *6. Because the result here is also the same, regardless of the scope of our review, we take a similar approach. Therefore, we assume, without deciding, that proper pleading under Rule 87 requires allegations supporting ripeness.

**[21, 22]** In the instant case, the trial court implicitly determined that Sharp properly pleaded a cause of action as required by Rule 87. Based upon our assumption that proper pleading under Rule 87 requires allegations supporting ripeness, we will consider whether the trial court correctly concluded that Sharp's petition included those allegations. Because ripeness is a component of subject matter jurisdiction, we review a ripeness determination under the same standard by which we review subject matter jurisdiction generally. *Alvarado v. Okla. Sur. Co.,* 281 S.W.3d 38, 42 (Tex.App.-El Paso 2005, no pet.). Under that standard, the pleader must allege facts that affirmatively demonstrate the court's jurisdiction to hear the cause. *Id.* We then take those facts as true, and focus on whether the pleader has alleged that an injury has occurred or is about to occur. *Patterson v. Planned Parenthood of Hous. & Se. Tex., Inc.,* 971

S.W.2d 439, 442 (Tex.1998); *Tex. Ass'n of Bus.,* 852 S.W.2d at 446.

**[23]** Sharp alleges in his petition that at the time of the collision, he had UIM coverage under a policy of insurance issued to him by Farm Bureau's predecessor. He alleges further that the collision was caused by Reynolds's negligence while acting in the course and scope of his employment with Pelhams. Sharp also avers that Reynolds and Pelhams were UIMs at the time of the collision, and therefore Farm Bureau is liable to him for the policy limits under the UIM provision in the policy. Sharp pleads generally that all conditions precedent to recovery under the policy have been complied with, that demand has been made for payment, and Farm Bureau has refused to pay. These allegations, when taken as true, provide sufficient facts to establish the requisite injury for ripeness. *See Alvarado,* 281 S.W.3d at 42.[5] Accordingly, the trial court did not abuse its discretion in concluding that Sharp had properly pleaded a cause of action against Farm Bureau under Rule 87 and that this claim could fix venue.

### SEVERANCE—ABUSE OF DISCRETION

Relators next argue that the trial court abused its discretion in denying reconsideration of their motions for severance of Sharp's claim against Farm Bureau and for transfer of venue. They argue that joinder of Sharp's claims against them with his claim against Farm Bureau is

---

**5.** In *Alvarado,* the plaintiff sued his employer's UIM insurer and a UIM who ran a red light and hit his vehicle. *Alvarado,* 281 S.W.3d at 39. He alleged that his employer carried an insurance policy with the named UIM insurer and that the policy included coverage for damages caused by a UIM. *Id.* at 40. He alleged further that the other driver involved in the collision was a UIM, and that "[d]espite Plaintiff's compliance with the terms and provisions of the policy, [the UIM

insurer] has failed and refused to pay benefits due under the policy provisions in question." *Id.* The UIM insurer filed a motion to dismiss arguing that the plaintiff's suit was premature and no cause of action had accrued against the insurer. *Id.* In its analysis, the El Paso court observed that the plaintiff (Alvarado) might not ultimately prevail on the merits, but held that he had pleaded sufficient facts to confer subject matter jurisdiction on the trial court. *Id.* at 42.

improper and therefore severance is required. Sharp disagrees.

### The Trial Court's Discretion

[24–26] Severance of claims under the Texas Rules of Civil Procedure rests within the sound discretion of the trial court. *Liberty Nat'l Fire Ins. Co. v. Akin,* 927 S.W.2d 627, 629 (Tex.1996) (orig. proceeding); *see* Tex.R. Civ. P. 41. Although the trial court has broad discretion in determining whether to grant severance, that discretion is not unlimited. *In re Gen. Agents Ins. Co. of Am.,* 254 S.W.3d 670, 673 (Tex.App.-Houston [14th Dist.] 2008, orig. proceeding [mand. denied]). Instead, the trial court is required to exercise "a sound and legal discretion within limits created by the circumstances of the particular case." *See Womack v. Berry,* 156 Tex. 44, 291 S.W.2d 677, 683 (1956) (orig. proceeding) (addressing denial of separate trials under Texas Rule of Civil Procedure 174). "That a claim *may* be severed does not always mean that it *must.*" *In re Wilkerson,* No. 14–08–00376–CV, 2008 WL 2777418, at *1 (Tex. App.-Houston [14th Dist.] June 6, 2008, orig. proceeding [mand. denied]) (mem. op.).

[27, 28] But there is no room for the exercise of discretion "[w]hen all of the facts and circumstances of the case unquestionably require a separate trial to prevent manifest injustice, there is no fact or circumstance supporting or tending to support a contrary conclusion, and the legal rights of the parties will not be prejudiced thereby...." *See Womack,* 291 S.W.2d at 683; *see also, e.g., In re Hochheim Prairie Farm Mut. Ins. Ass'n,* 296 S.W.3d 907, 912 (Tex.App.-Corpus Christi 2009, orig. proceeding) (applying *Womack* standard to severance under Texas Rule of Civil Procedure 41); *Gen. Agents Ins.,* 254 S.W.3d at 674 (same). Under these circumstances, the refusal to order a severance constitutes a violation of a plain legal duty, even though it is often termed a clear abuse of discretion. *Gen. Agents Ins.,* 254 S.W.3d at 674. In applying this standard, the desire to avoid some identified prejudice to the relator by denying severance must be weighed against the prejudice that could result from ordering severance. *See Womack,* 291 S.W.2d at 683.

### Requirements for Severance

[29, 30] A severance divides a lawsuit into two or more separate and independent causes. *Hall v. City of Austin,* 450 S.W.2d 836, 837–38 (Tex.1970). When a trial court grants a severance, the separated causes of action typically proceed to individual judgments that are themselves separately final and appealable. *Id.* at 838. Although severance runs counter to the general policy condemning a multiplicity of suits, it is indicated in some situations. 3 Roy W. McDonald & Elaine A. Grafton Carlson, *Texas Civil Practice* § 17.26 (2d ed. 2000).

[31, 32] A claim is properly severable only if (1) the controversy involves more than one cause of action; (2) the severed claim is one that would be the proper subject of a lawsuit if independently asserted; and (3) the severed claim is not so interwoven with the remaining action that they involve the same facts and issues. *Guar. Fed. Sav. Bank v. Horseshoe Operating Co.,* 793 S.W.2d 652, 658 (Tex.1990) (op. on reh'g). The controlling reasons for a severance are to do justice, avoid prejudice, and further convenience. *Id.*

[33, 34] Whether a trial court should grant a motion to sever is ultimately a question of law. *In re Liu,* 290 S.W.3d at 520 (citing *Guar. Fed. Sav. Bank,* 793 S.W.2d at 658–59). When considering whether to grant the motion, the trial court must generally accept the plaintiff's

pleadings as true and then determine whether severance is appropriate. *Id.* Consequently, the only remaining dispute concerns the legal consequences stemming from "accepted-as-pleaded facts." *Id.*

### *This Court's Prior Opinion*

The disagreement in this case concerns the third requirement for severance: whether the severed actions are "so interwoven ... that they involve the same facts and issues." Sharp contends the trial court correctly concluded that the claims are sufficiently interwoven to preclude severance. As authority, he cites *State Farm Mutual Automobile Insurance Co. v. White,* 461 S.W.2d 476, 479 (Tex.Civ.App.-Tyler 1970, no writ).

In *White,* an injured driver sued to recover damages he and his minor daughter sustained as a result of the alleged negligence of an uninsured motorist. *Id.* at 478. He also sued his insurer in the same action, requesting payment of uninsured motorist benefits. *Id.* The suit was filed in the county where the accident occurred, and the insurer filed a plea of privilege alleging it was entitled to be sued in the county of its residence. *Id.* As pertinent here, this court held that venue was proper against the insurer because (1) the liability of the tortfeasor and the uninsured motorist arose out of the same transaction and (2) the two causes of action were "so intimately connected that [they] should be joined to avoid a multiplicity of suits." *Id.* at 479 (applying former Article 1995, subdivision 4, predecessor to Tex. Civ. Prac. & Rem.Code Ann. § 15.005 (West 2002)). Sharp claims this holding mandates a conclusion that the claims in the instant case are sufficiently interwoven to preclude severance. We disagree.

[35] Under former Article 1995, subsection 4, all defendants could be sued together in any county in which at least one of them resided. *See id.* at 479. However, the claims against the resident defendant and the nonresident defendant were required to be "properly joinable." *See, e.g., Glens Falls Indem. Co. v. Sterling,* 213 S.W.2d 858, 861 (Tex.Civ.App.-Dallas 1948, no writ [mand. overruled] ). One means of satisfying this requirement was to allege a cause of action against the resident defendant and a cause of action against the nonresident defendant that were so "intimately connected" that they could be joined under the rule intended to avoid a multiplicity of suits. *See Stockyards Nat'l Bank v. Maples,* 127 Tex. 633, 95 S.W.2d 1300, 1302 (1936). However, the "intimately connected" test is not applicable when severance is the issue. *See, e.g., Guar. Fed. Sav. Bank,* 793 S.W.2d at 658. Instead, we must determine whether the claims are "interwoven," meaning that they "involve the same facts and issues." *See id.* Severance was not the issue in *White,* and therefore this court did not examine whether the claims in that case involved the same facts and issues. *See White,* 461 S.W.2d at 479. Consequently, our holding in *White* is not dispositive here.

### *Sharp's Pleadings*

According to the allegations in Sharp's third amended petition, which we take as true, Reynolds ran a red light and turned in front of Sharp's vehicle. Sharp's vehicle struck Reynolds's vehicle, an eighteen wheeler, and Sharp suffered personal injuries as a result. Reynolds was acting in the course and scope of his employment at the time of the accident. Sharp sued Reynolds for damages asserting the theories of negligence and negligence per se. Sharp also sued Pelhams, Reynolds's employer, under the doctrine of respondeat superior. Sharp alleges that Reynolds and Pelhams were underinsured at the time of

the accident and seeks UIM benefits from Farm Bureau.

[36, 37] To prevail on his negligence claim against Reynolds, Sharp must establish that Reynolds had a legal duty, he breached that duty, and Sharp suffered damages that were proximately caused by the breach. *See Lee Lewis Constr., Inc. v. Harrison,* 70 S.W.3d 778, 782 (Tex.2001).[6] To prevail on his claim against Pelhams, Sharp must show that Pelhams was Reynolds's employer and also that Reynolds's act was committed within the scope of his general authority, in furtherance of Pelhams's business, and for the accomplishment of the object for which Reynolds was hired. *Robertson Tank Lines, Inc. v. Van Cleave,* 468 S.W.2d 354, 357 (Tex.1971).

[38–40] UIM coverage provides payment to the insured of all amounts that the insured is legally entitled to recover as damages from owners or operators of underinsured motor vehicles because of bodily injury or property damage. Tex. Ins. Code Ann. § 1952.106 (West 2009). This amount is reduced by the amount recovered or recoverable from the insurer of the underinsured motor vehicle. *Id.* A UIM insurer has no contractual duty to pay benefits until the liability of the other motorist and the amount of damages suffered by the insured are determined. *Brainard,* 216 S.W.3d at 815. A motorist is underinsured if the available proceeds of his liability insurance are insufficient to compensate for the injured party's actual damages. *Stracener v. United Servs. Auto. Ass'n,* 777 S.W.2d 378, 380 (Tex. 1989). Therefore, to recover UIM benefits, Sharp must establish that he had UIM coverage, Reynolds's negligence proximately caused his damages and the

amount of his damages, and Reynolds and Pelhams were underinsured. *See Mid–Century Ins. Co. of Tex. v. McLain,* No. 11–08–00097–CV, 2010 WL 851407, at *11 (Tex.App.-Eastland Mar. 11, 2010, no pet.) (mem. op.); *State Farm Mut. Auto. Ins. Co. v. Grayson,* 983 S.W.2d 769, 770 (Tex. App.-San Antonio 1998, no pet.).

[41] Sharp's negligence and UIM claims have in common the facts and issues relating to whether Reynolds was negligent; if so, whether his negligence proximately caused Sharp's damages and the amount of his damages; and whether Pelhams is also liable. The remaining elements of Sharp's UIM claim—whether Sharp had UIM coverage and whether Reynolds and Pelhams had insurance coverage in at least the amount of the damages recovered—are unrelated to the facts and issues pertaining to his negligence claims. Thus, the two causes of action have some overlapping facts and issues, but do not involve "the same facts and issues." Therefore, they are not "interwoven." Accordingly, we conclude that the claims are properly severable. But as we acknowledged earlier, a claim need not be severed simply because it can be. *Wilkerson,* 2008 WL 2777418, at *1. To complete our analysis, we must consider whether severance is necessary to do justice, avoid prejudice, or further convenience. *See Guar. Fed. Sav. Bank,* 793 S.W.2d at 658.

*Injection of Insurance*

[42] Relators argued in the trial court, and continue to assert here, that if Sharp's claim against Farm Bureau is not severed, they will be prejudiced because insurance will be injected into the case. Ordinarily, a party seeking severance has the burden to show how it will be prejudiced if sever-

---

**6.** Negligence per se is merely one method of proving a breach of duty, a requisite element of any negligence cause of action. *Thomas v.*

*Uzoka,* 290 S.W.3d 437, 445 (Tex.App.-Houston [14th Dist.] 2009, pet. denied).

ance is not granted and to present evidence to the trial court, in camera if necessary, to support its position. *See In re Trinity Universal Ins. Co.,* No. 12–03–00314–CV, 2003 WL 22839280, at *2 (Tex. App.-Tyler Nov. 26, 2003, orig. proceeding) (mem. op.); *Allstate Ins. Co. v. Hunter,* 865 S.W.2d 189, 194 (Tex.App.-Corpus Christi 1993, no writ). Sharp points out that Relators presented only argument, and no evidence, to show prejudice.

**[43, 44]** The injection of insurance into a trial does not necessarily create prejudice. *See, e.g., Babcock v. Nw. Mem'l Hosp.,* 767 S.W.2d 705, 708 (Tex.1989) (trial court abused discretion by refusing to allow proposed voir dire questions about "liability insurance crisis" and "lawsuit crisis"); *Lewis v. United Parcel Svc., Inc.,* 175 S.W.3d 811, 816 (Tex.App.-Houston [1st Dist.] 2004, pet. denied) (reference to insurance not automatically reversible error). But evidence that a defendant was or was not insured against liability is not admissible on the issue of negligence. TEX.R. EVID. 411. "[This] rule is founded on the belief that the probative value of such evidence is vastly outweighed by the danger of unfair prejudice." 1 Steven Goode, Olin Guy Wellborn III, and M. Michael Sharlot, *Texas Practice Series: Guide to the Texas Rules of Evidence* § 411.1 (3d ed.2002); *see also Thornhill v. Ronnie's I–45 Truck Stop, Inc.,* 944 S.W.2d 780, 794 (Tex.App.-Beaumont 1997, writ dism'd by agr.) (recognizing that one purpose of Rule 411 is to avoid informing jury that someone other than defendant may be liable to pay damages).

Additionally, Texas courts have recognized that in the simultaneous trial of two claims, when evidence of liability insurance will be admissible as to only one of the claims, detailed evidence of insurance is prejudicial. *See, e.g., In re Foremost Ins. Co.,* 966 S.W.2d 770, 772 (Tex.App.-Corpus

Christi 1998, orig. proceeding) (conditionally granting mandamus requiring severance of personal injury claim joined with bad faith claim against defendant's liability insurer); *Black v. Smith,* 956 S.W.2d 72, 75 (Tex.App.-Houston [14th Dist.] 1997, orig. proceeding) (conditionally granting mandamus requiring severance of personal injury claim joined with claim against defendant's insurer for wrongful disclosure of medical information); *F.A. Richard & Assocs. v. Millard,* 856 S.W.2d 765, 767 (Tex.App.-Houston [1st Dist.] 1993, orig. proceeding) (conditionally granting mandamus requiring severance of negligence claim against UIM from bad faith claim against insurance adjuster).

**[45]** Here, evidence of insurance is not admissible in the trial of Sharp's negligence claims against Relators. *See* TEX.R. EVID. 411. But evidence of Relators' insurance and Sharp's UIM coverage is required to establish Sharp's UIM claims. *See Mid–Century,* 2010 WL 851407, at *11; *State Farm Mut.,* 983 S.W.2d at 770. To allow evidence of insurance would violate Relators' substantial right to have their liability decided without any mention of insurance, and to exclude evidence of insurance would prejudice Sharp's presentation of his UIM claim. *See Foremost,* 966 S.W.2d at 772; *Black,* 956 S.W.2d at 75; *Millard,* 856 S.W.2d at 767. This presents an irreconcilable conflict that is apparent without the introduction of evidence. *See In re Allstate Tex. Lloyd's,* No. 14–05–00762–CV, 2005 WL 2277134, at *4 (Tex. App.-Houston [14th Dist.] Sept. 2, 2005, orig. proceeding) (mem. op.) (per curiam) (pointing out, in response to argument that relator had not shown it would be prejudiced by denial of severance, that irreconcilable conflict was apparent in cases involving contractual and extracontractual claims). Therefore, we conclude that, in this situation, Relators' argument pertain-

ing to injection of insurance was sufficient to inform the trial court that prejudice would result from the simultaneous trial of Sharp's claims. Thus, Relators were not required to present evidence of prejudice. Consequently, Relators' failure to present evidence of prejudice is not fatal to their severance motion.

### *Avoidance of Prejudice*

Sharp acknowledges, at least implicitly, that Relators will suffer prejudice if insurance is injected into the trial of this case. He argues, however, that the procedure the trial court will follow at trial precludes the possibility of prejudice.[7] He argues further that there are no issues requiring the injection of insurance into the case before the jury.

**[46]** The rules authorize two distinct trial procedures-severance and bifurcation-for avoiding prejudice. *See* Tex.R. Civ. P. 41, 174(b). A severance divides the lawsuit into two or more separate and independent causes, resulting in a final, appealable judgment in each cause. *Hall,* 450 S.W.2d at 837–38. A bifurcated trial results in one trial with separate parts before one jury. *In re United Fire Lloyds,* 327 S.W.3d 250, 254 (Tex.App.-San Antonio 2010, orig. proceeding). An order for bifurcation, or separate trials, leaves the lawsuit intact but enables the court to hear and determine one or more issues without trying all issues at the same time. *Id.*

**[47]** Here, the trial court denied Relators' motion for severance and also denied their motion for reconsideration. Nothing in the record indicates that a bifurcation order has been requested or signed. *See In re Koehn,* 86 S.W.3d 363, 367 (Tex. App.-Texarkana 2002, orig. proceeding) (holding that granting of separate trial minimized danger of prejudice from evidence of liability insurance). Thus, it appears from the record that the claims will be tried simultaneously, and we decline to speculate about what issues will be contested at trial. Therefore, we cannot determine from the record before us that prejudice can be avoided at trial without severance.

### *Prejudice to Sharp*

Sharp next points out that Farm Bureau has not consented to be bound by the results of a separate trial of his claims against Relators. He urges that because of the consent provision of the policy, he will have to try his case twice if his claim against Farm Bureau is severed, and Farm Bureau will have "two bites at the apple" if Sharp's case results in the first judgment.[8] As a result, Sharp contends, he will be prejudiced by severance, and therefore the trial court correctly exercised its discretion by denying reconsideration of the motion to sever.

**[48]** Unless the UIM insurer has consented in writing to the suit, the usual result of a consent provision is that the insurer is not bound by a judgment entered in an action prosecuted by its insured against a UIM. *See, e.g., State Farm*

---

**7.** Specifically, Sharp points to his counsel's argument in the trial court that

[w]e have actually tried in this Court—in both this court and Judge Griffin's court, cases similar to this to a jury without injecting insurance. Without in any way prejudicing the third party with the fact that there was a third party with U–I–M in the case. So, we have done that successfully.

Counsel did not elaborate further, and did not represent to the trial court that the issue of prejudice had been addressed on appeal.

**8.** The record does not include a copy of the insurance policy State Farm issued to Sharp. Therefore, we are unable to quote the provision.

*Mut. Auto. Ins. Co. v. Azima*, 896 S.W.2d 177, 178 (Tex.1995) (per curiam); *Koehn*, 86 S.W.3d at 368. To avoid this result, an insured seeking the benefits of his UIM coverage may sue his UIM insurer directly without suing the UIM; obtain written consent from his UIM insurer and then sue the UIM alone, making the judgment binding against the insurance company; or sue the UIM without the written consent of the UIM insurer and relitigate liability and damages. *See, e.g., Azima*, 896 S.W.2d at 178; *Koehn*, 86 S.W.3d at 368.

Sharp acknowledges that in *Koehn*, the court concluded that the same rules apply when the UIM and the UIM insurer are joined in the same suit. *See Koehn*, 86 S.W.3d at 368. He argues, however, that *Koehn* was wrongly decided. Specifically, he urges that "[t]here is no logical reason that a carrier that is sued directly, and therefore participates at trial, will not be bound by the judgment simply because the uninsured motorist is also a party at trial. Nor is there any authority (other than *Koehn*) that suggests such a result." We are not persuaded.

The rule Sharp advocates would permit an insured in a UIM case to unilaterally negate the consent clause in his policy merely by joining the UIM insurer and the UIM in the same action. But the purpose of requiring the UIM insurer's consent to suit against the UIM is to protect the insurer from liability arising from a default judgment against the UIM or an insubstantial defense by the UIM. *Azima*, 896 S.W.2d at 178; *Koehn*, 86 S.W.3d at 368. Sharp does not address the purpose of the provision and therefore does not explain how the UIM's joinder will afford the same protection. Although Sharp does not suggest that the UIM insurer undertake the defense of the UIM, we note that a UIM insurer's defense of a UIM can create a conflict of interest under a variety of cir-

cumstances. *See Allstate Ins. Co. v. Hunt*, 450 S.W.2d 668, 671 (Tex.Civ.App.-Houston [14th Dist.] 1970), *aff'd*, 469 S.W.2d 151 (1971) (providing extensive discussion of the "[s]erious ethical problems that [can] arise when an insurance company seeks to participate in the defense of an uninsured motorist").

We cannot conclude that joinder of the UIM and the UIM insurer in the same action negates the consent clause. Therefore, even absent severance, Sharp will be required to relitigate his claim against Farm Bureau if he obtains a judgment against Relators and Farm Bureau does not consent to be bound by the judgment. *See Koehn*, 86 S.W.3d at 368. Accordingly, Sharp has not shown that he will be prejudiced by severance.

### Conclusion

Sharp's UIM claim against Farm Bureau is severable, and severance is necessary to avoid prejudice to Relators. Additionally, a simultaneous trial would violate Relators' substantial right to have their liability decided without mention of insurance. *See Foremost*, 966 S.W.2d at 772; *Black*, 956 S.W.2d at 75; *Millard*, 856 S.W.2d at 767. This would result in manifest injustice to Relators. *See Foremost*, 966 S.W.2d at 772; *Black*, 956 S.W.2d at 75; *Millard*, 856 S.W.2d at 767. And if Sharp obtains a judgment against Relators, he will have to relitigate his UIM claim, even if it is not severed, unless Farm Bureau consents to be bound by the judgment. Therefore, he will not be prejudiced by severance.

We also conclude that "all of the facts and circumstances of the case unquestionably require a [severance] to prevent manifest injustice, there is no fact or circumstance supporting or tending to support a contrary conclusion, and the legal rights of the parties will not be prejudiced thereby. . . ." *See Womack*, 291 S.W.2d at 683;

*Hochheim,* 296 S.W.3d at 912; *Gen. Agents Ins.,* 254 S.W.3d at 674. Accordingly, we hold that the trial court abused its discretion in denying reconsideration of Relators' motion for severance.

### VENUE–ABUSE OF DISCRETION

Relators further contend that if we conclude the trial court abused its discretion in denying their motion to reconsider severance, we must also conclude that the court abused its discretion in denying their motion to reconsider venue. They argue that if Sharp's claim against Farm Bureau is severed, there exists no basis for maintaining venue of the remaining claims in Shelby County.

#### *Venue After Severance*

Sharp sued Farm Bureau in Shelby County, the county of his residence at the time of the accident. *See* TEX. INS.CODE ANN. § 1952.110(1). Relying on Texas Civil Practice and Remedies Code Section 15.005, he joined his negligence claims against Relators in the same action. Farm Bureau did not object to venue in Shelby County. Therefore, venue of Sharp's claim against Farm Bureau is fixed in Shelby County. *See* TEX.R. CIV. P. 86(1).

Section 15.005 provides that where there are multiple defendants, and the plaintiff first establishes proper venue against at least one defendant, venue is then proper as to all defendants in all claims arising out of the same transaction, occurrence, or series of transactions or occurrences. *See* TEX. CIV. PRAC. REM.CODE ANN. § 15.005. Thus, as to Relators, venue is derivative only. *See* Underwood, *supra* at 582 ("Derivative-venue simply means venue over a particular claim or party that is derived from venue over some other claim or party in the same lawsuit-venue that would not exist independent of the other claim or party.").

We have held that the trial court abused its discretion in denying reconsideration of Relators' motion for severance. Severance would have divided the underlying action into two separate lawsuits. *See Hall,* 450 S.W.2d at 837–38. Therefore, because Section 15.005 is a derivative venue statute, it would not determine venue of Sharp's claims against Relators after severance. *Cf. Oryx Energy Co. v. Union Nat'l Bank of Tex.,* 895 S.W.2d 409, 416 (Tex.App.-San Antonio 1995, writ denied) (in addressing claim that trial court erred in denying motions to sever and transfer venue, appellate court first reviewed denial of severance; after concluding denial was not abuse of discretion, then reviewed venue in light of ruling on severance).

Relators contend that because severance is required, the general venue statute applies and venue is proper in Tarrant County. In pertinent part, the general venue statute provides that, subject to certain exceptions, a lawsuit may be brought in the county of the defendant's residence at the time the cause of action accrued if the defendant is a natural person, and the county of the defendant's principal office in this state if the defendant is not a natural person. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 15.002(2), (3). Sharp has alleged, and Relators agree, that Reynolds is a resident of Tarrant County, Pelhams is a company doing business and having its principal office in Tarrant County, and the accident occurred in Johnson County. Thus, under either subsection, Tarrant County is the correct venue.

[49] Sharp has not alleged that any basis exists for maintaining venue in Shelby County after severance. Consequently, we agree with Relators that because the trial court should have granted their motion to reconsider its severance ruling, it also should have granted their motion to reconsider its venue ruling and transferred

Sharp's claims against them to Tarrant County. *See Jones v. Ray,* 886 S.W.2d 817, 823 (Tex.App.-Houston [1st Dist.] 1994, orig. proceeding) (where severance order was abuse of discretion, order transferring venue in reliance on severance order must also fail). Its failure to do so constituted an abuse of discretion. *See id.*

### ADEQUACY OF APPELLATE REMEDY

**[50]** In evaluating benefits and detriments to determine the adequacy of an appellate remedy, we consider whether mandamus will (1) preserve important substantive and procedural rights from impairment or loss; (2) allow us to give needed and helpful direction to the law that would otherwise prove elusive in appeals from final judgments; and (3) spare litigants and the public the time and money utterly wasted enduring eventual reversal of improperly conducted proceedings. *Team Rocket,* 256 S.W.3d at 262; *Prudential,* 148 S.W.3d at 136.

### *Preservation of Rights*

**[51]** Relators have a substantial right to have their liability decided without any mention of insurance. *See, e.g., Foremost,* 966 S.W.2d at 772. We have held that severance is necessary to preserve that right. If Relators obtain judgment on a favorable jury verdict, they cannot appeal. If Sharp obtains a judgment against Relators on an unfavorable jury verdict, Relators could not obtain reversal for the incorrect denial of severance unless the court of appeals concludes that the trial court's error "probably caused the rendition of an improper judgment...." TEX.R.APP. P. 44.1(a)(1). Relators contend that, in that instance, "there will be no way to untangle how or whether prejudice and confusion infected the jury's deliberations." *See Hochheim,* 296 S.W.3d at 911. Although we cannot say that "there will be no way"

for them to meet this burden on appeal, we recognize that Relators cannot be assured of doing so. But even if Relators were to obtain a reversal, their substantial right will have been lost, in part, because only by a second trial will the right be available to them.

**[52]** Moreover, severance and venue are intertwined in this case. Therefore, if Relators are unable to obtain a reversal of the incorrect denial of severance, they will be unable to obtain reversal of the incorrect venue ruling as well. *See Oryx,* 895 S.W.2d at 416 (denial of severance was not abuse of discretion, and therefore denial of motion to transfer venue was not error). Our venue statutes create a balance. *See Team Rocket,* 256 S.W.3d at 262. Under the statutory venue scheme, a plaintiff has the first choice to fix venue in a proper county. *Masonite,* 997 S.W.2d at 197. But the trial court must transfer venue to the county specified in the defendant's motion to transfer if the plaintiff fails to establish proper venue and the defendant provides prima facie proof that its requested venue is proper. *Id.* That balance will be disrupted, and Relators' procedural right to a correct venue will be lost, if Relators are unable to obtain a reversal of the trial court's incorrect venue ruling. *See Team Rocket,* 256 S.W.3d at 262 (procedural rights impaired when plaintiff nonsuited and refiled elsewhere to circumvent ruling on defendant's motion to transfer venue because balance of venue statutes disrupted).

### *Direction for the Trial Court*

Severance is ultimately a question of law. *Liu,* 290 S.W.3d at 520. Sharp argues that this court's holding in *White* required the trial court to deny severance in this case. And his comments to the trial court suggest that the fact situation presented here—the denial of severance

when negligence and UIM claims are joined in the same action—is a recurring one. Therefore, our interpretation of *White* and the case law pertaining to severance can provide helpful guidance to the trial court and prevent the recurrence of the situation presented here.

### *Waste of Resources*

Finally, we note that if the trial court's order denying reconsideration of Relators' motion for severance were reversed on appeal, a second trial would be required. This second trial would be a waste of judicial and public resources in the instant case as well as any other cases in which this situation arises. We recognize that the resulting waste would be minimal in comparison to circumstances that have been addressed in other mandamus proceedings. *See, e.g., id.* (trial court's ruling permitted plaintiff "to abuse the legal system by refiling his case in county after county, which would inevitably result in considerable expense to taxpayers and defendants, requiring defendants to proceed to trial in the wrong county"); *Masonite,* 997 S.W.2d at 199 (order transferring venue "wrongfully burdened fourteen other courts in fourteen other counties, hundreds of potential jurors in those counties, and thousands of taxpayer dollars in those counties"). Thus, this factor, unlike the two we have previously considered, weighs against mandamus.

### *Summary and Holding*

We acknowledge that mandamus review of incidental, interlocutory rulings by the trial courts can unduly interfere with trial court proceedings, distract appellate courts' attention to issues that are unimportant both to the ultimate disposition of the case at hand and to the uniform development of the law, and add unproductively to the expense and delay of civil litigation. *Prudential,* 148 S.W.3d at 136. But in this case, the trial court's denial of Relators' motions for reconsideration has failed to preserve two important rights—the right of Relators to have their liability determined without mention of insurance and their right to defend against Sharp's claims in a proper venue.

If mandamus is unavailable, Relators cannot exercise those rights except by a successful appeal and retrial. But they have no assurance that they can prevail if an appeal is necessary. And even if they were to successfully appeal, Relators' rights will have been impaired because two trials will have been necessary to preserve them. Moreover, mandamus will allow us to provide direction to the trial court in this case, and prevent the recurrence of this procedural conundrum in the future. And despite the relatively small waste of resources in comparison to those addressed in other cases, the denial of Relators' rights is significant and, in our view, likely cannot be remedied satisfactorily except by mandamus.

Based upon these considerations, we conclude that the benefits of mandamus outweigh the detriments. Accordingly, we hold that Relators have no adequate remedy by appeal.[9]

### *Disposition*

For the reasons set forth above, we have concluded that Relators have satisfied both prerequisites to mandamus. Accordingly, we ***conditionally grant*** Relators' petition for writ of mandamus and direct the trial court to (1) vacate its order denying Rela-

---

**9.** Relators also assert that Section 15.005 is not applicable in this case because Sharp's claims against them and against Farm Bureau did not arise out of the same transaction, occurrence, or series of transactions and occurrences. That issue is not dispositive, however, and therefore we do not address it. *See* Tex.R.App. P. 47.1.

tors' motion for reconsideration of their motions for severance and transfer of venue and (2) issue an order granting the motion for reconsideration, severing Sharp's claim against Farm Bureau, and transferring his claims against Relators to Tarrant County. We trust that the trial court will promptly comply with this opinion and order. The writ will issue only if the trial court fails to do so *within ten days of the date of the opinion and order.* The trial court shall furnish this court, within the time for compliance with this court's opinion and order, a certified copy of its order evidencing compliance. This court's stay is *lifted.*



**Kevin T. MORTON, Appellant,**

**v.**

**HUNG NGUYEN and Carol S. Nguyen, Appellees.**

**No. 14–11–00126–CV.**

Court of Appeals of Texas, Houston (14th Dist.).

May 17, 2012.

**Background:** Vendor on contract for deed sued purchasers for breach of contract after purchasers informed vendor of their intent to cancel/rescind contract. Purchasers counter-claim for damages under Property Code, Finance Code, and Deceptive Trade Practices–Consumer Protection Act (DTPA), attorney fees and costs, and interest. The 55th District Court, Harris County, Dion Ramos, J., entered judgment in purchasers' favor on most, but not all of their claims. Vendor appealed and purchasers cross-appealed.

**Holdings:** The Court of Appeals, Sharon McCally, J., held that:

(1) vendor's ignorance of statutory requirements for contents of annual statement regarding status of contract for deed did not preclude finding of good faith attempt to provide purchasers with annual statements;

(2) *Flores* standard to determine whether vendor made good faith effort to provide purchasers with annual statement on contract did not provide vendor with defense to purchasers' statutory right to rescind contract;

(3) as matter of first impression, statute governing purchasers' right to cancel and rescind contract for deed did not require purchasers to provide vendor with notice of rescission or tender value of three-year possession of property back to vendor;

(4) common law defenses of quasi-estoppel and laches were not available remedies on purchasers' claims under Property Code;

(5) provision of Property Code authorizing purchasers to recover value of any improvements made to property upon cancellation or rescission of contract for deed did not require purchasers to prove that costs for repairs and improvements were reasonable;

(6) trial court's findings of fact did not permit award of statutory damages of $300 under Finance Code; and

(7) purchasers failed to support claim under DTPA for vendor's false, misleading or deceptive acts or practices.

Affirmed as modified in part; reversed and remanded in part.

**1. Vendor and Purchaser** ⊚⇒54

A contract for deed, unlike a mortgage, allows the seller to retain title to the

process. *Id.* at 910. We hold that the record does not support a finding of invidious discrimination or the systematic exclusion causing a substantial underrepresentation of women in the grand jury process in Duval County.

We find that the grand jury that indicted appellant contained no women on its composition. However, after examining records of recent earlier grand juries, we are not able to conclude that the absence of women in appellant's indicting grand jury was caused by purposeful discrimination. Appellant's third ground of error is overruled.

[15] In his final ground of error appellant contends reversible error exists because of the court reporter's failure to include in the appellate record a transcription of his notes covering the final jury arguments. Error is predicated upon a failure to comply with a timely request in the form of a pretrial motion seeking to have the portions allegedly absent transcribed and included in the record. The record indicates that the motion was granted by the trial court prior to trial.

No allegation is made that the jury arguments were not taken by the court reporter, but rather the complaint is that they are not included in the appellate record. Nor is there any allegation that the allegedly missing portion of the record reflects any trial error.

The records of this Court indicate that the transcript and statement of facts as originally prepared were received and filed with the clerk of this Court on December 16, 1981, without evidence of the trial court's approval. A supplemental transcript containing the trial court's approval of the statement of facts was filed with this Court on April 12, 1982. Appellant received notice of the trial court's approval of the record on May 10, 1982. Not until June 9, 1982, when appellant filed his motion to allow the filing of a supplemental statement of facts, did appellant ever complain of the omission of the part of the record now claimed to constitute error.

The missing portion of the statement of facts is now before this court designated as Volume 0 and although we have been directed to no portion of that volume as containing reversible error, we have nonetheless examined it for fundamental error. We have found none. We hold that no error was committed because a portion of the statement of facts was originally not included in the appellate record and that no harm resulted from the filing of that portion of the record at a subsequent time. This is particularly true in the absence of some claim of error in the missing portion.

The judgment of the trial court is affirmed.



**INDUSTRIAL DISPOSAL SUPPLY COMPANY, INC., Appellant,**

v.

**PERRYMAN BROTHERS TRASH SERVICE, INC. and Southern Refuse Company, Appellees.**

No. 04–81–00387–CV.

Court of Appeals of Texas, San Antonio.

Dec. 14, 1983.

Rehearing Denied Jan. 9, 1984.

Creditor brought action on a sworn account against debtor and buyer of debtor's assets. The 166th District Court, Bexar County, Carol R. Haberman, J., entered judgment in favor of creditor for sum of $14,575.19 plus interest but denied recovery against buyer. Creditor appealed from that portion of judgment denying attorney fees and denying recovery against buyer. Debtor cross-appealed challenging trial court's conclusion of law that contract involved was not usurious and trial court's denial of attorney fees. The Court of Appeals, Can-

tu, J., held that: (1) creditor was entitled to attorney fees but matter would be remanded to trial court for a determination of reasonable amount; (2) buyer of debtor's assets was not liable as an assignee; (3) implied agreement existed between creditor and debtor for payment of interest at specified rate; and (4) charge of 1½ percent interest per month as agreed between debtor and creditor, both of which were corporations, was not in violation of usury laws.

Affirmed in part and reversed and remanded in part.

**1. Costs ⊕→197**

An appellate court may not initiate an award of attorney fees, because to do so would be in effect an usurpation of trial court's fact finding function.

**2. Costs ⊕→173(1)**

Attorney fee statute expressly applies to suits on a sworn account. Vernon's Ann. Texas Civ.St. art. 2226.

**3. Costs ⊕→207**

Reasonableness of attorney fees is a fact question and as such is required to be supported by competent evidence.

**4. Costs ⊕→207**

Evidence of some character is required to set amount of attorney fees for judgment purposes, even in a nonjury case.

**5. Costs ⊕→173(1)**

Creditor was entitled to attorney fees against debtor in suit on sworn account where claim was presented more than 30 days prior to date suit was filed and payment in amount claimed was not tendered. Vernon's Ann.Texas Civ.St. art. 2226.

**6. Appeal and Error ⊕→1178(6)**

Where lower court made no finding as to reasonable value of services of attorney of creditor entitled to recover attorney fees in suit on sworn account, and where said value was not established as a matter of law, so that Court of Appeals could not make finding as to reasonableness of amount sought, claim for attorney fees would be severed and remanded for appro-

priate finding. Vernon's Ann.Texas Civ.St. art. 2226.

**7. Appeal and Error ⊕→1178(6)**

Claim for attorney fees is a severable claim and Court of Appeals is authorized to sever claim and to reverse and remand judgment only insofar as it pertains to attorney fees.

**8. Appeal and Error ⊕→931(1)**

Contention that undisputed evidence in suit on sworn account established, as a matter of law, opposite of trial court's conclusion of law amounted to a "no evidence" challenge requiring Court of Appeals to view evidence on appeal in light most favorable to ruling.

**9. Appeal and Error ⊕→205, 242(4)**

In the absence of a tender of evidence, a refusal to admit, and securing of some sort of ruling on alleged exclusion of the evidence, there is nothing presented for review on claim of wrongful exclusion of evidence.

**10. Appeal and Error ⊕→205, 242(4)**

In action on sworn account, nothing was presented for review on claim of error for excluding document from evidence in the absence of tender of document, refusal to admit document, and securing of some sort of ruling on alleged exclusion of document.

**11. Corporations ⊕→445.1**

Buyer of corporate debtor's assets was not liable to creditor suing on a sworn account as an assignee of debtor's debt.

**12. Evidence ⊕→265(8)**

Facts admitted in a pleading can be considered judicial admissions or a substitute for evidence.

**13. Evidence ⊕→265(7)**

A judicial admission is waived when evidence contrary thereto is heard.

**14. Pleading ⊕→36(3)**

Liability of buyer of debtor's assets to creditor on creditor's sworn account with debtor was not established through alleged admissions made by buyer in amended orig-

inal answer and counterclaim seeking recovery of penalties predicated upon usurious interest charges, forfeiture of principal claimed, and reasonable attorney fees, even if buyer's allegation that it was charged in excess of 18 percent interest on its account, identified by reference to invoices attached to creditor's petition, could be interpreted as admission that there was an account between creditor and buyer and that account was same as one being sued upon, where creditor did not allege in amended original petition that buyer was liable to it by virtue of existing account between them nor did it assume that posture during trial on merits.

**15. Contracts** ⊛➞29

Question of whether an agreement was reached by parties is generally a question of fact where existence of agreement is disputed.

**16. Interest** ⊛➞37(2)

Where creditor and debtor dealt with each other some eight to ten years and transacted between 500 and 1,000 invoiced dealings with each invoice containing late charge provision, and debtor never objected to late charge provision and even acquiesced to late charge by actually paying it on two occasions, an implied agreement existed between debtor and creditor for payment of interest rate specified in late charge provision. V.T.C.A., Bus. & C. § 2.204.

**17. Usury** ⊛➞42

Corporations may agree to an interest rate not exceeding 18 percent per annum, upon certain conditions. Vernon's Ann. Texas Civ.St. art. 1302–2.09.

**18. Usury** ⊛➞42

Charge of 1½ percent interest per month as agreed between debtor and creditor, both of which were corporations, was not in violation of usury laws. Vernon's Ann.Texas Civ.St. art. 1302–2.09.

**19. Usury** ⊛➞70

Where it was practice of creditor, which was borne out by exhibits, that late charges did not begin to accrue on creditor's

invoices until 60 days from last day of month in which statement was mailed, usury statute was not violated because invoices stated that interest was charged from end of month during which materials were supplied. Vernon's Ann.Texas Civ.St. art. 5069–1.06.

---

Addai Scheinberg and Juan A. Vasquez, Leighton, Hood & Vasquez, San Antonio, for appellant.

Donald O. Ferguson, Gardner, Ferguson, Sommers & Dorr, Wm. Richard Davis, Gilliland, McNeel & Davis, San Antonio, for appellees.

Before ESQUIVEL, CANTU and REEVES, JJ.

## OPINION

CANTU, Justice.

Industrial Disposal Supply Company, Inc. (IDS), plaintiff below, appeals from a portion of the judgment in a suit on a sworn account rendered in its favor for the sum of $14,575.19 plus interest.

IDS limits its appeal to the portion of the judgment denying attorney's fees and denying recovery against appellee, Southern Refuse Company (Southern). Appellee, Perryman Brothers Trash Service, Inc. (Perryman) brings forth cross-points challenging the trial court's conclusion of law that the contract involved was not usurious and the trial court's denial of attorney's fees.

IDS filed its original petition on March 5, 1981, and its amended original petition on May 11, 1981. Perryman filed its original answer and counterclaim on June 11, 1981 asserting the defense and affirmative claim of usury and seeking statutory forfeiture.

IDS's suit against Perryman arose out of the acquisition of certain equipment used in Perryman's refuse hauling business. The suit sought to recover the value of numerous containers and other supplies and equipment as well as interest representing late charges.

IDS is in the business of selling a number of trash disposal related items including garbage trucks, trash containers, small parts and accessories. Perryman was in the business of hauling refuse for commercial and industrial customers. IDS maintained two accounts under the name of Perryman Brothers Trash Services, Inc. One account was for the sale of small parts including small tools, replacement parts, supplies and miscellaneous refuse industry related items. Perryman was regularly invoiced and billed directly for these small items. Perryman paid for the items on this account promptly and was considered, by IDS, to be a good customer. The second account contained orders for large equipment and trucks. These orders, although placed by Perryman, were normally billed to Industrial Leasing (Industrial), a leasing company which subsequently leased the equipment to Perryman. As a matter of customary practice, IDS extended a line of credit to Industrial. IDS allowed the equipment purchases to build up to a dollar value equal to the line of credit before invoices and bills were sent to Industrial. This generally meant that IDS did not bill Industrial for a period of 30 to 90 days after the equipment was received by Perryman.

Over a period of 8 to 10 years between 500 and 1,000 orders were placed by Perryman on both accounts. Each time an order was placed, an invoice form was used which contained in bold type letters: LATE CHARGE OF 1½% PER MONTH WILL BE ADDED AFTER 30 DAYS. Although the invoice states interest will be added after thirty days, the testimony indicated that the 1½% late charge accrued thirty days from the end of the month following the invoice date and that interest was charged to the account thirty days thereafter.

Late charges were assessed on only two occasions during this 8 to 10 year period. The charges totalled $108.00 on the small parts account and were paid by Perryman's bookkeeper. More recently, the late charges pertained to orders placed in August and September of 1980 and were billed to Perryman's large equipment account.

Prior to the August and September orders, it was customary practice for Perryman to accept delivery of the equipment by signing a bill of lading evidencing receipt.

At the time the containers and related items were ordered in August and September, it was understood that the items would be billed to the leasing company as had been the practice. However, on October 1, 1980. Southern acquired 100% of the outstanding capital stock of Perryman and Perryman was subsequently dissolved. Consequently, Lee Perryman[1] informed IDS to invoice Perryman, rather than Industrial.

On December 31, 1980, IDS billed Perryman, rather than the leasing company, seeking the amount of fourteen thousand sixty-seven dollars and sixty two cents ($14,067.62) plus an additional five hundred and seven dollars and fifty seven cents ($507.57) as current and prior late charges.

IDS's first and second points of error dispute the trial court's conclusion of law that IDS was not entitled to attorney's fees because it failed to present sufficient evidence to justify an award of attorney's fees.

IDS argues that attorney's fees were established as a matter of law pursuant to TEX.REV.CIV.STAT.ANN. art. 2226 (Vernon Supp.1982–1983) because IDS presented its claim for $14,575.19 to appellees at least thirty days prior to filing suit and payment was not tendered by either appellee. IDS made no effort to offer any evidence on the issue of reasonable attorney's fees through its attorney. In fact, IDS attempted to reopen after both parties had closed for the sole purpose of discharging its burden of establishing reasonable attorney's fees. In support of its claim IDS relied entirely upon testimony elicited during cross-examination of appellees' attorney wherein he allegedly stated that a reasonable amount of time

1. One of two sole owners of the Perryman Brothers Trash Services, Inc. prior to the sale

of the company to Southern.

expended on this type of case for either plaintiff's or defendant's attorney was approximately sixty hours.

Appellant supports his argument with two lines of authority. The first line holds that an appellate court will award attorney's fees where the trial court, while denying attorney's fees, has made a factual determination of the amount of money that would constitute reasonable attorney's fees and the record discloses that a right to recovery was established as a matter of law. *Staley v. Zimmite Corp.,* 565 S.W.2d 335, 337 (Tex.Civ.App.—Houston [14th Dist.] 1978, no writ).

In the second line of authority, the trial court, in denying attorney's fees, makes no finding as to what would constitute reasonable attorney's fees even though the record confirms a right to recovery of attorney's fees as a matter of law. In these cases the appellate court has reversed and remanded for a determination of reasonable attorney's fees. *Woods Exploration & Producing Co., Inc. v. Arkla Equipment Co.,* 528 S.W.2d 568, 571 (Tex.1975); *Zemaco, Inc. v. Navarro,* 580 S.W.2d 616, 621 (Tex.Civ.App.—Tyler 1979, writ dism'd).

[1] It is well established that an appellate court may not initiate an award of attorney's fees, because to do so would in effect be a usurpation of the trial court's fact finding function. *International Security Life Insurance Co. v. Spray,* 468 S.W.2d 347, 349 (Tex.1971); *Staley v. Zimmite Corp., supra* at 337.

IDS sought to recover reasonable attorney's fees pursuant to the provisions of TEX.REV.CIV.STAT.ANN. art. 2226 (Vernon Supp.1982–1983).

[2] Article 2226 provides:

Any person, corporation, partnership, or other legal entity having a valid claim against a person or corporation for services rendered, labor done, material furnished, overcharges on freight or express, lost or damaged freight or express, or stock killed or injured, or suits founded upon a sworn account or accounts, or suits founded on oral or written con-

tracts, may present the same to such persons or corporation or to any duly authorized agent thereof; and if, at the expiration of 30 days thereafter, payment for the just amount owing has not been tendered, the claimant may, if represented by an attorney, also recover, in addition to his claim and costs, a reasonable amount as attorney's fees. The usual and customary fees in such cases shall be presumed to be reasonable, but such presumption may be rebutted by competent evidence. In a proceeding before the court, or in a jury case where the issue of amount of attorney's fees is submitted to the court for determination by agreement, the court may in its discretion take judicial knowledge of the usual and customary fees in such matters and of the contents of the case file without receiving further evidence. The provisions hereof shall not apply to contracts of insurers issued by insurers subject to the provisions of the Unfair Claim Settlement Practices Act (Article 21.21–2, Insurance Code), nor shall it apply to contracts of any insurer subject to the provisions of Article 3.62, Insurance Code, or to Chapter 387, Acts of the 55th Legislature, Regular Session, 1957, as amended (Article 3.62–1, Vernon's Texas Insurance Code), or to Article 21.21, Insurance Code, as amended, or to Chapter 9, Insurance Code, as amended, and each such article or chapter shall be and remain in full force and effect. This Act shall be liberally construed to promote its underlying purposes.

Said article expressly applies to suits on a sworn account. *Zemaco, Inc. v. Navarro, supra* at 620.

At trial, Donald Ferguson, attorney of record for Perryman, testified that pursuant to his employment by Perryman as attorney, both with respect to defending Perryman against IDS's claim and with respect to representing Perryman on its cross-claim against IDS, a total aggregate of $5,218.50 was incurred as attorney's fees. Ferguson supported his testimony with a computer

printout documenting the charges of $5,218.50 as attorney's fees.

During cross-examination of Ferguson by IDS's attorney the following transpired:

Q:  ... What was your total hours expended in the defense and counterclaim of this matter, sir?

A:  Fifty nine point plus, slightly less than sixty hours.

Q:  And would you think that is a reasonable expenditure of time either on defense or the plaintiff posture in this particular lawsuit?

A:  Yes ...

Q:  For either a plaintiff or defendant's attorney, that was my question?

A:  Well, here I are both.

IDS argues that Ferguson's offer of proof regarding the reasonable attorney's fees he sought to recover on behalf of Perryman, inures to the benefit of IDS so far as discharging its burden of proof on the matter is concerned.

[3] Reasonableness of attorney's fees is a fact question and as such is required to be supported by competent evidence. *Bullock v. Foster Cathead Co.,* 631 S.W.2d 208, 212 (Tex.App.—Corpus Christi 1982, no writ); *Underhill v. Underhill,* 614 S.W.2d 178, 181 (Tex.Civ.App.—Houston [14th Dist.] 1981, writ ref'd n.r.e.); *Huntley v. Huntley,* 512 S.W.2d 767, 771 (Tex.Civ.App.—Austin 1974, no writ).

[4] Evidence of some character is required to set the amount for judgment purposes, even in a non-jury case. *Uhl v. Uhl,* 524 S.W.2d 534, 538 (Tex.Civ.App.—Fort Worth 1975, no writ); *Underhill v. Underhill, supra* at 181.

We do not construe the foregoing statement by Perryman's attorney as a stipulation that IDS was entitled to the same amount of attorney's fees based upon an identical expenditure of time. Rather, it is clear that the statement is an affirmation of the time spent by Perryman's attorney in a dual capacity of defending one claim and advocating a counterclaim.

The rest of the record is entirely devoid of any evidence regarding time devoted by IDS's lawyers to represent IDS, the value of the services rendered or the necessity of the charges. IDS recognized that its proof was lacking when it rested its case and attempted to reopen for the purpose of tendering the required proof.

[5] Although the trial court declined to permit IDS to reopen its case, no complaint is made on appeal of the trial court's action in this respect. Nevertheless, the trial court found, as a fact, that IDS presented its claim to Perryman and Southern more than thirty days prior to the date that IDS filed its suit against Perryman and Southern and that neither tendered payment to IDS in the amount claimed. The record supports the trial court's finding and Perryman and Southern do not dispute the findings. We hold that IDS has met its burden of showing entitlement to attorney's fees as against Perryman under article 2226 and is entitled to reasonable attorney's fees as a matter of law. We sustain IDS's first and second points of error, but we must remand to the trial court for a determination of what is a reasonable amount.

[6] The reasonableness of attorney's fees is a question of fact. However, since the court below made no finding as to the reasonable value of the services of IDS's attorney, and since said value is not established as a matter of law, this court cannot make such a finding. *Chavez v. Aetna Finance Co.,* 553 S.W.2d 174, 178 (Tex.Civ.App.—San Antonio 1977) *writ ref'd n.r.e.,* 561 S.W.2d 799 (Tex.1978); *Zemaco, Inc. v. Navarro, supra* at 621.

[7] The claim for attorney's fees is a severable claim and we are authorized to sever the claim and reverse and remand the judgment only insofar as it pertains to attorney's fees. *Woods Exploration & Producing Co., Inc. v. Arkla Equipment Co., supra* at 571; *Leal v. Leal,* 628 S.W.2d 168, 171 (Tex.App.—San Antonio 1982, no writ); *Saums v. Saums,* 610 S.W.2d 242, 244 (Tex. Civ.App.—El Paso 1980, writ dism'd); *Zemaco, Inc. v. Navarro, supra* at 621; *Hopkins*

*v. Hopkins,* 539 S.W.2d 242, 249 (Tex.Civ. App.—Fort Worth 1976, writ dism'd); *Huntley v. Huntley,* 512 S.W.2d 767, 771 (Tex.Civ.App.—Austin 1974, no writ).

IDS contends in its third point of error that the trial court erred in concluding that IDS presented insufficient evidence to justify holding Southern liable to IDS as an assignee on Perryman's debt to IDS.

IDS argues that the undisputed evidence established, as a matter of law, that Southern is liable to IDS on IDS's claim for $14,575.19 as well as for reasonable attorney's fees. IDS further predicates error in the trial court's refusal to allow into evidence a copy of a Stock Purchase Agreement by and between the sole shareholders of Perryman and Southern.

[8] IDS's contention that the undisputed evidence establishes, as a matter of law, the opposite of the trial court's conclusion of law amounts to a "no evidence" challenge. Accordingly, we are required to view the evidence in the light most favorable to the ruling. Thus, we must discard all adverse evidence and consider only the evidence which supports the trial court's holding. *Brown v. Gonzales,* 653 S.W.2d 854, 857 (Tex.App.—San Antonio 1983, no writ); *San Antonio Bank & Trust v. Pletz,* 588 S.W.2d 797, 799–800 (Tex.Civ.App.—San Antonio 1979, writ ref'd n.r.e.).

The Stock Purchase Agreement sought to be admitted in evidence by IDS is dated on or about September 22, 1980, and represents an acquisition by Southern of 100% of the outstanding capital stock of Perryman from Lee Perryman and W.J. Perryman, the only stockholders of Perryman.

A copy of the Agreement appears in the record as an attachment to IDS's First Amended Original Petition.

Following appellant's presentation of its case, appellees called, as a witness, Bill Joregan, vice president and general manager of Southern. During cross-examination, IDS sought to introduce the Stock Purchase Agreement into evidence. The trial court, indicated that it was willing to admit it only for limited purposes. However, no further effort was made by IDS to have the exhibit marked and offered in evidence. Instead, IDS unsuccessfully interrogated the witness about the document and, although granted permission by the trial court to examine more extensively, the attorney for IDS elected not to pursue the matter. The document was, therefore, never admitted into evidence nor was a ruling secured from the court indicating the court's unwillingness to receive it.

[9–11] In the absence of a tender, a refusal to admit, and the securing of some sort of ruling on the alleged exclusion of the document, there is nothing presented for review. *Alcazar v. Southwestern Bell Telephone Co.,* 353 S.W.2d 933, 935 (Tex. Civ.App.—Austin 1962, no writ). The record does not support IDS's contention that the trial court excluded evidence. Rather, it is clear that IDS abandoned any effort to have the document admitted in favor of testimonial evidence, which proved less than beneficial. Without more, the trial court was correct in holding that IDS failed to introduce sufficient evidence to hold Southern liable as an assignee.

IDS further argues that liability of Southern may, nevertheless, be established through admissions made by Southern in its first Amended Original Answer and Counterclaim. It is argued that Southern's counterclaim seeking recovery of penalties predicated upon usurious interest charges, forfeiture of principal claimed and reasonable attorney's fees necessarily admits the existence of an account between IDS and Southern. IDS reasons that Southern is judicially estopped from asserting that liability on the "admitted" account does not exist since it sought to obtain the benefits of the penalty provisions of the usury statutes. TEX.REV.CIV.STAT.ANN. art. 5069–1.06 (Vernon Supp. 1982–1983).

Southern answers that its counterclaim was predicated upon the "charge" of interest alleged to be usurious since it was never a party to the account which was the basis of IDS's claim.

TEX.REV.CIV.STAT.ANN. art. 5069–1.-06 (Vernon Supp.1982–1983) provides in pertinent part:

> (1) Any person who contracts for, charges or receives interest which is greater than the amount authorized by this Subtitle, shall forfeit to the obligor three times the amount of usurious interest contracted for, charged or received, such usurious interest being the amount the total interest contracted for, charged, or received exceeds the amount of interest allowed by law, and reasonable attorney fees fixed by the court except that in no event shall the amount forfeited be less than Two Thousand Dollars or twenty percent of the principal, whichever is the smaller sum; provided, that there shall be no penalty for any usurious interest which results from an accidental and bona fide error.

*   *   *   *   *   *

IDS directs us to extracts from Southern's first Amended Original Answer and Counterclaim, to-wit:

> Now comes Defendant, Southern Refuse Company, hereinafter called Buyer in response to the first Amended Original Petition of Plaintiff, Industrial Disposal Supply Company, Inc., hereinafter referred to as Seller, and filed this its . . . Counter claim and would show the court the following: . . . [T]he Seller invoiced and charged Buyer in excess of 18% interest on its account . . .

It is apparently IDS's contention that the designation of Southern as "buyer" in its answer/counterclaim together with the allegation that it was "charged" usurious interest on "its account" by IDS amounts to a judicial admission of liability on the account sued upon by IDS.

In an effort to substantiate its reasoning, IDS cites us to *Windhorst v. Adcock Pipe & Supply*, 547 S.W.2d 260 (Tex.1977) and *Hagar v. Williams*, 593 S.W.2d 783 (Tex.Civ. App.—Amarillo 1979, no writ), wherein it was held that the definition of "charge" as used in 5069–1.06 includes ". . . the unilaterally placing on an account an amount due as interest."

Thus, IDS argues there cannot be a "charging" of interest, as that term is used in 5069–1.06, without the existence of an account between the party who charges the interest and the party to whom such interest is charged.

[12] We recognize that facts admitted in a pleading can be considered judicial admissions or a substitute for evidence. *Johnson v. Johnson*, 579 S.W.2d 30, 31 (Tex. Civ.App.—Beaumont 1979, no writ); *National Farmers Organization v. Smith*, 526 S.W.2d 759, 765 (Tex.Civ.App.—Corpus Christi 1975, no writ); *Rosse v. Northern Pump Co.*, 353 S.W.2d 287, 292 (Tex.Civ. App.—Austin 1962, writ ref'd n.r.e.). Moreover, so long as the admission stands unretracted, the fact alleged or admitted, for the purposes of the case, is accepted as true by the court (and jury), and is binding on the party making it, i.e., he cannot introduce evidence to contradict it. *Johnson v. Johnson, supra* at 31; 2 C. MCCORMICK & R. RAY, TEXAS LAW OF EVIDENCE, CIVIL AND CRIMINAL § 1127 (Texas Practice 3rd ed. 1980).

Southern's counterclaim alleged in pertinent part:

> Although there was no written or oral agreement to pay interest, the seller invoiced and charged buyer in excess of 18% interest on its account, copies of said invoices and charges are attached, verified and attached to plaintiff's First Amended Original Petition as Exhibits 'A' and incorporated herein as judicial admissions of Plaintiff and Cross Defendant Seller . . .

We believe that Southern's allegation that it was charged in excess of 18% interest on its account identified by reference to the invoices attached to IDS's petition can be interpreted as an admission that there was an account between the parties and that the account was the same as was being sued upon. However, IDS did not allege in its Amended Original Petition that Southern was liable to it by virtue of an existing account between them nor did it assume that posture during the trial on the merits.

We doubt that the allegations, even if considered judicial admissions, are sufficient to establish Southern's liability under IDS's pleadings and trial posture.

We note that IDS at no time contended in the trial court that Southern's pleadings were such admissions as to obviate necessity of evidence on the point. On the contrary, IDS treated the matter as a disputed issue by attempting to introduce the Stock Purchase Agreement and by eliciting testimony thereon.

The record further reflects through the testimony of Bill Joregan that Southern made attempts to establish an account relationship with IDS similar to the one existing between IDS and Perryman and involving a leasing company. According to Joregan, IDS refused to deal with Southern. Joregan denied ever hearing from IDS by mail, telephone or otherwise, regarding payment on the invoices. Joregan's testimony is unrefuted.

The evidence thus developed is contrary to the import of the purported judicial admission.

[13] A judicial admission is waived when evidence contrary thereto is heard. *Dallas Transit Co. v. Young,* 370 S.W.2d 6, 11 (Tex.Civ.App.—Dallas 1963, writ ref'd n.r.e.); *Restelle v. Williford,* 364 S.W.2d 444, 446 (Tex.Civ.App.—Beaumont 1963, writ ref'd n.r.e.); 31A C.J.S. *Evidence* § 381c (1964); 71 C.J.S. *Pleading* § 161 (1951).

[14] The evidence does not establish as a matter of law that Southern is liable to IDS as an assignee. On the contrary, the undisputed facts establish that IDS would have nothing to do with Southern even though Southern sought to create an account relationship with IDS. Therefore, we hold that the trial court's ruling is not without some support in the evidence. IDS's third point is overruled.

Appellee, Perryman brings three cross-points of error; the first two contesting the court's holding that the contract between Perryman and IDS was not usurious and the third contesting the trial court's denial of attorney's fees.

Cross-point of error one states: "The trial court erred in its Conclusion of Law number 1 'that the contract/account sued upon by IDS, in the amount of $14,575.19, is not usurious, because suit was filed before the effective date of House Bill 1228, and therefore the forfeiture clause is inoperative also, as amended May 9, 1982.'"

Perryman denied that the interest charged by IDS arose out of any agreement, oral or written. It further alleged that the interest rate charged was in violation of TEX.REV.CIV.STAT.ANN. art. 5069–1.03 (Vernon Supp.1982–1983) which provides:

> *When no specified rate of interest is agreed upon* by the parties, interest at the rate of six percent per annum shall be allowed on all accounts and contracts ascertaining the sum payable, commencing on the thirtieth (30th) day from and after the time when the sum is due and payable. (emphasis added.)

Forfeiture was sought under the provisions of TEX.REV.CIV.STAT.ANN. art. 5069–1.06 (Vernon Supp.1982–1983) which provides:

> (1) Any person who contracts for, charges or receives interest which is greater than the amount authorized by this Subtitle, shall forfeit to the obligor three times the amount of usurious interest contracted for, charged or received, such usurious interest being the amount the total interest contracted for, charged, or received exceeds the amount of interest allowed by law, and reasonable attorney fees fixed by the court except, that in no event shall the amount forfeited be less than Two Thousand Dollars or twenty percent of the principal, whichever is the smaller sum; provided that there shall be no penalty for any usurious interest which results from an accidental and bona fide error.

Forfeiture and attorney's fees were also sought under TEX.REV.CIV.STAT.ANN. art. 5069–1.06(2) (Vernon 1971) which, in pertinent part, provides:

Any person who contracts for, charges or receives interest which is in excess of double the amount of interest allowed by this Subtitle shall forfeit as an additional penalty, all principal as well as interest and all other charges and shall pay reasonable attorney fees set by the court ...

Because Perryman takes the position that a specific rate of interest was never agreed upon with IDS, it becomes critical to ascertain if such was the case in order to determine the applicability of article 5069–1.03.

[15] The question of whether an agreement was reached by the parties is generally a question of fact where the existence of the agreement is disputed. *Haws & Garrett General Contractors, Inc. v. Gorbett Brothers Welding Co.,* 480 S.W.2d 607, 610 (Tex.1972). Whether the parties agreed to a specified rate of interest is disputed in the instant case. The trial court found, as a fact, that IDS invoices provided notice that a late charge of 1½% per month would be charged on late accounts and that Perryman had, on two occasions, paid the late charge without voicing objection.

TEX.BUS. & COM.CODE ANN. § 2.204 (Vernon 1968) provides in pertinent part:

(a) A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.

(b) An agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined.

Recently, a similar, if not identical question, was presented to our Supreme Court in *Preston Farm & Ranch Supply v. Bio-Zyme Enterprises,* 625 S.W.2d 295 (Tex. 1981). *Preston Farm* involved a suit on a sworn account arising from a sale of goods and a counterclaim alleging usury. The question before the Court was whether there was evidence of an agreement to pay interest at a specified rate.

As in the instant case, no express agreement existed between the parties for the payment of interest. In concluding that an agreement existed between the parties, the Court relied upon "course of conduct" as defined in TEX.BUS. & COM.CODE ANN. § 2.204 (Vernon 1968) and upon pre-code case law addressing "contracts implied in fact." The Court in *Preston Farm* stated,

A contract implied in fact is one in which, under the circumstances, the acts of the parties are such as to indicate according to the ordinary course of dealing and the common understanding of men a mutual intention to contract, as where one accepts the tendered service of another under circumstances justifying the inference that such other expected to be paid for such services.... A contract implied from the facts and circumstances in evidence is as binding as would be an expressed one. (citations omitted.)

*Id.* at 298.

The classic example of an implied contract from course of dealing under the Uniform Commercial Code occurs where a buyer accepts delivery of goods with knowledge that the goods were offered at a certain price; in accepting the goods, the buyer impliedly agrees to pay the specified price. *See* 1A SQUILLANTE & J. FONSECA, WILLISTON ON SALES § 7–2 p. 199 (4th ed. 1973).

In finding evidence of a course of conduct giving rise to an agreement to pay interest, the Court recognized that the parties had extensive dealings with each other, that the monthly statements contained a service charge provision, that credit purchases continued with full knowledge of the service charge provision, that no objection to the service charge was ever made and that service charges were in fact paid.

Such conduct was likened by the Court to a transaction in which goods were accepted with knowledge that they were offered at a certain price. *Preston Farm,* 625 S.W.2d at 298.

In sustaining the trial court's finding that an agreement to pay specified interest existed, the Court stated, "[b]y his continued purchases and payments he at least impliedly agreed to pay the specified interest."

We think the conduct of Perryman equally gives rise to an implied agreement to pay the 1½% per month interest conspicuously appearing on IDS's invoices during their lengthy period of business dealings.

As in *Preston Farm* the parties in the instant case were "merchants" as that term is defined by TEX.BUS. & COM.CODE ANN. § 2.104 (Vernon 1968).[2]

[16] Perryman and IDS had more extensive business dealings than did the parties in *Preston Farm*. In *Preston Farm*, the business transactions consisted of some twenty transactions spanning a period of over a year. Perryman and IDS dealt with each other some eight to ten years and transacted between five hundred and one thousand invoiced dealings with each invoice containing the late charge provision.

As in *Preston Farm*, Perryman never objected to the late charge provision conspicuously appearing on each invoice, and even acquiesced to the late charge by actually paying it on two occasions.

We think the instant case presents facts more persuasive than does *Preston Farm* for concluding that an implied agreement existed between the parties for the payment of a specified interest rate. We hold that Perryman knew or should have known that the late charge was being imposed, and, that by its continued purchases following payment of interest as late charges, Perryman impliedly agreed to pay interest at the rate of 1½% per month. *Preston Farm*, 625 S.W.2d at 298.

Perryman relies upon *Houston Sash & Door Co. v. Heaner*, 577 S.W.2d 217 (Tex. 1979); *Windhorst v. Adcock Pipe & Supply*, 547 S.W.2d 260 (Tex.1977); *Mecey v. Seggern*, 596 S.W.2d 924 (Tex.Civ.App.—Austin 1980, writ ref'd n.r.e.); *Hagar v. Williams*, 593 S.W.2d 783 (Tex.Civ.App.—Amarillo 1979, no writ); *Watson v. Cargill, Inc., Nutrena Division*, 573 S.W.2d 35 (Tex.Civ.App. —Waco 1978, writ ref'd n.r.e.) and *Lafferty*

*v. A.E.M. Developers & Builders Co.*, 483 S.W.2d 279 (Tex.Civ.App.—San Antonio 1972, writ ref'd n.r.e.).

*Houston Sash* and *Watson* were both rejected as inapplicable in *Preston Farm* because in neither case was course of conduct giving rise to an agreement to pay interest raised on appeal. *See Preston Farm*, 625 S.W.2d at 300. We find them inapplicable for the same reason. The remaining authorities relied upon by Perryman are likewise inapplicable for the same reasons rendering *Houston Sash* and *Watson* inappropriate.

Perryman directs us to the recent case of *Triton Oil & Gas Corp. v. Marine Contractors & Supply, Inc.*, 644 S.W.2d 443 (Tex. 1982) wherein the Supreme Court held that the failure of a buyer to complain about interest being added to invoices sent to it by a seller does not establish an agreement between the parties *where the buyer did not pay the interest charged. Id.* at 445–46. We are in accord with the statement in *Triton* and find it to be in complete harmony with the holding in *Preston Farm*.

*Preston Farm* specifically recognized that failure to object within a reasonable time, *without more*, does not establish an agreement. *Preston Farm*, 625 S.W.2d at 300. The Court took special note that evidence of an agreement arose because of continued purchases and payment of service charges. *Id.*

In *Triton*, the Court again points out that the unilateral act of charging interest coupled with a failure to object to the charging of interest cannot amount to acquiescence. Because Marine never paid the interest charged, there was no evidence of any conduct by Marine indicating its acceptance to the charging of interest. *Triton Oil & Gas Corp.*, 644 S.W.2d at 446.

We reject Perryman's contention that *Triton* lends support to its position.

---

2. (a) " 'Merchant' means a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment or an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill."

TEX.REV.CIV.STAT.ANN. art. 5069–1.-02 (Vernon 1971), prescribing maximum rates of interest, sets the rate of interest which a creditor may charge on a non-written contract at 10% per annum. Where the parties do not agree upon an interest charge on an open account, an obligation to pay interest at the rate of 6% per annum arises by implication of law commencing on the thirtieth (30th) day from and after the time when the sum is due and payable. TEX.REV.CIV.STAT.ANN. art. 5069–1.03 (Vernon Supp. 1982–1983).

Any person charging more than the maximum legal rate allowed by Article 5069–1.-02 incurs the penalties imposed by Article 5069–1.06.

[17] Both Perryman and IDS are, however, corporations and corporations may agree to an interest rate not exceeding eighteen percent per annum, upon certain conditions. *Preston Farm & Ranch Supply, Inc. v. Bio-Zyme Enterprises,* 615 S.W.2d 258 (Tex.Civ.App.—Dallas), *aff'd,* 625 S.W.2d 295 (Tex.1981); TEX.REV.CIV. STAT.ANN. art. 1302–2.09 (Vernon 1980).

Article 1302–2.09 provides:

Notwithstanding any other provision of law, corporations, domestic or foreign, may agree to and stipulate for any rate of interest as such corporation may determine, not to exceed one and one-half percent (1½%) per month, on any bond, note, debt, contract or other obligation of such corporation under which the original principal amount is Five Thousand Dollars ($5000) or more, or on any series of advances of money pursuant thereto if the aggregate of sums advanced or originally proposed to be advanced shall exceed Five Thousand Dollars ($5000), or on any extension or renewal thereof, and in such instances, the claim or defense of usury by such corporation, its successors, guarantors, assigns or anyone on its behalf is prohibited; however, nothing contained herein shall prevent any charitable or religious corporation from asserting the claim or interposing the defense of usury in any action or proceeding.

Article 1302–2.09 applies to debts based upon open account, *Dean Vivian Homes, Inc. v. Sebera's Plumbing & Appliances, Inc.,* 615 S.W.2d 921 (Tex.Civ.App.—Waco 1981, no writ) provided they meet the conditions of the statute. *See id.* at 926.

The record does not disclose the original principal amount of the credit extended. However, we believe there is sufficient evidence in the record indicating that the parties intended the advancement of and the actual advancement of aggregate sums exceeding Five Thousand Dollars ($5,000.00). Indeed, Perryman in its brief concedes as much, and the testimony confirms that Perryman purchased goods from IDS valued at over One Million Dollars ($1,000,000.00). Admittedly, the bulk of the sales to Perryman were pursuant to the leasing agreement with Industrial. Nevertheless, the evidence establishes that the parties contemplated a long term open account involving in excess of Five Thousand Dollars ($5,000.00) for the purchase of parts and other refuse related items.

IDS's exhibits 7 and 8, are records indicating payment by Perryman to IDS on items billed directly to Perryman and include late charges paid by Perryman on two occasions in 1980. These records reflect purchases of $2,121.61 and $15,282.62 representing some 35 separate invoices.

[18] We hold that the provisions of Article 1302–2.09 apply to the instant transaction between Perryman and IDS and that the charge of 1½% interest per month as agreed between the corporations was not in violation of the usury laws.

[19] Perryman argues further that IDS violated the provisions of Article 5069–1.-06(1) because it charged interest from the end of the month during which the materials were supplied, rather than from the day payment was due plus thirty days as required by law. The record does not bear out Perryman's contention. It was the practice of IDS and the exhibits bear out that late charges did not begin to accrue on IDS's invoices until 60 days from the last day of the month in which the statement

was mailed. Furthermore, Article 5069–1.-06(1) has application only when *no specified rate of interest is agreed upon* by the parties. Perryman's contention is without merit.

Perryman's Original Answer and Counterclaim was filed on June 11, 1981, although IDS's Original Petition had been on file since March 5, 1981. Perryman's claim seeking forfeiture was, therefore, not pending at the time House Bill 1228 became effective, May 8, 1981.

We must, therefore, determine whether the account sued upon by IDS is usurious under the laws in effect at the time and whether the forfeiture claim is valid under the statutes in effect when the claim arose.

Perryman's counterclaim alleged that the contract/account was usurious and sought penalties and forfeiture of any principal debt which it may have owed to IDS under the provisions of Article 5069–1.06(1), (2). House Bill 1228 has been incorporated into the statutes as art. 5069–1A.01. TEX.REV. CIV.STAT.ANN. art. 5069–1A.01 (Vernon Supp.1982–1983). The title is Conversion of Open-end Accounts, and states in pertinent part:

> Any creditor electing to implement the provisions of Article 1.04 of this Title, as amended, to an open-end account existing on the effective date of this Act and not previously subject to Article 1.04, as amended, must allow the obligor to pay the balance then existing at the rate previously agreed to and at the minimum payment terms previously agreed to.

*Id.*

Section 27 of the Act states:

> This Act shall be applicable to all claims of forfeiture made after the effective date of this Act but, with respect to claims of forfeiture in litigation pending at such effective date, the amount forfeited shall be determined under the provisions of the law as it existed prior to the effective date of this Act.

Interest-Alternative Rate Ceilings Act, ch. 111, § 27, 1981 Tex.Gen.Laws 286.

House Bill 1228 amends Article 5069–1.04 to read as follows:

> (a) The parties to any written contract may agree to and stipulate for any rate of interest ... that does not exceed:
>
> (1) an indicated rate ceiling that is the auction average rate quoted on a bank discount basis for 26-week treasury bills issued by the United States government, as published by the Federal Reserve Board, for the week preceding the week in which the rate is contracted for, multiplied by two, and rounded to the nearest one-quarter of one percent; or, as an alternative,
>
> (2) an annualized or quarterly ceiling that is the average of the computations under Subsection (1) of this section and is computed pursuant to Section (d) of this Article.
>
> (b)(1) If a computation under Section (a)(1), (a)(2), or (c) of this Article is less than 18 percent a year, the ceiling under that provision is 18 percent a year....

Thus, even under the provisions of Article 5069–1.04 as amended by HB 1228, the parties to any written contract may agree to a rate of interest that does not exceed 18% a year.

The trial court correctly concluded that the contract/account sued upon by IDS is not usurious and that forfeiture under the usury laws was not available to Perryman. Perryman's cross-points one and two are overruled.

Perryman's final cross-point assails the trial court's denial of attorney's fees.

Reliance was had upon the provisions of Article 5069–1.06(1) which provides for reasonable attorney fees to be fixed by the court in the event a violation of the usury laws is found to have occurred. Since the trial court correctly found that the contract/account sued upon by IDS was not usurious and that IDS did not contract for, charge or receive interest which is greater than the amount authorized by law, the trial court correctly denied Perryman attorney's fees. *Thornhill v. Sharpstown Dodge Sales, Inc.,* 546 S.W.2d 151, 153 (Tex.Civ.

App.—Beaumont 1976, no writ). Perryman's final cross-point is overruled.

The judgment is affirmed in part and reversed and remanded in part.



David Michael McGINNIS, Appellant,

v.

The STATE of Texas, Appellee.

No. 07–82–0265–CR.

Court of Appeals of Texas,
Amarillo.

Dec. 19, 1983.

Defendant was convicted in the 72nd District Court, Lubbock County, Robert C. Wright, J., of aggravated robbery and he appealed. The Court of Appeals, Boyd, J., held that: (1) sentence was properly amended nunc pro tunc to reflect trial court's finding that a deadly weapon was used; (2) trial court was not required to instruct jurors not to consider fact that defendant had not entered a plea; (3) defendant was not entitled to continuance because of pretrial publicity; and (4) defendant had given consent to search of suitcases found in trunk of automobile.

Affirmed.

1. Criminal Law ⊕⇒996(1)

Purpose of "nunc pro tunc" order is to have the court records correctly reflect a judgment which was rendered by the court but which for some reason was not entered at the proper time.

See publication Words and Phrases for other judicial constructions and definitions.

2. Criminal Law ⊕⇒996(2)

Even after passage of 30 days since the entry of the judgment, trial court retains power to enter nunc pro tunc order correcting clerical error which may appear in judgment.

3. Criminal Law ⊕⇒996(1)

Whether error is judicial or clerical in nature for purposes of nunc pro tunc order is a question of law; error in entry of judgment will be styled as clerical in nature so long as error did not come about as the product of judicial reasoning.

4. Criminal Law ⊕⇒996(1)

Court acted within its power in entering judgment and sentence nunc pro tunc when it corrected the entry to reflect the court's finding of a use of deadly weapon.

5. Criminal Law ⊕⇒1166.14

Absence of defendant at some stage of the proceedings does not in every instance mandate reversal; to require reversal, there must be either an actual showing of injury or a showing of facts from which injury might reasonably be inferred.

6. Criminal Law ⊕⇒1166.14

Finding that defendant was not present when judgment was entered nunc pro tunc to include court's finding that deadly weapon had been used did not require reversal.

7. Criminal Law ⊕⇒829(1)

Where trial court instructed jury to consider only evidence from the witness stand, defendant was adequately protected and trial court did not have to instruct the jurors not to consider the fact that defendant had not entered a plea.

8. Criminal Law ⊕⇒591

Motion for continuance based on publicity was in the sound discretion of the trial court.

9. Criminal Law ⊕⇒591

Trial court which repeatedly instructed jury not to read, listen to, or watch any news accounts of defendant's trial or any other case tried during that week and which determined that no member of the panel had any knowledge of defendant's case from any source did not err in denying

2010 WL 851407
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR
DESIGNATION AND SIGNING OF OPINIONS.

Court of Appeals of Texas,
Eastland.

MID-CENTURY INSURANCE
CO. OF TEXAS, Appellant
v.
Synthia McLAIN, Appellee.

No. 11-08-00097-CV.  |  March 11, 2010.

On Appeal from the 42nd District Court, Taylor County,
Texas, Trial Court Cause No. 45,958-A.

**Attorneys and Law Firms**

Steven A. Springer, Lance E. Caughfield, for Mid-Century
Insurance Co. of Texas.

Burt L. Burnett, for Synthia McLain.

Panel consists of: WRIGHT, C.J. McCALL, J., and
STRANGE, J.

**MEMORANDUM OPINION**

TERRY McCALL, Justice.

**\*1** Synthia McLain, the insured, sued Mid-Century
Insurance Co. of Texas and its agent, Larry Chapman, after
her car wreck with Becky Morey. McLain had uninsured/
underinsured coverage under a policy written by Mid-Century
and sold to her by Chapman. McLain's lawsuit was for
contractual claims under the policy and for extra-contractual
and bad faith claims. The trial court granted Mid-Century's
motion to sever and ordered that McLain's extra-contractual
and bad faith claims against Mid-Century and Chapman be
severed from the underlying car accident claims. The extra-
contractual and bad faith claims were assigned Docket No.
45,958-B. McLain's claim in this case, made pursuant to
her insurance policy, was contractual in nature. *Henson v.
S. Farm Bureau Cas. Ins. Co.,* 17 S.W.3d 652 (Tex.2000);
*Franco v. Allstate Ins. Co.,* 505 S.W.2d 789 (Tex.1974).
Thus, this case was to establish the contractual obligation, if

any, of Mid-Century to pay under the uninsured/underinsured
motorist (UIM) provision of McLain's insurance policy.

A jury found that Morey's negligence was the cause of
the accident and awarded McLain $116,726: $5,000 for
physical pain and mental anguish sustained in the past; $0
for pain and mental anguish in the future; $80,000 for loss
of earning capacity sustained in the past; $10,000 for loss of
earning capacity in the future; $500 for physical impairment
sustained in the past; $0 for physical impairment that would
be sustained in the future; $11,226 for medical care in the
past; and $10,000 for future medical care. The trial court
also awarded prejudgment interest. Morey had settled with
McLain and did not participate in the trial.

After the verdict, Mid-Century put on evidence that its policy
limit was $20,000, that it had made personal injury payments
(PIP) of $2,500, that it had made a settlement offer of $1,500,
and that McLain had received a settlement of $21,500 from
Morey. At a hearing on entry of judgment, Mid-Century again
urged that these amounts be taken into consideration, citing
*Brainard v. Trinity Universal Insurance Co.,* 216 S.W.3d
809 (Tex.2006); *Henson,* 17 S.W.3d 652; and *State Farm
Mutual Automobile Insurance Co. v. Norris,* 216 S.W.3d 819
(Tex.2006). Mid-Century argued that its liability under the
UIM provision should not exceed $20,000, pointing out that
the extra-contractual claims had been severed and were to be
tried later. Despite the fact that it was her burden of proof,
McLain contended that Mid-Century had not introduced
McLain's policy during the jury trial and that it had failed
to establish the amount of the settlement from Morey. And
despite well-settled law, McLain convinced the trial court to
enter judgment against Mid-Century for the entire $116,726
plus prejudgment interest. The trial court also denied Mid-
Century's motion for a judgment n.o.v. and for a new trial.

Mid-Century presents four issues on appeal: that the trial
court erred in entering judgment for the entire $116,726
in this first phase of a UIM case; that the evidence was
legally and factually insufficient to support the award of lost
earning capacity; that the evidence was legally and factually
insufficient to support the award of future medical expenses;
and that it was incurable jury argument for counsel for
McLain to argue in closing that Mid-Century and its lawyer
were trying to "deceive" the jury because they believed the
jury was "ignorant" and that the jury should serve as the
conscience of the community. This argument was made after
counsel for McLain had repeatedly injected the idea of bad
faith on the part of Mid-Century during the entire trial from

the time of voir dire to closing. The first, second, and fourth issues are sustained, and the case is remanded for a new trial.

### UIM Coverage

**\*2** The Texas Insurance Code requires insurers to offer Texas motorists UIM coverage and mandates that such coverage:

> [P]rovide for payment to the insured of all amounts that the insured is legally entitled to recover as damages from owners or operators of underinsured motor vehicles because of bodily injury or property damage, not to exceed the limit specified in the insurance policy, and reduced by the amount recovered or recoverable from the insurer of the underinsured motor vehicle.

TEX. INS.CODE ANN. § 1952.106 (Vernon 2009). [1]

McLain's counsel erroneously argued to the trial court, and now to this court, that it was Mid-Century's burden to introduce McLain's policy and the amount of any settlement from Morey into evidence. The long established Texas law is that a plaintiff seeking recovery against an insurance company for injuries resulting from the negligence of an uninsured motorist must plead and prove that, at the time of the accident, the plaintiff was protected by uninsured motorist coverage. *Members Mut. Ins. Co. v. Olguin,* 462 S.W.2d 348, 350 (Tex.Civ.App.-El Paso 1970, no writ); *Members Mut. Ins. Co. v. Clancy,* 455 S.W.2d 447 (Tex.Civ.App.-San Antonio 1970, no writ); *Pan Am. Fire & Cas. Co. v. Loyd,* 411 S.W.2d 557, 560 (Tex.Civ.App.-Amarillo 1967, no writ). In the retrial of this case, McLain should introduce a copy of her policy and establish her UIM coverage if she continues to contend that the policy introduced by Mid-Century was not her policy at the time.

Before an insured is entitled to recover under a UIM policy provision, the insured must establish the tortfeasor's liability and the damages resulting from the tortfeasors negligence. The UIM insurer is under no contractual duty to pay benefits until the insured obtains a judgment establishing the liability and underinsured status of the other motorist. *Brainard v. Trinity Universal Ins. Co.,* 216 S.W.3d 809 (Tex.2006);

*Henson,* 17 S.W.3d at 654. [2] A motorist is underinsured if his or her liability insurance is insufficient to pay for the injured party's actual damages. *Stracener v. United Servs. Auto. Ass'n,* 777 S.W.2d 378, 380 (Tex.1989). Recovery from UIM coverage may be had only for damages sustained in an amount in excess of the total amount of the tortfeasor's liability coverage. Section 1952.106; *Olivas v. State Farm Mut. Auto. Ins. Co.,* 850 S.W.2d 564, 565 (Tex.App.-El Paso 1993, writ denied). It was McLain's burden to establish these elements to prove that Morey was at fault and underinsured and that McLain's damages exceeded the amount recovered or recoverable from Morey.

McLain argues that Mid-Century was required to plead, as affirmative defenses, policy limits and any offset such as Morey's coverage limits and Mid-Century's PIP payments. For her position, McLain cites *Southwestern Fire & Casualty Co. v. Larue,* 367 S.W.2d 162 (Tex.1963). However, *Larue* involved an action on a promissory note against the maker of the note. McLain's citation of *Brown v. American Transfer & Storage Co.,* 601 S.W.2d 931 (Tex.1980), and TEX.R. CIV. P. 94 on affirmative defenses is also not in point. McLain has confused a contractual condition precedent with an affirmative defense. The court of appeals in *Henson* held that the specific language in insurance contracts-"legally entitled to recover"-creates a condition precedent to a contractual obligation by insurance companies to perform under a UIM provision. *Henson v. Tex. Farm Bureau Mut. Ins. Co.,* 989 S.W.2d 837, 839 (Tex.App.Amarillo 1999), *aff'd,* 17 S.W.3d at 654. It was McLain's burden to satisfy the condition precedent by establishing that she was "legally entitled to recover" damages from Morey and that Morey was an underinsured driver.

**\*3** After the jury verdict, Mid-Century correctly established that it had paid PIP benefits and made a settlement offer to McLain. As pointed out in *Brainard,* those amounts are to be taken into consideration in determining the amount of prejudgment interest (that would have been owed by the underinsured motorist) under the "declining principal" formula. *Brainard,* 216 S.W.3d at 816. In *Brainard,* the supreme court held that UIM insurance covers prejudgment interest that the underinsured motorist would have owed to the insured and that prejudgment interest constitutes part of the damages caused by the underinsured motorist. On the other hand, the supreme court in *Henson* held that, because UIM insurers do not breach their contractual obligation to pay until tort liability is established, prejudgment interest against the UIM insurer does not begin running until the liability of

the uninsured/underinsured motorist is established. *See also Menix v. Allstate Indem. Co.,* 83 S.W.3d 877 (Tex.App.-Eastland 2002, pet. denied).

McLain attempts to distinguish *Brainard, Henson,* and *Nationwide Mutual Fire Insurance Co. v. Voight,* 971 So.2d 239 (Fla.Dist.Ct.App.2008), the cases cited by Mid-Century, by arguing that in this case Mid-Century undertook the defense of Morey and thereby undertook a duty to plead and prove the amount of money paid by Morey or her insurer and a duty to plead and prove McLain's UIM coverage. We disagree. Mid-Century simply put McLain to her burden of proof that she had to establish a contractual obligation of Mid-Century to pay an amount under the UIM provision.

The trial court erred in entering judgment against Mid-Century for $116,726. Despite McLains failure to introduce the policy, Mid-Century did introduce a copy of the policy with its provision for $20,000 in UIM benefits. At the outset of trial, counsel for McLain told the court that the underinsured motorist had paid McLain $20,100, that Mid-Century had paid her $2,500 in PIP benefits, and that the UIM limit in her policy was $20,000. The judgment against Mid-Century should not have exceeded $20,000. Mid-Century's first issue is sustained. We turn next to McLain's burden of proof on her damages from Morey's negligence. McLain had the burden to establish that her damages exceeded $22,600 ($20,100 settlement from Morey and $2,500 PIP benefits from Mid-Century).

### *Loss of Earning Capacity*

In its second issue, Mid-Century argues that the evidence was legally and factually insufficient to support the jury award of $80,000 for past lost earning capacity and $10,000 for future lost earning capacity.

Loss of earning capacity is the plaintiffs diminished capacity to earn a living. *See Plainview Motels, Inc. v. Reynolds,* 127 S.W.3d 21, 35 (Tex.App.-Tyler 2003, pet. denied); *Koko Motel, Inc. v. Mayo,* 91 S.W.3d 41, 51 (Tex.App.-Amarillo 2002, pet. denied). Loss of earnings is the loss of actual income due to an inability to perform a certain job that the person held before the injury. *Reynolds,* 127 S.W.3d at 35. Loss of earning capacity is the proper measure of damages, not loss of earnings, because even an unemployed person can recover for lost earning capacity. *Id.* However, evidence of loss of earnings is admissible to establish loss of earning

capacity. *Id.* at 35-36. When a plaintiff is employed at the time of his or her injury, the extent of his or her loss can best be shown by comparing his or her actual earnings before and after the injury. *See Strauss v. Cont'l Airlines, Inc.,* 67 S.W.3d 428, 436 (Tex.App.-Houston [14th Dist.] 2002, no pet.).

**\*4** McLain had the burden to introduce evidence from which a jury could reasonably measure in monetary terms her earning capacity prior to the injury. *Strauss,* 67 S.W.3d at 435. Although the amount of damages resulting from impairment of a plaintiff's earning capacity is largely within the discretion of the jury, the jury should not be left to mere conjecture when facts appear to be available upon which the jury could base an intelligent answer. *Id.* The damages need to be proved with that degree of certainty of which the case is susceptible. *Id.* at 436.

Mid-Century correctly states that McLain was required to prove (1) her earning capacity before the accident in April 2003 and (2) her earning capacity after the accident and before trial in November 2007, as well as her earning capacity in the future. Mid-Century concedes that there was some evidence through McLain's testimony as to the first element, but contends that evidence of the second element was lacking.

McLain testified that, before the accident, she worked forty hours a week at $10 an hour as an office aide for Hibbs & Todd, a civil engineering company. Her duties included filing and making copies of manuals that went with blueprints to the job site. In addition, she said that she worked "approximately eighteen hours a week at the Buffalo Gap Store." There, she made $6 an hour. McLain stated that her back pain became unbearable because both jobs kept her on her feet most of the time. According to McLain, "very shortly after the wreck [she] ended up leaving the Buffalo Gap store ." She believed that she left Hibbs & Todd during the first part of 2004, but she "would have to check to make sure." Her testimony was evidence of her earning capacity before the accident, but it was not the degree of certainty of which this case was susceptible. McLain could have easily provided her form W-2s from her employers, statements from her employers, and her tax returns.

If one assumes that McLain worked forty hours a week every week for Hibbs & Todd and eighteen hours a week every week for the Buffalo Gap store, she would have earned $508 per week or $26,416 per year. McLain acknowledged that she did not work forty hours a week every week for Hibbs &

Todd because sometimes she was sick, had to take care of her children, or took time for a vacation.

Within a few weeks of leaving Hibbs & Todd, McLain took a job as a substitute teacher at the Jim Ned school. As a substitute teacher, she earned $50 per day. There is no evidence on how often she worked as a substitute teacher; but, apparently, she had the capacity to earn $250 per week if substitute teacher jobs were available. Subsequently, although the record does not reflect when, she became a teacher's aide at $7 an hour, working from "8:30 in the morning to 3:30 in the afternoon." She was a teacher's aide from April 2004 until May 2007, working forty hours a week. McLain said that she also tutored students for $7 an hour for about five hours a week for three months during the summers of 2005 and 2006. She also worked at Albertson's for either $6.50 or $6.75 an hour for "between 14 and 21" hours a week. At the time of trial, McLain was a full-time student at Abilene Christian University with one year left to obtain a degree in special education. From her testimony, it appears that she continued to work as a bus driver and at Albertson's to help her husband support their family.

**\*5** We are unable to determine from the record how the jury arrived at $80,000 for past loss of earning capacity or $10,000 for future loss of earning capacity. Apparently, she wanted to stay with Hibbs & Todd, a job that she described as a good one with benefits. However, she could not because of her back pain. But even if we assume that she earned $508 per week before the accident, it is not clear how much she earned or had the capacity to earn after the wreck. Also, the $508 per week was based on her working fifty-eight hours a week. After McLain left Hibbs & Todd, a number of her jobs appear to have been at $7 per hour or $280 for a forty-hour week. She testified that she left Hibbs & Todd sometime during the first part of 2004. The difference between $508 and $280 per week is $228 less earnings per week. Assuming she left Hibbs & Todd in January 2004, there were approximately 204 weeks between that date and the date of trial in November 2007. Multiplying $228 times 204 weeks yields $46,512, a number far short of the $80,000 jury verdict. There is, of course, insufficient evidence to even support a verdict in the $40,000 range because there was no evidence as to how many hours she actually worked before the wreck and how many hours she worked after the wreck, much less any other evidence of loss of earning capacity.

The record does not reflect how the jury arrived at $10,000 in future loss of earning capacity. McLain acknowledged that,

after she is a college graduate, she will have an opportunity for greater earnings.

There was a lack of medical evidence as to McLain's loss of earning capacity. McLain testified that Dr. Daniel L. Munton did not take her off work because she requested that he not do so. She further testified that, after the procedure by Dr. Munton, she felt like "her old self" for a period. In his deposition, Dr. Munton stated, "No, I didnt recommend light duty. I just recommended avoiding aggravating activity." Dr. Munton specializes in physical medicine and rehabilitation; he treats people who want to avoid surgery.

From the record, it appears that McLain suffered a loss of earning capacity for some period. She should be commended for her decision to obtain a college degree; however, loss of earnings due to her decision to pursue a college degree was not a loss of earning capacity. There is insufficient evidence in the record to support the awards of $90,000 for loss of earning capacity. Mid-Century's second issue is sustained.

### *Future Medical Expenses*

Dr. Munton testified that McLain underwent a procedure, known as a medial branch block, where he tried to determine where her pain was coming from. That procedure uses needles up to eight inches long to inject a numbing medicine called Marcaine. After a few days, when her pain returned to the pre-injection level, Dr. Munton then determined that McLain needed to undergo a procedure termed "radiofrequency lesioning," which he described as being similar to cauterizing the nerves that appeared to be causing the pain. That procedure also utilized lengthy needles and was described by McLain as being quite painful. McLain had that procedure performed on October 2, 2003.

**\*6** McLain returned to Dr. Munton on November 24, 2003, and on December 22, 2003, and said that she felt pain in a different location. Dr. Munton gave her the option of therapy, chiropractic treatment, or medication, which she chose. At the time of his deposition in 2006, Dr. Munton had not seen her since 2003 because he had moved to another city. Before the trial, he had returned to Abilene. During his deposition, he testified that some patients will have their pain return but that sixty to seventy percent of patients after a year are pain free or continue to have reduced symptoms.

To sustain an award of future medical expenses, the plaintiff must present evidence to establish that, in all reasonable probability, future medical care will be required and the reasonable cost of that care. *See Rosenboom Mach. & Tool, Inc. v. Machala,* 995 S.W.2d 817, 828 (Tex.App.-Houston [1st Dist.] 1999, pet. denied). The reasonable value of future medical expenses may be established by evidence of the reasonable value of past medical expenses of a similar nature. *See City of Rosenberg v. Renken,* 616 S.W.2d 292, 293 (Tex.Civ.App.Houston [14th Dist.] 1981, no writ). The preferred method of establishing future medical expenses is through expert testimony, but such testimony is not required. *Nat'l Freight, Inc. v. Snyder,* 191 S.W.3d 416, 426-27 (Tex.App.-Eastland 2006, no pet.).

Dr. Munton did not address whether in all probability McLain will need future medical care, the type of care that would be required, and the reasonable cost of that care in the future. As to future treatment, Dr. Munton stated that McLain might develop conditions that require surgery but that "[i]t would be unlikely in her case." He repeated again that he could not recommend any kind of surgical procedure, and his opinion was there was no need for spine surgery. McLain testified that she anticipated having to have the cauterization process again in the future because the nerves grow back and have to be cauterized.

According to the medical records, Dr. Munton did see McLain again in January 2007. Dr. Munton wanted to determine the source of her pain by again performing a medial branch block and having an MRI done, but McLain thought these were unnecessary. They agreed that she would again have another radio frequency medial branch neurotomy that utilized the 3 inch radio frequency spinal needle. Subsequent to the procedure, Dr. Munton noted in February that McLain appeared to be "doing remarkably well." But on June 7, 2007, McLain again visited Dr. Munton and told him that her pain level had increased to level five. Dr. Munton described her condition as chronic, implying that she might have to undergo the procedure again in the future. This confirmed McLain's testimony that she thought her nerves would grow back and that she would need further treatments in the future. In 2007, McLain's medical expenses for the treatment were approximately $1,200. After reviewing the records of the costs for the injections, office visits with Dr. Munton, another possible medial branch block, and physical therapy, we cannot say that the jury's finding of $10,000 for future medical expenses was not supported by sufficient evidence. Mid-Century's third issue is overruled.

### Improper Jury Argument

**\*7** In its fourth issue, Mid-Century argues that counsel for McLain engaged in improper jury argument. To obtain reversal of a judgment on the basis of improper jury argument, Mid-Century must prove (1) an error (2) that was not invited or provoked; (3) was preserved at trial by a proper objection, motion to instruct, or motion for mistrial; and (4) was not curable by an instruction, a prompt withdrawal of the statement, or a reprimand by the trial court. *Standard Fire Ins. Co. v. Reese,* 584 S.W.2d 835, 839 (Tex.1979). Our review of an improper jury argument claim must cover the entire case, beginning with voir dire and ending with closing argument. *Id.* at 840. The complainant must show that the probability that the improper argument caused harm is greater than the probability that the verdict was grounded on the evidence. *Id.* at 840.

At the pretrial conference, counsel for Mid-Century requested that the trial court explain (or allow him to explain) at the outset to the jury the nature of the case and the posture of the case. He stated that a brief statement would give the jury the context of the case and explain why Morey, the underinsured driver, was not present and McLain's insurance company was the defendant. The trial court denied this request. However, the court did allow Mid-Century to state during voir dire that this case was not about how the claim was handled but was about the liability of Morey and the damages that resulted from the accident McLain had with Morey.

One of the first statements by McLain's attorney to the jury on voir dire was, "We find ourselves in an odd situation in that Mrs. McLain's own insurance company is fighting against her." The court sustained Mid-Century's objection, but moments later, McLain's counsel continued, "[E]ven though it's against her own insurance company, she has to prove and can only recover money." Then, the following occurred:

> [T]his lawsuit has been here for three-and-a-half years. The wreck has been-it happened four-and-a-half years ago, and within the last week they say for the first time it's her fault. Who thinks that's right? If you do, raise your hand and let's talk about that. Do you think that an insurance company owes better to their insured than that?

> ....

VENIREPERSON: Yes.

MR. BURNETT: If they think that her injuries were caused by something else don't you think within four-and-a-half years they ought to bring a doctor, any doctor-

Counsel for Mid-Century again objected, and the trial court sustained the objection. Counsel for McLain continued during voir dire to allude to the insurance company as being in bad faith even though this case was solely about the negligence of Morey and damages caused by her negligence. McLain's bad faith claims had been severed into a separate case and were not involved in this case.

Questions by the venire panel indicate the effect counsel for McLain had on the panel. One venireman asked counsel for Mid-Century, "But what about when the lady-y'all decided not to pay her, didn't you?" Counsel for Mid-Century answered, "No," but counsel for McLain immediately said, "I object to that. That's not true." When the venireperson continued with, "My question is, someone somewhere had already had to resolve the evidence to not pay her; the insurance company," the court intervened and said, "Well, that's what the lawsuit is about." The court's statement was not helpful. The venireperson may have interpreted the court's statement to mean that the lawsuit was over whether the insurance company had in bad faith failed to pay an amount that it owed, not that it was a lawsuit to determine whether the insurance company had any obligation at all under the UIM provision.

 **\*8** In opening statement, counsel for McLain continued the same tactic that he pursued during voir dire:

> [T]here aren't any other doctors to indicate otherwise, and yet here we are on her uninsured underinsured claim with this company and they haven't paid a penny.

Counsel for Mid-Century again objected, stating that Mid-Century had no obligation to pay at this point and that counsel's statements were prejudicial and had no relevance to this case. The court sustained the objection, telling counsel, "Do not do that again." The court instructed the jury to disregard counsel's statement, but overruled Mid-Century's motion for a mistrial.

McLain's counsel asked the investigating officer, "Did any of these artful questions by this lawyer here change your

opinion of who caused the wreck?" Mid-Century's objection was sustained.

In questioning McLain, her counsel continued in the same vein:

> When was the first time that you heard this company, your insurance company, say that this wreck was your fault?
>
> ....
>
> You have been telling this company that you were hurt, that it wasn't your fault, for four-and-a-half years, right?

Although it was McLain's burden to establish her lost earning capacity, her counsel did not produce any of her earning records. Instead, he attempted to persuade the jury that it was Mid-Century's burden to negate her testimony as to where and when she worked:

> Q. Is today the first time you have now heard they [Mid-Century] are quarreling with you over your lost earning capacity?
>
> A. Correct.
>
> Q. If we had known about that we could have brought somebody in here with those records, right?

The court sustained Mid-Century's objection, but counsel's next questions were:

> Q. Your earning records are available and have been available to them for four-and-a-half years, haven't they?
>
> A. Yes.
>
> Q. They could have gone down to Hibbs & Todd, they could have called anybody they wanted to and they would have give them that information, right?

The court again sustained Mid-Century's objection, but counsel continued:

> Q. Has anyone asked you, with this Defendant, to produce any records up until this moment?

The court again sustained Mid-Century's objection that counsel was misleading the jury with respect to the burden of proof and with respect to the law that the jury would be guided by in making its decisions.

It is apparent from the record that counsel for McLain created the impression that Mid-Century owed duties that it did not owe and that the insurance company had acted in bad faith. Although the court sustained Mid-Century's many objections, the court's actions had little effect. In closing argument, counsel for McLain argued:

> You know now that this insurance company, that these people, paid for this coverage.
>
> ....
>
> No witness, no evidence, all they have is a lawyer that came down here armed with a strong desire to deceive you.... Does he think-does this company think that out here in Abilene we're all so, I guess, ignorant that we can't read a doctor's order ... ?
>
>  **\*9**  [Y]ou don't have to get past tab one in the case in the medical records of the very first exhibit to see how untruthful and disingenuous these people's own insurance company is.
>
> ....
>
> Now, how is it that they can stand up here and say those things and expect you to be misled? ... [T]hey have to deceive you into believing.
>
> ....
>
> We know it's been 1,672 days since this happened. We know it's been 1,672 days where this company could have stepped up to the plate and honored its responsibility, and they have failed entirely to do that.

Counsel for Mid-Century objected, and the objections were sustained, as they had been throughout the case. Counsel for McLain continued to imply that the insurance was acting in bad faith in his rebuttal argument:

Do you really think when this insurance company is talking to people-

> ....
>
> To this insurance company that means their insured did not complain of back pain.
>
> ....
>
> And when you boil this case down they've got to prove she's a liar, and they can't do it and it's driving them crazy. They

not only have to prove shes a liar, they have to prove the police officer was a liar. They have to prove Doctor Munton was a liar.

....

I want you to be able to say you righted a wrong, and that as the standard bearer and setter of this community, this will not be tolerated. I look forward to your verdict.

Counsel for McLain was well aware that McLain's extra-contractual claims had been severed from this case. He points out that the court sustained Mid-Century's objections throughout the trial. It is obvious from the record, however, that the court's rulings had no effect on counsel.

In *Living Centers of Texas Inc. v. Penalver,* 256 S.W.3d 678, 680-81 (Tex.2008), the supreme court stated that the complaining party "must show that the argument by its nature, degree, and extent constituted such error that an instruction from the court or retraction of the argument could not remove its effects." Error as to improper jury argument must ordinarily be preserved by a timely objection that is overruled. *Tex. Employers' Ins. Ass'n v. Haywood,* 153 Tex. 242, 266 S.W.2d 856, 858 (Tex.1954). Here, however, unlike the situation in *Penalver,* Mid-Century did object, and its objections were sustained; counsel for McLain simply ignored them.

Unsupported, extreme, and personal attacks on opposing parties can compromise the basic premise that a trial court provides impartial, equal justice. *See Standard Fire Ins. Co. v. Reese,* 584 S.W.2d 835, 840 (Tex.1979). As the supreme court noted in *Penalver,* the serious effects of arguments not based on evidence or invited by opposing counsel are recognized in our Texas Rules of Civil Procedure. Rule 269 provides that, during final arguments, "[m]ere personal criticism by counsel upon each other shall be avoided, and when indulged in shall be promptly corrected as a contempt of court." TEX.R. CIV. P. 269(e).

 **\*10**  In this case, counsel's final arguments were made after he had consistently emphasized to the jury during the entire trial that McLain's own insurance company had acted in bad faith. That effect was not cured by the court's instruction during counsel's argument.

Counsel for McLain first argues that Mid-Century invited and provoked the argument in question because "Mid-Century waited over 3 years until days before trial to contest liability

or assert that McLain's damages resulted from a preexisting condition and then challenged the truthfulness of McLain on both liability and damages." Mid-Century had filed a general denial at the outset. It did file an amended petition just prior to trial. At a hearing on the amended petition, Mid-Century represented to the trial court that its amended petition was only based on testimony already reflected in the record. The trial court ruled that it was timely filed. Implicit in its ruling was a premise that McLain should not have been surprised by the amended petition. After reviewing the record, we find that there was no abuse of discretion in the trial court's ruling.

Counsel for McLain also argues that Mid-Century disregarded the fiduciary duties it owed to its insured by stepping into the shoes of the underinsured motorist, Morey. For this argument, counsel relies on *Allstate Insurance Co. v. Hunt,* 450 S.W.2d 668, 671 (Tex.Civ.App.-Houston [14th Dist.] 1970), *aff'd,* 469 S.W.2d 151 (Tex.1971). In *Hunt,* the supreme court held that the trial court did not abuse its discretion in ruling that Allstate could not participate in defending the underinsured motorist. The court emphasized that Allstate had agreed to be bound by the insured's suit against the other motorist and had been granted a severance of the suit against it. The supreme court reasoned that Allstate had a primary duty to its insured and that the insurance company would have conflicting duties if the "uninsured motorist should later decide to bring a cross-action against the insured motorist, the company would find itself under a duty to defend both antagonists." 469 S.W.2d at 153.

In this case, the facts are quite different from those in *Hunt.* There is no basis in the record for an argument that Mid-Century owed a fiduciary duty to McLain in this case. Shortly after *Hunt* was decided, the court in *Criterion Insurance Co. v. Brown,* 469 S.W.2d 484, 485 (Tex.Civ.App.-Austin 1971, writ ref'd n.r.e.), pointed out the choices someone in Mclain's position has:

> [The insured] may sue the insurance company directly without suing the uninsured motorist. *State Farm Mutual Automobile Ins. Co. v. Matlock,* 462 S.W.2d 277 (Tex.1970). When the insured obtains the written consent of the insurance company, he may sue the uninsured motorist alone, and that judgment binds the insurance company. *Allstate Ins. Co. v. Hunt, supra.* The insured may proceed against the uninsured motorist

without the consent of the insurance company, but the judgment in that suit will not be "conclusive," (i.e. liability and damages will have to be relitigated) in the suit against the insurance company. *Allstate Ins. Co. v. Hunt, supra.*

**\*11** This is still the law. *Soliz v. Cofer,* No. 03-01-00246-CV, 2002 WL 821909 (Tex.App.-Austin May 2, 2002, pet. denied); *Gov't Employees Ins. Co. v. Lichte,* 792 S.W.2d 546, 548 (Tex.App.-El Paso 1990, writ denied).

Here, the other motorist, Morey, was not involved because she had already settled with McLain. This suit was directly against Mid-Century. Mid-Century was not defending Morey; it was putting McLain to her proof on the issues of liability and damages. This case was only a suit on a contract and similar to automobile, fire, life, theft, accident, wind, and workers' compensation insurance cases brought by an insured against its own insurer over contractual coverage. Counsel's arguments to the jury were improper and incurable by the time they were made. Mid-Century's fourth issue is sustained.

### *Conclusion*

To establish her entitlement to underinsured motorist benefits, McLain was required to establish the following: (1) that she had UIM coverage; (2) that Morey's negligence caused her damages and the amount of her damages; and (3) that Morey was, in fact, underinsured. *State Farm Mut. Auto. Ins. Co. v. Grayson,* 983 S.W.2d 769, 770 (Tex.App.-San Antonio 1998, no pet'n).

McLain did not introduce her insurance policy and failed to carry her burden of proof to establish that she had uninsured/underinsured coverage from Mid-Century. It is basic law that when one sues on a contract, that person must first establish that he or she had a contract. McLain also had the burden to provide evidence of her settlement with Morey and the limits of Morey's insurance to establish that Morey was an underinsured motorist. She failed to provide that evidence. However, Mid-Century did not contest the coverage and provided evidence to the trial court that her policy provided for $20,000 in coverage.

McLain failed to provide sufficient proof to justify the jury's award of $80,000 in loss of past earnings capacity and

$10,000 in loss of future earnings capacity. Final argument by counsel for McLain apparently influenced the jury to give an award far in excess of the evidence.

It is well settled that, in this case, Mid-Century's liability for breach of contract is limited to the amount stated in McLain's contract. From the record provided by Mid-Century, it appears that amount was $20,000. On retrial, the judgment should not exceed $20,000.

*This Courts Ruling*

The judgment of the trial court is reversed, and the cause is remanded for a new trial.

Footnotes

1    Article 5.06-1(5) of the Insurance Code, which was a former version of Section 1952.106, was in effect when McLain filed this suit. *See* former TEX. INS.CODE art. 5.06-1(5) (1981). However, because the legislature made no substantive changes to Article 5.06-1(5) in enacting Section 1952.106, we refer to the current statute in the body of the opinion.

2    If the insured proceeds against the uninsured motorist without the consent of the insurance company, the judgment in that case will not be conclusive; the liability of the uninsured motorist and damages will have to be relitigated in the suit against the insurance company providing the uninsured/underinsured coverage. *Criterion Ins. Co. v. Brown,* 469 S.W.2d 484, 485 (Tex.Civ.App.-Austin, writ ref'd n.r.e.).

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

to be modified so as to be made final); *McNally v. Guevara,* 52 S.W.3d 195, 196 (Tex.2001) (remanding appeal from interlocutory summary-judgment order to court of appeals so court could determine whether to abate the appeal to permit the trial court to render a final judgment or to dismiss the appeal for want of jurisdiction); *Lehmann,* 39 S.W.3d at 206 (stating that appellate court can abate the appeal to permit the trial court to clarify the intention of its order).

### III. ABATEMENT

We grant Coastal's request that this appeal be abated for a reasonable period to allow the trial court to clarify whether it intended its August 23, 2002 judgment to be an interlocutory judgment and to allow the trial court a reasonable time to strike or sever Coastal's counterclaim, if the trial court wishes to do so. The clerk of the trial court is ordered to prepare and file with this court a supplemental clerk's record containing any additional orders signed by the trial court in response to this abatement order. If the trial court does not take action in this regard within thirty days of the date of this order, then this court shall dismiss this appeal for lack of jurisdiction.



**Lauren PERALTA, Appellant,**

**v.**

**Charles DURHAM, Appellee.**

**No. 05–03–00934–CV.**

Court of Appeals of Texas,
Dallas.

April 28, 2004.

**Background:** Motorist sued alleged tortfeasor for injuries incurred in car accident. Immediately before trial tortfeasor stipulated to liability. The 191st Judicial District Court, Dallas County, Catharina Haynes, J., entered judgment for damages on jury's verdict for motorist, and later awarded motorist expenses for tortfeasor's denial of certain requests for admissions related to liability. Tortfeasor appealed.

**Holdings:** The Court of Appeals, Morris, J., held that:

(1) motorist was entitled to award of expenses for tortfeasor's denial of matters later proven, and

(2) tortfeasor's stipulation of liability was judicial admission that satisfied "proof" requirement of sanction rule.

Affirmed.

**1. Appeal and Error ⚖984(1)**

The court's decision to award expenses, under rule allowing expenses for a party's denial of requests for admissions that are later proven, is reviewed under an abuse of discretion standard. Vernon's Ann.Texas Rules Civ.Proc., Rules 198.1, 215.4(b).

**2. Pretrial Procedure ⚖485**

Motorist was entitled to award of expenses after tortfeasor stipulated to liability on eve of trial, under rule authorizing sanctions for denial of matters thereafter proved, for tortfeasor's failure to admit fault in causing car accident in response to requests for admissions, even though tortfeasor claimed right to rely on her general denial and force motorist to prove his case; whether tortfeasor failed to maintain proper lookout, maintain safe distance, and apply her brakes properly at time of accident were matters within her knowledge, and tortfeasor made no objection to requests at time they were made. Vernon's Ann.Texas Rules Civ.Proc., Rules 198.1, 215.4(b).

**3. Pretrial Procedure ⚖︎472**

The primary purpose of requests for admission is to simplify trials by eliminating matters about which there is no real controversy. Vernon's Ann.Texas Rules Civ.Proc., Rule 198.1.

**4. Evidence ⚖︎265(9)**

**Pretrial Procedure ⚖︎485**

Tortfeasor's stipulation to liability for car accident on eve of trial was judicial admission that satisfied "proof" requirement of rule authorizing sanctions for party's failure to admit matters in discovery that are proved thereafter; tortfeasor responded to motorist's requests for admissions by denying she failed to maintain proper lookout, failed to keep a safe distance, and failed to apply her brakes properly at time of accident. Vernon's Ann.Texas Rules Civ.Proc., Rules 198.1, 215.4(b).

**5. Evidence ⚖︎265(7)**

Although a judicial admission relieves the opposing party of his obligation to present evidence on the issue, the fact admitted is proved for the purposes of trial.

**6. Evidence ⚖︎265(7)**

A judicial admission must be taken as true by the court and the jury and the declarant cannot introduce evidence to contradict it.

————————

Steven P. Amis, Amis & Bell, Arlington, for Appellant.

Ray Brooks, Attorney At Law, Garland, for Appellee.

Before Justices MORRIS, FITZGERALD, and FRANCIS.

**OPINION**

Opinion by Justice MORRIS.

This is an appeal of an award of expenses granted pursuant to rule 215.4(b) of the Texas Rules of Civil Procedure. Lauren Peralta contends the trial court abused its discretion in granting the award against her based on her denial of certain requests for admission because the requests were improper and Charles Durham never proved the truth of the matters she denied. For the reasons set forth below, we affirm the trial court's judgment.

**I.**

This case arose out of a traffic accident between Lauren Peralta and Charles Durham. Durham filed suit against Peralta claiming she negligently struck his car with her car causing him injuries. In response to the suit, Peralta filed a general denial. Durham sent requests for admission under rule 198 of the Texas Rules of Civil Procedure asking Peralta to admit, among other things, that she failed to keep a proper lookout, failed to maintain a safe distance, and failed to make a proper application of her brakes. Durham also asked Peralta to admit that she caused the accident. Peralta did not object to these requests and denied each of the matters.

Immediately before trial, Peralta stipulated to liability and the case was tried on the issue of damages alone. The charge of the court instructed the jury that Peralta was "negligent on the occasion in question and her negligence was a proximate cause of the occurrence in question." The jury awarded Durham $3,365 in damages.

On the same day judgment was granted, Durham filed a motion to recover expenses of proof under rule 215.4(b). At the hearing on the motion, Durham argued Peralta admitted in her deposition that she was turned around in her seat and was not

looking where she was going when her car struck Durham's. Furthermore, Peralta ultimately conceded liability just before trial. According to Durham, Peralta had no good faith basis for denying the requests for admission relating to liability and he was entitled to recover from her the reasonable expenses he incurred in preparing to prove liability at trial. Peralta responded she had a right to make Durham prove his case and because he was never forced to prove liability at trial, he is not entitled to expenses under rule 215.4(b). The trial court granted Durham's motion and awarded him $1,000 in expenses. This appeal ensued.

## II.

**[1]** Under rule 215.4(b) of the Texas Rules of Civil Procedure, "[i]f a party fails to admit the genuineness of any document or the truth of any matter as requested under rule 198 and if the party requesting the admissions thereafter proves the genuineness of the document or the truth of the matter he may apply to the court for an order requiring the other party to pay him the reasonable expenses incurred in making that proof, including reasonable attorneys fees." TEX.R. CIV. P. 215.4(b). The court must grant the order unless it finds that (1) the request for admission was held objectionable pursuant to rule 193, (2) the admission sought was of no substantial importance, (3) the party failing to make the admission had a reasonable ground to believe he might prevail on the matter, or (4) there was other good reason for the failure to admit. *Id.* The court's decision to decision to award expenses is reviewed under an abuse of discretion standard. *See Bodnow Corp. v. City of Hondo,* 721 S.W.2d 839, 840 (Tex.1986).

**[2]** Peralta first argues the trial court abused its discretion in awarding Durham his expenses of proof because the requests

for admission relating to Peralta's negligence improperly asked Peralta to admit she had no defense against Durham's claims. Peralta contends that punishing her for failing to admit fault in response to the requests for admission denies her the right to rely on her general denial and make Durham prove his case. We disagree.

**[3]** First, we note that Peralta did not object to the requests at issue or obtain a ruling on the propriety of the requests under rule 193. Accordingly, the alleged objectionable nature of the questions could not have been grounds for denying relief under rule 215.4(b). *See* TEX.R. CIV. P. 215.4(b). In addition, Peralta mischaracterizes the relationship between a general denial and responses to requests for admission. Although a defendant has a right to force a plaintiff to prove his case, a defendant also has an obligation to answer requests for admission in good faith to the extent of the information within her possession or easily attainable. *See* TEX.R. CIV. P. 198.2(b). The primary purpose of requests for admission is to simplify trials by eliminating matters about which there is no real controversy. *See Stelly v. Papania,* 927 S.W.2d 620, 622 (Tex.1996). In this case, it was within Peralta's knowledge when she responded to the requests for admission whether she failed to maintain a proper lookout, maintain a safe distance, and apply her brakes properly at the time of the accident. By failing to admit to these matters until immediately before trial, she forced Durham to unnecessarily incur expenses in preparing to prove her negligence at trial. We cannot conclude the trial court abused its discretion in awarding Durham his expenses on this basis.

Peralta next argues that Durham is not entitled to his expenses under rule 215.4(b) because he never proved her wrongful con-

duct or negligence at trial. It is Peralta's position that her judicial admission of liability relieved Durham of his obligation to prove the matter so the conditions giving rise to an award of expenses under rule 215.4(b) never occurred. We conclude Peralta's reading of rule 215.4(b) is too limited and would defeat the purpose of the rule.

[4–6] Peralta focuses on the language of the rule stating that expenses may be awarded if the requesting party *proves* the truth of a matter previously denied in response to a request for admission. *See* TEX.R. CIV. P. 215.4(b). Although a judicial admission relieves the opposing party of his obligation to present evidence on the issue, the fact admitted is proved for the purposes of trial. *See Gevinson v. Manhattan Const. Co.,* 449 S.W.2d 458, 466 (Tex.1969). A judicial admission must be taken as true by the court and the jury and the declarant cannot introduce evidence to contradict it. *See Sherman v. Merit Office Portfolio, Ltd.,* 106 S.W.3d 135, 140 (Tex.App.-Dallas 2003, pet. denied). Because Peralta's conduct was proved for purposes of the trial against her, we conclude rule 215.4(b) is applicable to her conduct.

As stated above, requests for admission are intended to simplify litigation and reduce costs by eliminating the need to discover and present evidence about matters over which there is no legitimate dispute. *Id.* Rule 215.4(b) furthers this goal by permitting the trial court to sanction parties who, in response to proper requests, fail to admit material facts without good reason or reasonable ground to believe they might prevail on the matter. *See* TEX.R. CIV. P. 215.4(b). If a party could avoid the sanction by admitting the matter

on the eve of trial, after discovery has been done and expenses incurred by the opposing party, the purpose of rule 215.4(b) would be thwarted.

Peralta does not dispute she had no good reason to deny her wrongful conduct or reasonable ground to believe she would prevail on the issue of her liability.[1] We conclude the trial court did not abuse its discretion in awarding Durham his expenses of proof under rule 215.4(b). We affirm the trial court's judgment.



**GRANT THORNTON LLP, Appellant,**

**v.**

**SUNTRUST BANK, Atlanta, as Trustee for Suntrust Retirement Sunbelt Equity Fund, and STI Classic Funds, for STI Classic Small Cap Growth Stock Fund, Appellees.**

**No. 05–03–00302–CV.**

Court of Appeals of Texas, Dallas.

April 29, 2004.

**Background:** Bank, as trustee for retirement fund, and mutual fund brought action against public accounting firm for material misstatements and omissions of material facts in registration statement for initial public offering. The 191st Judicial District Court, Dallas County, Catharina Haynes, J., certified action as a class action, and accounting firm appealed. The Court of Appeals reversed and remanded for fur-

---

**1.** Indeed, Peralta cannot dispute these issues as she failed to file a complete record with this court and, absent a complete record, we

cannot review the trial court's findings. *See Christiansen v. Prezelski,* 782 S.W.2d 842, 843 (Tex.1990).

Mrs. Mamie RESTELLE et al., Appellants,

v.

Billy Frank WILLIFORD, Appellee.

No. 6598.

Court of Civil Appeals of Texas.
Beaumont.

Jan. 10, 1963.

Rehearing Denied Feb. 6, 1963.

From an order of the District Court, Liberty County, Charles F. Kohlne, Jr., J., granting a temporary injunction against the execution sale of certain farming equipment claimed to be exempt, an appeal was taken. The Court of Civil Appeals, McNeill, J., held that even if allegations of the application for injunction that the property had been received by a divorce property settlement constituted a judicial admission in the trial court, the reviewing court in the absence of a statement of facts must presume that sufficient evidence was introduced to support the trial court's finding to effect that the debtor and his wife had not been divorced.

Affirmed.

**1. Appeal and Error ⬤⟶516**

Trial court's docket entry that plaintiff was granted divorce was not part of record which reviewing court could consider in determining whether parties were divorced but was memorandum made for convenience of trial court and clerk.

**2. Appeal and Error ⬤⟶909(1)**

Even if allegations of application for injunction that farming equipment claimed to be exempt from execution had been received by divorce property settlement constituted judicial admission in trial court, reviewing court without statement of facts presumed that sufficient evidence had been introduced to support trial court's finding to effect that debtor and his wife had not been divorced. Vernon's Ann.Civ.St. art. 3832.

**3. Appeal and Error ⬤⟶907(3)**

Reviewing court was required to indulge every reasonable presumption consistent with record in favor of correctness of judgment rendered, and in absence of statement of facts it was appellant's duty to show that under no possible state of case could court's judgment be upheld.

**4. Evidence ⬤⟶265(13)**

Judicial admission is waived when evidence contrary thereto is heard.

**5. Divorce ⬤⟶162**

Where no property settlement was properly consummated, no final judgment in divorce case could be rendered and entered in the minutes.

**6. Divorce ⬤⟶156, 165(1)**

Where court's order granting divorce disposed of only part of issues involved in divorce case and parties were unable to agree on property division, order granting divorce was interlocutory and could be set aside at subsequent term.

**7. Appeal and Error ⬤⟶909(1)**

In absence of statement of facts, reviewing court would presume in upholding order of trial court that issue whether property was exempt from execution under certain statute was tried with implied consent of parties, though not pleaded in application for injunction. Vernon's Ann. Civ.St. arts. 3832, 3834; Rules of Civil Procedure, rule 67.

———◆———

Preston E. Johnson, Liberty, for appellants.

Zbranek & Friend, Liberty, for appellee.

McNEILL, Justice.

The appeal is from an order granting a temporary injunction against appellants, Mamie Restelle, her attorney, and the sheriff of Liberty County, restraining the sale under execution of certain farming equipment belonging to appellee.

The principal question posed is whether appellee was married at the time of the levy upon his equipment. If he was, his farming equipment could be shown, under proper circumstances, to be exempt to him under Art. 3832, Vernon's Ann.Tex.Civ.St. No statement of facts is furnished us. The trial court's findings of fact reveal that at the time the judgment for debt rendered against appellee on February 4, 1959, he was married and the head of a family; that on March 13, 1962 appellee's wife, Luan Williford, filed suit in the district court of Liberty County against him for divorce and partition of community property; that on June 11, 1962, Luan Williford and husband were before the court, Judge J. Harris Gardner presiding, in divorce Cause No. 19,424, and the following entry was made on the court's docket:

"6/11/62: Plaintiff granted divorce and property division as per decree on file. It is further ordered by the Court that Plaintiff's maiden name of 'Nugent' be restored to her."

The findings further show: that the farming equipment was levied upon on June 15, 1962; that on July 9, 1962, at the time of the hearing on the application for temporary injunction, there was no written decree entered by the court in Cause No. 19,424, entitled Luan Nugent Williford vs. Billy Frank Williford, in Liberty County, Texas; that at the time the divorce suit was filed and at all times since, appellee was engaged in the occupation of farming.

The trial court concluded, as a matter of law, on the findings made that there was no judgment declaring the parties Williford to have been divorced and that therefore they were man and wife. He further concluded that there was no evidence that the parties had partitioned the community property in question between themselves in the manner provided by the constitution and laws of this state, and that consequently the property would not be subject to execution by reason of Art. 3832, supra.

[1] Appellants assail the trial court's conclusion that appellee and wife were not divorced and were man and wife upon three grounds: First, it is said that the docket entry of June 11, 1962 is proof the judge then pronounced judgment of divorce. We overrule this contention. The trial court's docket entry is not a part of the record which we may consider; it is a memorandum made for the convenience of the trial court and clerk. Williams v. Land, Tex. Civ.App., 300 S.W. 990; Burleson v. Moffett, Tex.Civ.App., 3 S.W.2d 544.

[2-5] Appellants' second ground—assailing the trial court's conclusion—is that appellee's application for injunction alleged that appellee and Luan Williford were formerly man and wife, and that the farming equipment involved was received by appellee in the divorce property settlement. It is said that these allegations constitute a judicial admission that the divorce was actually granted. We doubt that the allegations were made with such clarity that they, strictly construed, may be considered a judicial admission. If they should be so considered, there is a clear answer to the proposition that they must be accepted as an admission here. Since we have no statement of facts, to proceed upon it must be presumed upon appeal that sufficient evidence was introduced to support the trial court's finding that the parties were man and wife. City of Houston v. Adams, Tex.Civ.App., 326 S.W.2d 627. It is appellants' duty to show that under no possible state of the case could the court's judgment be upheld. First National Life Ins. Co. v. Herring, Tex.Civ.App., 318 S.W.2d 119. And we are required to indulge every reasonable presumption consistent with the record in favor of the correctness of the judgment rendered. Thomas v. International Harvestor Co., Tex.Civ.App., 325 S. W.2d 832. Accordingly, we indulge the presumption that evidence was heard by the trial court indicating that no legal property settlement had been consummated between the parties. This presumption is strengthened by the trial court's statement

in his conclusions that there was no evidence offered showing a legal division of the community property. It is held that a judicial admission is waived when evidence contrary thereto is heard. 31 C.J.S. Evidence § 381c, 1172; Plemmons v. Pevely Dairy Co., 233 S.W.2d (Mo.App.) 426. No property settlement having been properly consummated, no final judgment could be rendered and entered in the minutes.

[6] The third ground of attack on the trial court's finding that Williford and wife were still married was because of the recital in an order of the District Court (Judge Gardner again presiding) in the divorce case dated July 29, 1962, as follows: " * * * that the order of the court * * granting the divorce of plaintiff and cross-defendant, Luan Nugent Williford, from defendant and cross-plaintiff Billy Frank Williford * * * "; and it is asserted therefrom that it is shown unquestionably that the divorce had been rendered on June 11, 1962. The order of July 29th was one setting aside the docket entry of June 11, 1962 and resetting the case for trial in its regular turn. The July 29th order has no proper bearing upon the judgment granting the temporary injunction on July 9, 1962. 31 Tex.Jur.2d 343. But since it is relied upon by appellants, it may be stated that this very order contains a further recitation "and it further appearing to the court that the parties hereto nor their attorneys have been able to reach an understanding and agreement as to the property settlement proposed by the court; * * *." This order of July 29, which set the divorce case for trial in its regular turn, indicates that though there was a pronouncement of divorce, the court had left the details of the settlement of property rights to the lawyers and the parties involved, as is often done. But later the court discovered that the parties were unable to agree upon division of the property. So, it is seen that, whether he intended it or not, the trial court actually disposed of only part of the issues involved in the divorce case. His order granting

the divorce was consequently an interlocutory one which could be set aside at a subsequent term. Brannon v. Wilson, Tex. Civ.App., 260 S.W.2d 201; Consolidated Underwriters v. McCauley, Tex.Civ.App., 320 S.W.2d 60.

[7] Appellants finally urge that the temporary injunction should not have been granted for the reason that the application therefor did not plead the benefit of or refer to Art. 3832, but attempted to obtain the benefit of Art. 3834 which exempts proceeds of sale of homesteads for six months. In the absence of a statement of facts, we must presume in upholding the order of the trial court that the issue of exemption, as raised by Art. 3832, was tried with the implied consent of the parties. Rule 67, Texas Rules of Civil Procedure; Dorman v. Cook, Tex.Civ.App., 262 S.W.2d 744; 4 McDonald P.C.P. p. 1302.

The judgment is affirmed.



**PORT ARTHUR INDEPENDENT SCHOOL DISTRICT et al., Relators,**

**v.**

**Hon. Gordon D. GARY et al., Respondents.**

**No. 6637.**

Court of Civil Appeals of Texas.

Beaumont.

Jan. 28, 1963.

Proceeding for mandamus to compel district court judge to hear petitioning school district's application for temporary injunction against city's enforcement of ordinances. The Court of Civil Appeals, McNeill, J., held that court which had enjoined city from interfering with school district building lacked jurisdiction, once city had appealed and superseded the in-

**S & I MANAGEMENT,
INC., Appellant,**

**v.**

**SUNGJU CHOI a/k/a Sung Ju Choi
a/k/a Sam Choi and The Michael
Group, L.L.C., Appellees.**

**No. 05–09–00948–CV.**

Court of Appeals of Texas,
Dallas.

Jan. 25, 2011.

Rehearing Overruled March 2, 2011.

**Background:** Purchaser of gas station sued real estate agent and real estate brokerage for whom agent worked for fraud, violations of the Deceptive Trade Practices–Consumer Protection Act (DTPA), negligent misrepresentation, breach of fiduciary duty, and conspiracy. The 162nd District Court, Dallas County, Lorraine Raggio, J., granted defendants summary judgment. Purchaser appealed.

**Holdings:** The Court of Appeals, Myers, J., held that:

(1) independent contractor agreement was properly admitted in traditional motion for summary judgment, and

(2) purchaser's affidavit was some evidence that agent's alleged conduct was a substantial factor in bringing about purchaser's injury.

Affirmed in part, reversed in part, and remanded.

**1. Judgment** ⚖️185(6)

Defendants who move for summary judgment must show the plaintiffs have no cause of action and may meet this burden by either (1) disproving at least one essential element of each theory of recovery or (2) conclusively proving all elements of an affirmative defense.

**2. Judgment** ⚖️185(5)

A matter is conclusively established on motion for summary judgment if ordinary minds cannot differ as to the conclusion to be drawn from the evidence.

**3. Judgment** ⚖️185(2)

After the movants have established a right to summary judgment, the burden shifts to the nonmovants to present evidence creating a fact issue.

**4. Appeal and Error** ⚖️854(1)

When a successful summary judgment movant presents both traditional and no-evidence grounds, the Court of Appeals must affirm it if it can be sustained under either standard.

**5. Labor and Employment** ⚖️3027, 3045
**Principal and Agent** ⚖️159(1)

Under the doctrine of respondeat superior, an employer is vicariously liable for the negligence of an agent or employee acting within the scope of his agency or employment even though the principal or employer has not personally committed a wrong; the justification for imposing this liability is that the principal or employer has the right to control the means and methods of the agent or employee's work.

**6. Labor and Employment** ⚖️3125

An employer is not vicariously liable for the torts of an independent contractor it hires because an independent contractor has sole control over the means and methods of the work.

**7. Labor and Employment** ⚖️29

A contract between the parties that establishes an independent contractor relationship is determinative of the parties' relationship in the absence of extrinsic evidence indicating that the contract was a "sham or cloak" designed to conceal the true legal relationship of the parties or that despite the contract terms, the true

agreement vested the right of control in the principal.

**8. Judgment ⚯185(4), 185.3(7)**

Independent contractor agreement attached to affidavit of real estate brokerage's vice president did not have to satisfy statute of frauds to be considered on brokerage's motion for summary judgment in action against brokerage based on vicarious liability for alleged negligence of real estate agent; brokerage was not seeking to enforce agreement against agent or anyone else, but attached the agreement to show terms of the agreement indicating that it did not have sole control over manner and means used by agent to sell real estate, as required for finding it vicarious liable under doctrine of respondeat superior.

**9. Brokers ⚯7**

**Labor and Employment ⚯3143**

Statement in independent contractor agreement, that contractor understood that the real estate brokerage was legally accountable for the activities of the contractor, did not give brokerage sole control over the manner and means used by contractor to sell real estate, as required to find brokerage vicariously liable for contractor's alleged negligence under doctrine of respondeat superior.

**10. Judgment ⚯185(5)**

More than a "scintilla of evidence" required to defeat summary judgment motion exists when the evidence rises to a level that would enable reasonable, fair-minded persons to differ in their conclusions; less than a scintilla of evidence exists when the evidence is so weak as to do no more than create a mere surmise or suspicion of a fact.

> See publication Words and Phrases for other judicial constructions and definitions.

**11. Judgment ⚯185.1(8)**

Trial court's ruling on real estate agent's objections to purchaser's summary judgment affidavit was ineffective in negligence action, where trial court did not enter a written ruling on the objections.

**12. Judgment ⚯185.1(8), 189**

For a ruling on an objection to summary judgment evidence to be effective, the ruling must be reduced to writing, signed by the trial court, and entered of record.

**13. Appeal and Error ⚯242(4)**

Objections to summary judgment affidavit, based on assertions that affidavit contained hearsay and self-serving statements of an interested witness that were not clear, positive, direct, credible, or free from contradiction, were objections to defects of form which could not be raised on appeal, where objector failed to obtain written rulings on his objections from the trial court.

**14. Appeal and Error ⚯242(4)**

**Judgment ⚯185.1(8)**

Defects in the form of summary judgment affidavit must be objected to, the opposing party must have the opportunity to amend, and the trial court must rule on the objection; otherwise, the objection is waived and the objected-to material is in evidence.

**15. Judgment ⚯185.1(8), 189**

Objections that summary judgment documentary evidence contains hearsay, or that statements of an interested witness are not clear, positive, direct, credible, and free from contradiction, are defects of form.

**16. Appeal and Error ⚯223**

Objections that statements in a summary judgment affidavit are conclusory as-

sert defects of substance, which may be raised for the first time on appeal.

**17. Judgment ⚶185.1(4)**

Conclusory statement in summary judgment affidavit is one that does not provide the underlying facts to support the conclusion, and the statement may be either legal or factual in nature.

**18. Antitrust and Trade Regulation ⚶138**

**Fraud ⚶25**

For negligent misrepresentation, fraud, and breach of fiduciary duty, the plaintiff must prove proximate causation, but for violations of the Deceptive Trade Practices–Consumer Protection Act (DTPA), the plaintiff must prove producing causation; the components of proximate cause are cause in fact and foreseeability, but the test for both cause in fact and producing cause is whether the defendant's conduct was a substantial factor in bringing about the injury that would not otherwise have occurred. V.T.C.A., Bus. & C. § 17.50(a).

**19. Judgment ⚶185.3(7)**

Purchaser's affidavit was some evidence that real estate agent's alleged misrepresentations concerning business purchase site were a substantial factor in bringing about purchaser's loss of business revenue that otherwise would not have occurred, precluding no-evidence summary judgment in action for negligent misrepresentation; purchaser stated that his agent represented to him that the vacant gas station would remain vacant, that all agents knew a gas company was moving into that space, that he relied on agent's representations, that he would not have bought "the business" if he had known the

company was moving into the vacant gas station, and that as a result of purchasing the business and with the company having come, the business lost revenue and with it value.

————

William Chu, Jamie J. Lee, The Law Offices of William Chu, Dallas, TX, for Appellant.

Elaine T. Lenahan, Larry Johnson, Dallas, TX, Michael W. Eady, Thompson, Coe, Cousins, & Irons, LLP, Austin, TX, for Appellees.

Before Justices MARTIN RICHTER, LANG, and MYERS.

## OPINION

Opinion By Justice MYERS.

S & I Management, Inc. appeals the summary judgment rendered in favor of Sungju Choi a/k/a Sung Ju Choi a/k/a Sam Choi and The Michael Group, L.L.C. Appellant brings four issues asserting the trial court erred in granting appellees' motions for summary judgment. We affirm the trial court's judgment as to The Michael Group, we reverse the judgment as to Choi, and we remand the cause for further proceedings.

## BACKGROUND

In 2005, Steven Lee was looking to purchase a new business for his company, appellant. He met with Choi, a real estate agent or broker,[1] who advertised that he worked for The Michael Group real estate brokerage. Choi directed appellant to a gas station and store owned by New Chu-

1. Lee stated in his affidavit that Choi was a "broker," but The Michael Group attached a document to its traditional motion for summary judgment indicating Choi was an "agent."

dhri Enterprises, Inc., and appellant agreed to buy the businesses. Before appellant purchased the property, Choi and Lee were surveying the businesses' neighborhood when Lee asked Choi about a nearby property with a defunct gas station. Choi told Lee that no one would move into that space because the gas station there was decrepit and old. Choi said he would ask Chudhri Iqbal, the owner of New Chudhri Enterprises, about the property with the defunct gas station. Later, Choi told Lee that no one would move into that property because the gas tanks were old and leaking. After appellant purchased the businesses from New Chudhri Enterprises, Quiktrip opened a gas station on the lot with the old gas station.[2] Lee stated in his affidavit that after he bought the businesses, other brokers told him "that all the brokers knew about the coming of Quiktrip about the time I purchased the businesses." He stated he "never would have purchased the business had [he] known that Quiktrip was coming into that space." "As a result of purchasing the business and with Quiktrip having come, the business has lost revenue and with it value." Lee stated he "had to sell one of [the businesses] to keep the other afloat."

Appellant sued Choi and The Michael Group for fraud, violations of the Texas Deceptive Trade Practices–Consumer Protection Act (DTPA), negligent misrepresentation, breach of fiduciary duty, and conspiracy with Iqbal and New Chudhri Enterprises.[3] Appellant's causes of action against The Michael Group assert that The Michael Group is vicariously liable under the doctrine of respondeat superior for Choi's tortious conduct. Appellant sought actual and exemplary damages as well as attorney's fees. Choi and The Michael Group filed no-evidence motions for summary judgment, and The Michael Group also filed a traditional motion for summary judgment. The trial court granted appellees' motions for summary judgment.

## TRADITIONAL SUMMARY JUDGMENT

In the first issue, appellant contends the trial court erred in granting The Michael Group's traditional motion for summary judgment, which asserted The Michael Group was not liable as a matter of law under the doctrine of respondeat superior for Choi's torts.

[1–4] The standard for reviewing a traditional summary judgment is well established. *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex.1985); *Private Mini Storage Realty, L.P. v. Larry F. Smith, Inc.*, 304 S.W.3d 854, 858 (Tex. App.-Dallas 2010, no pet.). Defendants who move for summary judgment must show the plaintiffs have no cause of action. *Citizens First Nat'l Bank of Tyler v. Cinco Explor. Co.*, 540 S.W.2d 292, 294 (Tex. 1976). Defendants may meet this burden by either (1) disproving at least one essential element of each theory of recovery, *Anderson v. Snider*, 808 S.W.2d 54, 55 (Tex.1991), or (2) conclusively proving all elements of an affirmative defense. *Swilley v. Hughes*, 488 S.W.2d 64, 67 (Tex.

---

2. Appellees assert in their motions for summary judgment and in their brief on appeal that Quiktrip moved into the vacant gas station two years after appellant purchased the businesses. No evidence in the record supports this statement.

3. Appellant also sued Iqbal and New Chudhri Enterprises for a variety of causes of action related to the sale of the businesses. After the trial court granted appellees' motions for summary judgment, the court severed appellant's causes of action against appellees, rendering a final judgment on appellant's causes of action against appellees.

1972). A matter is conclusively established if ordinary minds cannot differ as to the conclusion to be drawn from the evidence. *Triton Oil & Gas Corp. v. Marine Contractors & Supply, Inc.,* 644 S.W.2d 443, 446 (Tex.1982). After the movants have established a right to summary judgment, the burden shifts to the nonmovants to present evidence creating a fact issue. *Denson v. Dallas County Credit Union,* 262 S.W.3d 846, 849 (Tex.App.-Dallas 2008, no pet.). When a successful summary judgment movant presents both traditional and no-evidence grounds, we must affirm it if it can be sustained under either standard. *Flood v. Katz,* 294 S.W.3d 756, 762 (Tex. App.-Dallas 2009, pet. denied)

[5–7] Under the doctrine of respondeat superior, an employer is vicariously liable for the negligence of an agent or employee acting within the scope of his agency or employment even though the principal or employer has not personally committed a wrong. *Baptist Mem'l Hosp. Sys. v. Sampson,* 969 S.W.2d 945, 947 (Tex.1998). The justification for imposing this liability is that the principal or employer has the right to control the means and methods of the agent or employee's work. *Id.* An employer is not vicariously liable for the torts of an independent contractor it hires because an independent contractor has sole control over the means and methods of the work. *Id.* A contract between the parties that establishes an independent contractor relationship is determinative of the parties' relationship in the absence of extrinsic evidence indicating that the contract was a "sham or cloak" designed to conceal the true legal relationship of the parties or that despite the contract terms, the true agreement vested the right of control in the principal. *Bell v. VPSI, Inc.,* 205 S.W.3d 706, 713 (Tex.App.-Fort Worth 2006, no pet.).

[8] The Michael Group attached a form contract to its motion for summary judgment with an affidavit of its vice-president, Kern Coleman, who testified the document was "a true and correct copy of the Independent Contractor Agreement entered into between [The Michael Group] and Sungju Choi." The Independent Contractor Agreement provided:

The Michael Group, LLC, and _____ ("Contractor") . . . hereby agree as follows:

Contractor agrees to work for Broker as an INDEPENDENT CONTRACTOR, and not as [an] employee; however, Contractor understands that Broker is legally accountable for the activities of the Contractor. All costs and obligations incurred by Contractor in conducting his/her independent business shall be paid solely by Contractor, who will hold Broker harmless from any and all such costs and obligations. Contractor will act independently as to the management of his/her time and efforts, and will be responsible for all of his/her expenses, such as industry association, dues, licensing renewals, pagers, cellular telephones, etc. as they are incurred.

. . .

Contractor understands and agrees that because Contractor is an Independent Contractor and not an employee of Broker, Broker will not withhold any Federal or State Income Tax, Social Security (FICA) or Unemployment (FUTA) taxes from Contractor's commission paid. Contractor is personally responsible for paying any and all Federal and State Income, Social Security and other taxes, and for maintaining all expense records as required by law, and represents to Broker that all such amount will be withheld and paid. Contractor shall indemnify and hold Broker harmless from any liability or costs thereof.

Contractor further understands and acknowledges that Broker provides no Workman's Compensation coverage. Contractor hereby specifically waives such coverage and represents to Broker that he/she understands that if Contractor desires such coverage, Contractor must personally obtain such coverage.

(Emphasis omitted.) Nothing in the contract gave The Michael Group the right to control the means and methods of Choi's work.

Appellant argues that the Agreement was insufficient to establish Choi's independent-contractor status as a matter of law because it does not identify the contractor and it is not signed by the alleged contractor. Under the statute of frauds, certain contracts are not enforceable unless they are in writing and signed by the person against whom enforcement of the contract is sought. *See* TEX. BUS. & COM. CODE ANN. § 26.01(a)(2) (West 2009). However, The Michael Group was not seeking to enforce the Agreement against Choi or anyone else; it attached the Agreement to show the terms of the agreement between it and Choi. Appellant cites no authority showing the Agreement was inadmissible or that it had to be signed for its terms to be admissible in evidence in a dispute with a third party such as appellant. Coleman testified in his affidavit that the terms in the Agreement constituted the terms between it and Choi, and appellant does not explain why Coleman's testimony, together with the Agreement, did not establish the terms of the contract between Choi and The Michael Group.

[9] Appellant also points to the statement in the Agreement that "Contractor understands that Broker is legally accountable for the activities of Contractor." However, whether The Michael Group is vicariously liable to third parties under the doctrine of respondeat superior for Choi's torts depends on whether it had sole control over the means and methods of Choi's work. Nothing in the contract, and no evidence presented by appellant, purports to give it that authority. The statement that "Contractor understands that Broker is legally accountable for the activities of Contractor" did not give The Michael Group sole control over the manner and means used by Choi to sell real estate.

The Independent Contractor Agreement, with Coleman's affidavit, established Choi's independent-contractor relationship with The Michael Group. Appellant does not assert on appeal that it presented any evidence controverting this relationship. *See Bell*, 205 S.W.3d at 713–14. Accordingly, we conclude the trial court did not err in granting The Michael Group's traditional motion for summary judgment. We overrule appellant's first issue. Having determined the trial court did not err in granting The Michael Group's traditional motion for summary judgment, we do not address appellant's third issue asserting the trial court erred in granting The Michael Group's no-evidence motion for summary judgment. Likewise, we do not address appellant's fourth issue addressing appellant's conspiracy cause of action as it relates to The Michael Group.

## NO–EVIDENCE SUMMARY JUDGMENT

[10] In the second issue, appellant asserts the trial court erred in granting Choi's no-evidence motion for summary judgment. We review a no-evidence summary judgment under the same legal sufficiency standard used to review a directed verdict. *See* TEX.R. CIV. P. 166a(i); *Flood*, 294 S.W.3d at 762. Thus, we must determine whether the nonmovant produced more than a scintilla of probative evidence to raise a fact issue on the material ques-

tions presented. *See id.* When analyzing a no-evidence summary judgment, we consider all the evidence in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the movant. *Sudan v. Sudan,* 199 S.W.3d 291, 292 (Tex.2006) (quoting *City of Keller v. Wilson,* 168 S.W.3d 802, 823 (Tex.2005)). A no-evidence summary judgment is improperly granted if the respondent brings forth more than a scintilla of probative evidence to raise a genuine issue of material fact. *King Ranch, Inc. v. Chapman,* 118 S.W.3d 742, 751 (Tex.2003). "More than a scintilla of evidence exists when the evidence rises to a level that would enable reasonable, fair-minded persons to differ in their conclusions." *Id.* (quoting *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997)). "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion' of a fact." *Id.* (quoting *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983)).

### Summary Judgment Evidence

Appellant attached the affidavit of its president, Lee, to its response to appellees' motions for summary judgment. Choi made numerous objections to this affidavit, and he submitted a draft order for the court's rulings on the objections. The trial court did not make a written ruling on the objections. However, in a subsequent hearing, Choi requested the court to rule on his objections to Lee's affidavit. The court stated, "Because your motions were granted, you can assume that the objections have been granted."

**[11, 12]** For a ruling on an objection to summary judgment evidence to be effective, the ruling must be reduced to writing, signed by the trial court, and entered of record. *Utils. Pipeline Co. v. Am. Petrofi-*

*na Mktg.,* 760 S.W.2d 719, 723 (Tex.App.-Dallas 1988, no writ); *see also Stewart v. Sanmina Tex. L.P.,* 156 S.W.3d 198, 206–07 (Tex.App.-Dallas 2005, no pet.). In this case, the trial court did not enter a written ruling on Choi's objections to Lee's affidavit. We conclude the record does not show the trial court ruled on Choi's objections.

**[13–15]** On appeal, Choi argues that much of Lee's affidavit should not be considered as evidence because it contains hearsay; it is self-serving statements of an interested witness that are not clear, positive, direct, credible, free from contradiction, and readily controvertible; and it is conclusory. Defects in the form of an affidavit must be objected to, the opposing party must have the opportunity to amend, and the trial court must rule on the objection; otherwise, the objection is waived and the objected-to material is in evidence. *See Hogan v. J. Higgins Trucking, Inc.,* 197 S.W.3d 879, 883 (Tex.App.-Dallas 2006, no pet.); *Stewart,* 156 S.W.3d at 207. Objections that a document contains hearsay are defects of form. *Stewart,* 156 S.W.3d at 207. Likewise, objections that statements of an interested witness are not clear, positive, direct, credible, and free from contradiction are defects of form. *Choctaw Props., L.L.C. v. Aledo I.S.D.,* 127 S.W.3d 235, 241 (Tex.App.-Waco 2003, no pet.). By failing to obtain written rulings on these objections, Choi cannot raise these defects on appeal. *See DMC Valley Ranch, L.L.C. v. HPSC, Inc.,* 315 S.W.3d 898, 905 (Tex.App.-Dallas 2010, no pet.); *Stewart,* 156 S.W.3d at 207.

**[16, 17]** Objections that statements in an affidavit are conclusory assert defects of substance, which may be raised for the first time on appeal. *Brown v. Brown,* 145 S.W.3d 745, 751 (Tex.App.-Dallas 2004, pet. denied). "A conclusory statement is one that does not provide the underlying

facts to support the conclusion." *Id.* at 751 (quoting *Choctaw Props.,* 127 S.W.3d at 242). A conclusory statement may be either legal or factual in nature. *Choctaw Props.,* 127 S.W.3d at 242.

## Causation

**[18]** Choi's no-evidence motion for summary judgment asserted appellant had no evidence to support the causation element of its causes of action, that is, that Choi's conduct was a proximate cause or producing cause of appellant's damages.[4] For negligent misrepresentation, fraud, and breach of fiduciary duty, the plaintiff must prove proximate causation. *Finger v. Ray,* 326 S.W.3d 285, 291 (Tex.App.-Houston [1st Dist.] 2010, no pet.) (breach of fiduciary duty); *Employees Retirement Sys. of Tex. v. Putnam, LLC,* 294 S.W.3d 309, 315 (Tex.App.-Austin 2009, no pet.) (fraud; negligent misrepresentation). For violations of the DTPA, the plaintiff must prove producing causation. TEX. BUS. & COM.CODE ANN. § 17.50(a) (West Supp. 2010); *Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.,* 896 S.W.2d 156, 161 (Tex.1995). The components of proximate cause are cause in fact and foreseeability. *W. Invs., Inc. v. Urena,* 162 S.W.3d 547, 551 (Tex.2005). The test for both cause in fact and producing cause is whether the defendant's conduct was a substantial factor in bringing about the injury that would not otherwise have occurred. *Ford Motor Co. v. Ledesma,* 242 S.W.3d 32, 46 (Tex. 2007) (producing cause); *W. Invs., Inc.,* 162 S.W.3d at 551 (cause in fact). Choi asserted appellant had no evidence that his conduct was a substantial factor in bringing about appellant's injury that otherwise would not have occurred.

**[19]** Lee testified in his affidavit that his broker, Choi, represented to him that the vacant gas station would remain vacant, that all brokers knew Quiktrip was moving into that space, that he relied on Choi's representations, that appellant would not have bought "the business" if he had known Quiktrip was moving into the vacant gas station, and that "as a result of purchasing the business and with Quiktrip having come, the business has lost revenue and with it value." This evidence shows Choi's representations about the vacant gas station were a substantial factor in appellant's purchasing the businesses and that he would not have purchased the businesses if Choi had told him Quiktrip would be moving into the vacant gas station. As Lee's affidavit demonstrates, if appellant had not purchased the gas station then it would not have suffered the alleged loss of revenue and value from Quiktrip's presence. We conclude Lee's testimony constitutes some evidence of the causation element of appellant's causes of action.

We conclude the trial court erred in granting Choi's no-evidence motion for summary judgment, and we sustain appellant's second issue.

## Conspiracy

In the fourth issue, appellant contends the trial court erred in granting the no-evidence motion for summary judgment asserting appellant had no evidence to support its conspiracy allegations. Appellant alleged that Choi and Iqbal agreed to commit the acts constituting the torts appellant alleged. Choi asserted in his motion for summary judgment that if appellant had no evidence to support its tort claims, then it had no evidence to support the

---

**4.** Choi did not move for summary judgment on the ground that appellant had no evidence of any of the other elements of the causes of action other than causation. Accordingly, we

do not consider whether Lee's affidavit contained any evidence of any element other than causation.

conspiracy claim. Because we have concluded appellant presented some evidence on the only element of appellant's causes of action that Choi challenged, we conclude the trial court erred in granting Choi's motion for summary judgment on appellant's conspiracy cause of action. We sustain appellant's fourth issue as to Choi.

## CONCLUSION

We affirm the trial court's summary judgment in favor of The Michael Group, we reverse the trial court's summary judgment in favor of Choi, and we remand the cause to the trial court for further proceedings.



**1**

**Larry SMITH, Appellant,**

**v.**

**Stephen JONES and Beth Jones, Appellees.**

**No. 05–11–00006–CV.**

Court of Appeals of Texas, Dallas.

Jan. 25, 2011.

On Appeal from the 417th Judicial District Court, Collin County, Texas, Trial Court Cause No. 417–00618–2009, Cynthia McCrann, Judge.

Anthony A. Petrocchi, Weil & Petrocchi, P.C., Dallas, TX, for Appellant.

William Todd Albin, Albin Harrison Roach, Plano, TX, for Appellee.

Before Chief Justice WRIGHT and Justices O'NEILL and LANG–MIERS.

## OPINION

Opinion By Chief Justice WRIGHT.

Before the Court is appellant Larry Smith's motion to dismiss the appeal. Appellant filed an interlocutory appeal from the trial court's order denying his motion to dismiss for failure of the appellees to attach a certificate of merit to their petition against a professional engineer. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 150.002(a) & (f) (West Supp. 2010). In his motion, appellant explains that the trial court reconsidered its ruling and on January 11, 2011, signed an order dismissing the appellees' claims against him. Accordingly, appellant asks that this appeal be dismissed.

We grant appellant's motion and dismiss the appeal. *See* TEX.R.APP. P. 42.1(a)(1).



**2**

**Lowell MERRITT, Appellant,**

**v.**

**Robert DAVIS, Appellee.**

**No. 05–09–01231–CV.**

Court of Appeals of Texas, Dallas.

Jan. 27, 2011.

Rehearing Overruled Feb. 23, 2011.

**Background:** Plaintiff brought action against opposing party's attorney in underlying lawsuit alleging that attorney filed fraudulent lien arising from sanctions imposed in underlying suit. The 380th Judicial District Court, Collin County, Suzanne

Jimmie Mae STARKS et al., Appellants,

v.

CITY OF HOUSTON, Appellee.

No. 15493.

Court of Civil Appeals of Texas.

Houston (1st Dist.).

Nov. 13, 1969.

Rehearing Denied Dec. 31, 1969.

Action for personal injuries sustained by four passengers when automobile in which they were riding went through "T" intersection and into ditch. The passengers alleged that their injuries were caused by city's negligence in failing to provide adequate warning of intersection. The District Court, Harris County, John L. Compton, J., entered take-nothing judgment against passengers, and they appealed. The Court of Civil Appeals, Peden, J., held that concession of counsel representing city in first trial of personal injury action resulting in mistrial, that failure of city to have barrier erected between "T" intersection and ditch was negligence, amounted to an opinion or conclusion which made any effort on his part to testify to such conclusion inadmissible but which did not preclude introduction of other evidence in second trial to show that city was not negligent in failing to erect barrier, and that passengers did not conclusively establish that failure of city to erect and maintain barrier at place in question was negligence.

Affirmed.

**1. Evidence ⚖=201**

In order for statement to constitute judicial admission, it must be clear, deliberate and unequivocal and must be a statement of fact rather than opinion.

**2. Evidence ⚖=201, 265(15, 17)**

Concession of counsel, representing city in first trial of personal injury action resulting in mistrial, that failure of city to have barrier erected between "T" intersection and ditch was negligence amounted

to an opinion or conclusion which made any effort on his part to testify to such conclusion inadmissible but which did not preclude introduction of other evidence in second trial to show that city was not negligent in failing to erect barrier.

**3. Evidence ⚖=265(10)**

Conclusiveness of a party's testimony, regardless of other evidence to contrary, is not recognized where his testimony is matter of opinion.

**4. Evidence ⚖=211, 265(10)**

Admissions against interest of a party, made when testifying as a witness on a former trial or in another action, are ordinarily not conclusive and are subject to contradiction or explanation by party against whom they are offered, and will not be given force and effect of judicial admission if they merely contradict some other portion of his testimony.

**5. Evidence ⚖=265(13)**

Assuming statement of city's counsel, to effect that city was negligent in failing to erect barrier between "T" intersection and ditch, amounted to judicial admission, such admission was waived when claimants failed to object to introduction of evidence to contrary and introduced evidence of their own on disputed issue.

**6. Evidence ⚖=591**

Where city engineer appeared as witness for city in personal injury action against it and testified as an expert to his opinions, city was not bound by whatever opinion testimony witness may have given.

**7. Evidence ⚖=591**

• Opinion testimony of an expert is not binding on party who calls him as witness.

**8. Automobiles ⚖=306(2)**

In action for personal injuries sustained by four passengers when automobile in which they were riding went through "T" intersection and into ditch, evidence did not conclusively establish that city was negligent in failing to erect barrier between "T" intersection and ditch.

Joseph D. Jamail, John Gano, Houston, for appellants.

William A. Olson, City Atty., Willard E. Dollahon, Senior Asst. City Atty., Houston, for appellee.

PEDEN, Justice.

Damage suit for personal injuries sustained by four passengers when the automobile in which they were riding went through a "T" intersection and into a ditch. Plaintiffs alleged that their injuries were caused by the negligence of the City of Houston in failing to provide signs, barricades and/or other devices so as to give warning of the concealed and dangerous condition to persons traveling up the stem of the "T" into the intersection. The City does not contend that it ever erected a barricade at the intersection but asserts that it gave an adequate warning by having a double-arrow sign in place.

In answer to special issues the jury did not find 1) that the failure of the City to have a barrier in place was negligence, nor did it find 3) that the City failed to have a warning sign in place at the time in question. It did find that the driver (who was not a party to the suit) committed several acts of negligence but did not find that any of them was the sole proximate cause of the accident. The jury found that each of the passengers failed to keep a proper lookout (Issues 16, 18, 20 and 22) and that each of those failures was a proximate cause of the accident (Issues 17, 19, 21 and 23).

In response to damage issues the jury found for each of the plaintiffs in a substantial amount. They have filed this appeal from a take-nothing judgment entered in the trial court.

Appellants' first contention on appeal is that the City judicially admitted that its failure to have a barrier between the intersection and the ditch was negligence.

The first trial of this case resulted in a mistrial because the jury was unable to reach a verdict. In the second trial Mr. Dollahon, counsel for the City, testified out of the presence of the jury that Special Issue No. 1 in the earlier trial had asked whether the jury found that the failure of the City to have a barrier between the intersection and the ditch in question was negligence. He admitted that in his argument to the jury in the first trial he had stated on at least two occasions that the answer to Special Issue No. 1 should be "We do".

We are not concerned with the question of admissibility. The narrow question before us is whether Mr. Dollahon's admission conclusively established as a matter of law in the second trial of this case that the City was negligent in failing to erect the barrier. We hold that it did not. It amounted to an admission against the interest of the City, but under the record in this case there are several reasons why it did not amount to a judicial admission and thus conclusively establish that the City was negligent in failing to provide the barrier.

Two leading cases in Texas on what constitutes a judicial admission are: Griffin v. Superior Insurance Co., 161 Tex. 195, 338 S.W.2d 415 (1960), and United States Fidelity & Guaranty Co. v. Carr, 242 S.W.2d 224 (San Antonio Tex.Civ. App.1951, writ ref.).

[1] The Carr and Griffin cases, supra, were recently cited as bases for the rule that in order for a statement to constitute a judicial admission it must be clear, deliberate and unequivocal and it must be a statement of fact rather than an opinion. Hedge v. Bryan, 425 S.W.2d 866 (Tyler Tex.Civ.App.1968, writ ref., n. r. e.).

[2, 3] Mr. Dollahon's concession in his argument was an opinion rather than a statement of fact. It amounted only to an opinion or conclusion on his part (and therefore the City's) based on the evidence that was before the jury. Hedge v. Bryan, supra.

The conclusiveness of a party's testimony, regardless of other evidence to the contrary, is not recognized where his testimo-

ny is a matter of opinion. 169 A.L.R. 825, citing Southwestern Portland Cement Co. v. Kezer, 174 S.W. 661 (El Paso Tex.Civ. App.1915, writ ref.); Quanah, A. & P. R. Co. v. Bone, 208 S.W. 709 (Amarillo Tex. Civ.App.1919, writ ref.), and McMath v. Staten, 42 S.W.2d 649 (El Paso Tex.Civ. App.1931, writ dism.).

"It is settled that a party is not necessarily bound to a fact which he admits only by way of opinion. Petit v. Klinke, 152 Tex. 142, 254 S.W.2d 769 (Tex.Sup. 1953); DeWinne v. Allen, 154 Tex. 316, 277 S.W.2d 95 (Tex.Sup.1955). We see no reason why the same rule would not apply to his counsel in making a jury argument." Bolstad v. Egleson, 326 S.W.2d 506, 521 (Houston Tex.Civ.App.1959, writ ref., n. r. e.).

Further, his statement was not unequivocal. He could not later rebut it by testifying as to his opinion that the City was not negligent, but he demonstrated that his position (and therefore that of the City) in the second trial was contrary to his admission during the first one by introducing evidence on behalf of the City in the second trial to show that the City was not negligent in failing to erect the barrier.

[4] Admissions against interest of a party, made when testifying as a witness on a former trial or in another action, are ordinarily not conclusive and are subject to contradiction or explanation by the party against whom they are offered. They will not be given the force and effect of a judicial admission if they merely contradict some other portion of his testimony. Padilla v. Texas E. I. A., 343 S.W.2d 473 (San Antonio Tex.Civ.App.1961, writ ref., n. r. e.). In Padilla, the party's testimony in another action was apparently not contradicted in that proceeding, but was contradicted in the trial upon which the appeal was based.

[5] Further, even if counsel's statement had amounted to a judicial admission, it was waived when evidence to the contrary was heard. Appellants not only did not object to such evidence, they also intro-

duced some on the disputed issue, and this certainly amounted to waiver. Restelle v. Williford, 364 S.W.2d 444 (Beaumont Tex.Civ.App.1963, writ ref., n. r. e.); Dallas Transit Co. v. Young, 370 S.W.2d 6 (Dallas Tex.Civ.App.1963, writ ref., n. r. e.); Plemmons v. Pevely Dairy Co., 233 S.W.2d 426 (St. Louis Mo.App.1950).

Appellants next assert that since a party vouches for the credibility of, and is bound by, the evidence of witnesses whom it places on the witness stand, the evidence conclusively established that the City was negligent in failing to have a barrier between the intersection and the ditch.

[6] We overrule this assertion. The witness to whom appellants refer was Mr. Harold Bastin, a design and planning engineer in the City's Department of Traffic and Engineering. He appeared as a witness for the City and testified as an expert to his opinions.

[7] As previously noted, not even a party is necessarily bound to a fact which he admits only by way of an opinion. And the general rule is that the opinion testimony of an expert is not binding on the party who calls him as a witness. Brumit v. Cokins, 281 S.W.2d 154 (Galveston Tex. Civ.App.1955, writ ref., n. r. e.); Gulf Colo. & Santa Fe Railway Co. v. Abbey, 313 S.W.2d 108 (Ft. Worth Tex.Civ.App. 1958, no writ). The facts in the instant case raise no exception to this rule.

[8] Having decided that the City was not conclusively bound by the admission of Mr. Dollahon or by whatever opinion testimony Mr. Bastin may have given, we turn to appellants' next contention, that the evidence establishes conclusively as a matter of law that the City was negligent in failing to erect the barrier. The latter position is, essentially, a "no evidence" point.

Mr. Bastin made frequent reference to a "Manual on Uniform Traffic Control Devices". He testified as to the conditions under which a double-arrow sign is placed at a "T" intersection and explained that a number of factors are examined to determine whether a barrier should be used.

They are normally placed at "T" intersections carrying relatively high speed, high volume traffic and at those where the area beyond the edge of the road at the top of the "T" is so hazardous that any motorist proceeding onward would be in great danger. He testified that the intersection in question was neither a high volume nor a high speed one (the speed limit was 30 miles per hour), and that the volume at that location would not warrant anything other than a normal warning sign such as a double arrow.

Some of his testimony as to the other factor, the danger involved in driving into the ditch in question, was more favorable to the appellants. We cannot agree with appellants, however, that it established the City's negligence as a matter of law. It merely raised a fact issue as to whether the ditch in question would fit the description which we have quoted of the danger encountered or whether it would fit one of the other descriptions which he said would call for erection of a barrier. They were:

"This would be normally at high speed, high volume, where the physical characteristics of the intersection would warrant more defined reflectivity and more warning than the other types of intersections. * * * Normally at high speed, high volume locations where. * * * At locations where a run off the roadway vehicle would be in extreme danger, such as a cliff, a drop-off that would create considerable damage. * * * It depends on several factors, none of which can be isolated. Even though the street may have a 40 to 50 mile an hour speed zone, it may not warrant a barricade. Yet a street with a 30 mile an hour speed limit with a condition such as a drop-off, at the end of a freeway ramp, where the freeway is cut through, and a residential street has come up to the edge of the freeway, this is a point where you would want to physically stop the automobile from dropping off the edge. * * *"

"Q As I understand, one of the factors, and there are many factors, that one of the factors considered by your department in deciding what kind of warning to use, that is whether to use a yellow sign or a black and silver sign or a barricade or one of these T symbols, one of the things you take into account, among others, is whether or not beyond the T there is a drop-off, to use your words that 'would likely do considerable damage'?

"A Yes."

It is uncontroverted that the appellants received painful injuries including broken bones. The witnesses' testimony as to their vehicle's speed as it approached the intersection on Dillard Street varied from 20 to 40 miles per hour, and there was also evidence that it sounded as if it were coming at a high rate of speed.

The lights of a freeway some 1200 feet beyond the ditch may have tended to give a false illusion that the street did not end.

Testimony as to the depth of the ditch varied between eighteen inches and four feet. Nor was its width agreed upon by the witnesses, but they did agree that the Pontiac automobile came to rest with its rear wheels outside the ditch near the road and its front end against the other side of the ditch.

There was no direct evidence as to slope of the sides of the ditch. No test was made to determine whether an automobile could drive through it without difficulty if proceeding within the speed limit.

We cannot say that the appellants conclusively established by the evidence that the failure of the City to erect and maintain a barrier at the place in question was negligence.

The only other primary negligence issues submitted to the jury were answered in favor of the City, and appellants do not complain on appeal of those findings. Our holding as to the barrier issue leaves the appellants without any finding that the City was negligent and makes a discussion of the appellants' other points unnecessary.

The judgment of the trial court is affirmed.

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Appellant,**

**v.**

**Patricia GRAYSON, Appellee.**

**No. 04–98–00137–CV.**

Court of Appeals of Texas,
San Antonio.

Oct. 28, 1998.

Rehearing Overruled Dec. 8, 1998.

Insured filed action against insurer for failure to pay underinsured motorist benefits. The 288th Judicial District Court, Bexar County, Carlos C. Cadena, Visiting Judge Presiding, entered take-nothing judgment against insured but taxed court costs against insurer. Insurer appealed. The Court of Appeals, Rickhoff, J., held that insured's recovery of settlement from other driver's insurer for amount greater than her damages precluded her success on merits of her claim against her insurer for underinsured motorist benefits and thus her entitlement to recovery of court costs as successful party.

Affirmed as modified.

**1. Costs ⚖️32(2)**

"Successful party" entitled by rule to recover costs of court is one who obtains a judgment vindicating a civil claim of right. Vernon's Ann.Texas Rules Civ.Proc., Rule 131.

See publication Words and Phrases for other judicial constructions and definitions.

**2. Insurance ⚖️3585**

Insured was not successful on merits of her claim against insurer for breach of contractual duty to provide underinsured motorist benefits, and thus was not entitled to recovery of her court costs, even though she established other driver's negligence was sole cause of accident, where insured did not dispute that she had already received settlement from other driver's insurer for amount greater than her damages. Vernon's Ann.Texas Rules Civ.Proc., Rule 131.

**3. Insurance ⚖️2782, 2787**

To establish entitlement to underinsured motorist benefits, insured was required to establish other driver's negligence, amount of her damages, and that other driver was, in fact, underinsured.

———

Alex M. Miller, Robert A. Allen, Allen, Stein, Powers, Durbin & Hunnicutt, P.C., San Antonio, for Appellant.

Paul D. Taylor, Bart L. Brzozowski, Law Offices of Bart L. Brzozowski, San Antonio, for Appellee.

RICKHOFF, STONE, and GREEN, Justices.

**OPINION**

RICKHOFF, Justice.

State Farm Mutual Automobile Insurance Company appeals from a take-nothing judgment rendered against Patricia Grayson. In its sole issue, State Farm argues that the trial court erred by assessing costs against it because it prevailed on Grayson's cause of action for underinsured motorist benefits. We agree with State Farm's contention. We therefore modify the judgment to assess costs against Grayson.

**FACTUAL AND PROCEDURAL BACKGROUND**

Grayson sued State Farm, claiming she sustained injuries in a car accident caused by the negligence of an underinsured motorist, Jerome Richard Perales. She alleged that on the date of the accident, she had underinsured motorist coverage under a policy with State Farm, but that State Farm had refused to compensate her pursuant to the policy. Grayson and State Farm stipulated that State Farm was entitled to a credit of $20,000, the amount that Grayson had already obtained in settlement from Perales's insurer. Three special issues were submitted to the jury: 1) whether the negligence of Grayson or Perales caused the accident; 2) what percentage of negligence was attributable to Grayson and Perales; and 3) what sum of money would compensate Grayson for her injuries. The jury determined that the accident was 100% attributable to Perales's neg-

ligence and that Grayson's damages were $6,550. Because the parties had stipulated to the $20,000 credit, the court rendered a take-nothing judgment against Grayson. However, the court taxed costs against State Farm.

## DISCUSSION

[1] Rule 131 of the Texas Rules of Civil Procedure provides that a "successful party" shall recover costs of court. A successful party under this rule is one who obtains a judgment vindicating a civil claim of right. *See Scholl v. Home Owners Warranty Corp.,* 810 S.W.2d 464, 468 (Tex.App.—San Antonio 1991, no writ). State Farm asserts that Grayson's claim for underinsurance benefits was not vindicated; instead, a take-nothing judgment was rendered on that claim. It therefore asserts that the trial court should have taxed costs against Grayson. *See Denney v. Texas Employers Ins. Ass'n,* 780 S.W.2d 412, 413 (Tex.App.—Texarkana 1989, no writ) ("The party in whose favor a take-nothing judgment is entered is the prevailing party.").

[2] Characterizing this case as a personal injury action, Grayson counters that she was successful on the merits because the jury found that Perales's negligence was the sole cause of the accident. She relies on *Perez v. Baker Packers,* 694 S.W.2d 138, 143 (Tex. App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.), in which the court held that "the determination of a successful party under rule 131 is to be based upon success upon the merits, not upon damages." We disagree with Grayson's characterization of this case and with her assertion that *Perez* is on point.

Although Grayson's petition alleged that her injuries were caused by Perales's negligence, and State Farm denied this allegation and claimed that Grayson was contributorily negligent, Grayson's asserted basis for recovering from State Farm was its contractual duty to provide her underinsured motorist benefits. She alleged that State Farm refused to pay these benefits "as it is contractually required to do."

[3] To establish her entitlement to the underinsured motorist benefits, Grayson was required to establish two things. First, she

was required to establish Perales's negligence and the amount of her damages. *See Essman v. General Accident Ins. Co.,* 961 S.W.2d 572, 573 (Tex.App.—San Antonio 1997, no pet.). Second, she was required to establish that Perales was, in fact, underinsured. *Cf. State Farm Mut. Auto. Ins. Co. v. Matlock,* 462 S.W.2d 277, 278–79 (Tex.1970) (plaintiff in uninsured motorist case has burden of proving tortfeasor was uninsured). Grayson satisfied the first requirement by convincing the jury that Perales's negligence caused her damages in the amount of $6,550. Grayson does not dispute, however, that she received a $20,000 settlement from Perales's insurer. Since her damages were less than this amount, Perales was not underinsured. *See Stracener v. United Servs. Auto. Ass'n,* 777 S.W.2d 378, 380 (Tex.1989) ("[A] negligent party is underinsured whenever the available proceeds of his liability insurance are insufficient to compensate for the injured party's actual damages.").

In *Perez,* the plaintiff sued a premises owner for negligence. A take-nothing judgment was rendered against the plaintiff because a second defendant had settled with the plaintiff in an amount greater than the total damages assessed against the premises owner. Nevertheless, the trial court assessed costs against the premises owner. *See Perez,* 694 S.W.2d at 143. The appellate court upheld the assessment of costs. *See id.* It is apparent that the plaintiff in *Perez* proved his cause of action against the defendant. Thus, he succeeded "on the merits," even though he was not entitled to recover damages from the defendant after the application of the offset. *See id.* As explained above, however, Grayson was not successful on the merits because Perales was not underinsured.

Since State Farm, rather than Grayson, was the successful party, the trial court erred by taxing costs against State Farm. We therefore modify the judgment to provide that costs are taxed against Grayson. As modified, the judgment of the trial court is affirmed.



Because the contract did not require Trinity to pay UIM benefits before Premier's negligence and underinsured status were determined, Brainard did not present a contract claim before the trial court rendered its judgment, and the court of appeals correctly concluded that Brainard is not entitled to recover attorney's fees under Chapter 38.

## V

### Conclusion

We reverse the portion of the court of appeals' judgment that denied Brainard prejudgment interest, affirm the portion that denied attorney's fees, and remand this case to the trial court to calculate prejudgment interest consistent with this opinion.  Tex.R.App. P. 60.2(a), (d).

Justice O'NEILL and Justice JOHNSON did not participate in the decision.



---

**STATE FARM MUTUAL AUTOMO-
BILE INSURANCE COMPA-
NY, Petitioner,**

**v.**

**Jimmie R. NORRIS, Respondent.**

**No. 04–0514.**

Supreme Court of Texas.

Argued April 14, 2005.

Decided Dec. 22, 2006.

**Background:** Insured brought action to recover underinsured motorist (UIM) benefits. The 87th District Court, Limestone County, Sam B. Bournias, J., entered a take-nothing judgment. Insured appealed. The Waco Court of Appeals, Vance, J., 217 S.W.3d 1, 2004 WL 811722, reversed and remanded. Review was granted.

**Holdings:** The Supreme Court, Jefferson, C.J., held that:

(1) prejudgment interest could not be calculated without payment dates for liability coverage proceeds and personal injury protection (PIP) benefits;

(2) as a matter of first impression, insured released claim for prejudgment interest on difference between liability coverage limits and tort settlement;

(3) UIM carrier's credits reduced principal, if payment was made before prejudgment interest began to accrue, and reduced interest, if payment was made after interest began to accrue; and

(4) insured was not entitled to attorney fees after take-nothing judgment in favor of carrier, disapproving *Allstate Insurance Company v. Lincoln*, 976 S.W.2d 873.

Reversed and remanded.

**1. Interest** ⚷**56**

The declining principal formula is used to calculate prejudgment interest on underinsured motorist (UIM) benefits; thus, the trial court considers the date on which the insured received each payment and cannot calculate prejudgment interest until those dates are established.

**2. Insurance** ⚷**2793(1), 2803**
   **Interest** ⚷**26**

When automobile accident victim settled tort claim for less than liability coverage limits and released tortfeasor, he also released any prejudgment interest in the difference between the policy limits and the settlement amount; thus, the victim could recover from his underinsured motorist (UIM) carrier prejudgment interest

only on the settlement amount plus the amount of judgment in excess of the liability coverage limits.

**3. Interest ⚷39(2.35)**

Prejudgment interest began to accrue on claim for underinsured motorist (UIM) benefits 180 days after UIM carrier received written notice of accident. V.T.C.A., Finance Code § 304.104.

**4. Insurance ⚷2806**

Automobile accident victim's settlement with tortfeasor's liability insurer for less than policy limits entitled underinsured motorist (UIM) carrier to credit equal to liability coverage limits.

**5. Insurance ⚷2806**

Underinsured motorist (UIM) carrier's payment of personal injury protection (PIP) benefits to insured entitled carrier to credit in than amount.

**6. Payment ⚷42**

Underinsured motorist (UIM) carrier's credits for payments before prejudgment interest begins to accrue will reduce the principal owed by carrier; thereafter, each credit will apply first to the accrued prejudgment interest and second to the remaining principal.

**7. Insurance ⚷3585**

Insured was not entitled to attorney fees after take-nothing judgment in favor of underinsured motorist (UIM) carrier; no just amount was owed by carrier; disapproving *Allstate Insurance Company v. Lincoln*, 976 S.W.2d 873. V.T.C.A., Civil Practice & Remedies Code § 38.002(2, 3).

**8. Insurance ⚷3585**

An insured may recover attorney fees for an underinsured motorist (UIM) carrier's failure to pay just amount owed within thirty days only if the carrier does not tender the UIM benefits within thirty days after the trial court signs a judgment es-

tablishing the liability and underinsured status of the other motorist. V.T.C.A., Civil Practice & Remedies Code § 38.002(2, 3).

————

Trenton Colby Hood, Naman Howell Smith & Lee, and Michael L. Scanes, Scanes, Routh & James, Waco, for Petitioner.

Amy C. Thomas, The Law Offices of Amy Thomas, Mexia, for Respondent.

Chief Justice JEFFERSON delivered the opinion of the Court.

An underinsured motorist (UIM) policy allows an insured to recover the difference between the negligent driver's insurance policy limit and the full amount of damages, including prejudgment interest, determined at trial. The trial court held that the insured was not entitled to prejudgment interest under his UIM policy because the insurer had already paid benefits that exceeded the actual damages found by the jury. Additionally, the trial court refused to award attorney's fees to the insured. The court of appeals reversed on both issues. In accordance with our *Brainard* opinion, we hold that the insured is entitled to prejudgment interest but not attorney's fees.

**I**

**Background**

Jimmie R. Norris was injured during a car accident with Allen Johnston on December 8, 1997. Norris sued Johnston on March 29, 1999, and subsequently settled with Johnston for $40,000 ($10,000 less than Johnston's policy limit). The record does not reflect the date of the settlement. On the same day that he dismissed his

claims against Johnston, Norris added State Farm as a defendant, seeking to recover benefits under his UIM policy. Although State Farm paid Norris $5,000 in personal injury protection (PIP) benefits, it never offered to settle Norris's UIM claim.

A jury found that: (1) Johnston's negligence caused the accident; (2) Norris suffered only past damages in the amount of $51,200; and (3) Norris's attorney's fees were $11,500 for trial, $5,000 for appeal to the court of appeals, and $7,500 for appeal to this Court. The trial court applied a $55,000 credit (the sum of Johnston's policy limit and the PIP benefits already paid to Norris) and signed a take-nothing judgment in State Farm's favor, finding that Norris was not entitled to attorney's fees or prejudgment interest. Reversing the trial court's judgment, the court of appeals held that Norris was entitled to both prejudgment interest and attorney's fees. 217 S.W.3d 2, 2004 WL 811722, at *1. We hold, contrary to the court of appeals, that: (1) Norris is entitled to prejudgment interest calculated by the declining principal formula; and (2) Norris is not entitled to attorney's fees under Chapter 38 of the Civil Practice and Remedies Code.

## II

### Prejudgment Interest

Norris argues that prejudgment interest is covered under his UIM policy and should be calculated on the full amount of damages before deducting State Farm's PIP and settlement credits. State Farm disputes that it owes prejudgment interest at all. According to State Farm, the $55,000 in PIP and settlement credits should be deducted from the $51,200 damages award before calculating prejudgment interest, leaving no principal on which prejudgment interest can accrue.

[1] We apply the "declining principal" formula to calculate prejudgment interest in a UIM case. *Brainard v. Trinity Universal Insurance Co.,* 216 S.W.3d 809, 816 (Tex.2006). Under this approach, the trial court considers the date on which the insured received each payment. *Id.* at *3. As Chief Justice Gray correctly observed, however, the record in this case does not reflect the dates of either the PIP or the settlement payments. 2004 WL 811722, at *3 (Gray, C.J., dissenting). Because prejudgment interest cannot be calculated until those dates are established,[1] we remand this case to the trial court for that purpose. TEX.R.APP. P. 60.2(f), 60.3.

[2] This case presents an additional issue that *Brainard* does not answer. Norris settled with Johnston for $40,000, which is $10,000 less than Johnston's policy limit of $50,000. Norris argues he is entitled to prejudgment interest on the entire $50,000 amount because, based on the jury's verdict, he would have been "legally entitled to recover" more than that amount from the tortfeasor. We disagree. UIM policies are intended to compensate injured parties "up to the limit specified in the policy, reduced by the amount *recovered or recoverable* from the insurer of the underinsured motor vehicle." TEX. INS.CODE art. 5.06–1(5) (emphasis added). When Norris settled and released his claims against Johnston, he also released any interest in the difference between Johnston's policy limit and the settlement amount. The purpose of prejudgment interest is to compensate a claimant for the lost use of money due as damages

---

1. In *Battaglia v. Alexander,* we recognized that "[i]n order for interest to actually compensate for the lost time value of money, no more and no less, the timing of settlement payments must be taken into account." 177 S.W.3d 893, 907 (Tex.2005).

during the lapse of time between the accrual of the claim and the date of the judgment. *Battaglia,* 177 S.W.3d at 907. Because Norris has not lost use of that $10,000, having released any entitlement to it, he can receive prejudgment interest only on the amount of the settlement ($40,000) plus the amount that exceeds Johnston's policy limits ($1,200).

## III

### Calculating Prejudgment Interest

**[3]**   Prejudgment interest begins to accrue on the earlier of: (1) 180 days after the date the defendant receives written notice of a claim; or (2) the date suit is filed. Tex. Fin.Code § 304.104; *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 529 (Tex.1998). Norris asserts that prejudgment interest began to accrue 180 days after the accident. The record does not indicate, however, that State Farm had written notice of the accident on the day it occurred, December 8, 1997. January 21, 1998, is the earliest date in the record showing that State Farm had written notice of the accident.[2]   Therefore, prejudgment interest began to accrue 180 days after January 21, 1998.

**[4–6]**   State Farm is entitled to: (1) a $50,000 credit, representing Johnston's policy limit, as of the date Johnston remitted the settlement amount; and (2) a $5,000 credit, representing the PIP benefits State Farm paid, as of the date it was tendered. Credits applied before prejudgment interest began to accrue will reduce the principal. Thereafter, each credit will apply first to the accrued prejudgment interest and second to the remaining principal. *Brainard,* 216 S.W.3d at 816. Thus, State Farm is liable, up to the UIM policy limits, for the principal plus accrued

prejudgment interest remaining after the credits are applied.

## IV

### Attorney's Fees

**[7]**   Norris argues that he is entitled to attorney's fees under Chapter 38 of the Civil Practice and Remedies Code. The trial court denied Norris those fees, notwithstanding the jury's verdict. The court of appeals reversed and awarded attorney's fees, citing its opinion in *Allstate Insurance Company v. Lincoln,* 976 S.W.2d 873 (Tex.App.-Waco 1998, no pet.). We disapprove of *Allstate Insurance Company v. Lincoln* to the extent it is inconsistent with our decision in *Brainard,* and we hold that State Farm is entitled to a take-nothing judgment with respect to attorney's fees.

**[8]**   An insured may recover attorney's fees under Chapter 38 only if the insurer does not tender the UIM benefits within thirty days after the trial court signs a judgment establishing the liability and underinsured status of the other motorist. *Brainard,* 216 S.W.3d at 811. Chapter 38 requires Norris to "present a claim" to State Farm, which must pay the "just amount owed" within thirty days of presentation. Tex. Civ. Prac. & Rem.Code § 38.002(2),(3). Under a UIM policy, however, there can be no "just amount owed" until the trial court establishes liability and damages. *Brainard,* 216 S.W.3d at 818; *Henson v. S. Farm Bureau Cas. Ins. Co.,* 17 S.W.3d 652, 654 (Tex.2000). Thus, Norris could not seek attorney's fees until, at the earliest, thirty days after the trial court rendered judgment—assuming that State Farm refused to pay the amount due

---

**2.**   This is the date that an attending physician   signed a report sent by State Farm.

under the UIM contract.[3] Therefore, the trial court did not err in refusing to award Norris attorney's fees, and the court of appeals erred in reversing that judgment.

## V

### Conclusion

We hold that Norris is entitled to prejudgment interest calculated under the declining principal formula. We reverse that part of the court of appeals' judgment and remand this cause to the trial court for further proceedings consistent with this opinion. TEX.R.APP. P. 60.2(f), 60.3. With respect to the attorney's fees issue, we reverse the court of appeals' judgment and render judgment for State Farm. TEX. R.APP. P. 60.2(c).

Justice O'NEILL did not participate in the decision.



**STATE FARM MUTUAL AUTOMO-BILE INSURANCE COMPA-NY, Petitioner,**

**v.**

**Teresa NICKERSON, Respondent.**

**No. 04–0427.**

Supreme Court of Texas.

Argued April 14, 2005.

Decided Dec. 22, 2006.

**Background:** Insured brought action to recover underinsured motorist (UIM) benefits. The 62nd Judicial District Court, La-

mar County, Scott McDowell, J., ordered insurer to pay insured's attorney fees. Insurer appealed. The Texarkana Court of Appeals, Ross, J., 130 S.W.3d 487, affirmed. Review was granted.

**Holding:** The Supreme Court, Jefferson, C.J., held that carrier was not liable for insured's attorney fees.

Affirmed.

**Insurance** ⚷**3585**

Underinsured motorist (UIM) carrier was not liable for insured's attorney fees where it paid policy limits within thirty days of judgment against the carrier; no just amount was owed, and the insured had no claim to present, before the judgment. V.T.C.A., Civil Practice & Remedies Code § 38.002(3).

———

Michelle E. Robberson, Steven Dillon Roberts, Mark Anthony Teague, R. Brent Cooper, Cooper & Scully, P.C., Dallas, for petitioner.

Jesse L. Nickerson III, Nickerson Law Office, James R. Rodgers, The Moore Law Firm, Paris, for respondent.

J. Wade Birdwell, Wallach, Andrews & Stouffer, P.C., Fort Worth, for Amicus Curiae Judith Moss, D.O.

Chief Justice JEFFERSON delivered the opinion of the Court.

The issue in this case is whether an insured can recover attorney's fees under Chapter 38 of the Civil Practice and Remedies Code from her underinsured motorist (UIM) insurer.

---

**3.** In this case, the trial court entered a take-nothing judgment against Norris. Thus, State

Farm was not presented with a claim for a just amount owed on the day of judgment.

which the Commission must follow and some findings which the Commission must make but has given the Commission broad discretion in deciding which factors it will consider in its rate design decision. *See Texas Alarm & Signal*, 603 S.W.2d at 772–73. If the statutory factors are addressed and the findings and conclusions as clarified by the adopted examiner's reports reasonably set forth the reasons for the administrative body's action, the fact-finding requirement of *Charter Medical* to support the ultimate fact findings is satisfied. *State Banking Board v. Allied Bank*, 748 S.W.2d 447, 449 (Tex.1988). In particular, courts are not to use the *Charter Medical* decision to require "intermediate" findings, a precise form of findings, or new "component parts to [be subjected to] a newly-minted, hypertechnical standard of review." *Id.* at 448–49. The voluminous Commission orders, findings, conclusions, and reports in this case addressed all the required statutory factors and adequately set forth the reasons for its decision so that all parties could adequately present their positions on appeal. There was no error in the Commission's failure to make numerous other intermediate, explanatory or differently-shaded findings to satisfy one or another of the many parties to the agency proceedings.

e. *Administrative Convenience*

There are numerous findings and conclusions in the administrative record, some of which I have quoted and several others that I decline to quote, that the rate design the PUC adopted causes the least disruption to existing Texas telephone utilities and consumer customers and is the easiest to administer on a short-term basis until further study discloses what would be a more optimal solution. The PUC orders left intact the state-wide pooling and settlements process on which small rural telephone companies rely for their existence, at least to the extent it could be left in place, but adopted an access charge system for intraLATA toll calls of IXCs that mirrored the access charge system mandated by the federal courts for IXC interLATA toll calls.

These proceedings were brought by the Commission with deadlines effectively imposed by federal court orders which required a relatively immediate short-term response. This court has alluded to administrative convenience as a factor which may be given weight by the PUC. *See Texas Alarm & Signal*, 603 S.W.2d at 771–72 and 772 n. 7. I would now expressly hold that the PUC had discretion, based on its findings of administrative convenience supported by substantial evidence in the record, to conclude that any discriminatory elements of the rate design it adopted as a temporary measure were reasonable. This ground alone supports the PUC's conclusion that the rate design was not unreasonable discriminatory to the IXCs. Like correction of past discrimination, it should be recognized as an independent ground for upholding the PUC's orders.

For the foregoing reasons, I agree with the court's judgment and opinion. The opinion simply does not go far enough.

SPEARS, GONZALEZ and DOGGETT, JJ., join in this concurring opinion.



Ronald **STRACENER**, Individually and as Natural Parent and Guardian of Tanya Stracener, et al., Petitioners,

v.

**UNITED SERVICES AUTOMOBILE ASSOCIATION, Respondent.**

**UNITED SERVICES AUTOMOBILE ASSOCIATION, Petitioner,**

v.

Scott **HESTILOW**, et al., Respondent.

Nos. C–7593, C–7874.

Supreme Court of Texas.

Sept. 13, 1989.

Rehearing Denied Oct. 18, 1989.

Two cases were brought involving extent of underinsured motorist coverage. In

the first case, the 127th District Court, Harris County, Sharolyn Wood, J., granted insurer's motion for summary judgment and insured's survivors appealed. The Court of Appeals, Houston, First District, 749 S.W.2d 158, affirmed, and survivor's petitioned for writ of certiorari. In the second case the 225th District Court, Bexar County, Rose Spector, J., entered judgment for claimant and insurer appealed. The Court of Appeals, San Antonio, Fourth District, 754 S.W.2d 754, affirmed and insurer petitioned for writ of certiorari. The cases were submitted together. The Supreme Court, Doggett, J., held that: (1) the term "payment of claims" in underinsured motorist statute included payment of claim of insured party seeking to recover proceeds of underinsured motorist coverage, and negligent party was underinsured whenever available proceeds of his liability insurance were insufficient to compensate for injured party's actual damages, and (2) set off provided under statute for recovery from insurer of underinsured motor vehicle was to be subtracted from amount of actual damages incurred by insured as a result of negligence rather than from limits specified in underinsured motorist insurance policy.

First case reversed and remanded; second affirmed.

### 1. Insurance ⟐467.51(8)

The term "payment of claims" in uninsured motorist statute defining "underinsured vehicle" as one on which liability coverage was originally lower than or had been reduced by payment of claims arising from same accident, to less than limitation of liability in applicable underinsured coverage, included payment of claim by liability insurer of underinsured motorist to insured under underinsured motorist coverage; therefore negligent party was underinsured whenever available proceeds of his liability insurance were insufficient to compensate for injured party's actual damages. V.A.T.S. Insurance Code, art. 5.06–1(2)(b).

See publication Words and Phrases for other judicial constructions and definitions.

### 2. Insurance ⟐531.3(4)

For purposes of setoff provided under underinsured motorist insurance statute for amounts recovered from liability insurer of underinsured vehicle, such recovery is to be subtracted from amount of actual damages incurred as result of negligence of underinsured motorist rather than from limit specified in the underinsured motorist insurance policy. V.A.T.S. Insurance Code, art. 5.06–1(5).

---

Jimmy Williamson, Susan McAuliffe, Houston, for Ronald Stracener, et al.

Cliff Harrison, Houston, John Milano, Jr., San Antonio, for United Services Auto. Ass'n.

Craig C. Radtke, Boerne, for Scott Hestilow.

DOGGETT, Justice.

These two cases were submitted together because each presents the issue of how the underinsured status of a motor vehicle is to be determined pursuant to article 5.06–1(2)(b) of the Texas Insurance Code. Additionally, we must decide the proper construction of article 5.06–1(5) of the Texas Insurance Code which provides for a set off in the amount an injured person recovers from the tortfeasor's insurer.

[1, 2] In *Stracener v. United States [sic] Automobile Association,* the First Court of Appeals held that the Straceners were not entitled to combine or "stack" the limits of underinsured motorist coverage under four separate insurance policies for the purpose of determining whether the tortfeasor was underinsured. 749 S.W.2d 158 (Tex.App.1988). In *United Services Automobile Association v. Hestilow,* the Fourth Court of Appeals held that such coverage may be stacked for the determination of the underinsured status of the tortfeasor, but held that the total coverage available to the beneficiary should be reduced by the limit of the tortfeasor's liability coverage. 754 S.W.2d 754 (Tex.App. 1988). We hold that under article 5.06–1(2)(b), "payment of claims" includes the payment of the claim of the injured party

seeking to recover the proceeds of underinsured motorist coverage. Therefore, a negligent party is underinsured whenever the available proceeds of his liability insurance are insufficient to compensate for the injured party's actual damages. We also hold that the set off provided for in article 5.06–1(5) is to be subtracted from the amount of actual damages incurred as a result of the negligence of the underinsured motorist rather than from the limits specified in the underinsured motorist insurance policy. Accordingly, we reverse the judgment of the First Court of Appeals in *Stracener*, affirm the judgment of the Fourth Court of Appeals in *Hestilow*, and remand *Stracener* to the trial court for further proceedings.

Both *Stracener* and *Hestilow* involve insurance policies issued by United Services Automobile Association (USAA) which provide benefits for injuries caused by drivers of underinsured motor vehicles defined as follows:

An underinsured motor vehicle is one to which a liability bond or policy applies but its limit of liability:

a. is less than the limit of liability for this coverage; or

b. has been reduced by payment of claims to an amount less than the limit of liability for this coverage.

\* \* \* \* \* \*

... The limit of liability shall be reduced by the amount recovered or recoverable from, or on behalf of the owner or operator of an underinsured motor vehicle.

LaDonna Stracener was killed when the car in which she was a passenger was struck from the rear by a car driven by Robert Lampe. It is uncontested that Stracener's death was proximately caused by Lampe's negligence. Lampe's car was covered by liability insurance, but settlement of claims of other parties involved in the same accident reduced the amount available for the wrongful death claim to $27,-500. Stracener was covered by four separate policies, which provided unin-

sured/underinsured motorist coverage to the following limits:

| | |
|---|---|
| American National Property and Casualty Company | $100,000;[1] |
| State Farm Mutual Automobile Insurance Company | 10,000; |
| Allstate Insurance Company | 25,000; |
| United Services Automobile Association | 15,000. |

Settlements were reached with all these insurers except USAA. USAA moved for summary judgment on the ground that the tortfeasor, Lampe, was not an underinsured motorist as defined in the policy, because the amount of his insurance available to pay Stracener's claim, $27,500, exceeded the $15,000 limit of the underinsured motorist coverage under the USAA policy. The trial court granted this motion and the court of appeals affirmed.

Scott Hestilow and his parents, Roger and Elinor, sought the recovery of insurance benefits under two separate USAA policies which provided underinsured motorist coverage. While driving his mother's car, Hestilow was injured in a collision with a car driven by Alvino Casarez. The parties stipulated that the amount of Hestilow's damages equaled or exceeded $30,-000. A settlement had previously been reached with Casarez' liability insurance carrier for the full amount of his $15,000 individual liability limits. Hestilow was covered both by his mother's insurance policy on the car he was driving and by a separate automobile policy owned by his father on which he was a named insured. Each policy provided underinsured motorist coverage of $15,000 per person. USAA initiated a declaratory judgment action seeking a determination of whether Casarez was an underinsured motorist under the terms of the two Hestilow policies. The *Hestilow* trial court concluded that the two policies should be stacked to determine whether Casarez was an underinsured motorist. Because the combined limits of the underinsured motorist coverage in the two policies, $30,000, exceeded the $15,000 limit of Casarez' policy, the trial court concluded that Casarez was an underinsured motorist. However, the trial court also conclud-

---

1. These limits, and the others referred to, are per person, rather than per occurrence.

ed that the $15,000 limit of Casarez' policy should be set off against the total $30,000 underinsured motorist coverage, and thus rendered judgment that USAA was liable under both policies for a total of $15,000. The court of appeals affirmed.

Article 5.06-1 of the Texas Insurance Code mandates the inclusion of uninsured and underinsured motorist coverage in automobile liability insurance coverage and provides in pertinent part:

(2) For the purpose of these coverages:
. . . .

(b) The term "underinsured motor vehicle" means an insured motor vehicle on which there is valid and collectible liability insurance coverage with limits of liability for the owner or operator which were originally lower than, or have been *reduced by payment of claims* arising from the same accident to, an amount less than the limit of liability stated in the underinsured coverage of the insured's policy.

\*   \*   \*   \*   \*   \*

(5) The underinsured motorist coverage shall provide for payment to the insured of *all sums which he shall be legally entitled to recover as damages* from owners or operators of underinsured motor vehicles because of bodily injury or property damage in an amount up to the limit specified in the policy, *reduced by the amount recovered or recoverable from the insurer of the underinsured motor vehicle.*

TEX.INS.CODE ANN. art. 5.06-1(2)(b), (5) (Vernon 1981) (emphasis added).

USAA contends that underinsured motorist protection under any given policy is not applicable whenever the amount of liability insurance proceeds available from a tortfeasor exceeds the limits of that policy's underinsured motorist coverage for the injured victim. Under USAA's interpretation, when a purchaser of underinsured motorist coverage with a $15,000 limit suffers $100,000 in damages from a negligent motorist with $15,000 liability limits, the injured party is not entitled to recover any benefits from the purchase of underinsured motorist coverage. According to

USAA, the tortfeasor, in this situation, by definition, would not be an underinsured motorist.

Agreeing with this interpretation, several courts have held that a tortfeasor with liability insurance in an amount equal to the injured victim's underinsured motorist coverage is not underinsured. *Tatum v. Mid-Century Ins. Co.*, 730 S.W.2d 41 (Tex. App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.); *Geisler v. Mid-Century Ins. Co.*, 712 S.W.2d 184 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.); *Infante v. Texas Farmers Ins. Co.*, 640 S.W.2d 321 (Tex.App.—Beaumont 1982, writ ref'd n.r. e.); *Muller v. Allstate Ins. Co.*, 627 S.W.2d 775 (Tex.App.—Houston [1st Dist.] 1981, no writ); . *But see Montanye v. Transamerica Ins. Co.*, 638 S.W.2d 518, 519–20 (Tex.App.—Houston [1st Dist.] 1982, no writ) (parties conceded that underinsured motorist coverage applied because liability limits were reduced to zero through the payment of plaintiff's claim). Moreover, section 5 of article 5.06-1 has been construed to require that any liability insurance benefits received be subtracted not from actual damages sustained but rather from the policy limits of the underinsured motorist coverage. *Geisler*, 712 S.W.2d 184; *Montanye*, 638 S.W.2d 518; *Infante*, 640 S.W.2d 321; *American Gen. Fire & Casualty Co. v. Oestreich*, 617 S.W.2d 833 (Tex.Civ.App.—Eastland 1981, no writ). It has been stated that:

The purpose of underinsured motorist coverage is to provide an individual injured by a motorist carrying insurance in an amount less than that required by law, or otherwise reduced by payments to *other* claimants in the same accident to an amount less than required by law, with no less coverage than the injured party would receive had the tortfeasor been fully insured or fully covered *in relation to plaintiff's underinsured motorist coverage* under the law.

*Muller v. Allstate Ins. Co.*, 627 S.W.2d at 777 (emphasis added).

We do not agree with this construction of the statute because it adds words not found in the statute and conflicts with prior

decisions of this court. Article 5.06–1 is to be construed, liberally to give full effect to the public policy which led to its enactment. *Employers Casualty Co. v. Sloan*, 565 S.W.2d 580, 583 (Tex.Civ.App.—Austin 1978, writ ref'd n.r.e.); *Fidelity & Casualty Co. of New York v. Gatlin*, 470 S.W.2d 924, 927 (Tex.Civ.App.—Dallas 1971, no writ). The purpose of the statute, as stated therein, is "the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured or underinsured motor vehicles...." TEX.INS.CODE ANN. art. 5.06–1(1) (Vernon 1981).

Originally enacted to provide for uninsured motorist protection, article 5.06–1, Act of Oct. 1, 1967, ch. 202, § 3, 1967 Tex.Gen.Laws 448, 449, was thereafter amended to add underinsured motorist coverage. Act of Aug. 29, 1977, ch. 182, § 1, 1977 Tex.Gen.Laws 370, 370–71. The Legislature had as its initial objective the protection of conscientious motorists from "financial loss caused by negligent financially irresponsible motorists...." Act of Oct. 1, 1967, ch. 202, § 3, 1967 Tex.Gen.Laws 448, 449. Further amendments in 1979 and 1981 resulted in the current form of the statute. Act of Jan. 1, 1980, ch. 626, § 1, 1979 Tex.Gen.Laws 1418; Act of Aug. 31, 1981, ch. 380, § 1, 1981 Tex.Gen.Laws 1002. Inasmuch as the only change made in the above quoted portion of article 5.06–1(1) was the inclusion of the phrase "or underinsured", the strong underlying public policy applies equally to both uninsured and underinsured motorist coverage. *Compare* Act of Oct. 1, 1967, ch. 202, § 3, 1967 Tex.Gen.Laws 448, 449 *with* Act of Aug. 31, 1981, ch. 380, § 1, 1981 Tex.Gen.Laws 1002.

This court construed the policy statement of article 5.06–1(1), as originally enacted, in *American Liberty Insurance Co. v. Ranzau*, 481 S.W.2d 793 (Tex.1972). Paula Ranzau was injured by an uninsured motorist. Two insurance policies providing uninsured motorist coverage were applicable to Ranzau, one she had purchased and the other obtained by the owner of the car in which she was a passenger. Ranzau's policy contained an "other insurance"

clause providing that liability under the uninsured motorist coverage was limited if the insured had other available insurance. We held that the "other insurance" clause contravened the statute and was therefore invalid. In reaching this conclusion, we stated:

> The Texas statute states its purposes to be "the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles." These are its key words. The statute does not expressly or by any reasonable inference limit *the recovery* of actual damages to the statutory limits of required coverage for one policy in circumstances where the conditions to liability are present with respect to two policies with different insurers and insureds. This is the effect, however, of "other insurance" clauses, whether in the form of "pro-rata," "excess insurance," "excess-escape" or like clauses; one or the other insurer escapes liability, or both reduce their liability. Paula Ranzau was a beneficiary of the uninsured motorist provisions in the policy issued by American Liberty covering the Ranzau automobiles, and in the Raphael policy issued by United Services Automobile Association covering the Raphael automobile in which she was a passenger. This was a contractual benefit for which premiums, presumably computed in the light of the respective risk exposures, were paid by the insureds in each instance; *and to permit one policy, or the other, to be reduced or rendered ineffective by a liability limiting clause would be to frustrate the insurance benefits which the statute sought to guarantee and which were purchased by the respective insureds.*

*Ranzau*, 481 S.W.2d at 797 (emphasis in original and added).

In *American Motorists Insurance Co. v. Briggs*, 514 S.W.2d 233 (Tex.1974), two separate uninsured motorist policies, each with limits of liability of $10,000 per person covered the injured insureds. We held that:

[T]he statute requires that whenever coverage exists under the uninsured motorist endorsement, *the person covered has a cause of action on the policy for his actual damages to the extent of the policy limits without regard to the existence of other insurance.* If coverage exists under two or more policies, liability on the policies is joint and several to the extent of the plaintiff's actual damages, subject to the qualification that no insurer may be required to pay in excess of its policy limits.

*Briggs,* 514 S.W.2d at 236 (emphasis added).

The prior constructions of article 5.06–1(2)(b) and (5) by some Texas courts of appeals require a comparison between two separate insurance policies and operate to limit the possibility that an injured insured can recover actual damages. This frustrates the purpose of the statute as interpreted in both *Ranzau* and *Briggs.*

Section (2)(b) of article 5.06–1 defines an "underinsured motor vehicle" to include one on which the "limits of liability for the owner ... have been reduced by the payment of claims arising from the same accident to, an amount less than the limit of liability stated in the underinsured coverage of the insured's policy." Nothing contained in this statutory definition limits claims to those made by "others" as did the court of appeals in *Muller,* 627 S.W.2d at 777. *See Montanye,* 638 S.W.2d at 519–20. We hold that the "payment of claims" includes any payments made by the liability insurance carrier to the beneficiary of an underinsured motorist policy as well as to any other persons who may have suffered damages in the same accident.

Section (5) of article 5.06–1 provides for a set off in the amount that the insured recovers from the insurer of the tortfeasor's vehicle. The court of appeals in *Montanye v. Transamerica Insurance Co.,* 638 S.W.2d at 521 held that the phrase "reduced by the amount recovered or recoverable from the insurer of the underinsured motor vehicle" modifies the phrase "an amount up to the limit specified in the policy." In doing so, the court applied the doctrine of "last antecedent" under which a qualifying phrase is said to modify the words or clause immediately preceeding it. *Id.*

Doctrines of construction, such as that of the last antecedent, are merely aids to be used in determining the meaning and intent of communications. Such doctrines must give way when there are indications that they are inapplicable. In analyzing the statute, the *Montanye* court did not note that the "reduced by" clause is separated by a comma from the remainder of the provisions in section (5). We find that this separation of the clause creates an ambiguity and, in keeping with the purpose of the statute, hold that the "reduced by" clause modifies the word "damages" used in the phrase "all sums which he shall be legally entitled to recover as damages".

In doing so, we note that unless the statutory language is construed, as we have done here, in a manner consistent with our decision in *Ranzau* and *Briggs,* underinsured motorist coverage would offer most motorists only nominal protection. Where the tortfeasor and the injured insured comply with the minimum statutory requirements, the underinsured motorist coverage for which the policyholder has paid a premium would be worthless unless there were multiple claimants with substantial damages.

Moreover, under the misinterpretation of the statute by some courts of appeals, insureds can never ascertain what, if anything, they have purchased. The availability of underinsured motorist insurance would be contingent upon numerous uncertainties including not only the limits of that coverage but also the limits of the tortfeasor's liability insurance, the extent of damages suffered by any other persons who may have been involved in the same accident and the amount of any settlements made with the liability insurance carrier. We doubt whether most Texas motorists understand that the amount of the coverage for which they are paying is only recoverable depending upon the limits of the liability coverage carried by the negligent driver and the peculiar facts of the particu-

lar accident. Even if they did, we believe this is not the coverage mandated by statute.

By purchasing this coverage along with basic liability coverage, the insured has expressed an intent not only to protect others from his or her own negligence but also to protect that person's own family and guests from the negligence of others. This intent and the purpose of the statute are frustrated under the courts of appeals' construction of article 5.06–1. Accordingly, we disapprove of those decisions which have construed article 5.06–1(2)(b) and (5) in a manner inconsistent with this opinion. Those clauses in insurance policies which are not consistent with and do not further the purpose of article 5.06–1 are invalid.

The court of appeals' judgment in *Stracener* is reversed and that cause is remanded to the trial court for a determination of the actual damages sustained by the injured insureds and for further proceedings in accordance with this opinion. Under this court's opinion, the Hestilows would also be entitled to additional relief; however the Hestilows as appellees in the court of appeals below and respondents in this court have not invoked the jurisdiction of this court to grant additional relief. For this court to grant additional relief, the Hestilows would have had to file their own application for writ of error supported by a motion for rehearing in the court of appeals complaining of its judgment. *Archuleta v. International Ins. Co.*, 667 S.W.2d 120, 123 (Tex.1984); *Wich v. Fleming*, 652 S.W.2d 353, 356 (Tex.1983). We affirm the judgment of the court of appeals in *Hestilow*.



**Andrew K. LOFTON, Petitioner,**

v.

**TEXAS BRINE CORPORATION, et al., Respondents.**

**No. C–7642.**

Supreme Court of Texas.

Sept. 20, 1989.

Rehearing Denied Nov. 1, 1989.

In motor vehicle accident case, the 239th District Court, Brazoria County, J. Ray Gayle, III, J., entered judgment on a jury verdict for injured driver. On appeal, the Court of Appeals, Houston County, reversed, 698 S.W.2d 691. On application for writ of error, the Supreme Court, 720 S.W.2d 804, held that the Court of Appeals failed to consider all relevant evidence supporting jury's finding of proximate causation and remanded to the Court of Appeals for further consideration. On remand, the Court of Appeals again held that the evidence was factually insufficient to support the proximate cause finding, 751 S.W.2d 197. On review, the Supreme Court, Doggett, J., held that the Court of Appeals applied an incorrect legal standard in its review of sufficiency of the evidence by basing its conclusion on a fact that was not established as a matter of law.

Reversed and remanded.

Gonzalez, J., dissented and filed opinion.

Hecht, J., dissented and filed opinion in which Phillips, C.J., and Cook, J., joined.

**1. Courts** ⇐91(1)

Supreme Court need not defend its opinions from criticism from the Courts of Appeals; rather they must follow the Supreme Court's pronouncements.

**2. Appeal and Error** ⇐1001(1)

Court of Appeals applied incorrect standard of review in determining that evidence was insufficient in motor vehicle accident case to support finding of proximate cause where opinion was based on fact that

Consequently, West End Market Place argues that the summary judgment evidence conclusively negated any finding of actual or constructive knowledge of the screw allegedly protruding from the escalator. See *Keetch v. Kroger Company*, 845 S.W.2d 262 (Tex. 1992). We disagree.

Klooster's affidavit revealed that no problem was reported the day before. Amaya's deposition revealed that she did not notice the protruding screw. However, as previously detailed, Amaya testified that a maintenance person for West End Market Place found and removed a protruding screw. There is a material question of fact as to whether West End Market Place had actual or constructive knowledge of the screw. See *Motel 6 G.P., Inc. v. Lopez*, 929 S.W.2d 1 (Tex.1996).

Anderson's first point of error is sustained. We reverse the judgment of the trial court and remand this case for trial.



## Sandra K. THORNHILL, et al., Appellants,

v.

## RONNIE'S I-45 TRUCK STOP, INC., et al., Appellees.

## No. 09–94–236 CV.

Court of Appeals of Texas, Beaumont.

May 1, 1997.

Administrators of estates of motel guests who died in fire at motel brought

action against lender which held mortgage interest on motel, and also against state fire marshal. After jury returned verdict in plaintiffs' favor, the 221st District Court, Montgomery County, Lee G. Alworth, J., granted defendants' motions for judgment non obstante veredicto (JNOV). Plaintiffs appealed, and the Court of Appeals, Ron Carr, J., (assigned), held that: (1) inspection reports and memoranda filed by employees of fire marshal which reported code violations were not tangible personal property under Texas Tort Claims Act; (2) marshal had not waived immunity under Act; but (3) jury finding that lender was possessor of motel and owed duty of care to keep premises in safe condition was supported by evidence; and (4) awards for loss of inheritance damages were supported by evidence.

Affirmed in part; reversed and remanded in part.

**1. States ⊜78**

State fire marshal is generally immune from liability unless requirements of Texas Tort Claims Act are met. V.T.C.A., Civil Practice & Remedies Code § 101.021.

**2. States ⊜79**

Inspection reports and memoranda prepared by employees state fire marshal following inspection of motel which violated state fire code were not "tangible personal property" within meaning of Texas Tort Claims Act, and thus, failure of marshal to shut down motel after receiving reports could not provide basis of liability under Act in action brought following fatal fire at motel. V.T.C.A., Civil Practice & Remedies Code § 101.021.

> See publication Words and Phrases for other judicial constructions and definitions.

serts that elevators or escalators should be treated by ordinary premise liability standards. See *Triangle Motors of Dallas v. Richmond*, 152 Tex. 354, 258 S.W.2d 60 (1953), and *University of Texas Medical Branch at Galveston v. Davidson*, 882 S.W.2d 83 (Tex.App.—Houston [14th Dist.] 1994, no writ). As we discussed in *Texas Utilities Electric Company v. Gold Kist, Inc.*, 817

S.W.2d 749 (Tex.App.—Eastland 1991), *reversed on other grounds*, 830 S.W.2d 91 (Tex.1992), the common-law rule of ordinary care is elastic enough to meet all emergencies, and the amount of care depends upon the exigency confronted. See also *DeLeon v. Otis Elevator Company*, 610 S.W.2d 179 (Tex.Civ.App.—San Antonio 1980, writ ref'd n.r.e.).

**3. Appeal and Error ⟐232(.5), 281(1)**

State's objection to submission of issue of whether its failure to close motel after receiving reports of fire code violations was misuse of personal property, thus waiving immunity under Texas Tort Claims Act, on basis that reports were not tangible personal property, preserved point of error for appeal; motion for new trial was not required, as issue was not one based on no evidence. V.T.C.A., Civil Practice & Remedies Code § 101.021; Vernon's Ann.Texas Rules Civ. Proc., Rule 274.

**4. Appeal and Error ⟐218.2(5.1)**

Motions to disregard jury findings and motions for judgment non obstante veredicto (JNOV) are not proper methods for preserving for appeal issues of jury submission other than issues alleging no support in evidence.

**5. Appeal and Error ⟐281(1)**

Motion for new trial is not required to preserve point of error for appeal where point alleged is one other than no evidence. Vernon's Ann.Texas Rules Civ.Proc., Rule 301.

**6. States ⟐79**

Fatal fire at motel, which had been named in reports filed by employees of state fire marshal as in violation of fire code but which had not been brought into compliance or closed, did not result from condition of real property owned by state, as would result in waiver of fire marshal's immunity under Texas Tort Claims Act; motel was not used by employee of fire marshal's office and was not owned, occupied, or controlled by fire marshal, and fire marshal did not create dangerous condition. V.T.C.A., Civil Practice & Remedies Code § 101.021.

**7. Appeal and Error ⟐1106(2)**

Usually, case is remanded in interest of justice when (1) there has been change in basic law between trial and appellate court action, or (2) case was tried upon wrong legal theory.

**8. Negligence ⟐54**

"Possessor" of land, for purposes of Restatement (Second) of Torts, is person who is in occupation of land with intent to control it

or person who has been in occupation of land with intent to control it, if no other person has subsequently occupied it with intent to control it, or person who is entitled to immediate occupation, if no other person is in possession. Restatement (Second) of Torts § 328E.

> See publication Words and Phrases for other judicial constructions and definitions.

**9. Negligence ⟐54**

Critical inquiry in determining whether party is possessor of premises for purposes of Restatement (Second) of Torts does not focus on occupancy, but on control over premises. Restatement (Second) of Torts § 328E.

**10. Negligence ⟐54**

Control of premises, exercise of which will qualify of individual as possessor for purposes of Restatement (Second) of Torts, is power or authority to manage, direct, superintend, restrict, regulate, govern, administer, or oversee. Restatement (Second) of Torts § 328E.

**11. Negligence ⟐54**

Holder of legal title to premises is not necessarily "possessor" of premises for purposes of Restatement (Second) of Torts. Restatement (Second) of Torts § 328E.

**12. Negligence ⟐54**

Party is "possessor" of premises for purposes of Restatement (Second) of Torts if he exercises control over premises, regardless of whether control is rightful between possessor and some third person. Restatement (Second) of Torts § 328E.

**13. Negligence ⟐54**

Under Restatement (Second) of Torts, person who is given control of premises by owner is under same duty as owner to keep premises in safe condition. Restatement (Second) of Torts § 328E.

**14. Appeal and Error ⟐1001(3)**

In determining whether trial court erred in disregarding jury finding, standard of review is no evidence standard of review.

**15. Judgment ⊕199(3.7)**

Trial court may not disregard jury's answer that has some support in evidence.

**16. Appeal and Error ⊕930(1)**

In determining whether there is any evidence to support jury finding, reviewing court may not consider or rely upon evidence and inferences that are not favorable to jury finding.

**17. Appeal and Error ⊕1001(1)**

If reviewing court finds any more than scintilla of evidence that supports jury findings, court must uphold finding.

**18. Innkeepers ⊕10.12**

Jury finding that lender which had loaned funds to operator of motel was possessor of motel, and thus owed duty of care to motel guests to keep motel in safe condition, was supported by evidence that lender had mortgage interest in motel, and by testimony of operator that he had told lender that he could not pay loan but that lender had asked him to stay on and operate motel, that lender had been in complete control of motel for several months and dictated what happened, and that lender agreed to allow operator to keep other collateral which had been pledged in exchange for his remaining to operate motel.    Restatement (Second) of Torts § 328E.

**19. Innkeepers ⊕10.1**

Bankruptcy stay created by filing of bankruptcy petition by motel owner did not preclude lender which held mortgage interest in motel from being found to be possessor of motel who owed duty to guests, based on lender's exercise of control of motel through its agreement with operator to allow him to continue operating motel in exchange for not foreclosing on mortgage.

**20. Appeal and Error ⊕761**

Appellant who challenges grant of judgment non obstante veredicto (JNOV) is not required to address on appeal other potential grounds for JNOV that were never presented to trial court.

**21. Judgment ⊕199(5)**

Motion to disregard jury finding must be directed to objectionable issue and point out reasons why such issue should be disregarded.

**22. Evidence ⊕571(10)**

Awards of loss of inheritance damages of $200,000 to spouse of motel guest who died in fire, and $50,000 to each of children of guests who died in fire, were supported by expert testimony.

**23. Evidence ⊕506**

Expert testimony that lender which held mortgage interest in motel at which fatal fire occurred controlled premises and thus had responsibility to do something about fire hazard at motel related to ultimate issue of fact about which expert was properly permitted to testify.    Rules of Civ.Evid., Rule 704.

**24. Appeal and Error ⊕1051.1(2)**

In action arising from fatal fire at motel, any error in admission of expert testimony that because lender which held mortgage interest in motel controlled premises of motel, it had duty to do something about fire hazards, was harmless; evidence was cumulative of other evidence admission of which was not challenged on appeal.    Rules of Civ. Evid., Rule 704.

**25. Appeal and Error ⊕1051.1(1)**

Any error by trial court in admitting testimony is not reversible if it is merely cumulative of other evidence, admission of which has not been challenged on appeal.

**26. Innkeepers ⊕10.11**

Provisions of loan agreement between operator of motel and lender which required operator to purchase property insurance for motel were relevant to show lender's control over motel and were admissible in action brought against lender following fatal fire at motel.    Rules of Civ.Evid., Rule 411.

**27. Trial ⊕127**

Rules of evidence only prohibit admission of evidence of "liability insurance," not "property insurance."    Rules of Civ.Evid., Rule 411.

**28. Trial** ⊕127

Rules of evidence only prohibit admission of evidence that person was or was not insured against liability upon issue of whether he acted negligently or otherwise wrongfully. Rules of Civ.Evid., Rule 411.

**29. Appeal and Error** ⊕1050.1(11)

In action arising from fatal fire at motel, any error in admission into evidence of provisions of loan agreement between operator of motel and lender which required operator to purchase property insurance for motel in action brought against lender following fatal fire at motel was harmless; such insurance did not pertain to or cover any of losses suffered by plaintiffs, and only pertained to whether lender or operator was to receive any insurance proceeds for property damage. Rules of Civ.Evid., Rule 411.

———

Robert D. Rapp, Mandell & Wright, H. Victor Thomas, Bennett, Brocks, Baker & Lange, Houston, for appellants.

Joseph J. Naples, III, Russell Serafin, Vinson & Elkins, Ciano Pasta, Howard R. King, John Engvall, Jr., Funderburk & Funderburk, Randy Donato, Donato & Associates, Houston, Guy E. Hopkins, Guy E. Hopkins & Associates, M. Kaye Applewhite, Assistant County Attorney, Conroe, S. Ronald Keister, Assistant Attorney General, Austin, for appellees.

Before BURGESS, STOVER and CARR,* JJ.

### OPINION

CARR (Assigned), Justice.

This is an appeal from a judgment n.o.v. in a premises liability case based on a wrongful death and survival action after the deaths of George Thornhill and Dale Ross[1] in a motel fire at Ronnie's I-45 Truck Stop in Spring, Texas.

A jury found,[2] among other things, that: (1) the first lien holder, appellee, Allegheny International Credit Corporation, ("AICC") was a possessor of the motel whose negligence in failing to remedy numerous fire hazards was a proximate cause of the deaths and the surviving families' injuries; (2) appellee State Fire Marshal's negligence in failing to have the fire hazards corrected or to close the motel was a proximate cause of the deaths and injuries; and (3) appellants suffered damages in the total amount of $4,350,-000.

AICC moved to have the trial court disregard the jury finding that it was a "possessor" of the motel. The State Fire Marshal moved to have the trial court disregard the adverse liability jury findings on the basis of no duty, no evidence and/or insufficient evidence, and sovereign immunity. The trial court granted both AICC's and the State Fire Marshal's motions and entered a take-nothing judgment in favor of AICC and the State Fire Marshal.

Appellants now bring this appeal which presents us with separate issues concerning the State Fire Marshal and AICC.

The trial evidence in our record can be summarized as follows:

Ronnie's I-45 Truck Stop was a motel in Spring, Texas. On April 26, 1987, a fire destroyed the motel. George Thornhill, 34, and Dale Ross, 41, were guests of the motel and were killed in the blaze.

David Glassel built and owned and operated the motel complex where the fire occurred. Glassel was an officer and a director. Glassel borrowed approximately $15,000,000 from AICC to finance the business. The loans were secured by a mortgage on the motel and other property.

Glassel first defaulted on the loans in 1985, approximately two years before the fire. Glassel remained in continuous default from

———

* The Honorable Ron Carr, sitting by assignment pursuant to Tex.Gov't Code Ann. § 74.003(b) (Vernon 1988).

1. George Thornhill was survived by his wife, Sandra, and their four children. Dale Ross was survived by his two sons and his mother.

2. The jury apportioned negligence findings among the defendants as follows: The alleged arsonist, Frederick Joseph Bixenmann 50%; AICC 19%; Operator David Glassel 19%; Owner of Ronnie's I-45 Truck Stop, Inc. 4%; and, State Fire Marshal 8%.

March of 1986 until the April 1987 fire and AICC could have foreclosed at any time. From the time the motel was built, numerous fire hazards existed which Glassel chose not to remedy. In 1986, the State Fire Marshal conducted a fire safety inspection and found needed corrections.

Glassel testified that he had no hope of ever repaying the AICC loan; that by the fall of 1986, he advised AICC that he no longer could go on and that AICC could repossess the property. Glassel told AICC that they need not even foreclose, as he would voluntarily turn over the premises.

AICC told Glassel that they wanted him to stay on and operate the motel for them. AICC had taken a security interest in Glassel's collection of antique automobiles, which were housed in a museum on the property, as additional collateral for the loans. AICC proposed that if Glassel would remain on and run the motel and complex for them, they would allow him to keep his antique automobile collection. He agreed.

According to Glassel, AICC delayed foreclosure not because it had any expectation that the loan would be repaid, but because it did not want to assume the liabilities of ownership. Glassel also testified that but for this new agreement with AICC, he would have left and the motel would have been closed down; that AICC was completely calling the shots in the operation and control of the motel, with Glassel taking directions virtually on a daily basis; that he fully advised AICC's vice president of the nature and extent of the fire hazards and violations, and informed and sent AICC's vice president copies of the Fire Marshal's letters enumerating the violations; that he requested additional funds from AICC to, among other things, correct the fire hazards, and was led to believe by AICC that funding would be forthcoming.

At the time of the fire, Ronnie's was in bankruptcy. AICC's trial position was that Ronnie's operated the hotel as a debtor-in-possession; that the parties had no agreements other than the loan agreements; and, that AICC's sole business and relationship with Glassel and Ronnie's was that of a lender.

At the time of the fire the State Fire Marshal's office was an entity created by the Legislature which was under the administrative control of the State Board of Insurance.

On June 2 and 3, 1986, State Fire Safety Inspector, J.O. Lewis, conducted a fire safety inspection. He noted four statutory violations throughout the commercial complex: 1) the absence of a "No Smoking, Stop Engine" sign at the fuel pumps; 2) smoke detectors missing in some of the rooms; 3) interior stair cases not completely enclosed; and, 4) fire escapes constructed of wood. He also noted thirty-eight (38) discrepancies or conditions not in compliance with National Fire Protection Association (NFPA) recommendations. In addition, the report concluded that "everything above the first floor of the Antique Car Building and the fourth floor of the Old Hotel Building" not be utilized. The report was forwarded to Glassel on June 5, 1986.

On June 9, 1986, Inspector Lewis prepared a memo directed to Vernon Ray, Statewide Supervisor of the Inspection Program, and Regional Manager Mark Cheney "recommend[ing] the immediate closing of parts of this facility until such hazards are corrected."

On June 11, 1986, Regional Manager Cheney prepared a memo directed to Vernon Ray, Statewide Supervisor of the Fire Safety Inspection Program in which Cheney concluded by saying:

> In the event any loss of life or injury occurs on or after June 9, 1986, we want it to be recorded that it was recommended that the aforementioned business be closed and not used until all hazards were corrected.

### State Fire Marshal Liability

The dispositive issues presented regarding the State Fire Marshal's liability are whether or not:

> (1) information contained in the State Fire Marshal's written inspection reports and memoranda constitutes tangible personal property within the meaning of Section 101.021(2) of the Texas Tort Claims Act;

(2) the State Fire Marshal has waived on appeal its governmental immunity legal argument by not presenting such argument to the trial court; and

(3) we should either (a) impose liability on the State Fire Marshal because, under the facts of this case, its governmental immunity has been waived under Texas Tort Claims Act Section 101.021(2) wherein a governmental unit is liable for death caused by a "condition of real property" or (b) accept appellants' invitation to remand, in the interest of justice, their "condition of real property" claim.

For the following reasons, we answer the first three issues in the negative and decline appellants' invitation.

### *Tangible Personal Property Issue*

At trial, appellants presented evidence that after inspection of the motel, employees of the State Fire Marshal issued internal reports finding numerous state fire code violations and recommending that action be taken to close the motel. Appellants also presented evidence that the State Fire Marshal, in spite of these reports, failed to take any legal action to penalize the owner of the motel for such violations or to obtain an order to close the premises pursuant to its authority under TEX.INS.CODE ANN. § 5.44 (Vernon 1981) (repealed 1987).

[1] The State Fire Marshal is generally immune from liability unless the requirements of TEX.CIV.PRAC. & REM.CODE ANN. § 101.021 (Vernon 1986), entitled "Governmental Liability" are met. It provides in relevant part as follows:

A governmental unit in the state is liable for:

(2) personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law.

To meet the requirements of Section 101.021, appellants submitted Question No. 7 to the jury, which states in part as follows:

Do you find from a preponderance of the evidence that the State Fire Marshal was negligent, and that such negligence, if any, was caused by the use or condition of tangible personal property which was a proximate cause of the injury in question?

The term "use" as used herein means to put or bring into action or service; to employ for or apply to a given purpose.

In answering this question, the tangible personal property is the State Fire Marshal's use or misuse of State Fire Marshal inspection reports and memoranda generated by their personnel.

The jury answered this question in the affirmative, and thus, found that the State Fire Marshal's use or misuse of inspection reports and memoranda was a proximate cause of the injury in question.

[2] Under certain appellate decisions interpreting Section 101.021 that existed at the time of trial, the jury finding was sufficient to impose liability on the State Fire Marshal under the Texas Tort Claims Act. *See Texas DMHMR v. Petty,* 848 S.W.2d 680, 683–84 (Tex.1992); *University of Texas Medical Branch at Galveston v. York,* 808 S.W.2d 106 (Tex.App.—Houston [1st Dist.] 1991), *rev'd,* 871 S.W.2d 175 (Tex.1994); *City of Houston v. Arney,* 680 S.W.2d 867, 874 (Tex.App.—Houston [1st Dist.] 1984), *rev'd,* 871 S.W.2d 175 (Tex.1994).

However, there was also authority which indicated that the use or misuse of written reports did not constitute the "use of tangible personal property" within the meaning of Section 101.021. *See Eakle v. Texas Dept. of Human Services,* 815 S.W.2d 869, 873 (Tex. App.—Austin 1991, writ denied); *Montoya v. John Peter Smith Hosp.,* 760 S.W.2d 361, 364 (Tex.App.—Fort Worth 1988, writ denied); *Russell v. Texas Dept. of Human Resources,* 746 S.W.2d 510, 513 (Tex.App.—Texarkana 1988, writ denied).

The split of authority concerning this issue was settled in *University of Texas Medical Branch v. York,* 871 S.W.2d 175, 178–79 (Tex. 1994). In *York,* the supreme court stated:

While the paper on which doctors and nurses may record information about a patient's condition is tangible in that paper can be seen and touched, information itself is an abstract concept, lacking corporeal, physical, or palpable qualities. Informa-

tion thus, is intangible; the fact that information is recorded in writing does not render the information tangible property. *See also Dallas County v. Harper,* 913 S.W.2d 207 (Tex.1995).

Following *York,* we hold information contained in the State Fire Marshal's inspection records and memoranda do not constitute tangible property within the meaning of the Texas Tort Claims Act.

### Waiver

Appellants contend that the State Fire Marshal has waived on appeal its governmental immunity based on its use or misuse of inspection reports and memoranda because such argument was not presented to the trial court by any motion to disregard the jury's answer to Question 7 or in its motion for judgment n.o.v.

[3] However, the record affirmatively reflects that the State Fire Marshal specifically objected to the submission of the issue and to the jury being instructed to consider "inspection reports and memoranda" as tangible personal property:

> The State objects to the submission of this question as the inspection reports and memoranda are not tangible personal property under the Tort Claims Act.

Such objection is sufficient to preserve this point of error for appeal under TEX.R.CIV.P. 274. *Cecil v. Smith,* 804 S.W.2d 509 (Tex. 1991); *Wright Way Constr. Co. v. Harlingen Mall Co.,* 799 S.W.2d 415, 418 (Tex.App.— Corpus Christi 1990, writ denied); *American Nat. Ins. Co. v. Tri–Cities Constr., Inc.,* 551 S.W.2d 106, 109 (Tex.Civ.App.—Houston [1st Dist.] 1977, no writ). A motion for new trial is not required under TEX.R.CIV.P. 324 to preserve this jury submission error for appeal.

[4] Furthermore, motions to disregard jury findings and motions for judgment non obstante veredicto are not proper methods for preserving issues of jury submission other than the issues alleging no support in the evidence. In *Dayton Hudson Corp. v. Altus,* 715 S.W.2d 670, 675 (Tex.App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.), *cert. denied,* 481

U.S. 1073, 107 S.Ct. 2471, 96 L.Ed.2d 364 (1987) the Court states:

> The appellant also contends that it raised this issue in its motion to disregard findings on special issues and in its motion for judgment non obstante veredicto. This is not the proper method for preserving error regarding the submission of special issues. Unless there is an agreement between the parties and the court to relax the rules of civil procedure, the proper time to make objections to the court's charge is before the court has submitted the charge to the jury. TEX.R.CIV.P. 274, 279.

*See also Tubb v. Bartlett,* 862 S.W.2d 740, 748 (Tex.App.—El Paso 1993, writ denied).

[5] TEX.R.CIV.P. 301 specifically requires a motion and reasonable notice to disregard a jury finding based upon no evidence grounds; however, such is not required when the point of error alleged is one other than no evidence. Furthermore, Rule 301 provides "that upon motion and reasonable notice, the Court may render judgment non obstante veredicto if a directed verdict would have been proper...." Therefore, as the improper submission here complained of is not an evidentiary issue and could not have been raised in motion for a directed verdict, the appellees were not required to raise this issue in their Motion for judgment n.o.v. The State Fire Marshal's cross-point number 1 alleges that the trial court, over prior objection, improperly instructed the jury that "inspection reports and memoranda" were tangible personal property. As this is not an issue based upon no evidence, the State Fire Marshal may properly raise the *York* issue by cross-point in their appeal in accordance with TEX.R.CIV.P. 324(c), which states that "the appellee may bring forward by cross-point contained in his brief filed in the Court of Appeals any ground which would have vitiated the verdict or would have prevented an affirmance of the judgment had one been rendered by the trial court in harmony with the verdict. *See Responsive Terminal Systems, Inc. v. Boy Scouts of America,* 774 S.W.2d 666 (Tex.1989).

We hold the State Fire Marshal has not waived its governmental immunity argument.

*Condition of Real Property*

Appellants next argue that because the evidence establishes as a matter of law that the governmental immunity of the State Fire Marshal has been waived under the alternate provision of Section 101.021(2) that a governmental unit is liable for death caused by a "condition of real property", i.e., the motel, we should reverse and render judgment in favor of appellants.

First, we find that the evidence was disputed and the appellants requested no findings from the trial court or jury concerning the issue and have waived any such argument. *See Mount Pleasant Indep. Sch. Dist. v. Lindburg,* 766 S.W.2d 208 (Tex.1989).

[6] Secondly, the property listed by appellants was not "used" by an employee of the Fire Marshal's office; therefore, there is no waiver of sovereign immunity in accordance with *LeLeaux v. Hamshire-Fannett Sch. Dist.,* 835 S.W.2d 49 (Tex.1992). Furthermore, the real property was not owned, occupied or controlled by the State Fire Marshal, nor did the State Fire Marshal create the dangerous condition; therefore, a private person in the position of the government would not be liable under the circumstances of this case, and sovereign immunity was not waived. *City of Denton v. Page,* 701 S.W.2d 831 (Tex.1986).

In the alternative, appellants invite this Court, in the interest of justice, to remand their claim against the State Fire Marshal for a new trial so that it might have a jury determine whether the deaths in question were caused by a "condition of real property."

[7] Usually, a case is remanded in the interest of justice when: (1) there has been a change in the basic law between the trial and appellate court action, or (2) the case was tried upon the wrong legal theory. *Hartford Accident & Indem. Co. v. Parrott,* 486 S.W.2d 405, 408 (Tex.Civ.App.—Beaumont 1972, no writ).

However, in the interest of judicial economy, we decline appellants' invitation because of the unlikelihood of appellants prevailing at retrial on a "condition of real property" theo-

ry for the reasons stated in *LeLeaux* and *Page.*

Appellants' third and fourth points of error are denied. The State Fire Marshal's first cross-point is sustained. We need not address the State Fire Marshal's second cross-point.

*AICC Liability*

The dispositive issues presented in appellants' first point of error and AICC's cross-points two and three regarding AICC's liability are whether or not:

(1) a lender [AICC], which has a mortgage interest that is in default, may be a "possessor" within the meaning of Section 328E of the Restatement (Second) of Torts if the lendor exercises control over the property;

(2) there is any evidence that AICC was a Section 328E(a) "possessor" of the motel; and,

(3) the lessee's [Ronnie's] 11 U.S.C. § 362 bankruptcy stay prevents as a matter of law AICC being a Section 328E(a) "possessor" of the motel. We answer the first two issues in the affirmative and the third issue in the negative.

Other dispositive issues relate to damages [AICC's cross-point one] and admission of evidence [AICC's cross-point four and five].

*"Possessor" Issues*

"Possessor" was defined for the jury in Question No. 4 according to the RESTATEMENT (SECOND) OF TORTS, § 328E (1965), as follows:

[8-10] A **possessor** of land is

(a) a person who is in occupation of the land with intent to control it or

(b) a person who has been in occupation of land with intent to control it, if no other person has subsequently occupied it with intent to control it, or

(c) a person who is entitled to immediate occupation of the land, if no other person is in possession under Clauses (a) and (b).

The possessor or occupier of premises has been interpreted by Texas courts to mean

the party in *control* of the premises. *Wal-Mart Stores, Inc. v. Alexander,* 868 S.W.2d 322, 324 (Tex.1993); *Howe v. Kroger Co.,* 598 S.W.2d 929, 930 (Tex.Civ.App.—Dallas 1980, no writ). The critical inquiry in determining whether a party is a "possessor" as defined by Section 328E "does not focus on occupancy, but on control over the premises." *Gunn v. Harris Methodist Affiliated Hosp.,* 887 S.W.2d 248, 251 (Tex.App.—Fort Worth 1994, writ denied). In the context of Section 328E, "control" is defined as "the power or authority to manage, direct, superintend, restrict, regulate, govern, administer, or oversee." *Id.* at 252.

[11, 12] The holder of legal title to the premises is not necessarily the "possessor" of the premises. *Bryan v. Dockery,* 788 S.W.2d 447, 450 (Tex.App.—Houston [1st Dist.] 1990, no writ). A party is a possessor if he exercises control over the premises, regardless of whether the control is rightful between the possessor and some third person. *Wal-Mart Stores,* 868 S.W.2d at 324. Comment "a" to Section 328E clarifies that: "The important thing in the law of torts is the possession, and not whether it is or is not rightful as between the possessor and some third person."

[13] The Supreme Court has recognized that a person who is given control of the premises by the owner is under the same duty as the owner to keep the premises in a safe condition. *Page,* 701 S.W.2d at 834.

At trial, the evidence was undisputed that AICC had a mortgage interest in the motel property that was in default; that unsafe fire hazards existed at the motel and were brought to the attention of the owner and AICC; and, that as a result of the motel fire the deaths of Thornhill and Ross occurred.

What was greatly disputed at trial by contradicting evidence from both sides was whether AICC exercised any control over the motel other than that of only a lender.

AICC's trial evidence was that AICC's sole business and relationship with Glassel and Ronnie's was that of a lender who only offered the mortgagee suggestions, recommendations, cooperation and consultation, all without any possessory rights before foreclosure. On appeal, AICC argues that the fact that one party makes helpful suggestions to another for the mutual benefit of both does not make that party liable for the other's acts or omissions, even when those suggestions are relied upon by the other; *see Triplex Communications, Inc. v. Riley,* 900 S.W.2d 716, 719 (Tex.1995); *Mid-Continent Frgt. Lines v. Carter Publications, Inc.,* 336 S.W.2d 885, 889 (Tex.Civ.App.—Fort Worth 1960, writ ref'd); *cf. Lawson-Avila Const., Inc. v. Stoutamire,* 791 S.W.2d 584 (Tex. App.—San Antonio 1990, writ denied); the fact that one person's actions further the business interests of another does not make the latter liable for the former's actions; *Eagle Trucking Co. v. Texas Bitulithic Co.,* 590 S.W.2d 200, 213 (Tex.Civ.App.—Tyler 1979), *aff'd in part, rev'd in part on other grounds,* 612 S.W.2d 503 (Tex.1981); cooperation and consultation with the employee of another does make one liable for that employee's actions; *Franks v. Associated Air Center, Inc.,* 663 F.2d 583, 587 (5th Cir.1981); and, that there is no evidence that AICC "controlled" or was a "possessor" of the motel.

Contrary to AICC's trial evidence, Glassel, who managed and operated the motel testified that from the fall of 1986 AICC was in complete control of the motel; that he remained at the motel at the "request" of AICC solely to run the complex for AICC; and that in exchange for his staying on to manage the motel for AICC, AICC agreed to allow Glassel to keep his collection of antique cars which had been pledged as collateral for the loans held by AICC; and, that AICC "dictated what happened."

Plaintiffs' Exhibit 18 included directives from the AICC auditors on how to operate the motel and truck stop.

[14–17] In determining whether the trial court erred in disregarding the jury finding that AICC was a possessor of the motel premises, the standard of review is a "no evidence standard of review." A trial court may not disregard a jury's answer that has some support in the evidence. *Harris County v. McFerren,* 788 S.W.2d 76, 78 (Tex. App.—Houston [1st Dist.] 1990, writ denied). In determining whether there is any evidence to support a jury finding, we may not

consider or rely upon evidence and inferences that are not favorable to the jury finding.

In deciding a no evidence point, the court should consider only the evidence and reasonable inferences therefrom, which viewed in its most favorable light, supports the jury finding and must reject all evidence or reasonable inferences to the contrary. *Glover v. Texas General Indem.,* 619 S.W.2d 400 (Tex.1981). Although the Court of Appeals purported to apply this standard, in fact, it did not. On the contrary, the Court of Appeals relied upon evidence not favorable to Nasser and which supported a finding contrary to that of the jury. This evidence should have been disregarded.

*Nasser v. Security Ins. Co.,* 724 S.W.2d 17, 18 (Tex.1987). If we find any more than a scintilla of evidence that supports the jury findings, the court must uphold the finding. *Edgington v. Maddison,* 870 S.W.2d 187, 189 (Tex.App.—Houston [14th Dist.] 1994, no writ).

[18] With the foregoing standard of review in mind, AICC's contentions that certain portions of the record indicate that:

(1) AICC only made suggestions to Glassel and not orders;

(2) Glassel contradicted his statement that AICC owned the property and had the right to profits; and

(3) AICC rejected Glassel's proposal that AICC take possession of the property and then have Glassel operate the property as AICC's manager, cannot be considered by this Court under the applicable "no evidence standard of review" which allows only consideration of evidence and inferences that support the jury findings.

Generally, each side vigorously presented evidence in support of the proposition that AICC was or was not in control of the motel and its operations. The record reflects a number of instances of conflicting testimony which required resolution of credibility issues or the determination of the context in which a particular statement was made. These are decisions within the province of the factfinder.

After reviewing the evidence in the record in the light most favorable to the jury finding that AICC was a possessor of the motel premises and indulging every reasonable inference in the jury's favor, we find that there is some evidence that is more than a scintilla of evidence to support the affirmative jury finding.

AICC's cross-points two and three also contend that the evidence is factually insufficient to support the jury finding that AICC was a possessor of the premises or that AICC controlled Ronnie's business.

When reviewing an insufficient evidence point, we consider and weigh all the evidence; and we set aside the verdict only if it so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *Dyson v. Olin Corp.,* 692 S.W.2d 456, 457 (Tex.1985).

After reviewing the entire record, we find that there is sufficient evidence to support the jury findings. Accordingly, we will not substitute our judgment for that of the jury.

AICC cites numerous decisions which address the issue of whether the evidence was sufficient to show the existence of an employment or agency relationship, such as *Mid-Continent Freight Lines v. Carter Publications, Inc.,* 336 S.W.2d 885 (Tex.Civ.App.—Fort Worth 1960, writ ref'd). We conclude these decisions have no application to this case, because none of them are premises liability cases. We hold (1) Section 328E does not require appellants to prove that Glassel was the employee or agent of AICC in order to show that AICC exercised sufficient control over the motel premises to be a possessor and (2) it is enough to show that Glassel was operating the motel premises according to the instructions of AICC to show that AICC was controlling the premises under 328E.

At oral argument, AICC contended for the first time that appellants were required to obtain a jury finding that an agency relationship existed between AICC and David Glassel before AICC could be held liable as a possessor of the motel. However, AICC did not object to Jury Question 4, which asked

whether AICC was a possessor of the motel, and it did not make this argument in any of its post verdict motions or in their appellee's brief. Because AICC never presented this objection to the trial court, it has been waived. TEX.R.APP.P. 52(a).

AICC argues that a party cannot be a possessor under Section 328E unless it controls the access of third persons to the property, citing *Prestwood v. Taylor*, 728 S.W.2d 455 (Tex.App.—Austin 1987, writ ref'd n.r.e.). *Prestwood* did not state that controlling access is the determinative test of whether someone is a possessor under Section 328E. *Prestwood* merely recognized that controlling access to the premises is some evidence of the exercise of control.

In *Gunn v. Harris Methodist Affiliated Hosp.*, 887 S.W.2d 248, 252 (Tex.App.—Fort Worth 1994, writ denied), the court held that in the context of Section 328E, *control* is defined as "the power or authority to manage, direct, superintend, restrict, regulate, govern, administer, or oversee." Thus, while control of access to the premises may constitute some evidence of control of the premises, the primary test is whether the defendant is managing or directing the operations of the premises.

Additionally, AICC's contention that physical occupancy is required to be a possessor under Section 328E is not supported by the case law. In *Gunn*, 887 S.W.2d at 251, the court recognized that under Texas case law, the critical inquiry in determining whether a party is a "possessor" as defined by Section 328E "does not focus on *occupancy*, but on *control* of the premises."

[19] AICC contends that the bankruptcy stay prevented it from being a possessor at the time of the fire. However, it was the exercise of control by AICC that makes AICC a "possessor". As previously discussed, in *Wal–Mart Stores, Inc.*, 868 S.W.2d at 324, the Supreme Court held that a possessor of land includes a person in occupation or control of land regardless of whether the occupation or control is rightful between the possessor and some third person. In *Orthmann v. Apple River Campground, Inc.*, 757 F.2d 909 (7th Cir.1985), the Seventh Circuit has recognized that a land owner who treats

his neighbor's property as part of his own, even though he has no legal right to do so, is a possessor under Section 328E, and is responsible for the safety of the property it wrongfully possesses. The court stated that lack of formal title is immaterial and that whoever controls the land is responsible. *Id.* at 914. The court held that a duty to keep the premises safe arises even if the exercise of control is unlawful. To illustrate this point, the court gave a hypothetical example. An amusement park builds a parking lot encroaching on a neighbor's land. A customer of the amusement park is injured by a pothole in the part of the lot that the amusement park actually did not own or have any right to occupy. The amusement park could not escape liability by arguing that it did not own or have any legal right to the property where the accident occurred. *Id.* at 914.

In addition, there is direct evidence that AICC continued to control the motel premises through Glassel just as it did before the bankruptcy. Glassel testified that after Ronnie's bankruptcy filing in March 1986, he was managing the motel premises for AICC: "*When you're talking off into the March and later, in 1987, it was their baby all the way.... I was running it for them.*" Also, AICC was the one that instructed Glassel to put Ronnie's into bankruptcy to serve AICC's purpose of keeping the motel open and there is no evidence that Glassel stopped taking orders from AICC after bankruptcy was filed.

The fact that AICC had not yet foreclosed on the motel at the time of the fire did not preclude its legal status as a possessor. A party may be a possessor without any ownership or possessory interest in the premises. The only necessary element for being a "possessor" is that the party exercise some degree of control over the premises. In *Western Hills Bowling Center, Inc. v. Hartford Fire Ins. Co.*, 412 F.2d 563 (5th Cir.1969), cited by the Texas Supreme Court in *Page*, 701 S.W.2d at 835, the plaintiff's bowling alley was partially destroyed by fire while the property was insured by the defendant. The defendant insurance company undertook an investigation of the original fire. During the investigation, vandals entered the build-

ing, set a second fire, and totally destroyed the bowling alley. The insurance company was held liable for the damage caused by the second fire because it took control of the bowling alley during its investigation. *Western Hills*, 412 F.2d at 565. The insurance company, which had *no ownership interest* in the bowling alley, was held liable as a possessor because it exercised control over the premises when the fire occurred.

Likewise, even though AICC may not have had a legal right to control the motel absent foreclosure, its actual exercise of control with the consent of Glassel, made AICC a possessor under Texas law. As a possessor, AICC owed a duty to keep the motel in a safe condition. *Wal-Mart Stores, Inc.*, 868 S.W.2d at 324.

In *Wal-Mart*, Wal-Mart argued that the lease expressly imposed on the lessor a duty to maintain the parking lot and that Wal-Mart's installation of the ramp did not relieve the lessor of its duty. The Supreme Court held that even if the lessor did owe a duty of care to Mrs. Alexander, Wal-Mart's duty, based on its actual control of the ramp, would remain. *Id.* at 325. The necessary implications of this holding are: (1) that more than one party may simultaneously possess a premises; and (2) that every party who exercises control over the premises has a duty to use ordinary care to keep the premises in a safe condition.

Accordingly, even if Glassel or Ronnie's I-45 Truck Stop, Inc. were a possessor of the motel, the jury was not precluded from finding that AICC was also a possessor of the motel by virtue of its control.

AICC also argues that its judgment n.o.v. should be affirmed because appellants have failed to challenge on appeal the trial court's disregard of the Question No. 5 jury finding that AICC's negligence proximately caused damages to appellants. We disagree.

In its motion for judgment n.o.v., AICC only moved to disregard the jury's answer to Question No. 5 on the ground that for various reasons it owed no duty to the appellants. We find each of the reasons in AICC's motion for judgment n.o.v. is fully addressed by appellants' argument.

[20, 21] The law does not require appellants to address on appeal other potential grounds for judgment n.o.v. that were never presented to the trial court. A motion to disregard a jury finding must be directed to the objectionable issue and *point out the reasons* why such issue should be disregarded. *St. Paul Fire & Marine Ins. v. Bjornson*, 831 S.W.2d 366, 369 (Tex.App.—Tyler 1992, no writ); *Dewberry v. McBride*, 634 S.W.2d 53, 55 (Tex.App.—Beaumont 1982, no writ).

Lastly, we reject AICC's policy argument that appellants' appeal advocates the creation of a new form of lender liability in Texas, i.e., a lender's liability for premises defects on its unforeclosed mortgaged property, that a decision in favor of appellants will send shock waves through the Texas financial community because it will negatively affect the decision of any lender contemplating loaning money to Texas business; or the same will hold true for existing lender-borrower relationships.

AICC is not liable because it was a lender that failed to foreclose on its secured property, but is liable because of the control it exercised over the motel premises with full knowledge of the multitude of fire code violations that existed at the motel. In most situations, a lender does not exercise the kind of control that AICC did over its secured property until after foreclosure. It is only in the rare instance where the lender exercises a high degree of control over the premises prior to the foreclosure, that a lender will be found to be a possessor under Section 328E of the Restatement (Second) of Torts. A judgment on the jury's verdict will not expand or create any new liability on the part of lenders that did not previously exist under Section 328E.

Also awarding judgment on the jury findings will not impose a duty on AICC or other lenders to foreclose. Under the loan agreements, AICC was authorized to correct any deficiencies in the premises at its sole discretion and to require Glassel to pay the costs of repair. Thus, AICC had a right to correct the fire hazards even in the absence of foreclosure.

But regardless of whether AICC had any contractual right to make the premises safe, it had such a duty under Section 328E because of the control it exercised over it. Section 328E does not require lenders to foreclose, but it does impose liability on them if they exercise control over the premises and fail to make it safe. AICC's liability here is not based on lendor status but rather possessor status.

For the reasons stated, appellants' first point of error is granted, AICC's cross-points two and three are denied, and we need not address appellants' second point of error.

AICC's cross-point one contends there is no legally and factually sufficient evidence to support the jury's award of damages for loss of inheritance.

The jury found loss of inheritance damages in the total amount of $500,000, which consisted of an award of $200,000 to Mrs. Thornhill and $50,000 to each of the children of Mr. Thornhill and Mr. Ross. Appellees have not challenged on appeal any of the other damages found by the jury which total $3,850,000.

[22] Loss of inheritance damages has been defined by the Texas Supreme Court as follows:

We define loss of inheritance damages in Texas as the present value that the deceased, in reasonable probability, would have added to the estate and left at natural death to the statutory wrongful death beneficiaries but for the wrongful act causing the premature death.

*Yowell v. Piper Aircraft Corp.*, 703 S.W.2d 630, 633 (Tex.1986). Both the Texas Supreme Court and intermediate appellate courts have found the same type of evidence that was presented in this case to be both legally and factually sufficient to support the jury findings of loss of inheritance damages.

In *Yowell*, Piper argued that no evidence supported loss of inheritance damages. The Supreme Court overruled this point stating:

The plaintiffs introduced evidence as to each of the decedents' salaries, expected raises, expected promotions and salary increases, earning capacities, enforced savings through pension plans, spending habits, age, health, and relationship with the

wrongful death beneficiaries. The plaintiffs also produced evidence of the age and health of the wrongful death beneficiaries. We hold that adequate pleadings and some evidence support the jury's finding of loss of inheritance damages.

*Id.* at 634.

In *Lopez v. City Towing Associates, Inc.*, 754 S.W.2d 254, 265 (Tex.App.—San Antonio 1988, writ denied), the defendants asserted that there was no evidence to support the jury's award of loss of inheritance damages, because plaintiffs failed to introduce any testimony of the probability that Mrs. Lopez would have accumulated assets and would have left this accumulation to the statutory beneficiaries. The court of appeals rejected this argument stating:

On the contrary, the record indicates that Mrs. Lopez had worked ten years in a day care center prior to the accident and had only quit her job one month before the accident. During her time at the day care center Mrs. Lopez obtained her G.E.D. and was promoted to teacher's aide and then to a teacher's position. Testimony indicated that Mrs. Lopez wanted to obtain a college degree so that she could return to work as an elementary school teacher or as a substitute teacher. There was testimony that Mrs. Lopez' earnings were not used to support the family, but were used to provide extra things for the family, primarily for the children. Finally, there was extensive testimony of Mrs. Lopez' close and loving relationship with the members of her family. We hold that there is some evidence to support the jury's findings of loss of inheritance damages.

*Lopez*, 754 S.W.2d at 265.

In this case, appellants' economist testified as to Mr. Thornhill's and Mr. Ross's (1) past and future earning capacity; (2) fringe benefits; and (3) projected personal consumption. The economist provided a detailed analysis showing all manner of specific economic losses, including: lost earnings, past and future; lost fringe benefits, past and future; loss of household services, and the likely amount of surplus after personal consumption from which an estate could be built and left to the

appellants. Also there was evidence presented of the great love that existed between the decedents and their families which is some evidence that they intended to leave their families an inheritance.

We find there is some evidence and sufficient evidence to support the jury's award of loss of inheritance damages. AICC's first cross-point is denied.

AICC's cross-points four and five complain of improper admission of evidence, expert testimony and exhibits containing references to insurance.

### Expert Testimony

[23] In Question 4, the jury was asked whether AICC was a possessor of the motel. Possessor was defined as a person who is in occupation of the property with intent to control it. Thus, whether AICC was in control of the motel was an ultimate issue of fact that appellants' expert Theodore Strybosch was properly permitted to testify about. TEX.R.CIV.EVID. 704 provides that testimony in the form of an opinion is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

[24] Strybosch's testimony that because AICC controlled the premises, it had a responsibility to do something about the fire hazards is harmless error because that is a correct statement of the law. *Wal–Mart Stores,* 868 S.W.2d at 324; *Howe,* 598 S.W.2d at 930 (Tex.Civ.App.—Dallas 1980, no writ).

[25] In any event, any error by the trial court in admitting Strybosch's testimony is not reversible if it is merely cumulative of other evidence, the admission of which AICC has not challenged on appeal. *See Mancorp., Inc. v. Culpepper,* 802 S.W.2d 226, 230 (Tex. 1990); *Keene Corp. v. Rogers,* 863 S.W.2d 168, 179 (Tex.App.—Texarkana 1993, writ stayed).

The essence of Strybosch's testimony was that AICC was in control of the motel premises, and therefore had a responsibility to correct the fire hazards. He also testified that AICC had a right under the loan agreement to correct the fire hazards.

This is not materially different than the testimony that was given by Fred Babb, the treasurer of AI, the parent of AICC. Babb testified that AICC had the right under the loan agreement to possess the motel to correct the fire hazards and that AICC had a responsibility to do so because of the benefits it received by keeping the complex open. More specifically, Babb testified that AICC should have foreclosed; mandated correction of the dangerous conditions; provided fundings to make the hazardous conditions safe; or shut down the areas where the dangerous conditions existed. Babb recognized that after Glassel's default, both AICC and Glassel shared a dual responsibility to make the motel safe because of the dual benefits they were receiving by keeping the motel open under the arrangement with Glassel. He testified:

> If, if a decision were made to keep the operation running that was both in the credit corporation's interest and in their opinion in the borrower's interest. What the relative obligations are, I'm not prepared to judge.... *Correct deficiencies, certainly.* ... Dual benefits, dual responsibilities.

Mr. Babb saw AICC's duty as follows:

> I, I would have felt compelled to make a judgment to either approve the additional financing [to correct the fire hazards] or to close down the motel or to do its equivalency.

Mr. Babb's testimony, as a high ranking officer of AI, was far more harmful than the testimony of a paid expert witness. The admission of Mr. Strybosch's testimony cannot be considered reversible error, because it did not probably cause an improper verdict. TEX.R.APP.P. 81(b).

We conclude the trial court did not err in allowing into evidence the expert testimony of Strybosch concerning AICC's control and responsibilities and any error, if any, in admitting such testimony is not reversible, because it did not probably cause the rendition of an improper verdict.

### Exhibits Containing References to Insurance

[26] The references to insurance that AICC complains about are provisions in the

loan agreement between AICC and Glassel which required Glassel to purchase insurance for the motel. The loan agreements between the parties were clearly admissible, and their provisions concerning property insurance were also admissible to show that AICC was exercising control over the motel premises. The undisputed evidence shows that although the loan agreements required Glassel to purchase insurance, AICC purchased its own property insurance on the motel premises when Glassel failed to do so, without advising Glassel. Glassel's failure to purchase insurance on the motel was another breach of the loan agreements that gave AICC the right to immediately foreclose. The jury could infer from these facts that AICC was attempting to control the motel premises and enjoy the benefits of ownership without having to actually foreclose.

[27] First, TEX.R.CIV.EVID. 411 only prohibits the admission of "liability insurance," not "property insurance." Thus, appellants' evidence concerning "property insurance" was admissible.

[28] Second, Rule 411 only prohibits the admission of evidence that a person was or was not insured against liability upon the issue of whether he acted negligently or otherwise wrongfully. Rule 411 specifically states that it "does not require the exclusion of evidence of insurance against liability when offered for another issue, such as proof of agency, ownership, or *control* ..." In *Jacobini v. Hall,* 719 S.W.2d 396, 401 (Tex. App.—Fort Worth 1986, writ ref'd n.r.e.), the court of appeals noted that Rule 411 does not require the exclusion of evidence of insurance when offered for the purpose of showing agency, ownership, or control. The court held that evidence of insurance was admissible, since the main point of contention in the lawsuit was the matter of ownership of the vehicle, and the proof of insurance was relevant to show who owned the vehicle.

Rule 411 does not exclude evidence that the loan agreements required Glassel to provide insurance on the motel, because it was offered not for the purpose of showing that AICC was negligent, but to show that AICC was exercising control over the motel premises.

[29] Additionally, the admission of the loan agreement requirements that Glassel provide property insurance did not cause AICC any harm, because such insurance did not pertain to or cover any of the losses that were suffered by the appellants. The insurance only pertained to whether either Glassel or AICC was going to receive any insurance proceeds to cover the property damage caused by the fire.

Even if the injection of insurance into a trial is error, the fact that the issue was injected into the proceeding does not automatically require reversal. *Dennis v. Hulse,* 362 S.W.2d 308, 309 (Tex.1962); *United Cab Co. v. Mason,* 775 S.W.2d 783, 786 (Tex.App.—Houston [1st Dist.] 1989, writ denied). The complaining party must show harm from any error before the judgment may be reversed. *Mason,* 775 S.W.2d at 786.

*Kenneth H. Hughes Interests, Inc. v. Westrup,* 879 S.W.2d 229, 238 (Tex.App.—Houston [1st Dist.] 1994, writ denied). In *Westrup,* appellants argued that the trial court erred in overruling their objections to both testimony and documentary evidence that showed they had liability insurance. The court of appeals did not reverse, because the appellants failed to carry their burden to show that the mention of insurance probably caused the rendition of an improper judgment. *Id.* at 238.

Likewise, the admission of the loan agreement requirements that Glassel provide insurance on the motel property is not reversible error, because it did not probably result in an improper verdict. TEX.R.APP.P. 81(b). One of the purposes of the rule against admitting evidence of insurance is to avoid informing the jury that someone other than the defendant may be liable to pay the damages. Here, the objected to evidence concerned not liability insurance, but property insurance. Thus, the harm that the rule was designed to prevent does not come into play.

We find the trial court did not err by admitting into evidence exhibits containing references to property insurance of the motel.

**Venkateswarlu THOTA, M.D. and North Texas Cardiology Center, Petitioners,**

**v.**

**Margaret YOUNG, individually, and as Representative of the Estate of William R. Young, Respondent.**

**No. 09–0079.**

Supreme Court of Texas.

Argued Nov. 10, 2011.

Decided May 11, 2012.

**Background:** On behalf of herself and her deceased husband's estate, widow brought medical malpractice action against physician and cardiology center after husband died following complications from internal bleeding caused by cardiac catheterization. Following jury trial, the 30th District Court, Wichita County, Robert P. Brotherton, J., entered judgment for defendants. Widow appealed. The Court of Appeals, 271 S.W.3d 822, Terrie Livingston, J., reversed and remanded. Physician sought review which was granted.

**Holdings:** The Supreme Court, Green, J., held that:

(1) presumed harm analysis did not apply to a broad-form submission in a single-theory-of-liability case; disapproving of *Block v. Mora*, 314 S.W.3d 440;

(2) any error associated with the inclusion of a jury question regarding patient's negligence was harmless; and

(3) any error in the trial court's submission of the new and independent cause instruction was harmless.

Reversed and remanded.

**1. Appeal and Error** ⚖=969

Supreme Court reviews a trial court's decision to submit or refuse a particular instruction under an abuse of discretion standard of review.

**2. Trial** ⚖=182, 215

The trial court has considerable discretion to determine proper jury instructions; if an instruction might aid the jury in answering the issues presented to them, or if there is any support in the evidence for an instruction, the instruction is proper.

**3. Trial** ⚖=232(1), 238, 250

A jury instruction is proper if it: (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence.

**4. Appeal and Error** ⚖=1064.1(1)

Jury charge error is generally considered harmful as required for reversal of a judgment if it relates to a contested, critical issue. Rules App.Proc., Rules 44.1(a), 61.1.

**5. Appeal and Error** ⚖=230, 231(9), 242(1)

The procedural requirements for determining whether a party has preserved error in the jury charge are explained by one basic test: whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling. Rules App.Proc., Rule 33.1; Vernon's Ann.Texas Rules Civ.Proc., Rule 274.

**6. Appeal and Error** ⚖=230, 231(9)

Under Supreme Court's preservation rules, a timely objection plainly informing the court that a specific element should not be included in a broad-form question because there is no evidence to support its submission preserves the error for appellate review. Rules App.Proc., Rule 33.1; Vernon's Ann.Texas Rules Civ.Proc., Rule 274.

**7. Appeal and Error** ⚖=230, 231(9)

Specific and timely no-evidence objection to jury charge question on patient's

contributory negligence and specific objection to the disputed instruction on new and independent cause was sufficient to place the trial court on notice that patient's widow believed the evidence did not support an inclusion of patient's contributory negligence or instruction on new and independent cause, and, thus, issue was preserved for appeal, although widow did not cite or specifically reference *Casteel*, a case which held that, when a single broad-form liability question erroneously commingled valid and invalid liability theories and the appellant's objection was timely and specific, the error was harmful when it could not be determined whether the improperly submitted theories formed the sole basis for the jury's finding. Rules App.Proc., Rule 33.1; Vernon's Ann.Texas Rules Civ.Proc., Rule 274.

**8. Appeal and Error ⬾1031(6)**

Presumed harm analysis, for when jury question incorporated multiple theories of liability, of which at least one was invalid, or when it commingled damage elements that were unsupported by legally sufficient evidence, did not apply to a broad-form submission in a single-theory-of-liability case in action by patient's widow against physician and cardiology center for medical malpractice, even if negligence charge included both an improper defensive theory of contributory negligence and an improper inferential rebuttal instruction, where charge provided two separate blanks for the jury to answer the single-theory-of-liability question, the only theory of liability asserted against physician was negligence, and the jury's findings on that theory were clear that physician was not negligent; disapproving of *Block v. Mora*, 314 S.W.3d 440. Rules App.Proc., Rule 33.1; Vernon's Ann.Texas Rules Civ.Proc., Rule 274.

**9. Appeal and Error ⬾1031(6)**

While appellate courts may presume harm when meaningful appellate review is precluded because the submitted charge mixes valid and invalid theories of liability or commingles improper damage elements, the courts do not presume harm because of improper inferential rebuttal instructions on defensive theories.

**10. Appeal and Error ⬾1064.1(8)**

Any error in negligence charge including both an improper defensive theory of contributory negligence and an improper inferential rebuttal instruction may be harmless when jury questions are submitted in a manner that allows the appellate court to determine that the jury's verdict was actually based on a valid liability theory. Vernon's Ann.Texas Rules Civ.Proc., Rules 277, 278.

**11. Trial ⬾252(1), 350.1**

Regardless of whether a granulated or broad-form charge is submitted, the trial court's duty is to submit only those questions, instructions, and definitions raised by the pleadings and the evidence. Vernon's Ann.Texas Rules Civ.Proc., Rule 278.

**12. Appeal and Error ⬾969**

When a trial court abuses its discretion by including erroneous charge questions or instructions in a single-theory-of-liability case, Supreme Court's traditional harmless error analysis applies and the entire record should be reviewed to determine whether the charge errors probably caused the rendition of an improper judgment. Rules App.Proc., Rule 61.1(a).

**13. Appeal and Error ⬾1062.1**

When jury charge questions are submitted in a manner that allows the appellate court to determine whether the verdict was actually based on a valid theory of liability, the error may be harmless.

**14. Appeal and Error ⚖1062.1**

Any error associated with the inclusion of a jury question regarding patient's negligence was harmless in action by patient's widow against physician and cardiology center for medical malpractice, where physician could only have been negligent in causing the tear in patient's artery, but the jury failed to find that he was negligent, and clarifying instructions made it clear that jury could answer question regarding whether physician or patient were negligent in any of the following combinations: (1) "Yes" to both physician and patient, (2) "No" to both, or (3) "Yes" to one and "No" to the other, the choice the jury ultimately made. Rules App.Proc., Rule 61.1(a).

**15. Appeal and Error ⚖1062.5**

When the answer to a jury question cannot alter the effect of the verdict, the reviewing court considers that question immaterial. Rules App.Proc., Rule 61.1(a).

**16. Health ⚖823(1)**

Fact that defendant-physician in medical malpractice action testified on his own behalf did not negate the weight that the jury could give to his testimony.

**17. Appeal and Error ⚖930(1)**

In circumstances where a reasonable jury could resolve conflicting evidence either way, Supreme Court presumes the jury did so in favor of the prevailing party.

**18. Appeal and Error ⚖1064.1(8)**

Any error in the trial court's submission of the new and independent cause instruction was harmless in action by patient's widow against physician and cardiology center for malpractice, where review of the entire record provided no clear indication that the new and independent cause instruction, if erroneous, probably caused the rendition of an improper verdict. Rules App.Proc., Rule 61.1(a).

Diana L. Faust, R. Brent Cooper, Cooper & Scully P.C., Dallas, J. Wade Birdwell, D. Michael Wallach, Jennifer M. Andrews, Wallach & Andrews P.C., Fort Worth, Marc Maraman Tittlebaum, Richard Clark Harrist, Cooper & Scully P.C., Matthew Christopher Kawalek, Sodal Security Administration, Michelle E. Robberson, Cooper & Scully, P.C., Dallas, for Venkateswarlu Thota, M.D.

Doug Perrin, Jerry Mark Perrin, The Perrin Law Firm, Dallas, for Margaret Young.

Justice GREEN delivered the opinion of the Court.

We have held that reversible error is presumed when a broad-form question submitted to the jury incorporates multiple theories of liability and one or more of those theories is invalid, *Crown Life Ins. Co. v. Casteel,* 22 S.W.3d 378, 388 (Tex. 2000), or when the broad-form question commingles damage elements that are unsupported by legally sufficient evidence, *Harris Cnty. v. Smith,* 96 S.W.3d 230, 233–34 (Tex.2002). We have not, however, addressed whether that presumed harm analysis applies to a broad-form submission in a single-theory-of-liability case when the negligence charge includes both an improper defensive theory of contributory negligence and an improper inferential rebuttal instruction. For the reasons explained below, we hold that it does not, and that meaningful appellate review is provided through a traditional harm analysis. Inasmuch as the court of appeals ruled otherwise, we reverse its judgment and remand the case to that court for further consideration consistent with this opinion.

**I. Background**

William R. Young (Ronnie) died of leukemia on March 10, 2005, at the age of

fifty-seven. Prior to his death, Ronnie suffered from several physical ailments, including a rare blood disorder called polycythemia vera, coronary artery disease, hypertension, and angina. In late 2001, Ronnie visited Venkateswarlu Thota, M.D., a cardiologist at the North Texas Cardiology Center (NTCC), complaining of chest pains. After medications failed, Dr. Thota recommended that Ronnie undergo a coronary angiography—a test using dye and x-rays to observe how blood flows through the heart—to evaluate Ronnie's heart condition. Dr. Thota performed the cardiac catheterization procedure—insertion and threading of a thin tube into the coronary arteries, through which dye is released into the bloodstream—on the morning of March 4, 2002, at the United Regional Health Care System in Wichita Falls, Texas. Ronnie was released from the hospital at approximately 2:30 p.m. that afternoon and given routine instructions to call if he experienced any problems. Ronnie's wife, Margaret, drove him home after the catheterization procedure.

Later that evening, Ronnie experienced abdominal pain. Ultimately, Ronnie's condition worsened, and he fell from his reclining chair around 11:30 p.m. Margaret called 911, and Ronnie returned by ambulance to the hospital's emergency room at approximately 1:15 a.m. Dr. Thota's partner, Siriam Sudarshan, M.D., saw Ronnie in the emergency room. An abdominal CT scan showed bleeding from the puncture site—where the needle and catheter were inserted during the catheterization procedure—at Ronnie's right external iliac artery, as well as a large hematoma. Because of those results, Dr. Sudarshan consulted Olyn Walker, M.D., a vascular surgeon in Wichita Falls, concerning Ronnie's

condition. Soon thereafter, Dr. Walker performed an emergency surgery to repair a tear in Ronnie's right external iliac artery, allegedly caused by the catheterization procedure. During the emergency surgery, Dr. Walker discovered a large hematoma from severe bleeding in Ronnie's peritoneal cavity. After repairing the tear in the iliac artery and draining the retroperitoneal hematoma, the emergency care providers placed Ronnie on a ventilator.

Ronnie remained on the ventilator for several months and required additional procedures to treat injuries resulting from the severe bleed. Ronnie suffered acute renal failure that required dialysis, had multiple blood transfusions, underwent a splenectomy, and had his gallbladder removed because it had turned gangrenous as a result of ischemia—the lack of blood supply—caused from the bleed. Ronnie ultimately lost his vision in one eye and suffered numerous strokes and blood clots, all allegedly as a result of the catheterization. Later, Ronnie was transferred from the Wichita Falls hospital to Baylor University Medical Center in Dallas to receive treatment for various other ailments. After several months of additional treatment, Ronnie was released from the hospital in August 2002. Nearly three years after the catheterization procedure, Ronnie died of leukemia, which had developed as a complication of his prolonged struggle with polycythemia vera.

**A. The Medical–Malpractice Lawsuit**

Following Ronnie's death, Margaret brought this suit both individually and on behalf of Ronnie's estate (collectively, Young) against Dr. Thota and NTCC (collectively, Dr. Thota).[1] Young alleged that

---

**1.** Young alleged that NTCC was liable for Ronnie's injuries on the basis of respondeat   superior.

Dr. Thota was negligent by: (1) failing to obtain Ronnie's complete medical history; (2) failing to heed Ronnie's underlying medical conditions, which may have exacerbated his risk of potential complications; (3) failing to properly locate Ronnie's femoral artery during the catheterization procedure and lacerating his right iliac artery instead; (4) failing to discover the iliac artery tear before discharging Ronnie from the hospital; and (5) failing to diagnose and treat the artery tear. Young sought damages for Ronnie's pain and suffering and mental anguish, medical expenses, physical disfigurement, and lost earnings. Additionally, Young sought damages for Margaret's loss of consortium and loss of household services.

In his answer, Dr. Thota generally denied all of Young's claims and, alternatively, claimed that Ronnie's injuries were the result of an unavoidable accident, a new and independent cause, or pre-existing or subsequent medical conditions. Dr. Thota's answer also contended that Ronnie's injuries were partially the result of Ronnie's own negligence and included a counterclaim against Young for contribution due to Young's alleged failure to mitigate his damages.

The case proceeded to a week-long jury trial. At the charge conference, both parties raised several objections and argued over the proper questions and instructions that the trial court should submit to the jury. Young's theory of liability rested on the claim that Dr. Thota breached the standard of care by puncturing Ronnie's iliac artery instead of the femoral artery, resulting in the extensive bleeding and concomitant injuries that Ronnie suffered. In contrast, Dr. Thota's theory of the case considered Ronnie's injury to be the extensive bleed. Accordingly, Dr. Thota alleged that Ronnie was negligent in failing to return to the hospital at the first sign of pain, which would have substantially alleviated Ronnie's resulting health problems. Dr. Thota averred that the negligence, if any, resulted from the concurrent actions of both parties, which made this a contributory negligence issue rather than a mitigation-of-damages issue.

At the charge conference, Young objected to the inclusion of the definitions of negligence, ordinary care, and proximate cause in reference to Ronnie, arguing that contributory negligence was not supported by the evidence and that any delay on Ronnie's part in seeking medical treatment was a mitigation-of-damages issue. The trial court overruled Young's objection and included a question on Ronnie's contributory negligence in the charge. Additionally, the trial court overruled Young's objections to the inclusion of instructions on new and independent cause and unavoidable accident. Neither party advised the trial court that the charge might contain a *Casteel* problem, which arises when a broad-form charge mixes valid and invalid theories of liability, making it impossible for the appellate courts to determine if the jury answered the liability question based on an invalid theory, nor did either party request separate submissions for the negligence of Dr. Thota and Young. *See Casteel*, 22 S.W.3d at 388–89. Instead, Young's objections rested on the argument that there was no evidence to support the inclusion of the disputed jury charge items in the broad-form question.

The charge included one broad-form submission as to the single theory of liability—negligence—and additional questions regarding apportionment and calculation of damages. Question 1 addressed both parties' liability and stated:

Did the negligence, if any, of those named below, proximately cause the injury in question, if any?

"Negligence," when used with respect to the conduct of Venkat Thota, M.D., means failure to use ordinary care, that is, failing to do that which a cardiologist of ordinary prudence would have done under the same or similar circumstances or doing that which a cardiologist of ordinary prudence would not have done under the same or similar circumstances.

"Ordinary care," when used with respect to the conduct of Venkat Thota, M.D., means that degree of care that a cardiologist of ordinary prudence would use under the same or similar circumstances.

"Proximate Cause," when used with respect to the conduct of Venkat Thota, M.D., means that cause which, in a natural and continuous sequence unbroken by any new and independent cause, produces an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a cardiologist using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

"New and independent cause," when used with respect to the conduct of Venkat Thota, M.D., means the act or omission of a separate and independent agency, not reasonably foreseeable by a cardiologist exercising ordinary care, that destroys the causal connection, if any, between the act or omission inquired about and the injury in question and thereby becomes the immediate cause of such injury.

"Negligence," when used with respect to the conduct of [Ronnie] Young means failure to use ordinary care, that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances.

"Ordinary care," when used with respect to the conduct of [Ronnie] Young means that degree of care that a person of ordinary prudence would use under the same or similar circumstances.

"Proximate cause," when used with respect to the conduct of [Ronnie] Young means that cause which, in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

An injury may be an "unavoidable accident," that is, an event not proximately caused by the negligence of any party to it.

Answer "Yes" or "No".

Venkat Thota, M.D.: _____

[Ronnie] Young: _____

If you have answered "Yes" to Question 1 for both of those named in Question 1, then answer Question 2. Otherwise do not answer Question 2.

If you have answered "Yes" to Question 1 only as to Mr. Young, then do not answer Questions 2, 3, or 4.

If you have answered "Yes" to Question 1 only as to Dr. Thota, then answer Questions 3 and 4.

Question 2 conditionally asked about Dr. Thota's and Ronnie's comparative negligence, and Questions 3 and 4 concerned the amount of damages owed for Ronnie's and Margaret's injuries.

The jury answered Question 1 with a "No" as to Dr. Thota's negligence and a "Yes" as to Ronnie's negligence. On July 18, 2005, the trial court entered final judgment that Young take nothing. Young filed a motion for new trial, arguing that the trial court had erred in overruling Young's objections to the jury charge and that the jury's findings were against the great weight and preponderance of the evidence or based on insufficient evidence. The trial court denied Young's motion for new trial, and Young timely appealed.

**B.   Appellate Court Proceedings**

On appeal, Young raised the same issues presented in the motion for new trial. Specifically, Young challenged the trial court's judgment for the following reasons: (1) the jury's finding of no negligence as to Dr. Thota was against the great weight and preponderance of the evidence and was manifestly unjust and/or the opposite answer was conclusively proven as a matter of law; (2) the evidence was insufficient to support the jury's findings as to Ronnie's contributory negligence, and the trial court erred by overruling Young's objection to the inclusion of contributory negligence in the jury charge; and (3) the trial court erred in overruling Young's objections and submitting jury instructions on unavoidable accident and new and independent cause.

The court of appeals held that the trial court's inclusion of the question on Ronnie's contributory negligence and the new and independent cause instruction in the jury charge was an abuse of discretion and constituted harmful error; accordingly, it reversed the trial court's judgment and remanded the case for a new trial. 271

S.W.3d 822, 841 (Tex.App.-Fort Worth 2008, pet. granted). The appellate court found that the "injury in question" was the tear in Ronnie's iliac artery and, contrary to Dr. Thota's arguments, not the extensive bleed. *Id.* at 834–35. The court of appeals compared the parties' theories of liability and concluded that Dr. Thota's premise for Ronnie's contributory negligence was "based upon Ronnie's alleged negligence occurring *after* the tear, not Ronnie's negligence in *causing* the tear." *Id.* at 833. The court recognized that contributory negligence must have a causal connection with the original accident, while a failure to mitigate damages "arises from an injured party's duty to act reasonably in reducing his damages." *Id.* (citing *Hygeia Dairy Co. v. Gonzalez,* 994 S.W.2d 220, 226 (Tex.App.-San Antonio 1999, no pet.)). Because it found that Dr. Thota's theory pointed only to Young's "*subsequent* negligence that might have increased his damages as opposed to Dr. Thota's original negligence," the court concluded "that Ronnie's negligence, if any, only increased the damages he suffered after the catheterization or tear, as opposed to causing the 'injury,' 'accident,' or 'occurrence' itself." *Id.*

The appellate court then considered whether the disputed inferential rebuttal instructions on new and independent cause and unavoidable accident were proper. *Id.* at 836–39. Finding that Dr. Thota presented some evidence that the tear in Ronnie's artery could have been a natural result of Ronnie's then-existing illnesses or an unexpected catastrophe, the court of appeals held that the trial court did not abuse its discretion in submitting the unavoidable accident instruction.[2] *Id.* at 837.

**2.**  In this Court, the parties do not contest the court of appeals' holding as to the unavoidable accident instruction. Therefore, our opinion focuses solely on the disputed charge

issues concerning the inclusion of Ronnie's contributory negligence and the instruction on new and independent cause.

The court concluded that Ronnie's massive bleed and resulting injuries were foreseeable risks in the catheterization procedure and held that the trial court abused its discretion by submitting the new and independent cause instruction in connection with Dr. Thota's negligence. *Id.* at 838.

After holding that the trial court erred in submitting the question of Ronnie's contributory negligence and the new and independent cause instruction as to Dr. Thota, the court of appeals considered which level of harm analysis applied. *Id.* at 839. The court, sua sponte, held that Young's objections to these specific aspects of the charge invoked *Casteel*'s presumed harm analysis because the improperly submitted broad-form question commingled valid and invalid theories of liability. *Id.* at 836 (citing *Casteel*, 22 S.W.3d at 388–89).[3] The court acknowledged our opinion in *Bed, Bath & Beyond, Inc. v. Urista*, 211 S.W.3d 753 (Tex.2006), which held that *Casteel*'s presumed harm analysis does not apply to broad-form questions based on a single theory of liability that are submitted with

improper inferential rebuttal instructions, *id.* at 757, but distinguished Young's situation because "the jury was not only given an erroneous defensive instruction on new and independent cause that benefitted only Dr. Thota but also an erroneous jury question on liability—Ronnie's contributory negligence—a theory not supported by the evidence." 271 S.W.3d at 839. Concluding that *Casteel*'s presumed harm analysis applied, the court of appeals reasoned:

> We simply cannot determine, on this evidence, whether the jury properly found Dr. Thota not negligent, properly found that his negligence was excused based upon the unavoidable accident instruction, or improperly found that his negligence was excused based upon the new and independent cause instruction alone or combined with its improper finding of Ronnie's negligence.

*Id.* Specifically, the court held that the charge commingled Dr. Thota's improper theory of liability (the extensive bleeding) with Young's proper theory of liability (the torn artery) and, consequently, prevented

---

3. As mentioned by Young's counsel at oral argument, at least one other appellate court has followed this approach and held that a broad-form charge that includes separate blanks for multiple parties' fault, under a single theory of liability, presents a *Casteel* issue. *See Block v. Mora*, 314 S.W.3d 440, 450 (Tex. App.-Amarillo 2009, pet. dism'd by agr.). In *Block*, Question 1 of the jury charge asked: "Did the negligence, if any, of those named below proximately cause the injuries, if any, to [the plaintiff]?" *Id.* at 444. Question 1 included two separate answer blanks next to the names of the plaintiff and the defendant. *Id.* The jury answered "Yes" to the plaintiff's negligence and "No" to the defendant's negligence. *Id.* On appeal, the plaintiff complained that the evidence supported judgment in his favor because the defendant's negligence was established as a matter of law. *Id.* The plaintiff also alleged that there was no evidence of his contributory negligence nor any evidence that he had proximately caused the accident or his injuries, and he claimed

that the trial court erred in submitting his negligence to the jury. *Id.* On appeal, the court of appeals held that it was error to submit the invalid theory of the plaintiff's contributory negligence to the jury. *Id.* at 450. Like the court of appeals in *Thota*, the *Block* court held that because "the trial court submitted two competing theories of liability within one broad-form liability question that asked whether the negligence of the two parties involved in the accident caused the plaintiff's injuries," it could not "determine whether the jury truly found that [the defendant] was not negligent in causing the accident or [that the plaintiff] was solely negligent in causing his injuries (both of which findings would be against the great weight and preponderance of the evidence)." *Id.* The court cited to *Casteel*'s presumed harm analysis, but held, under the traditional harmless error analysis that the charge error "likely caused the rendition of an improper judgment." *Id.; see* Tex.R.App. P. 44.1.

the appellate court "from being able to determine whether the jury's finding of no liability as to Dr. Thota was a finding of no negligence on his part, an erroneous finding of contributory negligence on Ronnie's part, or an erroneous finding of new and independent cause." *Id.* at 841. The court concluded: "Because these instructions likely caused rendition of an improper judgment or, at least, prevented [Young] from properly presenting her case on appeal, we conclude that such error was harmful." *Id.*

### C. Dr. Thota's Petition for Review

Dr. Thota petitioned our Court for review, and we granted his petition on rehearing. 54 Tex.Sup.Ct.J. 682 (Mar. 18, 2011). Dr. Thota argues that the court of appeals erred in holding that the trial court's inclusion of Ronnie's contributory negligence and the inferential rebuttal instruction constituted an abuse of discretion. Dr. Thota claims that even if there were error in the jury charge, it was harmless, and *Casteel*'s presumed harm analysis does not apply. Furthermore, Dr. Thota claims that the court of appeals improperly reversed the trial court's judgment based on unassigned error because Young neither raised a *Casteel* issue before the court of appeals nor made a timely or specific objection before the trial court to assert that the submission of Young's contributory negligence or the inferential rebuttal instruction would improperly commingle valid and invalid theories of liability and, therefore, prevent the appellate court from conducting a meaningful appellate review. Finally, Dr. Thota claims that the appellate court misapplied our holding in *Elbaor v. Smith*, 845 S.W.2d 240 (Tex.1992), by holding that the trial court abused its discretion by submitting a question on Ronnie's contributory negligence instead of an instruction on Ronnie's duty to mitigate his damages.

Young counters that the trial court's submission of Ronnie's contributory negligence and the inferential rebuttal instruction on new and independent cause was an abuse of discretion. According to Young, the court of appeals correctly interpreted *Elbaor* because Ronnie could not have been negligent in causing the tear to his iliac artery and any fault on Ronnie's part should have been submitted only through an instruction on Ronnie's failure to mitigate his damages. *See Elbaor*, 845 S.W.2d at 244–45. Young asserts that *Casteel*'s presumed harm analysis applies because the submitted jury charge was based on one valid and one invalid theory of liability, which obviously confused the jury to such a degree that an appellate court cannot determine whether the jury based its decision on the valid or invalid theory. Young claims that direct mention of *Casteel* to the trial court was not required to preserve the *Casteel* error, and Young's timely and specific no-evidence objections to the charge errors were sufficient to inform the trial court of the *Casteel* problem. Alternatively, Young claims that the trial court's judgment must be reversed even under the traditional harmless error analysis.

### II. Harm Analysis

Assuming, but not deciding, that it was error for the trial court to submit the question on Ronnie's contributory negligence and the instruction on new and independent cause, we consider whether these charge issues constituted harmful error. *See, e.g.,* TEX.R.APP. P. 61.1; *Urista*, 211 S.W.3d at 756. We first address whether the court of appeals correctly applied *Casteel*'s presumed harm analysis to the contested jury charge. We hold that it did not. For reasons stated below, we further hold that even if the submission of the contested charge issues were an abuse of

discretion, a review of the entire record provides no clear indication that the contested charge issues probably caused the rendition of an improper judgment and, therefore, we must conclude that the trial court's submission was harmless. *See* Tex. R.App. P. 44.1(a), 61.1(a).

### A. General Law

**[1–4]** "We review a trial court's decision to submit or refuse a particular instruction under an abuse of discretion standard of review." *In re V.L.K.,* 24 S.W.3d 338, 341 (Tex.2000). The trial court has considerable discretion to determine proper jury instructions, and "[i]f an instruction might aid the jury in answering the issues presented to them, or if there is any support in the evidence for an instruction, the instruction is proper." *La.-Pac. Corp. v. Knighten,* 976 S.W.2d 674, 676 (Tex.1998). "An instruction is proper if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence." *Columbia Rio Grande Healthcare, L.P. v. Hawley,* 284 S.W.3d 851, 855–56 (Tex.2009). An appellate court will not reverse a judgment for a charge error unless that error was harmful because it "probably caused the rendition of an improper judgment" or "probably prevented the petitioner from properly presenting the case to the appellate courts." TEX. R. APP. P. 61.1; *see* Tex. R.App. P. 44.1(a).[4] "Charge error is generally considered harmful if it relates to a contested, critical issue." *Hawley,* 284 S.W.3d at 856; *see also Quantum Chem. Corp. v. Toennies,* 47 S.W.3d 473, 480 (Tex.2001) ("An improper instruction is es-

pecially likely to cause an unfair trial when the trial is contested and the evidence sharply conflicting . . . .")

### B. *Casteel* and Its Progeny

*Casteel* involved a dispute between an insurance agent and the insurer. 22 S.W.3d at 381. In *Casteel,* the trial court submitted a single broad-form question on the issue of the insurer's liability to the agent, which included thirteen independent grounds for liability. *Id.* at 387. We determined that five of the thirteen independent grounds for liability did not apply and held that the trial court erred by submitting the invalid grounds for liability in the charge. *Id.* We then considered whether the charge error was harmful. *Id.* Because the single broad-form charge mixed valid and invalid theories of liability, we held that the charge error constituted harmful error, explaining:

> It is fundamental to our system of justice that parties have the right to be judged by a jury properly instructed in the law. Yet, when a jury bases a finding of liability on a single broad-form question that commingles invalid theories of liability with valid theories, the appellate court is often unable to determine the effect of this error. The best the court can do is determine that some evidence *could* have supported the jury's conclusion on a legally valid theory. To hold this error harmless would allow a defendant to be held liable without a judicial determination that a factfinder actually found that the defendant *should* be held liable on proper, legal grounds.

**4.** Rule 61.1 is the Supreme Court version of the harmful error rule. *See* Tex.R.App. P. 61.1. Similarly, the appellate court provision, Rule 44.1(a), states:

> No judgment may be reversed on appeal on the ground that the trial court made an error of law unless the court of appeals

concludes that the error complained of: (1) probably caused the rendition of an improper judgment; or (2) probably prevented the appellant from properly presenting the case to the court of appeals.

Tex.R.App. P. 44.1(a).

*Id.* at 388. Therefore, we held: "When a single broad-form liability question erroneously commingles valid and invalid liability theories and the appellant's objection is timely and specific, the error is harmful when it cannot be determined whether the improperly submitted theories formed the sole basis for the jury's finding." *Id.* at 389.

Following *Casteel,* we have clarified the extent of its presumed harm analysis on several occasions. *See Urista,* 211 S.W.3d 753; *Romero v. KPH Consolidation, Inc.,* 166 S.W.3d 212 (Tex.2005); *Harris Cnty.,* 96 S.W.3d 230. In *Harris County,* we extended *Casteel*'s presumed harm analysis to a broad-form question that commingled valid and invalid elements of damages for which there was no evidence. 96 S.W.3d at 233–34. In *Romero,* we applied *Casteel*'s presumed harm analysis to a single broad-form proportionate responsibility question that included a factually-unsupported malicious credentialing claim. 166 S.W.3d at 227–28 (noting that "unless the appellate court is 'reasonably certain that the jury was not significantly influenced by issues erroneously submitted to it,' the error is reversible" (citations omitted)). Later, in *Urista,* we declined to extend *Casteel*'s presumed harm analysis to the trial court's submission of an erroneous inferential rebuttal instruction. 211 S.W.3d at 756–57. In *Urista,* we explained:

> We specifically limited our holdings in *Casteel* and *Harris County* to submission of a broad-form question incorporating multiple theories of liability or multiple damage elements. We have never extended a presumed harm rule to instructions on defensive theories such as unavoidable accident, and we decline to do so now.... When, as here, the broad-form questions submitted a single liability theory (negligence) to the jury, *Casteel*'s multiple-liability-theory analy-

sis does not apply. Moreover, when a defensive theory is submitted through an inferential rebuttal instruction, *Casteel*'s solution of departing from broad-form submission and instead employing granulated submission cannot apply. Unlike alternate theories of liability and damage elements, inferential rebuttal issues cannot be submitted in the jury charge as separate questions and instead must be presented through jury instructions. Therefore, although harm can be presumed when meaningful appellate review is precluded because valid and invalid liability theories or damage elements are commingled, we are not persuaded that harm must likewise be presumed when proper jury questions are submitted along with improper inferential rebuttal instructions.

*Id.* (citations omitted). *Cf. Hawley,* 284 S.W.3d at 865 (applying Rule 61.1(b) in a non-*Casteel* context where the trial court omitted the defendant's proposed instruction in a single-theory-of-liability case, thereby allowing the jury to potentially find the defendant liable on an invalid basis). Because we held that *Casteel*'s presumed harm analysis did not apply to the inferential rebuttal question in *Urista,* we applied the traditional harmless error analysis, which considers whether the instruction "probably caused the rendition of an improper judgment." 211 S.W.3d at 757; *see* Tex.R.App. P. 61.1(a); *see also Reinhart v. Young,* 906 S.W.2d 471, 473 (Tex.1995) ("Error in the jury charge is reversible only if, in the light of the entire record, it was reasonably calculated to and probably did cause the rendition of an improper judgment."). After reviewing the entire record, we concluded in *Urista* that there was some evidence the plaintiff failed to meet his burden of proof and therefore held that the unavoidable accident instruction did not probably cause the

jury to render an improper verdict. 211 S.W.3d at 758–59.

Notwithstanding *Casteel*'s presumed harm analysis in situations that erroneously commingle valid and invalid theories of liability, we have repeatedly reaffirmed our longstanding, fundamental commitment to broad-form submission. *See, e.g., Harris Cnty.,* 96 S.W.3d at 235–36. We first expressed our preference for broad-form practice in 1973 and, after issuing multiple opinions in which we supported broad-form submission, we modified Rule 277 of the Texas Rules of Civil Procedure in 1988 to more expressly mandate the use of broad-form submission. *See id.; see also Lemos v. Montez,* 680 S.W.2d 798, 801 (Tex.1984) (explaining our progression from separate, granulated charge issues to the broad-form charge). *See generally* William G. "Bud" Arnot, III & David Fowler Johnson, *Current Trends in Texas Charge Practice: Preservation of Error and Broad–Form Use,* 38 St. Mary's L.J. 371, 416–40 (2007) (providing a more detailed history of Texas jury charge practice); William L. Davis, *Tools of Submission: The Weakening Broad–Form "Mandate" in Texas and the Roles of Jury and Judge,* 24 Rev. Litig. 57 (2005) (same). Since 1988, Rule 277 has stated, in pertinent part: "In all jury cases the court shall, whenever feasible, submit the cause upon broad-form questions." Tex.R. Civ. P. 277. *Casteel* and its progeny denote situations where broad-form submission may be unfeasible. *See, e.g., Casteel,* 22 S.W.3d at 389. But "whenever feasible," broad-form submission should be the norm. *See* Tex.R. Civ. P. 277; *Harris Cnty.,* 96 S.W.3d at 235–36; *see also Tex. Dep't of Human Servs. v. E.B.,* 802 S.W.2d 647, 649 (Tex.1990) (interpreting "whenever feasible" to mandate broad-form submission "in any or every instance in which it is capable of being accomplished").

## C. Preservation of Error

**[5]** We first address Dr. Thota's argument that the court of appeals improperly reversed the judgment of the trial court based on unassigned and unpreserved error. Our procedural rules govern the preservation requirements for raising a jury charge complaint on appeal and require the complaining party to make an objection before the trial court. Tex.R. Civ. P. 274; Tex.R.App. P. 33.1. Rule 274 requires that an objecting party "must point out distinctly the objectionable matter and the grounds of the objection," and states that "[a]ny complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections." Tex.R. Civ. P. 274. Additionally, to preserve error for appellate review, the rules generally require the complaining party to (1) make a timely objection to the trial court that "state[s] the grounds for the ruling that the complaining party [seeks] from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context," and (2) obtain a ruling. Tex. R.App. P. 33.1. As we stated twenty years ago, the procedural requirements for determining whether a party has preserved error in the jury charge are explained by one basic test: "whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling." *State Dep't of Highways v. Payne,* 838 S.W.2d 235, 241 (Tex.1992).

Although Young made a timely and specific objection at the charge conference to the inclusion of the question on Ronnie's contributory negligence and the instruction on new and independent cause, Dr. Thota argues that because Young failed to specifically state that these charge issues

raised a *Casteel* problem or notify either the trial or appellate court that the charge would prevent Young from obtaining meaningful appellate review, Young waived the right to invoke *Casteel* and the court of appeals improperly reversed the trial court on unassigned error. In essence, Dr. Thota argues that because Young did not cite *Casteel* or specifically object to the form of the charge question, Young waived any benefit of the presumed harm analysis.

Contrary to Dr. Thota's narrow and technical interpretation of our preservation of error requirements, we have never held that a no-evidence objection in this context is insufficient to preserve a broad-form complaint on appeal. *See, e.g., Romero,* 166 S.W.3d at 229; *Harris Cnty.,* 96 S.W.3d at 236; *Casteel,* 22 S.W.3d at 387, 389. Moreover, we have long favored a common sense application of our procedural rules that serves the purpose of the rules, rather than a technical application that rigidly promotes form over substance. *See Alaniz v. Jones & Neuse, Inc.,* 907 S.W.2d 450, 451–52 (Tex.1995) (per curiam) (citing *Payne,* 838 S.W.2d at 241) ("While *Payne* does not revise the requirements of the rules of procedure regarding the jury charge, it does mandate that those requirements be applied in a common sense manner to serve the purposes of the rules, rather than in a technical manner which defeats them.").

In addition, Dr. Thota's reliance on our opinions in *In re A.V.,* 113 S.W.3d 355, 362 (Tex.2003), and *In re B.L.D.,* 113 S.W.3d 340, 349–50 (Tex.2003), to support his contention that Young failed to preserve any complaint regarding the charge's broad-form submission is misplaced. Although in those cases we did hold that complaints of harmful charge error were not preserved, those cases are distinguishable from this case because in both *A.V.* and *B.L.D.,* the complaining party raised no objections to items included in the broad-form charge. *See A.V.,* 113 S.W.3d at 357; *B.L.D.,* 113 S.W.3d at 349. Moreover, the charge complaint at issue in those parental-rights-termination cases was that separate statutory grounds for terminating the parents' parental rights should not have been submitted within a single broad-form question. *See A.V.,* 113 S.W.3d at 357; *B.L.D.,* 113 S.W.3d at 349. The basis for the parents' complaints was not that the charge should not include the termination grounds at all, but that it was error for the trial court to submit them in a broad-form question. *See A.V.,* 113 S.W.3d at 357; *B.L.D.,* 113 S.W.3d at 349. In those circumstances, it was necessary for the complaining party to make a specific objection to the form of the charge to put the trial court on notice of the alleged error and afford the court an opportunity to correct the error. *See A.V.,* 113 S.W.3d at 363 (holding that the parent failed to preserve the issue for appellate review because he did not make "a specific objection to the charge to put [the] trial court on notice to submit a granulated question to the jury"); *B.L.D.,* 113 S.W.3d at 349; TEX. R. APP. P. 33.1. *Cf. Keetch v. Kroger Co.,* 845 S.W.2d 262, 267 (Tex.1992) (stating that "[e]rror in the charge must be preserved by distinctly designating the error and the grounds for the objection" and holding that error was not preserved when the complaint of the trial court's failure to submit in broad form was first raised in this Court). In this case, a separate objection to the form of the charge question was not necessary to inform the trial court of Young's complaint—that the inclusion of Ronnie's contributory negligence and the instruction on new and independent cause should not be submitted to the jury. A granulated submission would have cured the alleged charge defect in *A.V.* and *B.L.D.,* but here, even if the trial court submitted the issue of Ronnie's contributo-

ry negligence in a separate question, this would not have cured Young's no-evidence objection.

**[6, 7]** In every case in which we have considered *Casteel*'s presumed harm analysis, including *Casteel* itself, we have emphasized the need for the complaining party to make a timely and specific objection to preserve complaints of error in broad-form submission. *See, e.g., Casteel,* 22 S.W.3d at 387–89; *Romero,* 166 S.W.3d at 229. As we stated in *Harris County,* under our preservation rules: "A timely objection, plainly informing the court that a specific element . . . should not be included in a broad-form question because there is *no evidence to support its submission,* therefore preserves the error for appellate review." 96 S.W.3d at 236 (emphasis added). Again in *A.V.* and *B.L.D.,* we quoted that statement from *Harris County* and held that without some objection to the charge, claiming the submitted theory had no evidentiary support, or an objection to the form of the charge, any complaint of charge error was not preserved for review by the court of appeals. *See A.V.,* 113 S.W.3d at 362–63; *B.L.D.,* 113 S.W.3d at 349–50. In contrast to *A.V.* and *B.L.D.,* Young made a specific and timely no-evidence objection to the charge question on Ronnie's contributory negligence and also specifically objected to the disputed instruction on new and independent cause. In addition to Young's timely and specific objections at the charge conference, Young submitted a proposed charge to the trial court, which omitted any inclusion of Ronnie's contributory negligence and the new and independent cause instruction and presented the charge according to Young's theory of the case. This was sufficient to place the trial court on notice that Young believed the evidence did not support an inclusion of Ronnie's contributory negligence or instruction on new and independent cause, and our procedural rules require nothing more.

By making timely and specific objections that there was no evidence to support the disputed items submitted in the broad-form charge and raising these issues for the court of appeals to consider, Young properly preserved these issues for appellate review; Young did not have to cite or reference *Casteel* specifically to preserve the right for the appellate court to apply the presumed harm analysis, if applicable, to the disputed charge issues. *See, e.g., Harris Cnty.,* 96 S.W.3d at 236; *Casteel,* 22 S.W.3d at 387–88, 390. *Cf. Pat Baker Co., Inc. v. Wilson,* 971 S.W.2d 447, 450 (Tex.1998) (per curiam) ("It is axiomatic that an appellate court cannot reverse a trial court's judgment absent properly assigned error."). With the charge issues properly preserved and contested on appeal, an appellate court reviews the basis of the complaints and reverses only if the alleged charge errors were harmful. Tex. R.App. P. 44.1(a), 61.1. Because Young properly preserved error as to the disputed charge issues, we must consider whether the appellate court properly applied the correct harm analysis. *See Urista,* 211 S.W.3d at 757.

**D. Application of Harm Analysis Law**

**[8]** Young alleges, and the court of appeals agreed, that the trial court erred by submitting a jury question on Dr. Thota's theory of the case—Ronnie's contributory negligence. Even if Young is correct, *Casteel*'s presumed harm analysis does not apply because the separate answer blanks allow us to determine whether the jury found Dr. Thota negligent. Unlike *Casteel,* which involved thirteen independent grounds for liability with one answer blank for the defendant's liability, here, the charge provided two separate blanks for the jury to answer the single-theory-of-

liability question. *See Casteel*, 22 S.W.3d at 387. The charge mirrors the *Texas Pattern Jury Charges's* longstanding use of separate blanks when multiple parties' negligence are in issue. *See* Comm. On Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: General Negligence & Intentional Personal Torts* PJC 4.1 (2010). The only theory of liability asserted against Dr. Thota was negligence, and the jury's findings on that theory are clear: Dr. Thota was not negligent. We hold that this charge question simply does not raise a *Casteel* issue, and the court of appeals erred in applying *Casteel*'s presumed harm analysis.

Additionally, we hold that the new and independent cause instruction fails to present a *Casteel* situation. *See Urista*, 211 S.W.3d at 756–57. In concluding that the new and independent cause instruction constituted harmful error, the appellate court reasoned:

> Here, however, the jury was not only given an erroneous defensive instruction on new and independent cause that benefitted only Dr. Thota but also an erroneous jury question on liability—Ronnie's contributory negligence—a theory not supported by the evidence. So, we should not be limited to *Urista*'s traditional harm analysis when trying to determine the impact of the improperly submitted instruction on new and independent cause when combined with the improperly submitted question of Ronnie's contributory negligence. We simply cannot determine, on this evidence, whether the jury properly found Dr. Thota not negligent, properly found that his negligence was excused based upon the unavoidable accident instruction, or improperly found that his negligence was excused based upon the new and independent cause instruction alone or combined with its improper finding of Ronnie's negligence.

271 S.W.3d at 839. And in response to the dissent, the majority added:

> It is the combination of these two incorrect theories that prevents us from being able to determine whether the jury's finding of no liability as to Dr. Thota was a finding of no negligence on his part, an erroneous finding of contributory negligence on Ronnie's part, or an erroneous finding of new and independent cause.
>
> Importantly, we are not trying to extend *Casteel*'s presumed harm analysis to defensive theories; we are applying it to a single broad-form question that erroneously includes two different theories of liability. This error is only exacerbated by the erroneous defensive instruction of new and independent cause.

*Id.* at 841.

[9] We disagree with the court of appeals' interpretation of our holding in *Urista* and hold that, even assuming the new and independent cause instruction in this charge constituted error, it does not raise a *Casteel* issue. Like *Urista*, this case involves a single liability theory—negligence—so *Casteel*'s multiple-liability-theory analysis does not apply. *See* 211 S.W.3d at 756–57. Moreover, as we noted in *Urista*, "when a defensive theory is submitted through an inferential rebuttal instruction, *Casteel*'s solution of departing from broad-form submission and instead employing granulated submission cannot apply." *Id.* at 757. Inferential rebuttal issues are distinct from theories of liability and damage elements because they "cannot be submitted in the jury charge as separate questions and instead must be presented through jury instructions." *Id.* Like the inferential rebuttal instruction on unavoidable accident in *Urista*, the new and independent cause instruction "was given in reference to the causation element

of the plaintiff's negligence claim." *Id.* at 756–57. While appellate courts may presume harm when meaningful appellate review is precluded because the submitted charge mixes valid and invalid theories of liability or commingles improper damage elements, the courts do not presume harm because of improper inferential rebuttal instructions on defensive theories. *See id.* at 757. Therefore, assuming without deciding that the submission of the new and independent cause instruction was an abuse of discretion, we hold that this charge error does not present a *Casteel* problem.

**[10, 11]** Even if the inclusion of a jury question regarding a party's contributory negligence and an inferential rebuttal instruction were erroneous in a single-theory-of-liability case, the combination of these errors would not automatically trigger a situation where the appellate court must presume the error was harmful. If presumed harm analysis were required, then our fundamental commitment to submitting broad-form questions, whenever feasible, would routinely be discarded for separate, granulated submissions to the jury. *See* Tex.R. Civ. P. 277; *Harris Cnty.*, 96 S.W.3d at 235–36. Moreover, even in multiple-theory-of-liability cases like *Casteel*, the presumed harm analysis is not automatic. *See Casteel*, 22 S.W.3d at 389–90; *Romero*, 166 S.W.3d at 227–28. As we stated in *Casteel*, "when questions are submitted in a manner that allows the appellate court to determine that the jury's verdict was actually based on a valid liability theory, the error may be harmless." 22 S.W.3d at 389 (citing *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 752 (Tex.1995)). And regardless of whether "a granulated or broad-form charge is submitted, the trial court's duty is to submit only those questions, instructions, and definitions raised by the pleadings and the

evidence." *Harris Cnty.*, 96 S.W.3d at 236; *see* Tex.R. Civ. P. 278; *Elbaor*, 845 S.W.2d at 243.

**[12]** While *Casteel*'s presumed harm analysis is necessary in instances where the appellate court cannot determine "whether the improperly submitted theories formed the sole basis for the jury's finding" because the broad-form question mixed valid and invalid theories of liability, *Casteel*, 22 S.W.3d at 389, or when the broad-form question commingled damage elements that are unsupported by legally sufficient evidence, *Harris Cnty.*, 96 S.W.3d at 235, an improper inferential rebuttal instruction and improper defensive theory of contributory negligence presented in a broad-form question with separate answer blanks in a single-theory-of-liability case does not prevent the harmed party from obtaining meaningful appellate review. When a trial court abuses its discretion by including erroneous charge questions or instructions in a single-theory-of-liability case, our traditional harmless error analysis applies and the appellate courts should review the entire record to determine whether the charge errors probably caused the rendition of an improper judgment. *See* Tex.R.App. P. 44.1, 61.1; *Urista*, 211 S.W.3d at 757.

Because we hold that *Casteel*'s presumed harm analysis does not apply, we next consider whether, applying traditional harmless error analysis, the alleged charge errors constitute reversible error. *See* Tex.R.App. P. 61.1(a); *Urista*, 211 S.W.3d at 757. We address Young's objections to the inclusion of Ronnie's contributory negligence and the instruction of new and independent cause in turn.

**1. Contributory Negligence**

**[13, 14]** When charge questions are submitted in a manner that allows the appellate court to determine whether the

verdict was actually based on a valid theory of liability, the error may be harmless. *Casteel,* 22 S.W.3d at 389; *see also Alvarado,* 897 S.W.2d at 752 ("Submission of an improper jury question can be harmless error if the jury's answers to other questions render the improper question immaterial."); *Boatland of Hous., Inc. v. Bailey,* 609 S.W.2d 743, 750 (Tex.1980) (holding that the potentially erroneous submission of defensive theories was harmless error because the jury found for the defendant on independent grounds and the complaining party failed to show how it probably resulted in an improper verdict). Young's argument that the inclusion of Ronnie's contributory negligence was harmful error fails for several reasons. First, Dr. Thota could only have been negligent in causing the tear in Ronnie's artery, and the jury failed to find that he was. The jury's finding as to Dr. Thota's non-negligence is entirely separate from its finding as to Ronnie's negligence. Perhaps the jury was confused about whether to find Ronnie negligent and, despite the unavoidable accident instruction, believed that they had to find someone negligent. Either way, any error associated with the inclusion of a jury question regarding Ronnie's negligence was harmless.

Moreover, when determining whether harm occurred, we consider the entire charge. *See, e.g., Tex. Emp'rs Ins. Assoc. v. McKay,* 146 Tex. 569, 210 S.W.2d 147, 149 (1948). Here, the clarifying instructions at the end of Question 1 made it clear that the jury could answer in any of the following combinations: (1) "Yes" to both Dr. Thota and Ronnie; (2) "No" to both; or (3) "Yes" to one and "No" to the other—the choice the jury ultimately made. The charge's definition of proximate cause also clearly informed the jury that "[t]here may be more than one proximate cause of an event." In light of the entire charge and the separate answer blanks for Dr.

Thota and Ronnie, it is evident that the jury was well aware that its findings as to Dr. Thota's and Ronnie's negligence were separate and that there could be more than one proximate cause of an event.

**[15]** When the answer to a jury question cannot alter the effect of the verdict, the reviewing court considers that question immaterial. *See Alvarado,* 897 S.W.2d at 752. In *Alvarado,* we held that even if it were error for the trial court to submit a question as to the deceased plaintiff's negligence, that question was immaterial because of the jury's finding of "No" as to the defendant's liability for negligence. *Id.* Like *Alvarado,* any error in submitting the question of Ronnie's contributory negligence to the jury was harmless and rendered immaterial in light of the jury's finding of no negligence as to Dr. Thota. Once the jury answered "No" to whether any negligence of Dr. Thota proximately caused Ronnie's injury, Dr. Thota was exonerated, and neither a "Yes" nor a "No" answer as to Ronnie's contributory negligence could alter the verdict. *See id.*

#### 2. New and Independent Cause

Assuming without deciding that the new and independent cause instruction was improper, a review of the record does not indicate that it probably caused the rendition of an improper judgment. *See* Tex. R.App. P. 61.1(a); *Urista,* 211 S.W.3d at 757; *Reinhart,* 906 S.W.2d at 473. At trial, Dr. Thota testified on his own behalf, and Neill Doherty III, M.D. testified as Young's expert witness. The evidence from the medical records and Dr. Thota's testimony indicated that good hemostasis was most likely obtained, which would mean that Ronnie was in a stable condition by the time he was released from the hospital. Even Young's own medical expert, Dr. Doherty, admitted on cross-ex-

amination that there was a 99% chance that Ronnie was not bleeding when he was released after the catheterization procedure and that, based on the totality of the medical records, there was no objective evidence that Ronnie was bleeding or experiencing any complications at the time he was discharged from the hospital. Both Dr. Thota and Dr. Doherty testified that if there had been an improper puncture in the iliac artery preventing hemostasis, Ronnie would likely have developed signs of bleeding before his discharge. Dr. Doherty also testified that the cardiac catheterization was a reasonable procedure, given Ronnie's condition, and that the medical records did not indicate Dr. Thota had incorrectly performed the procedure.

Both parties' experts based their opinions, in part, on their interpretations of the doctors' reports from the emergency surgery the night of Ronnie's catheterization procedure. The report by Dr. Thota's partner, Dr. Sudharshan, noted that Ronnie had a "puncture site just about the inguinal ligament" and that a CT scan "apparently revealed bleeding from [the] external iliac artery puncture site." Based on Dr. Sudharshan's assessment, Dr. Walker performed the emergency surgery, and Dr. Walker's report noted that he repaired a "high tear" in Ronnie's right external iliac artery. Neither Dr. Sudharshan nor Dr. Walker testified at trial.

At trial, Dr. Thota's and Dr. Doherty's testimony about Ronnie's medical reports conflicted. Dr. Doherty testified that the standard of care for cardiac catheterization was to insert a needle and catheter into the right femoral artery below the inguinal ligament. In Dr. Doherty's opinion, Dr. Thota punctured Ronnie's artery at the wrong location, above the inguinal ligament and into the right external iliac artery. Dr. Doherty's opinion was based on

Dr. Walker's report, the CT scan mentioned on Dr. Sudharshan's report, and the bleed in Ronnie's retroperitoneal cavity, which could occur when the puncture is too high, rather than the more visible femoral bleed that would occur if the puncture is in the femoral artery. In contrast, Dr. Thota claimed at trial that he did not breach the standard of care during Ronnie's catheterization procedure. He testified that he had no problems inserting the catheter and that he believed he entered the artery at the appropriate location. Dr. Thota stated that Dr. Sudharshan's finding that the puncture site was at "about the inguinal ligament," would indicate that the puncture site was correct. He further testified that Dr. Walker's report was ambiguous as to what he repaired and how far above or below the inguinal ligament the bleed originated. Also, Dr. Thota testified that a retroperitoneal bleed can occur with a femoral artery stick as well as an iliac artery stick and that, based on his review of the medical records and his own knowledge of the procedure, he met the standard of care.

**[16, 17]** Like many medical malpractice cases, this record contains conflicting expert opinions. The fact that Dr. Thota testified on his own behalf does not negate the weight that the jury could give to his testimony. *See City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005) (holding that the proper test for legal-sufficiency review must "credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not"); *see also Wilson v. Scott,* 412 S.W.2d 299, 303 (Tex.1967) (noting that the defendant physician's own testimony can establish the standard of care). "Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony." *City of Keller,* 168 S.W.3d at 819. Because of the conflicting testimony

of Dr. Doherty and Dr. Thota, and because both testifying experts agreed that Ronnie was likely not bleeding upon his discharge from the hospital, the jury could have reasonably believed Dr. Thota's opinions and discounted Dr. Doherty's opinions. In circumstances where a reasonable jury could resolve conflicting evidence either way, we presume the jury did so in favor of the prevailing party. *See id.* at 821.

**[18]** Based on the conflicting evidence, the jury could have reasonably concluded that Dr. Thota did not breach the standard of care without reaching the issue of proximate cause. In that case, the jury would not have relied on the new and independent cause instruction because it pertains only to the proximate cause element. *See Hawley,* 284 S.W.3d at 856 ("New and independent cause is a component of the proximate cause issue."). Thus, the record supports the jury's finding of no negligence as to Dr. Thota. Accordingly, our review of the entire record provides no clear indication that the new and independent cause instruction, if erroneous, probably caused the rendition of an improper verdict. We therefore conclude that any error in the trial court's submission of the new and independent cause instruction was harmless. *See Urista,* 211 S.W.3d at 759.

### III. Conclusion

In sum, we hold that Young's timely and specific no-evidence objections were sufficient to preserve the disputed charge issues for appellate review. Because the trial court submitted a broad-form question on a single theory of liability that included separate answer blanks for Dr. Thota's and Ronnie's negligence, we hold that the court of appeals misapplied *Casteel* and its presumed harm analysis.[5]

Even assuming the trial court abused its discretion by including a question as to Ronnie's contributory negligence and an instruction on new and independent cause, for the reasons explained above, we hold that these alleged charge errors were harmless and did not probably cause the rendition of an improper judgment. Because *Casteel*'s presumed harm analysis does not apply and any error in the disputed charge issues was harmless, we need not address Dr. Thota's remaining issues. Accordingly, we reverse the court of appeals' judgment and, without addressing whether the trial court erred by submitting the question as to Ronnie's contributory negligence or the instruction on new and independent cause, we remand the case to the court of appeals to consider Young's remaining issues.



**In re Billy Frederick ALLEN, Relator.**

**No. 10–0886.**

Supreme Court of Texas.

Argued Jan. 12, 2012.

Decided May 18, 2012.

**Background:** Applicant sought compensation under the Tim Cole Act (TCA), which allowed a wrongfully imprisoned person to seek compensation from the state for the period of wrongful imprisonment, after the Court of Criminal Appeals, 2009 WL 282739, granted habeas relief from a judgment of conviction against him for two

---

**5.** To the extent that it conflicts with this opinion, we expressly disapprove the appellate court's opinion in *Block v. Mora,* 314 S.W.3d

440 (Tex.App.-Amarillo 2009, pet. dism'd by agr.).